No. 23-1970

---

# United States Court of Appeals for the Federal Circuit

---

PERCIPIENT.AI, INC.,

*Plaintiff-Appellant,*

v.

UNITED STATES, CACI, INC.-FEDERAL,

*Defendants-Appellees.*

---

Appeal from the United States Court of Claims
No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink

---

**CORRECTED NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT
PERCIPIENT.AI, INC.
[CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER OMITTED]**

---

Hamish P.M. Hume
Samuel C. Kaplan
Eric J. Maurer
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
emaurer@bsfllp.com
grossman@bsfllp.com

*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Percipient.ai, Inc. certifies that:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Percipient.ai, Inc.

2.     **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

None.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Not applicable.

5.     **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6.     **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated:  June 12, 2023                    /s/ Samuel C. Kaplan
                                         Samuel C. Kaplan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................ vi

GLOSSARY ................................................................................... ix

STATEMENT OF RELATED CASES ................................................ xi

STATEMENT OF JURISDICTION ................................................... 1

STATEMENT OF ISSUE ................................................................... 1

STATEMENT OF THE CASE ............................................................ 1

   I.  Statutory Background .................................................................. 3

   II. Factual Background .................................................................... 7

      A. Percipient Offers a State-of-the-Art Platform Licensed By
         Commercial and Government Customers That Meets NGA's
         Stated Need for an Advanced Computer Vision Software Platform. ........ 7

      B. NGA Stated Both Prior To And After The Solicitation And Task
         Order That It Intended to Leverage Commercial Technology and
         Committed to Evaluate Percipient's Product For That Purpose. .............. 9

      C. Notwithstanding Percipient's Best Efforts, NGA Chose to Allow
         Its Contractor To Develop The CV System Without Evaluating
         Percipient's Product As the Law Required. ............................................ 13

      D. Percipient's Complaint Set Forth Four Counts Based on NGA's
         Decision to Allow its Contractor to Develop a New Product to
         Meet its CV System Requirements. ....................................................... 15

      E. The Administrative Record Revealed That NGA's Violations Were
         Even More Egregious Than Previously Understood, and Also Even
         Worse Than the Violations That This Court Condemned in
         *Palantir v. United States* ........................................................................ 16

F.  The Claims Court Denied Defendants' Initial Motions to Dismiss and Found It Had Jurisdiction to Consider Percipient's Claims. .............20

G.  After Defendants Moved for Reconsideration, the Claims Court Vacated Its Previous Decision, Ordered Additional Briefing, and Dismissed Percipient's Protest Based on 10 U.S.C. § 3406(f). ...............23

SUMMARY OF THE ARGUMENT ....................................................................24

ARGUMENT ......................................................................................................28

I.  Standard of Review..........................................................................28

II.  Percipient's Protest Is Not "In Connection With The Issuance Of A Task Order" ........................................................................................28

A.  The Claims Court's Application of 10 U.S.C. § 3406(f) Conflicts With Its Plain Text....................................................................29

B.  The Structure, Legislative History, and Purpose of § 3406(f) Refute the Claims Court's Understanding of the Task Order Bar. ..........35

C.  The Nature of The Obligations and Violations At Issue Foreclose the Court's Application of the Task Order Bar. .......................................37

1.  10 U.S.C. § 3453 Imposes Statutory and Regulatory Obligations That Are Analytically Distinct From the Issuance and Proposed Issuance Of Task Orders. ..............................................37

2.  The Claims Court's Misinterpretation Would Thwart Congress' Intent By Eliminating Enforcement of § 3453 and Related Provisions And Immunizing All Post-Award Statutory and Regulatory Violations From Review. ..................................................42

D.  The Claims Court Misunderstood the Basis for Percipient's Complaint. ..................................................................................46

III. Even Under the Claims Court' View That The Protest Is "In Connection With The Issuance Or Proposed Issuance Of A Task Or Delivery Order," Such A Task Order Would Exceed The Scope Of The Original Contract And Thereby Confer Jurisdiction Under § 3406(f)(1)(A) ..................................................................................49

CONCLUSION AND REQUEST FOR RELIEF....................................................50

ADDENDUM


\* Redacted statements on page 18 contain information regarding CACI's purported evaluation of Percipient's product that was filed under seal, COFC Dkt. 47.

# TABLE OF AUTHORITIES

**PAGE(S)**

## Cases

*22nd Century Techs., Inc. v. United States*,
  57 F.4th 993 (Fed. Cir. 2023) ....................................................... 32, 34

*22nd Century Techs., Inc. v. United States*,
  157 Fed. Cl. 152 (2021) ....................................................................34

*A & D Fire Prot., Inc. v. United States*,
  72 Fed. Cl. 126 (2006) .....................................................................36

*CW Gov't Travel, Inc. v. U.S.*,
  61 Fed. Cl. 559 (2004) .....................................................................50

*DataMill, Inc. v. United States*,
  91 Fed. Cl. 740 (2010) .....................................................................30

*Distributed Sols., Inc. v. United States*,
  539 F.3d 1340 (Fed. Cir. 2008) ........................................... 28, 33, 46

*Fluor Intercontinental, Inc. v. United States*,
  147 Fed. Cl. 309, 322 (2020) ...........................................................48

*Glob. Comput. Enters., Inc. v. United States*,
  88 Fed. Cl. 350 (2009) ............................................................. *passim*

*Henke v. United States*,
  60 F.3d 795 (Fed. Cir. 1995) ...........................................................28

*McAfee, Inc. v. United States*,
  111 Fed. Cl. 696 (2013) ...................................................................41

*McEntee v. Merit Sys. Prot. Bd.*,
  404 F.3d 1320 (Fed. Cir. 2005) .......................................................29

*Mission Essential Pers. v. United States*,
  104 Fed. Cl. 170 (2012) ........................................................ 32, 34, 39

*mLINQS, LLC v. United States*,
  No. 22-1351, 2023 WL 2366654 (Fed. Cl. Mar. 6, 2023)...................40

*MORI Assocs., Inc. v. United States,*
   113 Fed. Cl. 33 (2013) ......................................................33

*MORI Assocs., Inc. v. United States,*
   102 Fed. Cl. 503 (2011) ............................................... 42, 46

*Palantir v. United States,*
   904 F.3d 980 (Fed. Cir. 2018) ................................... *passim*

*Savantage Fin. Servs., Inc. v. United States,*
   81 Fed. Cl. 300 (2008) ......................................................41

*Splane v. West,*
   216 F.3d 1058 (Fed. Cir. 2000) .......................................29

*SRA Int'l, Inc. v. United States,*
   766 F.3d 1409 (Fed. Cir. 2014) ................................. *passim*

*Tolliver Grp., Inc. v. United States,*
   151 Fed. Cl. 70 (2020) ......................................................42

**Statutes**

10 U.S.C. § 3406(f) .................................................... *passim*

10 U.S.C. § 3453 ......................................................... *passim*

28 U.S.C. § 1295(a) ...........................................................1

28 U.S.C. § 1491(b) .....................................................1, 34

National Defense Authorization Act for Fiscal Year 2009,
   Pub. L. 110-417, 122 Stat 4356 (2008) ...............................6

National Defense Authorization Act for Fiscal Year 2022,
   P.L. 117-81, § 227(a)-(b), 135 Stat. 1609 (2021)................45

**Rules**

Fed. R. App. P.4(a)(1)(B) ................................................1

**Regulations**

48 C.F.R. § 6.001(f) ........................................................35

48 CFR § 212.212 ................................................................................6, 39

48 C.F.R. § 19.502-2(b) ...............................................................................42

## Legislative Materials

H. Rep. No. 103-545(I) (1994), 1994 WL 261997 ...................................................4

S. Rep. No. 103-258, at 6 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2561 ......3, 36

S. Rep. No. 103-259, at 5 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2598 ......3, 45

## Other Authorities

National Security Commission on Artificial Intelligence,
    *Final Report* (Mar. 2021), https://www.nscai.gov/wp-
    content/uploads/2021/03/Full-Report-Digital-1.pdf ...........................................45

Shane Harris, *Palantir Wins Competition to Build Army Intelligence System*, The
    Washington Post, Mar. 26, 2019,
    https://www.washingtonpost.com/world/national-security/palantir-wins-
    competition-to-build-army-intelligence-system/2019/03/26/c6d62bf0-3927-11e9-
    aaae-69364b2ed137_story.html ..............................................................6

# **GLOSSARY**

| | |
|---|---|
| CICA | Competition In Contracting Act |
| CV | Computer Vision |
| DDI | Data and Digital Innovation Office |
| DFARS | Defense Federal Acquisition Regulation Supplement |
| FAR | Federal Acquisition Regulation |
| FASA | Federal Acquisition Streamlining Act |
| GOTS | Government-Off-The-Shelf |
| IDIQ | Indefinite Delivery Indefinite Quantity |
| LAR | Limited Administrative Record |
| ML | Machine Learning |
| NDAA | National Defense Authorization Act |
| NGA | National Geospatial-Intelligence Agency |
| NSCAI | National Security Commission on Artificial Intelligence |
| OCI | Organizational Conflict of Interest |
| OTA | Other Transaction Authority Agreement |

| | |
|---|---|
| SDP | SOM Data Production |
| SER | SOM Enterprise Repository |
| SOM | Structured Observation Management |

## <u>STATEMENT OF RELATED CASES</u>

There has been no prior appeal of the underlying case to this Court or any other appellate court.  Counsel is not aware of any pending actions that will directly affect, or be affected by, the Court's decision in this appeal.

## STATEMENT OF JURISDICTION

This is an appeal from the United States Court of Federal Claims (the "Claims Court" or "COFC").  The Claims Court had jurisdiction under 28 U.S.C. § 1491(b)(1).  The Claims Court entered final judgment on May 18, 2023.  Percipient.ai, Inc. ("Percipient") timely filed its notice of appeal on May 24, 2023.  Fed. R. App. P.4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## STATEMENT OF ISSUE

Whether the Claims Court erred in holding that 10 U.S.C. § 3406(f) barred Percipient's protest of the National Geospatial-Intelligence Agency's violations of 10 U.S.C. § 3453 and related statutes and regulations in procuring a Computer Vision system.

## STATEMENT OF THE CASE

This case addresses statutory and regulatory violations that NGA has committed related to its ongoing SAFFIRE procurement.  SAFFIRE seeks, among other things, to procure a Computer Vision ("CV") System for analyzing, storing, organizing, and producing useful intelligence from the vast amounts of geospatial-intelligence data that the National Geospatial-Intelligence Agency ("NGA") collects from satellites and other sources.

Percipient offers a product that meets SAFFIRE's CV System requirements and is used by other government intelligence agencies. 10 U.S.C. § 3453 and related provisions impose various requirements meant to ensure that agencies and their contractors prefer, evaluate, and procure commercial and nondevelopmental items "to the maximum extent practicable," in lieu of lengthy and expensive development projects that seek to reinvent products that already exist. Further, and as the Claims Court recognized in its initial decision denying Defendants' motion to dismiss, § 3453 "imposes an obligation on agencies to incorporate commercial products that continues beyond the contract's award." Appx9.

NGA is violating these provisions in connection with the SAFFIRE procurement. The SAFFIRE contract and initial task order left open the extent to which NGA's system would be developed or acquired, and NGA stated following award that it intended to ensure meaningful evaluation and procurement of commercial and nondevelopmental products before allowing its contractor to develop. Ultimately, however, NGA failed to meet its obligations. Instead, without evaluating the ability of Percipient's product to meet SAFFIRE's requirements, NGA is permitting its contractor to proceed with a wasteful developmental effort to meet requirements that Percipient's product already satisfies.

While rejecting the principal grounds for dismissal offered by the Government and Defendant-Intervenor CACI, Inc. – Federal (CACI), the Claims Court dismissed the case based on its interpretation of 10 U.S.C. § 3406(f), which bars protests "in connection with the issuance or proposed issuance of a task or delivery order." This interpretation was erroneous. Percipient does not protest the issuance of a task order, or any action in connection with it. Instead, Percipient challenges statutory and regulatory violations that came well after the contract and initial task order (which were awarded at the same time), and that are both conceptually and temporally distinct from the issuance of any task order.

## I. STATUTORY BACKGROUND

Congress enacted the Federal Acquisition Streamlining Act of 1994 ("FASA") to address the waste and inefficiencies stemming from long-term developmental contracts. S. Rep. No. 103-259, at 5 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2598. Such contracts led to cost overruns, wasted resources, unnecessary delay, and use of inferior and outdated technology, particularly in the defense industry. *Id.* The Senate Committee on Government Affairs found that the "purchase of proven products such as commercial and nondevelopmental items can eliminate the need for research and development, minimize acquisition lead time, and reduce the need for detailed design specifications or expensive product testing." S. Rep. No. 103-258, at 6 (1994), *as reprinted in* 1994 U.S.C.C.A.N.

3

2561. The House Committee on Government Operations agreed, stating that "the Federal Government must stop 're-inventing the wheel' and learn to depend on the wide array of products and services sold to the general public on a routine basis." H. Rep. No. 103-545(I), at 28 (1994), 1994 WL 261997.

FASA addresses these concerns by requiring federal agencies to solicit and procure "commercial products" "to the maximum extent practicable." 10 U.S.C. § 3453(b). This statute "expresses a significant preference for commercial products" that "manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products at nearly every stage of the procurement." Appx10.

First, the "head of an agency shall ensure that, to the maximum extent practicable," the agency's requirements are defined so that commercial products "may be procured to fulfill such requirements" and offerors of commercial products "are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a). FASA next directs agency heads to "ensure that procurement officials in that agency, to the maximum extent practicable" (1) "acquire" commercial products; (2) "modify requirements" in appropriate cases to ensure that the requirements can be met by commercial products; and (3) "state specifications in terms that enable and encourage bidders and offerors" to supply commercial products. *Id.* § 3453(b)(1), (3), (4).

4

In addition, FASA requires agencies to evaluate commercial products throughout the acquisition process.  Agency heads are required to conduct market research (1) "before developing new specifications for a procurement by that agency"; (2) "before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold"; and (3) "before awarding a task order or delivery order in excess of the simplified acquisition threshold."  *Id.* § 3453(c)(1).  Agency heads must then use the results of their market research to determine whether there are commercial products available that could (1) "meet the agency's requirements"; (2) "be modified to meet the agency's requirements"; or (3) "meet the agency's requirements if those requirements were modified to a reasonable extent."  *Id.* § 3453(c)(2).

Recognizing the incentive of contractors to prefer development to acquiring someone else's product, the statute also imposes affirmative obligations on agencies to ensure that their contractors comply with the same requirements.  Specifically, they must ensure "to the maximum extent practicable" that prime contractors and subcontractors incorporate commercial products "as components of items supplied" to the agency.  *Id.* § 3453(b)(2).  Further, agencies must ensure that prime contractors engage "in such market research as may be necessary" to meet the requirements of § 3453(b)(2) for purchases over $5,000,000 made "for or on behalf of the Department of Defense."  *Id.* § 3453(c)(5).

5

Congress has reinforced these requirements in the areas of computer

software and artificial intelligence, as seen in the Defense Federal Acquisition

Regulation Supplement ("DFARS").  Regarding computer software, departments

and agencies are required to identify and evaluate "opportunities for the use of

commercial computer software and other non-developmental software in

accordance with Section 803 of the National Defense Authorization Act for Fiscal

Year 2009 (Pub. L. 110-417)."  48 CFR § 212.212(1).  This duty applies "at all

stages of the acquisition process (including concept refinement, concept decision,

and technology development)."  *Id.*

This Court first enforced the requirements of 10 U.S.C. § 3453 by

invalidating an Army solicitation for a developmental project in *Palantir v. United*

*States*, 904 F.3d 980 (Fed. Cir. 2018).  Following this Court's decision, the Army

field-tested commercial alternatives to development, including Palantir's

product.  *See* Shane Harris, *Palantir Wins Competition to Build Army Intelligence*

*System*, The Washington Post, Mar. 26, 2019.[1]  The Army ultimately decided to

procure Palantir's product, and so it was able to deploy its commercial solution

years ahead of schedule.  *Id.*

---

[1] Available at https://www.washingtonpost.com/world/national-security/palantir-
wins-competition-to-build-army-intelligence-system/2019/03/26/c6d62bf0-3927-
11e9-aaae-69364b2ed137_story.html.

II.   **FACTUAL BACKGROUND**

   **A. Percipient Offers a State-of-the-Art Platform Licensed By Commercial and Government Customers That Meets NGA's Stated Need for an Advanced Computer Vision Software Platform.**

NGA's mission is to provide geospatial intelligence through exploitation and analysis of imagery and geospatial information that it obtains from a variety of sources, including satellites, drones, and other aircraft. Appx56. NGA has a "mission-critical need" for improving the agency's production, analysis, and storage of so-called Structured Observation Management or "SOM" data and for integrating these capabilities with Computer Vision technology. Appx57. "Structured Observation Management" refers to NGA's process for observing, classifying, organizing, and sharing geospatial intelligence data. "Computer Vision" is a type of artificial intelligence technology that trains and uses computers to interpret the visual world. Appx56.

NGA's SAFFIRE solicitation, issued in 2020, sought to address this need. Appx57. SAFFIRE's requirements include: (a) the "SOM Enterprise Repository," or "SER," which will be the enterprise backbone for storing, disseminating, and regulating access to data and (b) a user-facing CV System. Appx58.

SAFFIRE provides three types of requirements for the CV System. *Id.* The SOM Data Production or "SDP" requirements provide the primary user experience for producing imagery-derived structured data. *Id.* They enable analysts to use

7

CV capabilities in their workflow by, for example, choosing relevant CV models to use, specifying their parameters, viewing and analyzing the data, and creating the SOM data for storage in the SER. *Id.* The CV Integration capabilities refer to the ability to integrate, evaluate, and train different CV models. Appx59. Finally, the CV Processing capabilities refer to the automatic application of CV models to analyze the raw data and provide relevant geospatial intelligence data to users for their analysis. *Id.*

Founded in 2017, Percipient offers a state-of-the-art CV platform named "Mirage" that meets NGA's CV System requirements. *Id.* Mirage's geospatial module combines a robust software CV engine and numerous tools (including alerting and geofencing features) with a seamless user interface so that users can more accurately and quickly analyze and categorize intelligence data. Appx61. It also provides "incremental learning" features that allow users to train models (both its own and those designed by third parties) and incorporate the lessons learned to improve future performance. Appx63. Percipient currently licenses Mirage to commercial and government customers in the intelligence and national security community. Appx65. It meets and exceeds NGA's requirements for a CV System. Appx59-64.

**B. NGA Stated Both Prior To And After The Solicitation And Task Order That It Intended to Leverage Commercial Technology and Committed to Evaluate Percipient's Product For That Purpose.**

Both prior to and following the award of SAFFIRE, NGA claimed that it intended to make maximum use of commercial technology to meet SAFFIRE's requirements.  The SAFFIRE solicitation required the "Offeror" to "describe . . . a process to identify, evaluate and implement opportunities from the Government *and commercial industry* as part of each planning increment to satisfy requirements faster, reduce or avoid cost and increase system performance."  Appx68-69 (emphasis added).  The SAFFIRE solicitation also generally required the contractor "to the maximum extent practicable" to "incorporate, and require its subcontractors at all tiers to incorporate, commercial products, commercial services, or non-developmental items as components of items to be supplied under this contract."  Appx69.

The initial task order (which was published alongside the solicitation) likewise did not purport to resolve how or to what extent commercial technology would be used to meet the requirements of the SAFFIRE procurement.  *Id*.  It provided, for example, that CACI was to initially focus on transition activities, that it was to shift mid-term by "*leveraging the rapidly maturing commercial computer vision technology*," and that its later focus was "on increasing the efficiency and

effectiveness of deployed capability through *technology insertion* and reuse of maturing enterprise services." Appx860 (emphasis added).

Further, as the SAFFIRE solicitation was being considered, a separate office of NGA responsible for identifying promising commercial technologies (known as its Outpost Valley office) was in the third phase of an Other Transaction Authority Agreement ("OTA") with Percipient that sought to use Percipient's product and develop a "ground order of battle prototype" that could be used for detecting and classifying vehicles and integrating it into agency's analysts' workflows. Appx69. Shortly after NGA issued the SAFFIRE solicitation, the NGA senior analyst tasked with supervising the project informed Percipient that the SAFFIRE project was "plug and play" designed, and that "Mirage might be asked to be integrated into the larger SAFFIRE construct." Appx68.

Percipient did not bid on the SAFFIRE contract both because it could not meet the SER component and because NGA had represented that it was committed to integrating commercial technology into SAFFIRE. Appx43-44. NGA awarded SAFFIRE as a single award, Indefinite Delivery Indefinite Quantity (IDIQ) five-year contract to CACI on January 14, 2021. Appx70. Task Order 1 (which was attached to the solicitation) was awarded a week later. Appx860.

Percipient immediately reached out to NGA to secure an evaluation of its product to meet SAFFIRE's CV System requirements. Appx71. It was told to

10

contact CACI but when it did so, a CACI representative told Percipient "that ship has sailed," suggesting that CACI intended to develop software no matter the qualities of already existing software. Appx71-72. Alarmed by this response, Percipient sent a detailed letter to NGA explaining the ability of its software to meet SAFFIRE's requirements. Appx72-73. The letter also attached a crosswalk to the solicitation explaining how Mirage met each of the CV System requirements. Appx936-946. It further stated that NGA's obligations to consider commercial and nondevelopmental items did not stop at the time of the contract's award. Appx108-109. Rather, it was NGA's obligation to ensure a full and fair evaluation of Mirage and any other commercial or nondevelopmental product before developing software to meet its requirements. Appx119-120.

NGA subsequently stated that it and CACI had made no decisions about Mirage or the capability of commercial and nondevelopmental items to meet SAFFIRE's requirements. For example:

- NGA stated in its initial response to Percipient's letter that "[n]on-developmental solutions are a key to SAFFIRE's success and CACI has assured NGA that it will consider commercial products prior to developing new software." Appx122.

- NGA represented that as "to the integration of commercial solutions into SAFFIRE, will be opportunities for percipient.ai and other commercial vendors to submit their products for review." *Id.*

- NGA stated that "NGA will implement this process through numerous Performance Work Statement requirements for CACI to leverage commercial technology, conduct test and evaluation activities, employ a

11

modular open systems architecture, and otherwise support the integration of commercial technology." *Id.*

- NGA disavowed CACI's comment that the "ship" had already "sailed" in terms of offering Mirage as an "unfortunate miscommunication" by a CACI business representative. Appx74.

- NGA stated that it had made no decision as to the ability of commercial items to meet SAFFIRE's requirements, including the ability of Mirage and its geospatial module to meet SAFFIRE's requirements and replace or interoperate with any legal platform. *Id.*

Percipient subsequently performed a brief demo of Mirage's capabilities for CACI representatives and an NGA Contracting Officer's Representative. Appx76. The demo was met with great enthusiasm by those present who agreed that the next logical step was a "deep dive." *Id.* The promised deep dive, however, never occurred. *Id.* Despite active follow-up and inquiries as to when the evaluation of its product would occur, both NGA and CACI failed to provide Percipient with any update on the status of the evaluation over the next several months. Appx76-78. NGA stated as late as September 7, 2021, that NGA "has not had an opportunity to complete its review of CACI's evaluation, or determine next steps with regard to Mirage." Appx133. NGA also never informed Percipient of any decision it had made with respect to use of its product. Instead, NGA told Percipient to expect more delay, stating that funding concerns "at the outset of FY22," may "delay any action taken under SAFFIRE, including actions related to Mirage." *Id.*

12

The next month, however, Percipient learned from an informal conversation with CACI at an October 2021 industry conference that CACI intended to develop software to meet NGA's requirements. Appx78-79. Percipient then approached NGA's Associate Director of Capabilities Phillip Chudoba who agreed to receive a demo of Mirage's capabilities. Appx79. This demo took place on December 1, 2021. Appx79-80. Following it, Mr. Chudoba stated that "Mirage meets all of NGA's analytic transformation requirements." Appx80.

### C. Notwithstanding Percipient's Best Efforts, NGA Chose to Allow Its Contractor To Develop The CV System Without Evaluating Percipient's Product As the Law Required.

On July 25, 2022, NGA entered into a bailment agreement with Percipient to "test and evaluate Mirage platform Geospatial Module (GSM) capabilities." Appx80; Appx83. Percipient devoted over $1 million of time and resources in negotiating and implementing the bailment agreement. Appx44. But when the testing period concluded on October 23, 2022, Percipient realized that NGA had failed to evaluate Mirage as promised. Appx83-84. Percipient thus offered to extend the no-cost testing period to allow for a full and fair evaluation. Appx84. NGA rejected Percipient's offer on November 23, 2022, stating the evaluation addressed "NGA's operational needs for an enterprise Machine Learning (ML) Platform as identified by DDI" but that it "was not an evaluation of the ML models generated and inferenced in Mirage, *nor of Mirage as*

13

*an Analytic tool*." Appx85 (emphasis added). Given that SAFFIRE's central component is a CV System that would provide users with advanced analytic capabilities, this response confirmed that NGA had deliberately failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements. *Id.*

Further, even this limited evaluation supported the conclusion that Mirage could serve as the core CV System platform. Appx85-86. NGA's testers concluded that "Percipient's commercial capability performed as described in meetings, correspondence, and in the documentation provided to support the assessment." *Id.* Given that Percipient had repeatedly emphasized Mirage's ability to meet all of SAFFIRE's enterprise CV requirements in all meetings and correspondence with NGA, this statement would appear to have acknowledged Mirage's ability to do so. Appx86. However, NGA confirmed that there would be no broader evaluation of Mirage to meet SAFFIRE's requirements. Appx85.

On December 9, 2022, Percipient sent a letter to NGA reiterating this background and asking that NGA comply with its obligations under 10 U.S.C § 3453. Appx87-89. NGA provided its written response on January 3, 2023. Appx88-91. It ignored the substance of Percipient's allegations and focused on procedural defenses it intended to offer. *Id.* This lawsuit followed on January 9, 2023.

14

### D. Percipient's Complaint Set Forth Four Counts Based on NGA's Decision to Allow its Contractor to Develop a New Product to Meet its CV System Requirements.

Percipient's Complaint does not challenge the issuance of a task order but rather challenges the agency's failure to ensure that it or its contractor procure commercial or nondevelopmental items and conduct the necessary market research into the availability of such items to meet SAFFIRE's CV System requirements. Count One of Percipient's Complaint asserts that NGA violated 10 U.S.C. § 3453(b)(1) and (2) and related statutes and regulations in failing to procure commercial products "to the maximum extent practicable" and in failing "to the maximum extent practicable" to require its contractors to "incorporate commercial services, commercial products, or nondevelopmental items other than commercial products as requirements of items supplied to the agency." Appx94-96.

Count Two of Percipient's Complaint alleges that NGA violated § 3453(c)(1)(C) and (c)(5) by failing to take appropriate steps to ensure that its contractor has engaged in such market research as may be necessary to enable NGA to comply with its requirements under § 3453(b)(2). Appx96-98. Count Three of Percipient's complaint also asserts that NGA unlawfully delegated inherent governmental authority when it allowed its contractor, CACI, to determine agency policy on commercial technology without any oversight. Appx98-99.

Finally, in Count Four, Percipient contends that the agency acted arbitrarily in failing to evaluate commercial and nondevelopmental items in connection with the SAFFIRE procurement and engaged in bad faith conduct towards Percipient through its false statements and stonewalling. Appx99-101. None of the counts challenge or rely on the issuance of any task order. The only task order referred to in the Complaint (which was the only one Percipient had knowledge of) left open whether and the extent to which the CV System would be developed or acquired as a commercial or nondevelopmental item. Appx69.

### E. The Administrative Record Revealed That NGA's Violations Were Even More Egregious Than Previously Understood, and Also Even Worse Than the Violations That This Court Condemned in *Palantir v. United States*.

After Defendants' motions to dismiss were fully briefed, the Claims Court ordered production of the limited administrative record ("LAR") on February 8, 2023. COFC Dkt. 15. The LAR showed that NGA's violations were more egregious than previously understood. It revealed that Defendants, without informing Percipient, were using the demos of Percipient's software not to evaluate whether commercial products could meet SAFFIRE's requirements, but instead to identify additional features for the software they decided to develop. For example, Engineering Change Proposal 4 provided "specifications for new and updated requirements," which included the "Orchestration of Algorithm-to-Algorithm tipping & Queueing." Appx1268. Tipping and cueing was not part of

16

SAFFIRE's original requirements and instead was a Mirage feature that was added via contract modification shortly after Percipient demoed Mirage's capabilities for NGA leadership.

The record also revealed no decision at any point by NGA as to Mirage's ability to meet SAFFIRE's requirements. This was even more deficient than the violations this Court condemned in *Palantir*. In that case, the Army had at least issued a decision on market research that, at least in conclusory fashion, identified particular requirements that commercial items purportedly could not satisfy. 904 F.3d at 987-88. Further, the Army issued a Determination of Non-Commercial Item after the filing of the complaint that also purported to identify certain requirements that commercial items did not satisfy. *Id.* at 988. This Court found these determinations insufficient, however, because they were conclusory and did not document the basis for the conclusion in a manner that allowed the Court to determine that there was a reasonable basis for it. *Id.* at 994.

Here, the record does not even contain the level of consideration that was present in *Palantir*. The record nowhere identifies, even in conclusory fashion, any SAFFIRE CV System requirement that Percipient's product could not meet. It nowhere addresses Percipient's detailed showing of how it could meet those requirements.

[Confidential Material Subject to Protective Order Omitted]

Percipient had cautioned from the start that NGA needed to be actively involved in CACI's evaluation of Percipient's product given CACI's tremendous and obvious financial incentives to favor development. Appx73. NGA, however, failed to heed its warnings. Instead, the sole evaluation of Percipient's product is found in a two-page report by CACI claiming that capabilities "[omitting descriptor]" at the CACI demo [omitting evaluation's purported conclusion] and did not "[omitting evaluation's purported conclusion]." Appx967. This was wordplay. This "initial" evaluation did not purport to have evaluated all of Mirage's capabilities and did not identify a single SAFFIRE CV System requirement that Percipient could not meet. Appx967-968. By [omitting limits of evaluation] and then never evaluating the remainder of Mirage's capabilities, CACI cynically sidestepped any evaluation of Mirage's actual capabilities even though Percipient had already provided a detailed crosswalk of Mirage's ability to meet all of SAFFIRE's CV System capabilities and offered to demonstrate its ability do so. Appx931-935; Appx936-946. Then, despite multiple attempts by Percipient to secure an evaluation of its full capabilities, there was no follow-up by NGA or further evaluation by CACI and thus no attempt by either to account for Percipient's claims that it could meet all of SAFFIRE's requirements.

The record also reflects great enthusiasm for Percipient's product by analysts who were using it under the OTA to develop the "ground order of battle

prototype." Analysts found that Percipient's product had "amazing potential," Appx921, and praised its detection and alerting capabilities as superior to other available options. *See* Appx920 (stating that the vehicle detector model that was developed and trained using Mirage was the "first tool" that the authors had seen "to detect and classify" various equipment with "enough accuracy to make it a functional tool for vehicle detection at all scales and across all orders of battle"); *id.* ("While some AI tools do offer alerts (such as TMA), none that I am familiar with are paired with a detector/classifier algorithm" with "as high a level of fidelity as Mirage does, and the level of flexibility to adjust the alert requirements"); Appx919-920 (recommending that NGA "[c]ontinue funding and contracting with Percipient to retain access to the tool"). Nothing in the CACI evaluation accounts for this feedback.

The record also reflects no subsequent consideration of the adequacy of CACI's evaluation or consideration of what sort of evaluation might fairly measure the capabilities of Mirage. Nor does it reflect any determination by NGA—even of the limited conclusory sort found wanting by this Court in Palantir—identifying requirements that Percipient's product could not meet. Instead, the record makes clear that NGA entirely left the decision to proceed with development to its financially interested contractor with no independent oversight or effort to meet the

19

affirmative obligations that § 3453 imposes on agencies to ensure that their

contractors procure and evaluate commercial and nondevelopmental items.

### F. The Claims Court Denied Defendants' Initial Motions to Dismiss and Found It Had Jurisdiction to Consider Percipient's Claims.

Following the filing of the Complaint, Defendants moved to dismiss.  COFC

Dkt. 10; COFC Dkt. 11.  Their motions rested on the incorrect premise that the

SAFFIRE "procurement" ended when CACI was awarded the contract, and that

the Court is powerless to redress statutory violations that occur after that award.

Appx.157-168; Appx180-181.  On subject-matter jurisdiction, Defendants

primarily argued that the protest was not "in connection with a procurement" and

was instead a challenge to NGA's contract administration.  Appx191-197.

Defendants also argued that Percipient was not an "interested party" because it had

not bid on the contract and was only a disappointed subcontractor.  Appx160-163;

Appx185-191.  Both also argued in passing (CACI in a footnote) that the claims

could not be considered because of the task order bar.  Appx164; Appx195-196.

The Claims Court denied Defendants' motions to dismiss on March 9, 2023,

and more fully explained its reasoning in its March 31, 2023 Opinion.  Appx2.  In

denying Defendants' motions, the Claims Court recognized the mandatory and

continuing obligations imposed by 10 U.S.C. § 3453 and the importance of

ensuring agencies' compliance with all its provisions:

20

- The "statute uniquely expresses a significant preference for commercial products. That preference manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products *at nearly every stage of the procurement*";

- "*It would thwart Congress's intent* behind § 3453 if offerors of commercial products could not bring challenges under the statute";

- Requiring "these challenges to be brought before contract award makes little sense when § 3453's requirements continue beyond the contract's award and can still be violated afterward. But for another, *that limitation would also allow agencies to ignore § 3453 with impunity as long as they defer decisions about commercial products until after the contract award*";

- "No doubt, Congress has the power to oversee federal procurements, yet Congress vested this court with exclusive bid protest jurisdiction *and surely had in mind that we would remedy procurement violations*"; and

- Foreclosing judicial review of § 3453 violations "*would be untenable, especially when Congress enacted this statute to stem wasteful and inefficient agency spending*."

Appx10-11 (emphasis added).

The Claims Court also concluded that Percipient was an interested party based, *inter alia*, on its recognition that "offerors of commercial products have standing" under § 3453 and "Percipient's actions over the last two years make clear that it was willing and ready to offer its commercial software." Appx9; Appx11. It further rejected the suggestion that Percipient's challenge was not "in connection with a procurement" and instead was a challenge to NGA's administration of the SAFFIRE contract. The Court explained that a "protest does

21

not become a contract administration dispute simply because the agency's statutory

violation occurs after the contract award." Appx6. Lastly, the Claims Court

rejected the Government's characterization of Percipient's protest as an untimely

challenge to the solicitation, recognizing that the solicitation did not dictate that the

CV System be developed. Instead, the Court explained:

> The solicitation was flexible enough to allow for a development solution, but it did not require one. And that approach is entirely consistent with §3453, which allows for development solutions when a commercial one is impracticable or nonexistent. Likewise, NGA's actions here only confirm that the solicitation did not require a development solution as NGA repeatedly explained to Percipient that there would be opportunities for Percipient to offer its commercial product.

Appx12.

The Claims Court ultimately held that it had subject matter jurisdiction over

"Percipient's non-frivolous allegation of a statutory violation in connection with

the SAFFIRE procurement." Appx14.

The Claims Court also correctly rejected Defendants' argument that

Percipient's claims were foreclosed by 10 U.S.C. § 3406(f). Appx7. The

Claims Court, however, did so based on an incorrect rationale that Percipient

had not advanced—namely that because the amount of the task order

exceeded $25,000,000, the Court had jurisdiction.[2] While the ultimate result

---

[2] The only reference to the $25,000,000 rationale was in CACI's footnote which stated: "There are two exceptions to a bar against protest, neither of which are

was correct for reasons detailed herein, the rationale was incorrect because the Government Accountability Office has exclusive jurisdiction of protests that fall within the scope of the $25,000,000 exception. *See* 10 U.S.C. § 3406(f)(2).

### G. After Defendants Moved for Reconsideration, the Claims Court Vacated Its Previous Decision, Ordered Additional Briefing, and Dismissed Percipient's Protest Based on 10 U.S.C. § 3406(f).

Defendants filed coordinated motions for reconsideration based on the Claims Court's finding that "FASA's task order bar will not apply when, as here, a task order exceeds $25,000,000." COFC Dkt. 50; COFC Dkt. 51. Percipient agreed that the rationale was incorrect but argued that the task order bar did not apply for other reasons. As a result, the Claims Court vacated its 14-page opinion and ordered additional briefing on the applicability of the task order bar. COFC Dkt. 53.

On May 17, 2023, the Claims Court granted Defendants' renewed motions to dismiss based on its finding that Percipient's "challenge to the agency's actions under §3453 is 'in connection with the issuance of a task order' and is barred by FASA.'" Appx27.

---

applicable here insofar as Plaintiff does not allege any task order issued to CACI increased the scope, period, or maximum value of the contract, or that any task order exceeded $25,000,000." Appx164 (citations omitted).

23

## SUMMARY OF THE ARGUMENT

The Claims Court determined that Percipient's protest is in connection with the issuance of the first task order issued under the SAFFIRE contract. This conclusion requires reversal. Percipient does not protest the issuance of any task order which, like the solicitation that it accompanied, left open the extent to which the CV System would be developed. Nor does it protest an action that took place in connection with the task order's issuance. Instead, Percipient challenges independent statutory and regulatory violations that took place following the contract and task order award and were thus temporally and conceptually distinct from both.

The Claims Court concluded that the task order bar applied because the initial task order was the "'direct and immediate cause' of the agency's statutory obligation to consider" commercial products, and "without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this § 3453 violation." Appx26-27. This interpretation is incorrect and contravened by the text, structure, and purpose of 10 U.S.C. § 3406(f). Congress did not prohibit all protests that relate to any and all actions that occur in the course of performing a task order. Instead, Congress limited protests "in connection with *the issuance or proposed issuance* of a task order," which when read with the words "in connection with," encompass challenges to task orders, as well as those

24

actions on which the issuance of the task order depends to go forward. All of this Court's decisions applying the task order bar have involved this scenario and have only applied the task order bar to post-award actions on which the issuance of the task order depended to proceed. By treating § 3406(f) as immunizing all statutory and regulatory violations that follow a task order's issuance and occur in the course of its implementation, the Claims Court's interpretation unduly expands the task order bar's scope and fails to account for the statutory text which is far more limited.

The Claims Court application of § 3406(f) also ignores the Complaint's allegations. Even assuming it mattered, it simply is not true that the task order directly and immediately caused the statutory obligation to consider commercial products. Regardless of whether NGA ever issued a task order, NGA's decision and award of a contract to procure a CV System triggered the duties to ensure that its contractor procured commercial products and conducted necessary market research. And this case is still more afield because the initial task order left open the question of whether the CV System would be developed as reflected in NGA's post-award representations that it and its contractor would consider commercial and nondevelopmental items before developing new software.

The structure and legislative history of the provision further refute the Claims Court's interpretation. Congress enacted § 3406(f) at the same time and

alongside a list of requirements for awarding task orders.  These requirements in turn were designed to encourage multi-award IDIQ contracts and streamline the requirements and process for awarding task order contracts.  That structure and the accompanying legislative history confirm that § 3406(f) was intended to limit the ability of disappointed awardees to challenge task order awards, not preclude any and all review of any statutory and regulatory violations that occur over the course of an IDIQ procurement.

In addition, the nature of the statutory and regulatory preference for commercial products demonstrate that the Claims Court's interpretation is incorrect.  Section 3453 and related statutory and regulatory requirements impose ongoing obligations on the agency throughout procurements to ensure, "to the maximum extent practicable" that agencies and their contractors procure commercial products and conduct necessary market research.  Further, National Defense Authorization Acts (NDAAs) and implementing regulations have imposed even more exacting requirements in the areas of software and artificial intelligence that likewise apply throughout procurements, including after contracts are awarded.  These requirements are not tied to the issuance of task orders, and nothing suggests that Congress contemplated that their enforcement would be foreclosed by § 3406(f).  Instead, they are analytically distinct obligations imposed

on the agency to ensure that their contractors consider and procure commercial products before supplying goods and services to the agency.

Applying the task order bar here would conflict with Congress' intent by immunizing all violations of 10 U.S.C. § 3453 that occur over the course of IDIQ contracts and rendering § 3453 a dead letter. Agencies would now have carte blanche to allow contractors to embark on expensive, wasteful, and harmful development efforts without appropriate market research and regardless of whether commercial and nondevelopmental items can satisfy the Government's requirements. Agencies also would have a roadmap to evading the type of pre-award challenge that this Court recognized in *Palantir* by leaving open the question of whether and to what extent products would be developed, and then relying on the task order bar to slam the door on protests.

In sum, the Claims Court's understanding of the task order bar would thwart Congress' goals in enacting § 3453, and the text, structure, and purpose of the relevant provisions all make clear that it did not intend this perverse result. The Claims Court's decision must be reversed.

## ARGUMENT

### I. STANDARD OF REVIEW

This Court reviews questions of subject matter jurisdiction *de novo*. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1343 (Fed. Cir. 2008). It reviews factual determinations for clear error. *Id.* This Court also assumes all facts alleged by plaintiff to be true and draws all reasonable inferences in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

### II. PERCIPIENT'S PROTEST IS NOT "IN CONNECTION WITH THE ISSUANCE OF A TASK ORDER"

10 U.S.C. § 3406(f)(1) provides that a "protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order" absent specified exceptions. According to the Claims Court, the bar applies because the task order was the "'direct and immediate cause' of the statutory obligation to consider" commercial products and "without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this § 3453 violation." Appx26-27. Therefore, the Claims Court concluded that the violations alleged were not "'logically distinct' from its decision to procure that same computer system through a task order." Appx27. Under this formulation, all protests challenging any statutory violation that follows a task order are prohibited by FASA. The Claims Court is incorrect.

## A. The Claims Court's Application of 10 U.S.C. § 3406(f) Conflicts With Its Plain Text.

The text of § 3406(f) forecloses the Claims Court's interpretation. *McEntee v. Merit Sys. Prot. Bd.*, 404 F.3d 1320, 1328 (Fed. Cir. 2005) (holding that "[s]tatutory interpretation begins with the language of the statute"). Congress did not bar all protests that relate to a task order or work performed under a task or delivery order. Instead, Congress barred protests "in connection with the *issuance or proposed issuance of* a task or delivery order." By concluding that § 3406(f) bars the protest merely because the challenged violations occurred in the course of a task order's performance, the Claims Court gave no meaning to the words "issuance or proposed issuance of" in violation of well-established canons of statutory construction. *See Splane v. West*, 216 F.3d 1058, 1068 (Fed. Cir. 2000) ("We must construe a statute, if at all possible, to give effect and meaning to all its terms."); *see also Glob. Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 350, 412-13 (2009) (applying this principle in construing the provision at issue here).

As stated by Judge Sweeney in a decision that was favorably cited in *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413-14 (Fed. Cir. 2014):

> If Congress intended to prohibit protests stemming from any action *related to a task order contract*, then it could have explicitly drafted a statute that barred any protest *in connection with a task order*. It did not do so. Instead, Congress prohibited bid protests in connection with either the *issuance or proposed issuance* of a task order.

*Glob. Comput. Enters.*, 88 Fed. Cl. at 414-15 (emphasis added); *see also id.* at 410 (declining defendants' invitation "to broadly construe the phrase 'in connection with' contained in the FASA as barring a protest that has *any* connection with a task order").

Further, and as stated in *DataMill, Inc. v. United States*, 91 Fed. Cl. 740 (2010), in construing § 3406(f), the "phrase 'in connection with' means that there is a direct and causal relationship between two things that are *mutually dependent*." *Id.* at 756 (emphasis added).[3]  Accordingly, for a protest to be covered by the task order bar, the challenged action must either be the task order itself or an action on which the task order depends for its issuance.  Here, there is no mutual dependence because NGA's issuance of the task order did not depend on its subsequent violations to go forward.

This understanding also is consistent with common parlance.  The statement "I have no complaints in connection with the issuance of your order" would not mean that the speaker approved of any and all violations of law that occurred in the course of its performance.  Rather, it would be consistent for the speaker to add ". . ., but your supervision of the work that followed was unlawful, wasteful, and dangerous to national security."  Likewise, a ban on protests "in connection with

---

[3] Notably, the Government proffered *DataMill* for its definition of "in connection with," Appx1228, and Percipient explained at oral argument why it was fatal to the Government's position.  The Claims Court's opinion does not address *DataMill*.

the issuance of a task order" does not foreclose protests of the NGA's subsequent violations of 10 U.S.C. § 3453 and related statutes and regulations in failing to ensure "to the maximum extent practicable" that its contractor conducted necessary research and procured commercial items in supplying a CV System.

This Court's precedent reflects this understanding. The bases for the protests in cases where this Court has applied the task order bar were task order awards or actions on which they depended for their issuance. In *SRA Int'l*, for example, the protestor purported to challenge the waiver of an Organizational Conflict of Interest ("OCI"). 766 F.3d at 1412. The Court, however, applied the task order bar because it was clear from the complaint that the protestor's true grievance was with the issuance of the task order and because the challenged action enabled the issuance of the task order. *Id.* at 1414.

Specifically, the challenged action (the OCI waiver) "was directly and causally connected to issuance of" the task order. *Id.* at 1413. The agency "issued the waiver *in order to go forward with*" the award of the task order, and the Court found that plaintiff's protest was "actually with the issuance of the task order, rather than the waiver alone." *Id.* at 1413-14 (emphasis added). The Court also noted that the relief plaintiff sought was the setting aside of the task order. *Id.* at 1414. By contrast, Percipient was not aggrieved by the issuance of the task order to CACI, nor does it seek to set it aside. And unlike the challenged OCI waiver,

31

NGA's subsequent violations of 10 U.S.C. § 3453 were not necessary for NGA to issue the task order to CACI.

This Court's decision in *22nd Century Technologies, Inc. v. United States*, 57 F.4th 993 (Fed. Cir. 2023), is similarly inapposite. In that case, the claim depended on the language of a task order, and the injury complained of was the cancellation of a task order and its reissuance to another awardee. *Id.* at 999-1000. Finally, in *Mission Essential Personnel v. United States*, 104 Fed. Cl. 170, 178 (2012), the Claims Court held that the agency's challenged action was the "direct and immediate cause" of the issued task order. Unlike here, the challenged action enabled the issuance of the task order, and the protestor's quarrel was with the issuance of the task order. *See id.*; s*ee also SRA Int'l*, 766 F.3d at 1413-14.

There was accordingly no basis for the Court to equate actions that directly cause or enable the issuance of a task order with any and all actions that occur in the course of its performance.[4] The two are not equivalent, no case says that they are, and for the reasons already discussed, the contrary suggestion fails to account for the plain text of § 3406(f). As the Claims Court explained in a prior decision:

---

[4] The Claims Court incorrectly paraphrased *SRA Int'l* to hold that an "agency's challenged action is 'in connection with the issuance' of a task order if there is a direct and causal relationship between the two." Appx26. As discussed in the text, however, this Court in *SRA Int'l* held only that an action is connection with the issuance of a task order if it caused the task order by enabling it to go forward. Nothing in *SRA Int'l* presented the question of whether all violations that follow a task order are covered.

> Procurement decisions that are made *after* task orders have been issued are similarly not affected by the FASA prohibition. These include the assignment of new work to an existing task order through a modification, *see Global Computer Enters., Inc. v. United States,* 88 Fed.Cl. 350, 410–15 (2009), or the use of an already-issued task order to obtain products and services through subcontracts, *see Distributed Solutions, Inc. v. United States,* 104 Fed.Cl. 368, 371 n.5, 372, 380, 385 n.24 (2012). There is no direct, causal relationship between these decisions and the issuance of task orders to fulfill an agency's needs, since the task orders had already issued.

*MORI Assocs., Inc. v. United States*, 113 Fed. Cl. 33, 38 (2013).  This Court itself recognized in *SRA Int'l* that "a temporal disconnect may, in some circumstances, help to support the non-application of the FASA bar . . . ."  766 F.3d at 1413.  It was insufficient in *SRA Int'l* only because, unlike here, the OCI waiver enabled the task order to proceed and because the true basis for the protest was the issuance of the task order.

The Claims Court's disregard for the statutory language is also reflected in two other places in its opinion.  First, the Claims Court held that "the protest cannot be abstracted away from CACI's performance under a task order."  Appx27.  Again, however, the task order bar does not encompass protests of all statutory violations that relate in any way to "performance under a task order."  Instead, it applies to protests "in connection with the *issuance or proposed issuance* of a task or delivery order."

Second, the Claims Court asserted that "any meaningful relief would require this court to partially suspend or discontinue performance under a task order,

which further evidences the connection between the challenge and the task order." *Id.* This description of potential relief proves the opposite because it makes clear that Percipient's grievance is not with the issuance of the task order but rather with violations by NGA that occurred over the course of its performance. By contrast, in the cases cited by the Claims Court, it was necessary to set aside the task order to provide meaningful relief to the protestor. *See SRA Int'l*, 766 F.3d at 1414 (noting that the protestor sought recission of the task order's issuance); *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 155 (2021), *aff'd*, 57 F.4th 993 (Fed. Cir. 2023) (applying task order bar when protestor requested that the court "preliminarily and permanently enjoin the Army from terminating the task order and require the Army to proceed with 22nd Century's performance of the task order"); *Mission Essential Pers.*, 104 Fed. Cl. at 179 (same when protestor requested that court order the Army to recompete the task order solicitation).

The use of the words "issuance or proposed issuance of" in 10 U.S.C. § 3406(f) also contrasts with Congress' expansive grant of jurisdiction to this Court in 28 U.S.C. § 1491(b)(1) over "*any* alleged violation of statute or regulation *in connection with a procurement or a proposed procurement*." 28 U.S.C. § 1491(b)(1) (emphasis added). The Court's overbroad interpretation of 10 U.S.C. § 3406(f) would thwart the broad jurisdiction conferred by Congress by allowing the

34

Government's use of a task order to immunize all statutory and regulatory

violations that occur over the course of an IDIQ contract's performance.

### B. The Structure, Legislative History, and Purpose of § 3406(f) Refute the Claims Court's Understanding of the Task Order Bar.

Section 3406(f)'s structure, legislative history, and purpose confirm what is

clear from the statutory text—that § 3406(f) limits protests of task order awards by

disappointed awardees.  It does not strip this Court of jurisdiction to review any

and all statutory and regulatory violations connected to work performed "under" a

task order.

Section 3406(f) was enacted in 1994 in the same section as new procedures

for issuing task orders.  Those procedures were designed to encourage multiple

task order IDIQs and relax Competition In Contracting Act (CICA) and the Federal

Acquisition Regulation (FAR)'s full and open competition requirements for the

issuance of task and delivery orders.  *See also* 48 C.F.R. § 6.001(f) (exempting

from CICA open competition requirements "[o]rders placed against task order and

delivery order contracts entered into pursuant to subpart 16.5").

Specifically:

- Section 3403(b) provides that certain actions are not required "for issuance of a task or delivery order under a task order or delivery order contract."

- Section 3403(c) provides for a "fair opportunity to be considered" for multiple award task or delivery orders under any of the contracts except in specific circumstances;

35

- Section 3403(d) imposes various "enhanced competition" requirements for multiple award task or delivery orders above $5,000,000; and

- Section 3403(e) requires task orders to contain a statement of work.

Section 3406(f) immediately follows and thereby demonstrates Congress' purpose was exactly what the text reflects—limiting CICA protests of task order awards. "The FASA establishes that 'when a procurement envisioned through a multiple award [ID/IQ] contract, creating, through competition, a pool of contractors for certain work projects, the issuance of individual task orders to these contractors would not be subject to protests.'" *Glob. Comput. Enters.*, 88 Fed. Cl. at 413 (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 133 (2006)).

The legislative history likewise makes clear that the purpose of the provisions was to encourage multiple award task order contracts while giving contracting officers latitude to determine the procedures for defining the process by which the task orders would be issued. *Glob. Comput. Enters.*, 88 Fed. Cl. at 413-15; *see also* S. Rep. No. 103-258, at 16 (1994) ("Accordingly, contracting officials will have wide latitude and will not be constrained by CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order."). This further shows that Congress enacted § 3406(f) to limit competitors' ability to challenge the issuance and award of task

orders. As discussed, that purpose is not implicated by this protest.

**C. The Nature of The Obligations and Violations At Issue Foreclose the Court's Application of the Task Order Bar.**

### 1. 10 U.S.C. § 3453 Imposes Statutory and Regulatory Obligations That Are Analytically Distinct From the Issuance and Proposed Issuance Of Task Orders.

The nature of the legal obligations at issue further demonstrates that 10 U.S.C. § 3406(f) does not apply both because (i) the obligations they impose are textually, structurally, and analytically distinct from the issuance and proposed issuance of task orders and (ii) the Court's reasoning would thwart their enforcement and thereby conflict with Congress' intent in enacting the provisions.

As the Claims Court previously recognized, 10 U.S.C. § 3453 (which appears in a separate chapter from 10 U.S.C. § 3406) establishes a preference for commercial products that "manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products at nearly every stage of the procurement." Appx10. These obligations do not cease when a task order is issued, and they are not tied to the issuance of task orders. Instead, they are defined with reference to whether the agency makes required determinations using market research and when and to what extent it is practicable to procure commercial or nondevelopmental items to meet agency requirements.

The agency's obligations with respect to its prime contractors are also not defined with reference to the issuance of task orders. Instead, the "head of an

37

agency shall ensure that procurement officials in that agency, to the maximum extent practicable . . . require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial services, commercial products, or nondevelopmental items other than commercial products *as components of items supplied to the agency*." 10 U.S.C. § 3453(b)(2) (emphasis added). Under this requirement, compliance is determined by what actions it is practicable for the agency to take and what is ultimately "supplied." Compliance is not determined by the issuance of a task order.

The same is true of the agency's obligation to ensure its contractors conduct necessary market research. This obligation requires the head of the agency to "ensure that any prime contractor of a contract (or task order or delivery order) in an amount in excess of $5,000,000 . . . engages in such market research as may be necessary to carry out the requirements of subsection (b)(2) *before making purchases for or on behalf of the Department of Defense*." *Id.* § 3453(c)(5) (emphasis added). Under this provision, the issuance of the task order does not determine compliance, nor does any action that enables its issuance. Instead, § 3453(c)(5) imposes requirements that must be satisfied prior to contractor *purchases*. This requirement thus is likewise analytically distinct from the *issuance* of the task order.

Finally, the regulations include additional requirements imposed by Congress through NDAAs that govern agency procurement of computer software that likewise are analytically distinct from the issuance and proposed issuance of task orders. Specifically, 48 CFR § 212.212 implements a prior NDAA by requiring identification and evaluation "at *all stages of the acquisition process (including concept refinement, concept decision and technology development)*, opportunities for the use of commercial computer software . . . ." *Id.* § 212.212(1) (emphasis added). This provision applies throughout procurements, and again, violation of the provision is not determined by the issuance of the task order.

Further, courts have recognized that determinations made pursuant to 10 U.S.C. § 3453 are analytically distinct from the issuance of task orders even where, unlike here, the violations preceded the issuance of the task order. Most recently in *mLINQS, LLC v. United States*, No. 22-1351, 2023 WL 2366654 (Fed. Cl. Mar. 6, 2023), the court held that FASA did not bar claims that the Air Force failed to conduct adequate market research and to procure commercial items "to the maximum extent practicable" before proceeding to develop software under an IDIQ task order. *Id.* at *1, *16, *22. The *mLINQS* court recognized that 10 U.S.C. § 3453 and related regulations required the Air Force to conduct market research during the acquisition planning process, and that commercial preference analyses do not necessarily result in the issuance of a task order. *Id.* at *15. Plaintiff's

claims were thus "logically distinct" from the Air Force's subsequent decision to task the defendant-intervenor with software development, "considering an agency has to review the regulations irrespective of the eventual procurement vehicle selected." *Id.* at *16. Had the *mLINQS* court adopted the Claims Court's position here, such a protest would have been barred because the prohibited development work was taking place "under" a task order. But the *mLINQS* court expressly rejected this argument, explaining that the "type of procurement vehicle cannot dictate jurisdiction." *Id*.

Courts have recognized that challenges to similar types of violations are analytically distinct from the issuance of task orders. This includes specific challenges to task orders where the underlying basis for the challenge was an earlier software standardization decision that the task order merely implemented. In such situations, courts have held that the challenged task orders did not comprise the "jurisdictional basis" for the protest but were instead the "natural consequences" of the standardization decision that injured the protester. *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 710 (2013). As the *McAfee* court explained, task order "[m]odification 6 was but one further step in a series of moves that had already been taken by the Air Force to implement its decision to shift the entire network to sole-source security." 111 Fed. Cl. at 708. Like a

decision to develop in lieu of procuring commercial items, the agency's challenged decision was "not tied to any single solicitation or delivery order." *Id.* at 707.

The court reached a similar conclusion in *Savantage Financial Services, Inc. v. United States*, 81 Fed. Cl. 300, 308 (2008). In that case, the Department of Homeland Security issued a task order solicitation to migrate government systems over to a shared software baseline, and the protestor sought to enjoin the agency from proceeding with the solicitation. *Id.* The court held that it had jurisdiction because the protestor was not challenging the solicitation itself but instead was challenging "DHS's decision to use Oracle and SAP software systems as the baseline for its TASC initiative. Defendant's arguments regarding the TASC solicitation are therefore irrelevant." *Id.*

Finally, courts have previously held that the task order bar does not apply to claims that an agency failed to determine whether work could be set aside for small businesses under the "Rule of Two"[5] before deciding to procure services under an existing IDIQ contract. *See, e.g, Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 104-06 (2020); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 533 (2011); *Glob. Comput. Enters.*, 88 Fed. Cl. at 446-50. The "Rule of Two" analysis

---

[5] The Rule of Two provides that "[t]he contracting officer shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation that-(1) Offers will be obtained from at least two responsible small business concerns; and (2) Award will be made at fair market prices." 48 C.F.R. § 19.502-2(b).

41

is a "logically distinct step from the issuance or proposed issuance of task orders" because "an agency could just as well choose not to go down the task order road as to follow it." *MORI Assocs., Inc.*, 102 Fed. Cl. at 533-34.  Unlike the Claims Court here, the *MORI* court correctly recognized the circular nature of the Government's argument.  The *MORI* court explained that merely because an agency's failure "if left unchecked, would ultimately result in the issuance of a task order does not necessarily connect a protest of that failure with that hypothetical order—which might never be proposed if the protest succeeds." *Id.* at 533.  The Claims Court here did not address *mLINQS*, the software standardization cases, or the "Rule of Two" cases discussed in Percipient's briefing.

### 2. The Claims Court's Misinterpretation Would Thwart Congress' Intent By Eliminating Enforcement of § 3453 and Related Provisions And Immunizing All Post-Award Statutory and Regulatory Violations From Review.

Under the Claims Court's broad interpretation, an IDIQ contract immunizes an agency's choice of development from judicial review regardless of its compliance with 10 U.S.C. § 3453's requirements.  No matter how long the contract, no matter how practicable it is to acquire commercial items, and no matter how deficient a contractor's market research, courts would have no ability to review an agency's choice to allow a contractor to develop software or other products in lieu of acquiring commercial or nondevelopmental items.  An agency could announce in a task order:  "You shall develop even where commercial items

can do the job." Or it could issue broad task orders that leave the question open and then choose to spend years allowing or requiring lengthy and wasteful product development by giving carte blanche to its contractors. As discussed above, however, there is no basis for such interpretation given that a protest of that choice is not a protest of the issuance of a task order but rather of separate decisions and actions that take place before, following, and in between their issuance.

This ruling also would provide a roadmap for evading § 3453's pre-award requirements, such as those that this Court applied in *Palantir*. Agencies could preclude pre-award protests by leaving open the possibility that an IDIQ will use commercial items and then using the task order bar to slam the door on future protests. This would be aided by the fact that contractor proposals for satisfying broad IDIQ contracts, and thus their plan for using commercial items, are confidential. Commercial item offerors realistically would have no option to challenge agency decisions to develop in lieu of acquiring commercial items.

As the Claims Court previously recognized in addressing Defendants' waiver argument, "requiring these challenges to be brought before contract award makes little sense when §3453's requirements continue beyond the contract's award and can still be violated afterward." Appx11. That "limitation would also allow agencies to ignore § 3453 with impunity as long as they defer decisions about commercial products until after the contract award." *Id.* The Claims Court's

broad interpretation of the task order bar cannot be reconciled with its previous

conclusion that Congress wanted 10 U.S.C. § 3453 enforced.

This result directly contradicts Congress' intent in enacting these provisions,

which have been repeatedly reinforced since FASA with new provisions in the

precise areas that this protest implicates, including by imposing additional

requirements with respect to computer software and by promoting adoption of

cutting-edge artificial intelligence technologies by defense agencies.  In passing

FASA, the Senate Armed Services Committee stressed that it was "critical" that

the Department of Defense "rely to the maximum extent possible on the

commercial sector rather than promote government-dependent sectors," and that its

"outmoded system" needed to be transformed to "meet the defense industrial and

technology base requirements of the future."  S. Rep. No. 103-259, at 6.  Many

recent public reports have emphasized the importance of acquiring artificial

intelligence technology from the private sector to meet quickly evolving national

security needs.  Appx52-53; Appx55-57.  In fact, the National Security

Commission on Artificial Intelligence (NSCAI) found that "[t]he speed of

technology development by the private sector has vastly outpaced federal policies

and regulations" and recommended simplification of the "contracting process to attract non-traditional vendors." NSCAI, *Final Report* 449-51 (Mar. 2021).[6]

Congress implemented the NSCAI's recommendation in the NDAA for Fiscal Year 2022, requiring the Secretary of Defense to ease certain requirements "to ensure that Department of Defense components can more easily contract with leading commercial artificial intelligence companies to support the rapid and efficient development and deployment of applications and capabilities." National Defense Authorization Act for FY22, P.L. 117-81, § 227(a)-(b), 135 Stat. 1609 (2021). Congress also mandated that the Secretary of Defense "ensure that, to the maximum extent practicable, commercial artificial intelligence companies are able to offer platforms, services, applications, and tools to Department of Defense components through processes and procedures under part 12 of the Federal Acquisition Regulation." *Id.* § 227(c).

It would thwart Congress' intention of promoting adoption of commercial artificial intelligence technology if the existence of companies capable of providing those products was to be ignored, merely because an agency had issued a single-award IDIQ contract for hardware and software services years before. *See MORI Assocs.*, 102 Fed. Cl. at 532-33 (holding that in the Rule of Two context, it

---

[6] Available at https://www.nscai.gov/wp-content/uploads/2021/03/Full-Report-Digital-1.pdf.

"would hardly serve the purpose of setting aside government contracts for small businesses if the existence of responsible small businesses capable of providing required services at market prices was to be ignored, merely because the businesses were not alive when multiple ID/IQ contracts were awarded a decade earlier and thus failed to protest the terms of the solicitation for those contracts"). The Claims Court's decision opens the procurement process to new opportunities for abuse, in an area where Congress has taken specific action to avoid this exact result.

### D. The Claims Court Misunderstood the Basis for Percipient's Complaint.

The Claims Court also ignored the Complaint's allegations. *See Distributed Sols.*, 539 F.3d at 1344 (reversing the lower court for misinterpreting the basis for the protestors' complaint). Even if it were relevant, it would not be correct to say that the first "task order" caused the "statutory obligation" to consider commercial products. To the contrary, under 10 U.S.C. § 3453, it was the decision to procure and award a contract to procure a CV System that caused the statutory obligation to ensure that its contractor procure and conduct research into the availability of commercial and nondevelopmental items—not any particular task order.

Application of the task order bar also is misplaced because the task order in no way "directly and immediately" caused the *violations* at issue here—*i.e.*, it did not dictate that CACI fail to conduct necessary market research or fail to procure commercial items where it was practicable do so. The Claims Court did not find

that it did, and there would have been no basis for doing so. Instead, the task order left open the extent to which commercial items would be procured to meet its requirements and the extent of any market research that would be conducted.

This is first shown by the language of the task order itself which contemplated use of commercial items to meet its requirements. *See* Appx860 (stating that after transitioning older systems, the "mid-term focus shifts to augmenting user capability with automated detection of observations *by leveraging the rapidly maturing commercial technology*" (emphasis added)). It is further shown by NGA and CACI's representations, well after issuance of the task order, that (i) CACI and NGA had made no decision as to whether and to what extent to use commercial items to meet SAFFIRE's CV System requirements and (ii) CACI and NGA would evaluate commercial items prior to developing software to meet SAFFIRE's CV System requirements.

These facts clearly demonstrate that the violations were both temporally and logically distinct from the issuance of the task order. Following the award of the SAFFIRE contract and first task order, NGA could have chosen to do a good job in ensuring procurement of commercial items or a bad job that violated 10 U.S.C. § 3453. It chose to do a bad job. It is these and other separate violations that Percipient challenges, not the issuance of a task order in January 2021. The Claims Court's order fails to account for these allegations.

47

It also was error to consider the initial task order as separate from the solicitation when it accompanied the solicitation and was awarded at the same time as the contract. Because the initial task order and the SAFFIRE contract "were obtained through the exact same procurement vessel," the Claims Court was required to read Task Order 1 together with all the provisions of the SAFFIRE solicitation. *See Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 322 (2020) (reading the task order in conjunction with the solicitation and declining to apply the FASA bar).

Finally, as the contract proceeded, NGA took various procurement actions other than task orders to propel it forward, including modifications to the contract to increase funding for software development and the exercise of contract options. Appx872-873 (first option authorizing additional software development funding); Appx895-896 (second option authorizing such funding). The record shows implementation of Engineering Change Proposals that modified the SAFFIRE contract itself with associated increases in funding specifically for software development. Appx865-871; Appx874-882; Appx883-892. Contract modifications are not covered by § 3406(f), nor are the exercise of contract options. *See Glob. Comput. Enters.*, 88 Fed. Cl. at 410-14 (holding that the FASA bar did not apply to task order modifications). These procurement actions further break any causal chain between the task order and the subsequent violations.

48

**III.   EVEN UNDER THE CLAIMS COURT' VIEW THAT THE PROTEST IS "IN CONNECTION WITH THE ISSUANCE OR PROPOSED ISSUANCE OF A TASK OR DELIVERY ORDER," SUCH A TASK ORDER WOULD EXCEED THE SCOPE OF THE ORIGINAL CONTRACT AND THEREBY CONFER JURISDICTION UNDER § 3406(F)(1)(A)**

The Claims Court stated in passing that Task Order 1 "directed CACI to develop and deliver a computer vision system." Appx26. It is unclear what the Claims Court meant, and as discussed *supra*, there was no basis for this assertion. Instead, as reflected in the subsequent representations of the Government, Task Order 1 left open the question of whether and the extent to which the SAFFIRE CV System would be developed or procured as a commercial or nondevelopmental item, and NGA continued to maintain well after the task order's issuance that its contractor and it would consider commercial and nondevelopmental items before developing.

If, however, the task order had truly mandated development where practicable to do otherwise—and if a protest of the decision to develop in that instance were viewed as "in connection with the issuance" of a task order— this Court would still have jurisdiction under 10 U.S.C. § 3406(f)(1)(B). That section provides for jurisdiction over such protests "on the ground that the order increases the scope, period, or maximum value of the contract upon which the order is issued." *Id.* § 3406(f)(1)(B).

49

In this case, the original contract required the awardee "to the maximum extent practicable" to "incorporate, and require its subcontractors at all tiers to incorporate, commercial products, commercial services, or non-developmental items as components of items to be supplied under the contract." Appx857; *see also* Appx844 (requiring a process for incorporating, identifying, and evaluating opportunities from commercial industry to "satisfy requirements faster" and reduce costs). The issuance of a hypothetical task order that mandated development even where practicable to do otherwise would increase the scope of the contract by providing for far more software development than called for by the original contract. *See, e.g., CW Gov't Travel, Inc. v. U.S.*, 61 Fed. Cl. 559, 574 (2004) (holding that modification increased the scope where it requires "materially different" duties or "significantly altered the type of work to be performed under the contract"). Indeed, the entire point of 10 U.S.C. § 3453 is that a contract to reinvent the proverbial wheel is materially different from a contract to buy one that already exists.

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

For the reasons set forth above, Percipient respectfully requests that this Court reverse the decision by the Claims Court dismissing the Complaint for lack of subject matter jurisdiction.

Respectfully Submitted,

By: /s/ Samuel C. Kaplan

Hamish P.M. Hume
Samuel C. Kaplan
Eric J. Maurer
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
emaurer@bsfllp.com
grossman@bsfllp.com

Dated:  June 12, 2023

*Counsel for Plaintiff-Appellant*
*Percipient.ai, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served the foregoing on counsel of record on June 26, 2023 by use of the Court's CM/ECF system.

Dated: June 12, 2023          /s/ Samuel C. Kaplan
                                         Samuel C. Kaplan

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that pursuant to Federal Rule of Appellate Procedure 32(a) and Federal Circuit Rule 28(a)(14), the foregoing Brief was prepared in MS Word, is proportionally spaced, has a typeface of 14-point Times New Roman, and contains 11,380 words, excluding those sections identified in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

Dated: June 12, 2023          /s/ Samuel C. Kaplan
                                         Samuel C. Kaplan

# ADDENDUM

| Filing Date | Doc. No. | Description | Page No. |
|---|---|---|---|
| 04/07/2023 | 44 | Opinion | Appx1 |
| 05/18/2023 | 61 | Judgment | Appx21 |
| 05/19/2023 | 62 | Opinion | Appx22 |

# In the United States Court of Federal Claims

No. 23-28C
(Filed: March 31, 2023)
(Re-filed: April 7, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

PERCIPIENT.AI, INC.,

            *Plaintiff,*

v.

THE UNITED STATES,

            *Defendant,*

and

CACI, INC. – FEDERAL,

            *Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * *

    *Samuel C. Kaplan,* Washington, DC, for plaintiff, Percipient.ai, with whom were *Hamish P.M. Hume*, *Eric J. Maurer*, and *Gina A. Rossman*, of counsel.

    *Reta E. Bezak*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director, for defendant. *Graham Day*, National Geospatial-Intelligence Agency, of counsel.

    *Anne B. Perry*, Washington, DC, for intervenor, CACI, Inc. – Federal, with whom was *Jonathan S. Aronie* and *Ariel E. Debin*, of counsel.

---

[1] This opinion was originally issued under seal to give the parties an opportunity to propose redactions. Because the parties agreed that none were necessary, the opinion appears in full.

OPINION

This is a post-award bid protest of the National Geospatial-Intelligence Agency's alleged violation of 10 U.S.C. § 3453, a statute that requires agencies to procure commercial or non-developmental products "to the maximum extent practicable." Both the United States and the intervenor, CACI, Inc. – Federal, move to dismiss the protest for lack of subject-matter jurisdiction.

The matter is fully briefed, and oral argument was held on March 6, 2023. We denied the motions to dismiss in an order issued on March 9, 2023. This opinion more fully explains our reasoning.

BACKGROUND[2]

The National Geospatial-Intelligence Agency (NGA) obtains and analyzes images and other geospatial information to provide the federal government with intelligence data. Supplying this kind of intelligence on a global scale is a burdensome analytical task and cannot be done effectively without the help of advanced computer technology. One of those advanced technologies is computer vision, a form of artificial intelligence that "trains and uses computers to interpret the visual world." Compl. ¶ 55. With computer vision, users can more efficiently compile and analyze geospatial intelligence.

Hoping to benefit from this technology, NGA, more than three years ago, issued the SAFFIRE solicitation—which was an indefinite delivery, indefinite quantity contract containing two parts. The first was a data repository that would store and disseminate geospatial intelligence "across various large organizations." Compl. ¶ 60. The second, which is at the heart of this dispute, would integrate a computer vision system to enhance the

---

[2] When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). These undisputed facts are drawn from the complaint, the attached materials, and the administrative record.

2

agency's ability to produce, review, and classify intelligence from "millions" of images. Compl. ¶ 58.

The plaintiff, Percipient, is a technology company that developed a computer vision software called "Mirage." Mirage is an open architecture software that works alongside other computer systems and can detect equipment, vehicles, and faces—each of which is a critical aspect of geospatial intelligence. More than that, though, Mirage's tools also allow users to narrow the computer's focus to specific objects, patterns, or geographical areas, and it can even learn to anticipate its users' needs over time. Despite these features and capabilities, Percipient did not bid on the SAFFIRE contract because its software could only fulfill SAFFIRE's computer vision requirements, not the entire contract. For that reason, Percipient relied on what it viewed as the agency's statutory obligation to consider incorporating commercial products and hoped to be part of NGA's SAFFIRE efforts.

In January 2021, NGA awarded the SAFFIRE contract to CACI and informed Percipient that if it wanted to participate in SAFFIRE, it needed to speak with CACI. This eventually led to a meeting between Percipient and CACI in March 2021. At this meeting, CACI expressed significant interest in partnering with Percipient on future projects, but explained that, as for working together on SAFFIRE, "that ship" had already "sailed." Compl. ¶ 93.

Alarmed by this revelation, Percipient asked NGA if it would independently evaluate Mirage as a possible commercial solution for SAFFIRE's computer vision system. NGA responded several weeks later and reassured Percipient of its commitment to using commercial products. NGA further explained that CACI's "ship has sailed" statement was an "unfortunate miscommunication" that did not reflect the agency's position. Compl. ¶ 100. Instead, the agency had not yet decided whether it needed to incorporate a commercial product because CACI was still reviewing NGA's legacy systems. NGA confirmed that commercial products would be evaluated once CACI finished.

Another two months went by before Percipient finally secured a meeting with CACI to demonstrate Mirage, although CACI's Program Manager—the individual largely responsible for deciding whether to

3

incorporate a commercial product—left the meeting after only 20 minutes. Still, Mirage received positive feedback, and CACI promised to evaluate Mirage more fully. This "deep dive" into Mirage never happened, however. Compl. ¶ 108.

Several months later, Percipient learned at the 2021 GEOINT Symposium that CACI would be developing a computer vision system for SAFFIRE when CACI employees visited Percipient's symposium booth. Surprised by the news, and no longer believing that CACI could fairly evaluate Mirage, Percipient met with NGA and asked to set up a demonstration. NGA agreed but requested that Percipient "ease up on the legal pressure." Compl. ¶ 118. Percipient then demonstrated Mirage's abilities to several NGA representatives in December 2021, at the end of which NGA concluded that Percipient's software met "all of NGA's analytical transformation requirements." Compl. ¶ 120.

Over the next several months, the parties worked to reach an agreement that would allow NGA to test Mirage with live data, something that Percipient agreed to do at no cost. Just before signing an agreement to that effect, however, NGA changed its tune. Citing legal and security complexities, NGA would no longer use live data and would instead use previously released and publicly available images. Percipient pushed back, claiming that these images would not allow NGA to test Mirage's geospatial module or some of its unique features, like its ability to alert changes over time. After significant delay, NGA relented and allowed the use of live data.

NGA completed its testing of Mirage in October 2022. Based on the results, Percipient suspected that NGA was not assessing Mirage as a possible commercial solution for SAFFIRE's computer vision requirements because, among other reasons, Percipient could only identify four NGA searches over the 12-week testing period. Thus, Percipient offered to extend the testing period, again at no cost, so NGA could more fully evaluate Mirage as a computer vision system. Percipient's suspicions appeared to be confirmed, though, when NGA explained one month later that it had evaluated Mirage as "an enterprise Machine Learning Platform," and not "as an Analytical tool." Compl. ¶ 137.

After Percipient's efforts to be incorporated into SAFFIRE proved unfruitful, it filed this protest. In its complaint, Percipient alleges that the

4

agency violated its statutory and regulatory obligations by wastefully pursuing a development solution when a possible commercial solution existed. It also alleges that the agency unlawfully delegated inherent government authority when it allowed its contractor, CACI, to determine agency policy on commercial technology. Finally, Percipient believes that the agency acted arbitrarily in handling the SAFFIRE project. In response, the government and CACI have moved to dismiss for lack of subject matter jurisdiction.

DISCUSSION

## I. Subject Matter Jurisdiction

Like all federal courts, we possess limited jurisdiction, with ours being defined mainly by the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). Under the Tucker Act, we have jurisdiction over non-frivolous allegations of statutory or regulatory violations "in connection with a procurement or a proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).

First, Percipient has alleged a non-frivolous violation of 10 U.S.C. § 3453, which provides, in short, that defense agencies and their contractors must acquire "commercial products" "to the maximum extent practicable." § 3453(b)(1)-(2). To that end, the statute requires agencies to conduct market research throughout the procurement process—including before each task order award—to identify commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(1)-(2). In addition, offerors of commercial products must be given an opportunity to compete. § 3453(a)(3).

While the parties may dispute the merits of Percipient's claim, no party has argued Percipient's allegations are frivolous. Indeed, Percipient alleges specific facts that, if true, may violate §3453. Percipient alleges that it owns a commercial product that could fulfill NGA's computer vision

5

**Appx5**

requirements and that NGA ignored whether a commercial solution existed before it allowed CACI to develop a solution.[3]

Second, to invoke our bid-protest jurisdiction, a protestor must allege a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2018). The statute's "operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Group v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). The phrase encompasses any statutory violation connected to a procurement, and a procurement includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols.*, 539 F.3d at 1345 (quoting 41 U.S.C. § 111).

With this in view, NGA's alleged violation of §3453 has a connection to a procurement. That is because §3453 is itself a procurement statute and establishes a preference for commercial products and services. A violation of a statute that sets out what an agency can lawfully acquire has a connection to a procurement. *RAMCOR*, 185 F.3d at 1289 (holding that a violation has a connection with a procurement when an agency's actions under that statute affect the award or performance of the contract).

The government disagrees and argues that Percipient's protest is not in connection with a procurement and is instead a challenge to NGA's administration of the SAFFIRE contract. In reaching that conclusion, the government reasons that Percipient's protest cannot be in connection with a procurement because it alleges a post-award statutory violation that relates to NGA's oversight of CACI's performance.

We reject the government's characterization of Percipient's protest. A protest does not become a contract administration dispute simply because the agency's statutory violation occurs after the contract award. Indeed, the Tucker Act "does not require an objection to the actual contract procurement"—only an objection to a statutory violation with a connection to a procurement. *RAMCOR*, 185 F.3d at 1289. Nothing in the Tucker Act

---

[3] On the current record, we know that CACI will at least develop portions of the computer vision system, but it has not decided yet whether it will develop the entire system. Tr. 25:6–15.

6

suggests that those violations must occur before the contract award for the court to have jurisdiction.

Next, as a matter of statutory construction, the government invokes sovereign immunity to argue that we should narrowly construe the Tucker Act's jurisdictional grant to exclude post-award procurement violations. But the "sovereign immunity canon is just that—a canon of construction." *Richlin Sec. Serv. v. Chertoff*, 553 U.S. 571, 589 (2008). It does not "displace[] the other traditional tools of statutory construction" and, like all canons of construction, applies only when ambiguity exists. *See id.* at 590. No ambiguity exists here, however, as we simply apply the Federal Circuit's interpretation of the Tucker Act in this protest. *Distributed Sols.*, 539 F.3d at 1345.

Finally, CACI turns to the Federal Acquisition Streamlining Act's (FASA) task order bar, which excludes from our jurisdiction any protest "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). It argues that we lack jurisdiction over Percipient's protest because its development of a computer vision system is being performed under a task order and therefore falls outside this court's jurisdiction. All of that may be true, but FASA's task order bar will not apply when, as here, a task order exceeds $25,000,000. § 3406(f)(1)(B). Thus, we conclude that we have subject matter jurisdiction over Percipient's protest, which alleges a non-frivolous violation of a statute "in connection with a procurement."

## II. Standing

Even though we may have subject matter jurisdiction, we can only exercise our jurisdiction when a plaintiff has established that it has standing to bring its claim. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Standing ensures that plaintiffs who seek review in federal court have a sufficient "personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Although we are an Article I court, we apply Article III standing requirements. *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

When it comes to bid protests, a plaintiff must do more than establish Article III standing. That is because Congress, through the Tucker Act,

7

provided that only an "interested party" has standing to challenge a procurement. 28 U.S.C. § 1491(b)(1) (2018). The phrase "interested party" "imposes more stringent standing requirements than Article III," *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009), and limits claims "to actual or prospective bidders" who have a "direct economic interest" in the award of the contract, *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

The government mostly disputes the first standing requirement, which requires a protestor to be an actual or prospective bidder. As all the parties agree, Percipient did not (and could not) bid on the SAFFIRE contract. That failure, in the government's view, is fatal to Percipient's protest and reveals that Percipient is simply a "disappointed subcontractor" without standing.

Normally, a protestor is an actual or prospective bidder if it either submitted a proposal in response to a solicitation, or it is "expecting to submit an offer" before the solicitation closes. *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (emphasis omitted). But the requirement that a protestor have submitted a bid for it to be an interested party is anything but absolute. For example, *SEKRI v. United States* refused to apply the actual or prospective bidder requirement to a challenge brought under a mandatory source statute because doing so would thwart Congress's intent behind the statute. 34 F.4th 1063, 1072–73 (Fed. Cir. 2022). *Distributed Solutions* allowed contractors to challenge an agency's noncompetitive procurement vehicle without bidding because they "were prepared to submit bids" if the agency had solicited them. 539 F.3d at 1345. *Elmendorf Support Services v. United States* held that an incumbent contractor need not be a bidder for it to challenge an agency's in-sourcing decision because it had an obvious interest in "maintaining its incumbency." 105 Fed. Cl. 203, 208–09 (2012). *Electra-Med Corporation v. United States* determined that contractors can be interested parties without bidding when they challenge an agency action that denies them the opportunity to compete. 140 Fed. Cl. 94, 103 (2018); *see also McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 708–09 (2013). And finally, the interested party requirements have even been relaxed when their rigid application would make statutory guarantees illusory. *See Navarro Rsch. & Eng'g v. United States*, 94 Fed. Cl. 224, 230 (2010).

What these cases make clear is that the "judicial review of procurement methods should not be thwarted through the wooden application of standing requirements." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997). In other words, those requirements should be sensitive to a protestor's specific claim and should not deny standing to those who otherwise have a sufficient "personal stake in the outcome of the controversy." *Baker*, 369 U.S. at 204.

With that in mind, we turn to the statute at issue. Under §3453, the critical issue is whether offerors of commercial products have standing. We conclude that they do and that §3453 does not require an offeror of a commercial product to have bid on the prime contract.

First, unlike most procurement statutes, §3453 contemplates that offerors of commercial products have rights under the statute. Specifically, §3453 provides that agencies must give offerors of commercial products "an opportunity to compete in any procurement to fill [the agency's] requirements." § 3453(a)(3). And this clause guarantees more than just a right to compete by bidding on the contract because the statute expressly distinguishes between bidders and offerors of commercial products. § 3453(b)(4) (requiring agencies to state their specifications "in terms that enable and encourage bidders *and offerors* to supply commercial services or commercial products" (emphasis added)); *see also Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("[D]ifferences in language . . . convey differences in meaning."). A violation of §3453 therefore denies these commercial product owners an opportunity to compete that is guaranteed to them by the statute, *see Electra-Med*, 140 Fed. Cl. at 103; *cf. Distrib. Sols.*, 539 F.3d at 1345, and that guarantee would become illusory if offerors of commercial products could not sue under §3453, *Navarro Rsch. & Eng'g*, 94 Fed. Cl. at 230.

Second, §3453 imposes an obligation on agencies to incorporate commercial products that continues beyond the contract's award. For example, agencies must conduct market research even before "awarding a task order or delivery order." § 3453(c)(1)(C). They must then use the results of that research to identify any commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(2). So, putting

9

this all together, an agency must conduct market research even after the contract award and then, depending on the results, need to incorporate a commercial product. This means that an agency can still violate §3453 after the contract award and is why—unlike most other protests—it is irrelevant whether the commercial product offeror bid on the prime contract.

The government emphasizes Percipient's inability to perform the entire contract and appears to suggest that standing under §3453 is limited to those offerors whose commercial product can meet every requirement in a solicitation. But the statutory text does not support this conclusion as it provides in at least one part that agencies must "require prime contractors and subcontractors . . . to incorporate commercial services [and] commercial products . . . as *components of items supplied* to the agency." § 3453(b)(2) (emphasis added). The word "component" means a "part or element of a larger whole" and contradicts a requirement that commercial products satisfy every agency requirement. New Oxford American Dictionary (3d ed. 2010).

Because the text's meaning is plain, we could stop there. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). But relevant caselaw further suggests that this ability of a commercial product to meet every agency requirement is unnecessary for standing under §3453. In *Palantir USG v. United States*, the Federal Circuit held that the Army violated §3453 when it failed to use market research results to identify possible commercial solutions, but it reached that conclusion without deciding whether Palantir's product could satisfy every Army requirement. *See* 904 F.3d 980, 990–91, 993 (Fed. Cir. 2018).

Third, the statute uniquely expresses a significant preference for commercial products. That preference manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products at nearly every stage of the procurement. This preference then culminates in Congress encouraging agencies to sacrifice their own requirements if doing so would allow the agency to incorporate a commercial product or service. § 3453(b)(3), (c)(2)(C). It would thwart Congress's intent behind §3453 if offerors of commercial products could not bring challenges under the statute. *SEKRI*, 34 F.4th at 1072–73.

We thus hold that offerors of commercial products need not bid on the prime contract to have §3453 standing. Instead, the appropriate question in

10

this context is whether the protestor was prepared to offer its commercial product to the agency if the agency had complied with the statute. In this case, Percipient's actions over the last two years make clear that it was willing and ready to offer its commercial software.

On a different note, CACI contends that offerors of commercial products do not have §3453 standing because procurement violations, like the one alleged here, can be prevented through congressional oversight. No doubt, Congress has the power to oversee federal procurements, yet Congress vested this court with exclusive bid protest jurisdiction and surely had in mind that we would remedy procurement violations. And again, *Palantir* upheld a protestor's §3453 challenge even though Congress had taken some remedial steps of its own. *See, e.g.*, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 113, 220 (2016).

The government's final salvo is to once again argue that offerors of commercial products cannot challenge a post-award violation of §3453 because these disputes become challenges to the government's contract administration. Just as we rejected this argument as a jurisdictional defense, we reject it here too. For one thing, requiring these challenges to be brought before contract award makes little sense when §3453's requirements continue beyond the contract's award and can still be violated afterward. But for another, that limitation would also allow agencies to ignore §3453 with impunity as long as they defer decisions about commercial products until after the contract award. That result would be untenable, especially when Congress enacted this statute to stem wasteful and inefficient agency spending.[4]

---

[4] *See, e.g.*, *Formula for Action: A Report to the President on Defense Acquisition by the President's Blue Ribbon Commission on Defense Management* at 23–24 (April 1986); H.R. Rep. No. 103-545, at 21 (1994); S. Rep. No. 103-258, at 6 (1994); H.R. Rep. No. 103-712, at 233 (1994) (Conf. Rep.); S. Rep. No. 112-173, at 162–63 (2012); *Hearing to Receive Testimony on the Current Readiness of U.S. Forces in Review of the Defense Authorization Request for Fiscal Year 2014 and the Future Years Defense Program: Hearings Before the Subcomm. on Readiness and Management Support, Comm. on Armed Services*, 113th Cong., 1st Sess. 24–27 (2013) (statement of Sen. McCaskill); *Hearing to Receive Testimony in Review of the Defense Authorization Request for Fiscal Year 2016 and the Future Years*

11

Finally, the parties do not seriously dispute Percipient's economic interest. A protestor has a direct economic interest if, "but for the alleged error in the procurement process," it would have received an award. *Info. Tech. & Applications v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The only argument advanced against Percipient's economic interest is its failure to bid on the SAFFIRE contract. But Percipient is an offeror of a commercial product under §3453 and is prepared to offer NGA its product. Viewed in that light, Percipient has an economic interest in that opportunity. Thus, Percipient has standing to challenge the agency's alleged violation of §3453.

### III. Timeliness

The government and CACI assert two timeliness defenses, both of which we reject. First, the government invokes *Blue & Gold Fleet v. United States*, which held that a protestor waives its right to protest if it "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process." 492 F.3d 1308, 1313 (Fed. Cir. 2007). In the government's view, Percipient's protest is essentially a challenge to the solicitation and is therefore waived under *Blue & Gold*.

We disagree: In the limited record we have, nothing in the solicitation appears to violate §3453. The solicitation was flexible enough to allow for a development solution, but it did not require one. And that approach is entirely consistent with §3453, which allows for development solutions when a commercial one is impracticable or nonexistent. Likewise, NGA's actions here only confirm that the solicitation did not require a development solution as NGA repeatedly explained to Percipient that there would be opportunities for Percipient to offer its commercial product. Thus, Percipient's protest is not barred by *Blue & Gold*.

Second, CACI argues that Percipient's complaint is barred by the doctrine of laches. In essence, laches is "a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby*

---

*Defense Program: Before the Subcomm. on Airland of the S. Comm. on Armed Servs.*, 114th Cong. 60–62 (2015) (statement of Sen. Cotton).

12

*Prods.*, 580 U.S. 328, 333 (2017). CACI maintains that laches applies because Percipient's protest should have been brought in March 2021 when, according to CACI, Percipient first learned of a potential §3453 violation.

We cannot apply the doctrine of laches to defeat Percipient's cause of action on a motion to dismiss. Of course, a party's delay in suit is relevant when deciding whether to grant a permanent injunction, which requires us to consider, among other things, "whether the balance of hardships leans in the plaintiff's favor." *Fed. Acquisition Servs. Team v. United States*, 124 Fed. Cl. 690, 708 (2016). But the Supreme Court has long held that laches is not an affirmative defense when a statute of limitations exists. *United States v. Mack*, 295 U.S. 480, 489 (1935). A statute of limitations is a "congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted." *SCA Hygiene*, 580 U.S. at 334–35. Thus, applying laches to a claim brought within the statute of limitations violates "separation-of-powers principles" because it would "give judges a 'legislation-overriding' role that is beyond the Judiciary's power." *Id.* at 335 (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014)).

In this case, Congress has established a six-year statute of limitations for any claim in this court, 28 U.S.C. § 2501, and we "are not at liberty to jettison Congress' judgment on the timeliness of suit," *SCA Hygiene*, 580 U.S. at 335. Therefore, because Percipient's suit was brought within six years, its claim is timely, and laches is no defense.

13

CONCLUSION

In sum, we have subject matter jurisdiction over Percipient's non-frivolous allegation of a statutory violation in connection with the SAFFIRE procurement. In addition, Percipient, as an offeror of a commercial product, has standing under §3453 because it was prepared to offer its product to NGA, and it had a direct economic interest in that opportunity. Therefore, the motions to dismiss for lack of subject matter jurisdiction are denied.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

14

# In the United States Court of Federal Claims

**No. 23-28 C**
**Filed: May 18, 2023**

PERCIPIENT.AI, INC.
    **Plaintiff**


    **v.**

                                     **JUDGMENT**

**THE UNITED STATES**
    **Defendant**

    **and**

**CACI, INC. - FEDERAL**
    **Defendant-Intervenor**


       Pursuant to the court's Opinion, filed May 17, 2023, granting defendant's and defendant-intervenor's motions to dismiss,

       IT IS ORDERED AND ADJUDGED this date, that plaintiff's complaint is dismissed for lack of subject-matter jurisdiction.   No costs.


                    Lisa L. Reyes
                    Clerk of Court

        By:    **s/** Debra L. Samler

                    Deputy Clerk


<u>NOTE</u>: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 23-28C
(Filed: May 17, 2023)
(Re-filed: May 19, 2023)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PERCIPIENT.AI, INC.,

                     *Plaintiff,*

v.

THE UNITED STATES,

                     *Defendant,*

and

CACI, INC. – FEDERAL,

                     *Intervenor.*

Bid protest; post-award bid protest; motions to dismiss for lack of subject matter jurisdiction; Tucker Act; Federal Acquisition Streamlining Act; task order bar.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Samuel C. Kaplan,* Washington, DC, for plaintiff, Percipient.ai, with whom were *Hamish P.M. Hume*, *Eric J. Maurer*, and *Gina A. Rossman*, of counsel.

*Reta E. Bezak*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director, for defendant. *Graham Day*, National Geospatial-Intelligence Agency, of counsel.

*Anne B. Perry*, Washington, DC, for intervenor, CACI, Inc. – Federal, with whom was *Jonathan S. Aronie* and *Ariel E. Debin*, of counsel.

---

[1] This opinion was originally issued under seal, and the parties were given an opportunity to propose redactions of any protected material. The parties agreed that none were necessary, so it appears in full.

OPINION

This is a post-award bid protest of the National Geospatial-Intelligence Agency's alleged violation of 10 U.S.C. § 3453, a statute that requires agencies to procure commercial or non-developmental products "to the maximum extent practicable." Both the United States and the intervenor, CACI, Inc. – Federal, move to dismiss the protest for lack of subject-matter jurisdiction. For the reasons below, we grant the motions to dismiss.

BACKGROUND[2]

The National Geospatial-Intelligence Agency (NGA) obtains and analyzes images and other geospatial information to provide the federal government with intelligence data. Supplying this kind of intelligence on a global scale is a burdensome analytical task and cannot be done effectively without the help of advanced computer technology. One of those advanced technologies is computer vision, a form of artificial intelligence that "trains and uses computers to interpret the visual world." Compl. ¶ 55. With computer vision, users can more efficiently compile and analyze geospatial intelligence.

Hoping to benefit from this technology, NGA, more than three years ago, issued the SAFFIRE solicitation—which was for an indefinite delivery, indefinite quantity contract containing two parts. The first was a data repository, which would store and disseminate geospatial intelligence "across various large organizations." Compl. ¶ 60. The second, which is at the heart of this dispute, would integrate a computer vision system to enhance the agency's ability to produce, review, and classify intelligence from "millions" of images. Compl. ¶ 58.

The plaintiff, Percipient, is a technology company that developed a computer vision software called "Mirage." Mirage is an open architecture software that works alongside other computer systems and can detect

---

[2] When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). These undisputed facts are drawn from the complaint, the attached materials, and the administrative record.

2

equipment, vehicles, and faces—each of which is a critical aspect of geospatial intelligence. More than that, though, Mirage's tools also allow users to narrow the computer's focus to specific objects, patterns, or geographical areas, and it can even learn to anticipate its users' needs over time. Despite these features and capabilities, Percipient did not bid on the SAFFIRE contract because its software could only fulfill SAFFIRE's computer vision requirements. For that reason, Percipient relied on what it viewed as the agency's statutory obligation to consider incorporating commercial products and hoped to be part of NGA's SAFFIRE efforts.

In January 2021, NGA simultaneously awarded the SAFFIRE contract to CACI and issued Task Order 1, which directed CACI, among other things, to "develop and deliver the Computer Vision (CV) suite of systems." AR 3030. The agency then informed Percipient that, if it wanted to participate in SAFFIRE, it needed to speak with CACI. This eventually led to a meeting between Percipient and CACI in March 2021. At this meeting, CACI expressed significant interest in partnering with Percipient on future projects, but explained that, as for working together on SAFFIRE, "that ship" had already "sailed." Compl. ¶ 93.

Alarmed by this revelation, Percipient asked NGA if it would independently evaluate Mirage as a possible commercial solution for SAFFIRE's computer vision system. NGA responded several weeks later and reassured Percipient of its commitment to using commercial products. NGA further explained that CACI's "ship has sailed" statement was an "unfortunate miscommunication," which did not reflect the agency's position. Compl. ¶ 100. Instead, the agency had not yet decided whether it needed to incorporate a commercial product because CACI was still reviewing NGA's legacy systems. NGA confirmed that commercial products would be evaluated once CACI finished.

Another two months went by before Percipient finally secured a meeting with CACI to demonstrate Mirage, although CACI's Program Manager—the individual largely responsible for deciding whether to incorporate a commercial product—left the meeting after only 20 minutes. Still, Mirage received positive feedback, and CACI promised to evaluate Mirage more fully. This "deep dive" into Mirage never happened, however. Compl. ¶ 108.

3

**Appx24**

Several months later, Percipient learned at the 2021 GEOINT Symposium that CACI would be developing a computer vision system for SAFFIRE when CACI employees visited Percipient's symposium booth. Surprised by the news, and no longer believing that CACI could fairly evaluate Mirage, Percipient met with NGA and asked to set up a demonstration. NGA agreed but requested that Percipient "ease up on the legal pressure." Compl. ¶ 118. Percipient then demonstrated Mirage's abilities to several NGA representatives in December 2021, at the end of which NGA concluded that Percipient's software met "all of NGA's analytical transformation requirements." Compl. ¶ 120.

Over the next several months, the parties worked to reach an agreement that would allow NGA to test Mirage with live data, something that Percipient agreed to do at no cost. Just before signing an agreement to that effect, however, NGA changed its tune. Citing legal and security complexities, NGA would no longer use live data and would instead use previously released and publicly available images. Percipient pushed back, claiming that these images would not allow NGA to test Mirage's geospatial module or some of its unique features, such as its ability to alert changes over time. After significant delay, NGA relented and allowed the use of live data.

NGA completed its testing of Mirage in October 2022. Based on the results, Percipient suspected that NGA was not assessing Mirage as a possible commercial solution for SAFFIRE's computer vision requirements because, among other reasons, Percipient could only identify four NGA searches over the 12-week testing period. Thus, Percipient offered to extend the testing period, again at no cost, so NGA could more fully evaluate Mirage as a computer vision system. Percipient's suspicions appeared to be confirmed, though, when NGA explained one month later that it had evaluated Mirage as "an enterprise Machine Learning Platform," and not "as an Analytical tool." Compl. ¶ 137.

After Percipient's efforts to be incorporated into SAFFIRE proved unfruitful, it filed this protest. In its complaint, Percipient alleges that the agency violated its statutory and regulatory obligations by wastefully pursuing a development solution when a possible commercial solution existed. It also alleges that the agency unlawfully delegated inherent government authority when it allowed its contractor, CACI, to determine agency policy on commercial technology. Finally, Percipient believes that

4

the agency arbitrarily handled the SAFFIRE project. In response, the government and CACI have moved to dismiss for lack of subject matter jurisdiction, arguing that Percipient's protest is barred by the Federal Acquisition Streamlining Act's (FASA) task order bar.

## DISCUSSION

Like all federal courts, we possess limited jurisdiction, with ours being defined mainly by the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). Under the Tucker Act, we have jurisdiction over bid protests that allege a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Even if a protest falls within the Tucker Act's jurisdictional grant, it may still be barred by FASA. Through FASA, Congress effectively eliminate[d] all judicial review for protests made in connection with a procurement designated as a task order." *22nd Cent. Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023). In particular, FASA excludes from our jurisdiction any protest "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). An agency's challenged action is "in connection with the issuance" of a task order if there is a direct and causal relationship between the two. *SRA Int'l v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014).

Here, Percipient's protest is directly and causally related to the agency's issuance of Task Order 1. Specifically, Percipient alleges that— *after* the agency issued Task Order 1, which directed CACI to develop and deliver a computer vision system—the agency violated §3453 because it failed to consider whether Percipient's product could meet those same requirements. That challenge is barred by FASA.

First, it is unclear whether §3453 requires an agency to consider commercial products after it issues a task order—an issue we need not decide. But even if it does, that task order would be the "direct and immediate cause" of the agency's statutory obligation to consider those commercial products. *See Mission Essential Pers. v. United States*, 104 Fed. Cl. 170, 178 (2012) (holding that FASA barred a protest because an agency's challenged action was the "direct and immediate cause" of the issued task order). In other

words, without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this §3453 violation. Second, the agency's alleged procurement decision not to consider commercial products is not "logically distinct" from its decision to procure that same computer system through a task order. *See 22nd Cent. Techs., Inc. v. United States*, 157 Fed. Cl. 152, 157 (2021) (holding that FASA applies unless a procurement decision is "logically distinct" from the issuance of a task order). Instead, that decision would be in direct response to the task order that the agency had already issued.

In short, the protest cannot be abstracted away from CACI's performance under a task order. And certainly, if Percipient prevailed on the merits, any meaningful relief would require this court to partially suspend or discontinue performance under that task order, which further evidences the connection between the challenge and the task order. *See SRA*, 766 F.3d at 1414 (explaining that a protestor's requested relief can support the application of FASA's task order bar). We hold that Percipient's protest is "in connection with the issuance" of a task order and is therefore barred by FASA from being brought in this court.

CONCLUSION

In sum, we lack subject matter jurisdiction over Percipient's protest. Its challenge to the agency's actions under §3453 is "in connection with the issuance of a task order" and is barred by FASA. Thus, the motions to dismiss for lack of subject matter jurisdiction are granted. The Clerk of Court is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

6