No. 2023-1970

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**PERCIPIENT.AI, INC.**
***Plaintiff-Appellant***

**v.**

**UNITED STATES, CACI, INC.-FEDERAL**
***Defendants-Appellees***

---

Appeal From The United States Court Of Federal Claims
No. 1:23-Cv-00028-EGB
Senior Judge Eric G. Bruggink

---

# BRIEF FOR DEFENDANT-APPELLEE, CACI, INC.-FEDERAL

Dated: July 24, 2023

Anne B. Perry
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
Email: aperry@sheppardmullin.com

*Attorney of Record for Defendant-Appellee CACI, Inc. – Federal*

*Of Counsel*:
Jonathan S. Aronie
Townsend L. Bourne
Ariel E. Debin
Lillia J. Damalouji

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee, CACI, Inc.-Federal, certifies the following:

1. The full name of every party represented by me is: **CACI, Inc.-Federal**.

**2.** The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **N/A**

3. All parent corporations and publicly held companies that own 10 percent or more of stock of the party represented by me are: **CACI International Inc**.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or that are expected to appear in this court (and who have not or will not enter an appearance in this care) are: **None**.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are: **None**.

Respectfully submitted,

Dated: July 24, 2023

____/S/ Anne B. Perry___________________
ANNE B. PERRY
*Attorney of Record for Defendant-Appellee*
*CACI, Inc. – Federal*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 2

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 3

I. Counterstatement to Percipient's Statement of the Case ........ 3

II. Overview of the Commercial Preference. ........ 7

III. Factual Background ........ 11

A. The SAFFIRE Solicitation and Contract Award to CACI. ........ 11

B. Task Order Award. ........ 13

C. Percipient's Bid Protest at the Court of Federal Claims. ........ 14

SUMMARY OF THE ARGUMENT ........ 17

ARGUMENT ........ 19

I. Standard of Review ........ 19

II. The CFC Is A Court Of Limited Jurisdiction. ........ 19

III. The CFC Correctly Held That It Lacked Jurisdiction Over Any Aspect Of Percipient's Claims Made In Connection With The Issuance Or Proposed Issuance Of Task Orders To CACI. ........ 21

A. FASA Vests Exclusive Task Order Protest Jurisdiction with the Government Accountability Office for Protests of Orders Valued at Over $25 Million. ....21

B. The CFC Correctly and Reasonably Applied the Ordinary, Plain, and Generally Recognized Meaning of "In Connection With" in Dismissing Percipient's Protest. ....23

C. Percipient's Construction of Section 3453 Would Produce an Absurd and Unconscionable Result Where Section 3453 Does Not Expand the Court's Bid Protest Jurisdiction or Limit the Scope of the FASA Task Order Bar. ....40

D. Percipient Failed Adequately to Allege that TO 1 Exceeds the Scope of the SAFFIRE Contract. ....47

IV. Even if the Task Order Bar Did Not Apply, the CFC's Ruling Should be Affirmed on Alternative Grounds Because the CFC Lacks Bid Protest Jurisdiction Over Contract Administration Claims. ....50

CONCLUSION ....53

CERTIFICATE OF COMPLIANCE ....54

CERTIFICATE OF SERVICE ....55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*22nd Century Technologies, Inc. v. United States*
57 F.4th 993 (Fed. Cir. 2023) ....................26, 35, 38

*A&D Fire Protection, Inc. v. United States*
72 Fed. Cl. 126 (2006) ....................21

*Akira Technologies, Inc. v. United States*
145 Fed. Cl. 101 (2019) ....................29

*Alliant Techsystems, Inc. v. United States*
178 F.3d 1260 (Fed. Cir. 1999) ....................51

*Associated Electric Cooperative, Inc. v. United States*
226 F.3d 1322 (Fed. Cir. 2000) ....................19, 21

*Bailey v. Dart Container Corporation of Michigan*
292 F.3d 1360 (Fed. Cir. 2002) ....................50

*BayFirst Solutions, LLC v. United States*
104 Fed. Cl. 493 (2012) ....................45, 46

*Blue & Gold Fleet, L.P. v. United States*
492 F.3d 1308 (Fed. Cir. 2007) ....................15

*Blueport Company, LLC v. United States*
533 F.3d 1374 (Fed. Cir. 2008) ....................20

*Cessna Aircraft Company v. Dalton*
126 F.3d 1442 (Fed. Cir. 1997) ....................51

*Crandon v. United States*
494 U.S. 152 (1990) ....................21

*CW Government Travel, Inc. v. United States*
61 Fed. Cl. 559 (2004) ....................48

*DataMill, Inc. v. United States*
91 Fed. Cl. 740 (2010) ....................24, 26, 28, 29

*Diaz v. United States*
853 F.3d 1355 (Fed. Cir. 2017) ....................20

*Doyon, Ltd. v. United States*
214 F.3d 1309 (Fed. Cir. 2000) ....................19, 21

*Dupuch-Carron v. Secretary of Health & Human Services*
969 F.3d 1318 (Fed. Cir. 2020) ....................43, 44

*Fluor Intercontinental, Inc. v. United States*
147 Fed. Cl. 309 (2009)....................48

*Frazier v. McDonough*
66 F.4th 1353 (Fed. Cir. 2023) ....................43

*Global Computer Enterprises, Inc. v. United States*
88 Fed. Cl. 350 (2009)....................29

*Graham v. John Deere Company*
383 U.S. 1 (1966)....................41

*Guardian Moving & Storage Co., Inc. v. United States*
657 Fed.Appx. 1018 (Fed. Cir. 2016)....................19

*Haggar Company v. Helvering*
308 U.S. 389 (1940)....................43

*Harmonia Holdings Group, LLC v. United States*
156 Fed. Cl. 238 (2021)....................26

*Holley v. United States*
124 F.3d 1462 (Fed. Cir. 1997) ....................20

*Holy Trinity Church v. United States*
143 U.S. 457 (1892)....................43

*Innovative Management Concepts, Inc. v. United States*
119 Fed. Cl. 240 (2014)....................25

*Insap Services, Inc. v. United States*
145 Fed. Cl. 653 (2019)....................30

*International Genomics Consortium v. United States*
104 Fed. Cl. 669 (2012)....................................................................51

*Kellogg Brown & Root Services, Inc. v. United States*
117 Fed. Cl. 764 (2014)....................................................................51

*Kokkonen v. Guardian Life Insurance Company of America v. United States*
511 U.S. 375 (1994)....................................................................19, 20

*Lane v. Pena*
518 U.S. 187 (1996)....................................................................20

*LaSalle Talman Bank, F.S.B. v. United States*
462 F.3d 1331 (Fed. Cir. 2006) ....................................................................19

*McAfee, Inc. v. United States*
111 Fed. Cl. 696 (2013)....................................................................32

*McNeill v. United States*
563 U.S. 816 (2011)....................................................................43

*Milavetz, Gallop & Milavetz, P.A. v. United States*
559 U.S. 229 (2010)....................................................................43

*Mission Essential Personnel, LLC v. United States*
104 Fed. Cl. 170 (2012)....................................................................24

*mLINQS, LLC v. United States*
No. 22-1351, 2023 WL 2366654 (Fed. Cl. Mar. 6, 2023)..................7, 44, 45, 46

*MORI Associates, Inc. v. United States*
102 Fed. Cl. 503 (2011)....................................................................32, 45

*MORI Associates, Inc. v. United States*
113 Fed. Cl. 33 (2013)....................................................................29, 30

*Nexagen Networks, Inc. v. United States*
124 Fed. Cl. 645 (2015)....................................................................19

*NLRB v. Lion Oil Co.*
352 U.S. 282 (1957)....................................................................21

*Omega World Travel, Inc. v. United States*
82 Fed. Cl. 452 (2008) .......... 49

*Orff v. United States*
545 U.S. 596 (2005) .......... 20

*Palantir USG, Inc. v. United States*
129 Fed. Cl. 218, *aff'd* 904 F.3d 984 (Fed. Cir. 2018) .......... 44, 46

*Pitsker v. Office of Personnel Management*
234 F. 3d 1378 (Fed. Cir. 2000) .......... 43

*Res. Conservation Grp., LLC v. United States*
597 F.3d 1238 (Fed. Cir. 2010) .......... 19

*Savantage Financial Services, Inc. v. United States*
81 Fed. Cl. 300 (2008) .......... 32

*Sealift, Inc. v. United States*
82 Fed. Cl. 527 (2008) .......... 41

*Sebelius v. Cloer*
569 U.S. 369 (2013) .......... 43

*Soriano v. United States*
352 U.S. 270 (1957) .......... 20

*SRA International, Inc. v. United States*
766 F.3d 1409 (Fed. Cir. 2014) .......... 22, 25, 26, 30

*Toibb v. Radloff*
501 U.S. 157 (1991) .......... 21

*Tolliver Group, Inc. v. United States*
151 Fed. Cl. 70 (2020) .......... 31, 45

*Trident Technologies, LLC v. United States*
118 Fed. Cl. 430 (2014) .......... 48, 49

*United States v. Sherwood*
312 U.S. 584 (1941) .......... 20

*United States v. Testan*
424 U.S. 392 (1976)....................20

*United States v. Turkette*
452 U.S. 576 (1981)....................43

*Winter v. FloorPro, Inc.*
570 F.3d 1367 (Fed. Cir. 2009)....................20

**Statutes**

10 U.S.C. § 3406....................passim

10 U.S.C. § 3453....................passim

28 U.S.C. § 1295....................2

28 U.S.C. § 1491....................passim

41 U.S.C. §§ 7101 *et seq*....................41, 51

**Regulations**

48 C.F.R. § 7.102....................12

48 C.F.R. § 10.003....................10

48 C.F.R. § 44.403....................10

48 C.F.R. § 52.210-1....................passim

48 C.F.R. § 52.244-6....................passim

**Rules**

Federal Circuit Rule 28....................2

Federal Circuit Rule 47.5....................1

Federal Rules of Appellate Procedure Rule 28....................2

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule ("Fed. Cir. R.") 47.5(a)(1), counsel for Defendant-Appellee, CACI, Inc.-Federal, is not aware of any other appeal in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court.

Pursuant to Fed. Cir. R. 47.5(a)(2), counsel for CACI, Inc.-Federal is not aware of any case that is pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

Pursuant to the Federal Rules of Appellate Procedure ("FRAP") Rule 28 and Fed. Cir. R. 28, Defendant-Appellee, CACI, Inc.-Federal ("CACI"), respectfully submits this brief in opposition to Plaintiff-Appellant's, Percipient.ai, Inc. ("Percipient"), appeal from the judgment of the U.S. Court of Federal Claims ("CFC") dismissing Percipient's protest. As set forth herein, CACI respectfully requests that the Court deny Percipient's appeal and affirm the CFC's holding.[1]

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3), which provides for an appeal from a final decision of the CFC. However, CACI disagrees with Percipient's assertion that the CFC had jurisdiction over any aspect of Percipient's allegations. *See* Pl. Br.[2] at 1. Even if Percipient's protest fell within the CFC's bid protest jurisdiction under the Tucker Act, 28 U.S.C. § 1491(b)(1), the protest would be barred pursuant to the Federal

---

[1] Pursuant to Fed. Cir. R. 28(b), CACI's "statements of jurisdiction, the issues, the case and facts, and the standard of review must be limited to specific areas of disagreement with" Percipient's. Thus, CACI addresses only those specific areas of disagreement with Percipient's Brief, or where additional discussion or clarification is necessary on material issues. CACI does not concede any of the general characterizations made by Percipient or allegations made relating to matters that are immaterial to the narrow issue on appeal.

[2] Citations to "Pl. Br." refer to Percipient's latest filed Corrected Confidential Brief, Document No. 20, filed on June 26, 2023, in this case.

Acquisition Streamlining Act's ("FASA") task order bar (10 U.S.C. § 3406(f)(1)), because it involves a protest "in connection with" the issuance or proposed issuance of a task order, and is, thus, jurisdictionally barred under Federal law. Additionally, and in the alternative, CACI contends Percipient's protest is barred by other threshold matters.

## STATEMENT OF THE ISSUES

A. Whether the CFC determined correctly that the FASA task order bar divested the CFC of subject matter jurisdiction over Percipient's bid protest, when Percipient's challenges are directly and causally connected to Defendant-Appellee's, the United States Government, acting through the National Geospatial-Intelligence Agency ("NGA"), issuance of Task Order 1 ("TO 1") under an Indefinite Delivery, Indefinite Quantity ("IDIQ") contract.

B. Whether, assuming that the CFC was not divested of jurisdiction under the FASA task order bar, the CFC's holding should be affirmed based on other threshold issues fully briefed below that nonetheless bar Percipient's protest.

## STATEMENT OF THE CASE

### I. Counterstatement to Percipient's Statement of the Case.

With limited exceptions described below, CACI respectfully disagrees with Percipient's characterizations of the case. Percipient spills much ink in its Brief not only discussing factual allegations that are not relevant to this Appeal, but also

attempting to litigate the merits of factual and legal issues that have not been briefed before the CFC. We do not intend to address all of our disagreements with Percipient's summary, because our goal is not to further detract from the limited issue of jurisdiction before this Court. However, we feel it essential to set out a few specific allegations with which we disagree.

First, CACI disagrees with the assertion that Percipient offers a product that meets or exceeds the SAFFIRE Contract's Computer Vision ("CV") System[3] requirements. *See, e.g.*, Pl. Br. at 2, 8, 14. Not only is this statement belied by the record – including evaluations by CACI (Appx964-68) – but ultimately is irrelevant to the question of the CFC's bid protest jurisdiction under the FASA task order bar.

Second, CACI disagrees with Percipient's characterizations that Defendants failed to evaluate Percipient's Mirage product. *See, e.g.*, Pl. Br. at 2, 14, 16. The record below demonstrates this is demonstrably false (Appx964-68), and is irrelevant to the question of the CFC's jurisdiction before this Court. CACI further disagrees with Percipient's allegations that any evaluations performed by NGA and CACI were not reasonable or complete. *See, e.g.*, Pl. Br. at 12-14. The sufficiency

[3] As aptly described by the CFC, Computer Vision is "a form of artificial intelligence that 'trains and uses computers to interpret the visual world.'" Appx23.

and reasonableness of the evaluations is a merits question that was not briefed before the CFC. In any event, Percipient's mere disagreement with NGA's and/or CACI's evaluation of the Mirage offering is not relevant to the question of jurisdiction before this Court.

Third, CACI disagrees with the characterization that the Defendants are proceeding with a "wasteful development effort," while performing a task order in accordance with NGA's issued requirements. *See, e.g.*, Pl. Br. at 2. There is no evidence in the record, let alone findings by the CFC, to demonstrate what development effort CACI is or has been undertaking. What the record does make clear is that CACI was directed to evaluate pre-existing, legacy Government Off-the-Shelf ("GOTS") software (*e.g.*, the WATCHMAN system) and determine how this system could be integrated into the larger contracted-for CV System development and integration effort. *See, e.g.*, Appx496; *see also* Appx966-67. In other words, CACI is not developing an entirely new system, but rather is using a government owned system and updating it to meet the NGA's current needs. *See, e.g.*, Appx966-67.

Fourth, CACI contests the relevancy of any tests, agreements, or conversations relating to Percipient's other transaction agreement ("OTA") and the July 2022 bailment agreement intending to evaluate Percipient's Mirage platform as a Geospatial Module. *See, e.g.*, Pl. Br. at 10, 13. These agreements are wholly

distinct and separate from the contract at issue in this Appeal, including issued task orders. Percipient brings this bid protest challenging the SAFFIRE procurement, not the OTA or the bailment. Furthermore, neither the OTA nor the bailment are relevant to the issue before this Court of whether the CFC lacks bid protest jurisdiction to hear Percipient's complaint.

Fifth, CACI disagrees with Percipient's "conclusions" in Section II.E of its Statement of the Case. Pl. Br. at 16-20. The parties never were given the full opportunity to brief evidence in the Limited Administrative Record ("LAR") or the Administrative Record. The Parties never argued, and the CFC never found, that "The LAR showed that NGA's violations were more egregious than previously understood" or that "Defendants, without informing Percipient, were using the demos of Percipient's software not to evaluate whether commercial products could meet SAFFIRE's requirements, but instead to identify additional features for the software they decided to develop." Pl. Br. at 16. These are Percipient's arguments that have not been briefed, argued, or ruled upon at the lower court. Percipient's unsubstantiated allegations suggesting improper conduct on the part of either NGA or CACI again are entirely irrelevant to the question of whether its challenges are jurisdictionally barred.

## II. Overview of the Commercial Preference.

Although CACI agrees with Percipient's general summary of the statutory background associated with the commercial preference, we disagree with many of the assumptions Percipient draws from this background. *See generally*, Pl. Br. at 3-6. Percipient argues that "Section 3453 and related statutory and regulatory requirements impose ongoing obligations on the agency throughout procurements to ensure, 'to the maximum extent practicable' that agencies and their contractors procure commercial products and conduct necessary market research." Pl. Br. at 26.

10 U.S.C. § 3453 creates a preference for agency procurement of "commercial services, commercial products, or nondevelopmental items other than commercial products," to the "maximum extent practicable." 10 U.S.C. § 3453(b). This is not a mandate to procure commercial offerings in every instance, but a preference. *See, e.g.*, *mLINQS, LLC v. United States*, No. 22-1351, 2023 WL 2366654 at *26 (Fed. Cl. Mar. 6, 2023). Further, Section 3453 largely governs Department of Defense ("DOD") procurement actions *prior* to contract performance. For example, 10 U.S.C. § 3453(c) includes "Preliminary Market Research" requirements to be conducted (1) "before developing new specifications for a procurement," (2) "before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold," and (3) "before awarding a task order or

delivery order in excess of the simplified acquisition threshold." 10 U.S.C. § 3453(c)(1)(A)-(C).

10 U.S.C. § 3453(a) likewise refers largely to pre-solicitation, pre-award conduct. Section 3453(a)(2) governs an agency's drafting of requirements for a solicitation, requiring agencies to ensure "requirements are defined so that commercial services or commercial products or… nondevelopmental items" are "procured to fulfill such requirements." 10 U.S.C. § 3453(a)(2). Section 3453(a)(3) similarly requires agencies to draft specifications in a manner that ensures "offerors of commercial services, commercial products, and nondevelopmental items…are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a)(3).

Additionally, under 10 U.S.C. § 3453(b), agencies must "to the maximum extent practicable…*acquire* commercial services, commercial products, or nondevelopmental items…to meet the needs of the agency." 10 U.S.C. § 3453(b)(1) (emphasis added). Here, the NGA's "acquisition" occurred when it selected CACI for the SAFFIRE Contract. Section 3453(b)(3) requires agencies to "*modify requirements* in appropriate cases," such as the requirements of the SAFFIRE Solicitation, "to ensure that the requirements can be met by" commercial offerors, thus giving commercial offerors the option to compete for such awards in the first place. 10 U.S.C. § 3453(b)(3) (emphasis added). Finally, Section

3453(b)(4) requires agencies to "state *specifications* in terms that enable and encourage bidders and offerors to supply" commercial products "*in response to the agency solicitations*." 10 U.S.C. § 3453(b)(4) (emphasis added).[4]

In all of the forgoing requirements, agencies are instructed do something *before* entering into an agreement with a contractor to perform work. Percipient repeatedly has alleged that its protest does not challenge the Solicitation, or any pre-award requirement, or NGA's actions relating thereto. *See, e.g.*, Pl. Br. at 24, 34; *see also* Appx24.

10 U.S.C. § 3453 also includes two provisions that relate to an agency's oversight of contractor performance. Section 3453(b)(2) provides that the agency must require prime contractors and subcontractors "to the maximum extent practicable" "to incorporate commercial services, commercial products, or nondevelopmental items…as components of items supplied to the agency." 10 U.S.C. § 3453(b)(2). Section 3453(c)(5) provides that the agency must "take appropriate steps to ensure that any prime contractor of a contract (or task order or delivery order)…for the procurement of products other than commercial products or services…engages in such market research as may be necessary to [determine

[4] 10 U.S.C. § 3453(b)(5) and (b)(6) relate to requirements to revise internal agency policies and required training for personnel. Neither are relevant to this Appeal or the underlying protest.

whether there are commercial products available that meet the agency's requirements], before making purchases for or on behalf of the Department of Defense." 10 U.S.C. § 3453(c)(5).

Agencies satisfy these oversight requirements, for example, by incorporating terms and conditions into contracts requiring prime contractors to conduct market research and to utilize commercial products to the greatest extent practicable. For example, agencies are mandated to include the Federal Acquisition Regulation ("FAR") clause 52.210-1, Market Research, in all "solicitations and contracts over $6 million." *See* 48 C.F.R. § 10.003; 48 C.F.R. § 52.210-1. FAR 52.210-1 requires prime contractors "[b]efore awarding subcontracts for other than commercial acquisitions" to "conduct market research to…[d]etermine if commercial products…are available that - (i) Meet the agency's requirements; (ii) Could be modified to meet the agency's requirements; or (iii) Could meet the agency's requirements if those requirements were modified to a reasonable extent." 48 C.F.R. §52.210-1. FAR 52.210-1 also requires prime contractors to consider "the extent to which commercial products…could be incorporated at the component level." *Id.*

Agencies also are mandated to incorporate FAR 52.244-6, Subcontracts for Commercial Products and Commercial Services, into all prime contracts other than for commercial products and services. 48 C.F.R. § 52.244-6; 48 C.F.R. § 44.403;

*see also* Appx797; Appx857. Among other requirements, FAR 52.244-6 directs prime contractors "[t]o the maximum extent practicable," to "incorporate, and require its subcontractors at all tiers to incorporate, commercial products, commercial services, or non-developmental items as components of items to be supplied under this contract." 48 C.F.R. 52.244-6(b).

Agencies then are responsible for monitoring contractors' performance in accordance with these requirements – including whether prime contractors conduct market research "[b]efore awarding subcontracts" and incorporate commercial products "as components of items to be supplied" under the agreement – and perceived failures to comply would be matters of contract administration.

Federal agencies thus comply with Section 3453's preference for commercial products by taking action pre-award to ensure adequate participation by commercial offerors, and through incorporating commercial preference terms into their prime contractors' agreements, and through monitoring prime contractor performance against those contract terms.

## III. Factual Background

### A. The SAFFIRE Solicitation and Contract Award to CACI.

NGA created the SAFFIRE program to provide the development, integration, and deployment of two key components: a Structured Observation Management ("SOM") capability, and a Computer Vision ("CV") system

capability. Appx38-39; Appx23; Appx58. To that end, NGA conducted market research in 2019 to gather the information necessary to plan the SAFFIRE procurement, including releasing two Requests for Information ("RFI"), hosting industry days, and preparing a Market Research Report in August 2019. Appx571; *see also*, *e.g.*, Appx567, Appx572-73, Appx907. NGA's market research was conducted in accordance with FAR 7.102, requiring agencies to "perform acquisition planning and conduct market research…for all acquisitions in order to promote and provide for," *inter alia*, the "Acquisition of commercial products…to the maximum extent practicable." 48 C.F.R. § 7.102(a)(1); Appx569.

NGA released Solicitation No. HM047620R0006 (the "SAFFIRE Solicitation") on January 13, 2020. Appx783. Percipient did not submit a proposal. Pl. Br. at 10. NGA notified CACI it was awarded Contract No. HM047621D0004 on January 14, 2021 (the "SAFFIRE Contract" or the "Contract"). Appx70. The Contract is a single award, IDIQ contract, anticipating multiple types of pricing throughout performance, and the issuance of task orders to direct work. *See, e.g.*, Appx750; Pl. Br. at 10. Under the Contract, CACI is tasked with development and delivery of the SOM data repository capabilities, as well as development and delivery of the CV System. Appx23.

### B. Task Order Award.

To facilitate CACI's performance under the Contract, CACI has been awarded three task orders since 2021. Task Order 1, No. HM0476-21-F-0020, was issued on January 21, 2021, with one year base period followed by four 1-year option periods of performance ("TO 1"). Appx860; *see also* Appx1247. TO 1 initially directed CACI to evaluate and transition certain legacy government software into operational use. Appx470, Appx496. CACI then was directed, *inter alia*, to develop, deliver, and integrate the CV suite of systems. Appx24; Appx470.

NGA exercised its contractual right to extend the term of the SAFFIRE Contract for option year 1 on January 12, 2022, with a period of performance running from January 31, 2022 through January 30, 2023. Appx872-73. The term was again extended for option year 2 on January 20, 2023, with a period of performance running through January 30, 2024. Appx895-96.

The TO 1 Performance Work Statement ("PWS") fully contemplated CACI's role in the design (Appx479), software development (Appx481), and integration (Appx483) aspects of the SAFFIRE program. *See also* Appx26. In designing the SAFFIRE program, CACI was instructed to support the incorporation of commercially available, off-the-shelf items ("COTS"), GOTS items, Open Source, or custom software development "as applicable to support system design, with Government approval." *See* Appx479-80; *see also* Appx497.

In the case of custom software development, CACI was to prioritize reusing existing code over creation of new software. *See* Appx480.

Nowhere in the text of TO 1 PWS is CACI directed to procure a commercial CV System, to contract with a commercial vendor for the CV System requirements, or to procure Percipient's Mirage offering. *See* Appx463-520 (TO 1 PWS). CACI complied with its contractual obligations to consider commercial offerors in performance of the SAFFIRE procurement (*see, e.g.*, Appx792; Appx797; Appx857; 48 C.F.R. § 52.210-1; 48 C.F.R. § 52.244-6), including evaluating Percipient specifically in relation to the CV System capabilities. *See, e.g.*, Appx955-60; Appx963-68.

### C. Percipient's Bid Protest at the Court of Federal Claims.

Percipient waited until January 9, 2023 to file its bid protest with the CFC – three years after NGA released its SAFFIRE Solicitation, and two years after CACI was awarded the SAFFIRE Contract and TO 1 in 2021.

Percipient's Complaint alleged violations of the commercial preference obligations in 10 U.S.C. § 3453 in performance of the SAFFIRE Contract. NGA and CACI immediately moved to dismiss Percipient's bid protest on several grounds, including: (1) lack of subject matter jurisdiction, (2) lack of standing, and (3) timeliness. *See, e.g.*, Appx152, Appx175, Appx248, Appx269. As part of Defendants' arguments relating to subject matter jurisdiction, Defendants alleged,

*inter alia*, (1) the CFC lacked bid protest jurisdiction over Percipient's complaint because Percipient challenged issues of contract administration, which are not covered by the CFC's grant of bid protest jurisdiction under the Tucker Act (28 U.S.C. § 1491(b)(1)), and (2) even if Percipient's claims could properly be identified as a bid protest challenge, such allegations were jurisdictionally barred by the FASA task order bar, because the allegations are in connection with the issuance of the task order issued to CACI under the SAFFIRE Contract. *See, e.g.*, Appx157, Appx159, Appx164, Appx195-197. Defendants also argued that Percipient, as a mere disappointed potential subcontractor, lacked standing to bring a bid protest at the CFC because it neither submitted a proposal nor protested the SAFFIRE Solicitation or the ensuing award to CACI. Accordingly, Percipient was not an interested party with a direct economic interest in the SAFFIRE procurement. Finally, Defendants alleged that Percipient's Complaint should be dismissed as an untimely challenge to the terms of the SAFFIRE Solicitation, barred by this Court's precedent in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).

The CFC released its full opinion on the motions on March 31, 2023, wherein the CFC made several statements that CACI viewed as contrary to law and precedent. *See, e.g.*, Appx1. Among those findings was the error in holding that "FASA's task order bar will not apply when, as here, a task order exceeds

$25,000,000." Appx7. To correct this clear error of law, Defendants filed Motions for Reconsideration on April 25, 2023 asking the CFC to reconsider its holding that the CFC has jurisdiction over protests under FASA's task order bar. *See, e.g.*, Appx32, Appx1185, Appx1193. As a result of these filings, and a telephonic conference with all parties on April 26, 2023 (Appx32), the CFC vacated its earlier opinion, re-opening Defendants' motions to dismiss on the specific question of the FASA task order bar. *See* Appx32. After all parties were given the opportunity for additional briefing on the issue of the task order bar, the CFC held an oral argument on May 12, 2023. *See, e.g.*, Appx33. On May 17, 2023, the CFC granted the Defendants' renewed motions to dismiss for lack of subject matter jurisdiction, dismissing Percipient's protest in its entirety. Appx22. The CFC found that "Percipient's protest is directly and causally related to the agency's issuance of Task Order 1," in part because "without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this §3453 violation." Appx26-27.

Additionally, the CFC reasoned that NGA's decision "not to consider commercial products is not 'logically distinct' from its decision to procure that same computer system through a task order" because its "procurement decision" to not procure a commercial CV System "would be in direct response to the task order that the agency had already issued." Appx27. Finally, the CFC recognized

that "any meaningful relief would require this court to partially suspend or discontinue performance under that task order, which further evidences the connection between the challenge and the task order." Appx27.

In response to the CFC's rulings, Percipient filed a Notice of Appeal with this Court on May 24, 2023.

## SUMMARY OF THE ARGUMENT

The Court should affirm the CFC's judgement that it lacked jurisdiction over Percipient's protest claims made in connection with the issuance of TO 1 to CACI, which directed CACI to design, develop, and deliver an integrated CV System.

CFC's bid protest jurisdiction, although broad, is not unlimited. Under FASA, Congress imposed a statutory bar on task and delivery order protests before the CFC. Accordingly, the CFC lacks jurisdiction over all protests "in connection with the issuance or proposed issuance" of task and delivery orders, unless such orders "increase the scope, period, or maximum value of the underlying prime contract." 10 U.S.C. § 3406(f)(1).[5] Percipient's protest grounds are clearly precluded by the FASA task order bar. Furthermore, Percipient's arguments that 10 U.S.C. § 3453's commercial preference confers unlimited and ongoing bid

---

[5] Though FASA provides another exemption to the task order bar for task orders valued in excess of $25,000,000, giving the Government Accountability Office ("GAO") exclusive jurisdiction over such protests, Plaintiff elected not to bring this protest at the GAO.

protest jurisdiction that somehow overrides FASA's restriction on jurisdiction, and the Tucker Act's limited waiver of sovereign immunity, is fundamentally flawed as a matter of statutory interpretation.

Percipient cannot overcome the plain fact that, on its face, its allegations are "in connection with" the issuance of a task order to CACI and, thus, the CFC is divested of bid protest jurisdiction. Percipient's allegations relate directly to NGA's decision to issue TO 1 to CACI, the terms of the TO 1 PWS, the work CACI is performing under TO 1, market research conducted prior to the issuance of TO 1, and any NGA decisions to issue future, follow-on task orders to CACI. Accordingly, it is clear that Percipient's protest is "in connection with the issuance or proposed issuance" of a task order and thus falls within the FASA jurisdictional bar. Section 3453 neither expands the scope of the CFC's bid protest jurisdiction under the Tucker Act, nor places limitations on the scope of FASA's task order bar. Section 3453, in fact, creates no independent bid protest jurisdiction.

Alternatively, even if the FASA bar did not apply, Percipient's protest warrants dismissal for other independent reasons, *e.g.*, because it amounts to a clear challenge to the Defendants' administration of the SAFFIRE Contract, for which the CFC lacks statutory bid protest jurisdiction. Accordingly, because Percipient's protest was appropriately dismissed, CFC's judgment should be

affirmed on the grounds that it did not possess jurisdiction to entertain Percipient's allegations.

## ARGUMENT

### I. Standard of Review

This Court reviews "the Claims Court's findings of fact for clear error" and "the Claims Court's determination on the legal issue…without deference." *Guardian Moving & Storage Co., Inc. v. United States*, 657 Fed.Appx. 1018, 1023 (Fed. Cir. 2016); *see also LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331, 1336 (Fed. Cir. 2006). Further, this Court "review[s] decision[s] of the Court of Federal Claims regarding subject matter jurisdiction de novo." *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1242 (Fed. Cir. 2010). Issues of statutory interpretation likewise are reviewed de novo. *Associated Elec. Co-op, Inc. v. United States*, 226 F.3d 1322, 1326 (Fed. Cir. 2000); *Doyon, Ltd. v. United States*, 214 F.3d 1309, 1314 (Fed. Cir. 2000).

### II. The CFC Is A Court Of Limited Jurisdiction.

The CFC does not have unlimited jurisdiction. *Nexagen Networks, Inc. v. United States*, 124 Fed. Cl. 645, 650 (2015) (the CFC "possess[es] only that power authorized by the Constitution and statute….") (quoting *Kokkonen v. Guardian Life Ins. Co. of Am. v. United States*, 511 U.S. 375, 377 (1994)). Indeed, "the United States, as sovereign, 'is immune from suit save as it consents to be

sued…and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)); *Soriano v. United States*, 352 U.S. 270, 277 (1957) ("[T]his Court can enforce relief against the sovereign only with the limits established by Congress."). Any such "waiver of sovereign immunity must be strictly construed in favor of the sovereign." *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009) (quoting *Orff v. United States*, 545 U.S. 596, 601-02 (2005)) (quotations omitted). "Such a waiver must be unequivocally expressed in the statutory text and will not be implied." *Id*. (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)) (quotations omitted).

When faced with a motion to dismiss for lack of jurisdiction, the inquiry "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted). Percipient "bears the burden of establishing jurisdiction by a preponderance of the evidence." *Diaz v. United States*, 853 F.3d 1355, 1357 (Fed. Cir. 2017). "Indeed, it is to be presumed that a cause of action lies outside the limited jurisdiction of the federal courts." *Blueport Co., LLC v. United States*, 533 F.3d 1374, 1381 (Fed. Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377).

## III. The CFC Correctly Held That It Lacked Jurisdiction Over Any Aspect Of Percipient's Claims Made In Connection With The Issuance Or Proposed Issuance Of Task Orders To CACI.

In interpreting a statute, the Court must "give effect to the intent of Congress." *Doyon*, 214 F.3d at 1314; *Associated Elec. Co-op*, 226 F.3d at 1326 (citing *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297 (1957)). Assessing Congressional intent starts "with the language of the statutes at issue." *Doyon*, 214 F.3d at 1314 (citing *Toibb v. Radloff*, 501 U.S. 157, 162 (1991)). To give full meaning and effect to the statute, the Court must look "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Id*. (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)). In finding that Percipient's protest is "in connection with the issuance or proposed issuance of task or delivery orders," and thus excluded from the CFC's protest jurisdiction, the CFC gave full meaning and effect to the Congressional bar on task order protests, correctly holding that "Percipient's protest is directly and causally related to the agency's issuance of Task Order 1." Appx26.

### A. FASA Vests Exclusive Task Order Protest Jurisdiction with the Government Accountability Office for Protests of Orders Valued at Over $25 Million.

FASA was intended to make the acquisition process more efficient, with one key area of reform being the realm of bid protests. *See A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 133 (2006).

Accordingly, the FASA task order bar, as relates to DOD contracts, states:

> (f) Protests.- (1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for-
>
> > (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
> >
> > (B) a protest of an order valued in excess of $25,000,000.
>
> (2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

10 U.S.C. § 3406(f).

The statute is very clear. Jurisdiction exists in the CFC *only* if a protester alleges that the scope of the task order exceeds the scope of the base IDIQ contract. For orders in excess of $25,000,000, *only* the Government Accountability Office ("GAO") has bid protest jurisdiction. The FASA task order bar thus limits the jurisdiction of the CFC under the Tucker Act, 28 U.S.C. §1491(b)(1), over certain pre- and post-award bid protest actions. *See, e.g.*, *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014). Percipient's attempts to limit the reach of FASA by contorting the plain language of the statute warrant rejection.

### B. The CFC Correctly and Reasonably Applied the Ordinary, Plain, and Generally Recognized Meaning of "In Connection With" in Dismissing Percipient's Protest.

In its protest, Percipient alleges that NGA and CACI essentially failed to comply with the SAFFIRE Solicitation, SAFFIRE Contract, and TO 1 requirements by allegedly failing to conduct sufficient analysis of Percipient's product. Pl. Br. at 2, 13-14, 15-16, 17-19. Percipient also has claimed that NGA either should have awarded a direct contract to Percipient, or effectively directed CACI to award a subcontract to Percipient, for the CV System requirements included in the SAFFIRE Contract. *See, e.g.*, Pl. Br. at 15, Appx209, Appx226. Percipient alleges that these perceived failures violated provisions of 10 U.S.C. § 3453. In doing so, Percipient raises clear challenges both to agency pre-award conduct and contract administration, while simultaneously arguing the agency conduct in question is somehow not "in connection with" the procurement decision to issue CACI a task order. But the facts demonstrate Percipient's arguments necessarily are challenges to (1) the sufficiency of the terms in TO 1 and (2) Defendants' performance pursuant to those same terms. As a bid protest challenge, these allegations are *directly* and *causally* linked to the issuance of TO 1.

The FASA task order bar is not limited to protests regarding the actual issuance or proposed issuance of a task order. Rather, Congress added the phrase

"in connection with" to expand the scope of the jurisdictional bar. *Mission Essential Pers., LLC v. United States*, 104 Fed. Cl. 170, 178 (2012) ("That the law must have a broader effect than simply blocking protests of task-order awards is made evident by the statutory use of the phrase 'in connection with' such awards"); *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 756 (2010) ("If Congress intended to bar [solely] protests involving the actual 'issuance' or 'proposed issuance' of a deliver order, then it could have drafted FASA accordingly. It did not."). If this Court were to adopt Percipient's reasoning, the phrase "in connection with" effectively would be read out of the statutory text. *See, e.g.* Pl. Br. at 36 (suggesting the intent of Congress was to "limit[] CICA protests of task order awards" ignoring the phrase "in connection with"); *see also id*. at 36-37 (stating, "[t]his further shows that Congress enacted § 3406(f) to limit competitors' ability to challenge the issuance and award of task orders," without giving meaning to "in connection with").

Percipient not only often omits the phrase "in connection with" in its arguments, but also suggests a narrow standard for determining applicability of the FASA task order bar. According to Percipient, in order "for a protest to be covered by the task order bar, the challenged action must either be the task order itself or an action on which the task order depends for its issuance." Pl. Br. at 30 (citing *DataMill*, 91 Fed. Cl. 740); *see also id*. at 32 (citing *Mission Essential*, 104 Fed.

Cl. at 178). Percipient's interpretation of the FASA task order bar not only is unsupported by the text of the statute, but also directly contradicts legislative intent. Nowhere does the text of FASA require that an agency's actions must "enable the issuance of the task order" in order for the bar to apply. *See, e.g.*, Pl. Br. at 32. If Congress intended for the bar to apply only to actions that precede the issuance of a task order – or to actions that somehow "enable" the issuance of a task order – it would have so drafted the jurisdictional bar. It did not. Congress chose to apply the bar expressly to actions made, at any time, "in connection with the issuance or proposed issuance" of a task order.

The Federal Circuit previously has explained that "[t]he statutory language of FASA is clear and gives the [Claims Court] no room to exercise jurisdiction over claims made '***in connection with*** the issuance or proposed issuance of a task or delivery order.'" *SRA Int'l, Inc.*, 766 F.3d at 1413 (emphasis added). Furthermore, "[e]ven if the protester points to an alleged violation of statute or regulation," as Percipient does here, "the court still has no jurisdiction to hear the case if the protest is ***in connection with*** the issuance of a task order." *SRA Int'l*, 766 F.3d at 1413 (emphasis added). "In other words, FASA confines the court's jurisdiction to adjudicate claims that challenge the underlying procurement vehicle, not any subsequent specific task order or award." *Innovative Mgmt. Concepts, Inc. v. United States*, 119 Fed. Cl. 240, 245 (2014) (citing *SRA Int'l*, 766 F.3d at 1413).

The CFC further has recognized that "[t]he FASA's reach is not restricted to protests that concern the 'issuance' or 'proposed issuance' of a delivery order." *DataMill*, 91 Fed. Cl. at 756. Rather, "Congress included in the statute the phrase 'in connection with,' which modifies the terms 'issuance' and 'proposed issuance,' and defined the specific types of protests that are unauthorized under the FASA." *Id*. Accordingly, "the phrase 'in connection with' encompasses those occurrences that have a direct and causal relationship to the 'issuance' or 'proposed issuance' of a delivery order." *Id*.

In *SRA International*, this Court recognized that FASA's ban is sweeping in scope and "effectively eliminates all judicial review for protests made in connection with a procurement designated as a task order." *SRA Int'l*, 766 F.3d at 1413; *see also 22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023) (recognizing "FASA's unambiguous language categorically bars jurisdiction over protests… 'in connection with the issuance of a task or delivery order.'"); *Harmonia Holdings Grp., LLC v. United States*, 156 Fed. Cl. 238, 243 (2021) ("The Federal Circuit has recognized the FASA protest bar as expansive and unyielding."). This Court has not held that a procurement decision must *predate* the issuance of a task order in order for the bar to apply. As described herein, Percipient's allegations have both a direct and causal connection to the issuance or proposed issuance of a task order to CACI under the SAFFIRE

Contract – if not for the issuance of TO 1 to CACI, Percipient would not have a challenge to bring before the CFC. Appx27.

1. Percipient's Challenges Relating to the Failure to Acquire or Incorporate its Mirage Product or Other Nondevelopmental Item into the SAFFIRE Procurement are Directly and Causally Connected to NGA's Decision to Issue TO 1.

Percipient's allegations that NGA failed to acquire, or failed to ensure CACI incorporated, "commercial products, or nondevelopmental items other than commercial products as components of items supplied to the agency" to the maximum extent practicable (Pl. Br. at 15, 38) are direct challenges to the decision to issue CACI a task order that did not dictate the use of any particular solution for the CV System.

As explained above, TO 1 required CACI to develop and deliver a CV System and to use COTS, GOTS, nondevelopmental items, Open Source, or even custom software in its design. Appx38; *see also* Appx480. The requirements to "develop" and "deliver" a complete CV System suite, of which Percipient asserts its Mirage product should be a part, is expressly contemplated by the TO 1 PWS. By arguing that NGA should have given Percipient a direct contract to perform the requirements needed to develop and deliver a CV System, rather than utilize the SAFFIRE Contract with CACI, Percipient is directly challenging NGA's decision to *issue* TO 1 to CACI. *See, e.g.*, Appx226 (in making "[t]he decision to favor

CACI's development solution over Percipient's commercial item solution, NGA resolved a putative competition between its contractor CACI and Percipient in a manner that violates § 3453 and associated regulations."). There can be no more a direct challenge to the issuance of a task order than a challenge to the decision directing a prime contractor to perform work the protester believes should have been set aside for itself. *See, e.g.*, *DataMill*, 91 Fed. Cl. at 756 ("An agency's underlying decision to procure goods or services without competition through a delivery order has a direct and causal relationship to the 'issuance' or 'proposed issuance' of the delivery order that the agency ultimately utilizes to effectuate the procurement.").

That Percipient alleges the protested conduct in question occurred *after* issuance of TO 1 does not break the causal connection or alter the breadth of the FASA task order bar. Percipient's argument that NGA should have dictated certain analyses and/or directed CACI to use a commercial product beyond the terms of the task order, also does not break the causal connection. The decision to issue a task order that leaves these decisions to the awardee in the first instance is directly and causally connected to the issuance or proposed issuance of the actual task order. Percipient has cited no case law at the Federal Circuit supporting a holding that procurement decisions made after task orders have been issued are not subject to the FASA task order bar.

The lone CFC case Percipient relies upon for this contention, *MORI Associates, Inc. v. United States*, 113 Fed. Cl. 33 (2013), is inapposite. The court in *MORI* cited to two cases at the CFC to support this sweeping conclusion – both of which have been overtaken by CFC precedent. First, *MORI* relies on *Global Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350 (2009), to support the statement that the FASA task order bar does not apply to task order modifications. But as the court in *DataMill,* 91 Fed. Cl. 740 (2010) explained, such reliance is misplaced. The *Global Computer* decision did not "interpret the scope of the phrase 'in connection with' because its analysis of the FASA was limited to determining whether the issuance, without competition, of task order modifications was encompassed by the terms 'issuance' or 'proposed issuance' of a task order." *DataMill*, 91 Fed. Cl. at 754. Additionally, "decisions following *Global Computer* have distinguished that case based on its unique facts and have affirmed the wide breadth of FASA's protest bar for any protest 'in connection with' the issuance of a task or delivery order," including the issuance of task order modifications. *Akira Techs., Inc. v. United States*, 145 Fed. Cl. 101, 107 (2019) (holding that protester's "challenge to CMS' decision to sole source the migration work required in the IDIQ contract to C-HIT through a task order modification is a protest in connection with the issuance of a task order and thus falls within the FASA's protest bar."); *see also, e.g.*, *DataMill*, 91 Fed. Cl. 740 (holding protester could not circumvent

the FASA bar by conceptually protesting the decision to make a sole source award as separate from issuance of the task order doing so); *Insap Servs., Inc. v. United States*, 145 Fed. Cl. 653, 655 (2019) (bundling services prior to a task order solicitation is in connection with the task order).

Additionally, the *MORI* court's reliance on *Distributed Solutions* to demonstrate the bar does not apply to "the use of an already-issued task order to obtain products and services through subcontracts," also is immaterial. 113 Fed. Cl. at 38; Pl. Br. at 33. As this Court explained in *SRA International*, the *Distributed* opinion "did not discuss FASA," because the protest did not involve a challenge under the task order bar. *SRA Int'l*, 766 F.3d at 1412. Thus, the *MORI* court's sweeping statement that *Distributed* foreclosed challenges to actions occurring after the issuance of a task order was rejected by this Court in *SRA International*.

Throughout its arguments, Percipient attempts to read a temporal restriction into Section 3406(f) that does not exist in the statutory language. *See, e.g.*, Pl. Br. at 33 (citing *SRA Int'l*, 766 F.3d at 1413). FASA does not require the action protested occur before the issuance of the task order for the bar to apply. The fact that a protester claims the challenged action occurred after the task order was issued does not disconnect the allegation from being in connection with the

issuance of a task order – particularly when the action was expressly contemplated and permitted under the terms of the task order.

Moreover, the only "temporal disconnect" between the relevant procurement decision and the issuance of a task order in this case was artificially created by Percipient's decision to wait two years to file a bid protest. NGA made the "procurement decision" in question when it issued TO 1 to CACI, directing CACI to develop and deliver a CV System and to use commercial or nondevelopmental items in its design, with Government approval, without directing CACI to procure a specific commercial CV product. Appx38; *see also*, *e.g.*, Appx471, Appx480. NGA issued TO 1 in January 2021. *See, e.g.*, Appx24. That Percipient waited *two years* to bring a bid protest only after its attempts to circumvent competition requirements and intimidate NGA into awarding Percipient a directed contract for the Mirage offering does not exempt Percipient's challenges from the task order bar.

Furthermore, many of the cases on which Percipient relies to demonstrate jurisdiction are factually distinguishable. For example, Percipient's reliance on Rule of Two cases is misplaced where all such cases occur in the vacuum of being decided pre-award, in connection with an agency cancellation decision, and ultimate issuance of a separate task order without consideration of the Rule of Two. *See, e.g.*, *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70 (2020) (pre-

award bid protest sustained where challenge ultimately was to decision to cancel prior procurement); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503 (2011) (same).

Percipient's reliance on other pre-award challenges also do not support jurisdiction where Percipient directly challenges the award of TO 1 to CACI, not some decision NGA made back in 2020 or 2021. The court's decision in *McAfee, Inc. v. United States*, 111 Fed. Cl. 696 (2013), for example, was predicated on the pre-award challenge to the Government's decision to use a sole source contract, rather than compete the requirements, not the ultimate issuance of a task order. *See also*, *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300 (2008) (pre-award challenge to an allegedly improper sole-source procurement conducted via task order).

In all of these cases, plaintiffs ultimately were protesting, pre-award, a decision made by the agency that restricted competition through cancelling a procurement or pursuing a sole source contract, not the eventual issuance of a task order. Percipient has made no such allegations here. In fact, Percipient repeatedly has alleged it is *not* challenging any conduct that occurred prior to the issuance of TO 1, but rather the "violations by NGA that occurred over the course of its performance." Pl. Br. at 34; *id*. at 24. Accordingly, none of these pre-award protest

cases support CFC jurisdiction here, where Percipient directly challenges the issuance of a task order to CACI, and not NGA decisions pre-award.

Despite Percipient's best attempts to overly complicate this case, the facts, as they relate to the question of the CFC's jurisdiction in light of the FASA task order bar, actually are quite straightforward:

- NGA issued the SAFFIRE Solicitation in January 2020. Appx783.
- Percipient did not submit a response to the SAFFIRE Solicitation. Pl. Br. at 10; Appx24.
- NGA awarded an IDIQ contract to CACI in January 2021, requiring CACI to provide the requested SOM and CV System components to support NGA's needs. *E.g.*, Appx70.
- NGA made the decision to issue CACI a task order in January 2021 to, *inter alia*, develop and deliver a CV System. Appx24; Appx470; Appx471; Appx479-83.
- Percipient believes it has a commercially available offering that could satisfy NGA's CV System requirements. Pl. Br. at 2, 8, 14.
- Percipient believes it should have been awarded a direct contract or subcontract to provide its commercial CV System. Pl. Br. at 15; *see also, e.g.*, Appx226.
- CACI evaluated the Mirage system and provided the results to NGA. Appx967.

Percipient's protest is a clear, obvious, and direct challenge to NGA's decision to issue CACI a task order to provide the CV System as part of an

integrated contractual effort. A protest of this decision falls within the FASA task order bar.

2. Percipient's Challenges Relating to the Terms of TO 1 are Directly and Causally Connected to the Actual Issuance of TO 1 to CACI.

CACI was instructed to consider the use of COTS and GOTS throughout the design phase of TO 1 (Appx38; Appx480). Percipient concedes CACI considered commercial and nondevelopmental items. *See* Pl. Br. at 18. Percipient only disagrees with CACI's ultimate conclusions of whether those COTS and nondevelopmental items met the requirements of the overall CV System solution. *Id*.; *see also* Appx963-68. Not only was CACI directed to evaluate COTS and GOTS offerings, but CACI's IDIQ contract also incorporates FAR 52.210-1, Market Research, which requires CACI "[b]efore awarding subcontracts for other than commercial acquisitions" to conduct market research and determine if commercial products are available to meet NGA's needs under the SAFFIRE Contract. *See, e.g.*, Appx792 (Solicitation); 48 C.F.R. § 52.210-1. Similarly, the SAFFIRE Contract incorporated FAR 52.244-6, Subcontracts for Commercial Products and Commercial Services, which again directed CACI to incorporate commercial offerings "as components of items to be supplied under this contract," to the "maximum extent practicable." 48 C.F.R. § 52.244-6(b); *see also* Appx797; Appx857. In performing TO 1, CACI was thus directed to consider the

incorporation and use of both commercial and nondevelopmental items, such as GOTS, but was at no point *required* to procure a particular COTS CV System. Appx38; Appx480.

Percipient's claims reflect clear concerns with the suitability and sufficiency of these requirements in fulfilling both NGA's and CACI's obligations under 10 U.S.C. § 3453, as well as CACI's performance pursuant to these requirements. Pl. Br. at 15 (NGA violated Section 3453 "by failing to take appropriate steps to ensure that its contractor has engaged in such market research as may be necessary…"); Pl. Br. at 25 ("NGA's decision and award of a contract to procure a CV System triggered the duties to ensure that its contractor procured commercial products and conducted necessary market research."). Percipient thus raises concerns that either (1) the terms *of the task order* were insufficient to ensure CACI considered and incorporated commercial products into its performance efforts, or (2) CACI failed to perform to the requirements *in the task order*. In either event, this necessarily amounts to a challenge in connection with the issuance of CACI's task order. *E.g.*, *22nd Century Techs.*, 57 F.4th 993 (challenge to the alleged failure to require offerors to re-certify size status in task order is barred by FASA).

Percipient's allegation that NGA failed to ensure its prime contractor incorporated commercial products to the maximum extent practicable in

performance of its obligations under TO 1 (Pl. Br. at 37-38, 47) is a direct challenge to the sufficiency of the terms NGA incorporated into TO 1 instructing CACI to consider the use of commercial products. Further, by challenging the adequacy of CACI's market research under TO 1 (Pl. Br. at 18), and the adequacy of CACI's incorporation of commercial offerings under TO 1 (Pl. Br. at 15), Percipient again is raising a challenge directly connected to CACI's performance under TO 1. As explained in Section IV of the Argument, *infra*, if this Court were to find such challenges are not barred by the FASA task order bar, they necessarily would fall outside the CFC's protest jurisdiction as clear and obvious challenges to contract administration.

3. <u>Percipient's Challenges Relating to NGA's Perceived Failures to Conduct or Require CACI to Conduct Adequate Market Research are Inextricably Linked to the Issuance of TO 1</u>.

Percipient further argues that NGA (and by extension, CACI) failed to conduct adequate market research as required by Section 3453. *See* Pl. Br. at 15-16. As discussed in Sections III.B.1-2 of the Argument, *supra*, challenges to the sufficiency of CACI's market research are directly and causally linked to the terms of TO 1, and CACI's performance thereunder, and are thus necessarily barred by FASA. But Percipient challenges more than CACI's conduct – it also alleges that NGA has failed to conduct adequate market research. *See, e.g.*, Appx39 ("Further, NGA has done this without itself conducting or requiring its contractor to conduct

whatever market research or further evaluation it claims is necessary…"); Pl. Br. at 15 (Percipient's Complaint challenges "the agency's failure to ensure that it or its contractor procure commercial or nondevelopmental items and conduct the necessary market research into the availability of such items to meet SAFFIRE's CV System requirements."); Pl. Br. at 26 ("Section 3453 and related statutory and regulatory requirements impose ongoing obligations on the agency throughout the procurement to ensure…that agencies and their contractors…conduct necessary market research."); Pl. Br. at 37 ("These obligations do not cease when a task order is issued…Instead, they are defined with reference to whether the agency makes required determinations using market research…"). Percipient has downplayed these allegations for fear its protest would be seen as an untimely challenge to pre-award conduct. But both the Complaint and text of Section 3453 make clear that allegations involving NGA's market research again are inextricably connected to the issuance of a task order.

By stating it is not protesting the terms of the SAFFIRE Solicitation or subsequent award to CACI, Percipient concedes there is no dispute that NGA met its market research obligations under Section 3453(c)(1) prior to releasing the SAFFIRE Solicitation and TO 1. *See, e.g.*, Pl. Br. at 24, 34. In order to challenge the sufficiency of NGA's market research, then, Percipient is left with a challenge to the sufficiency of the steps the agency took to ensure its contractor conducted

"such market research as may be necessary to carry out the requirements of subsection (b)(2) before making purchases for or on behalf of the Department of Defense." Appx96-97. Here, a key step taken was the incorporation of FAR 52.210-1, Market Research, and FAR 52.244-6, Subcontracts for Commercial Products and Commercial Services into the SAFFIRE Contract. *See, e.g.*, Appx792; Appx797; Appx857. Among other requirements, CACI thus was directed (1) "[b]efore awarding subcontracts for other than commercial acquisitions" to conduct market research to determine if commercial products are available to meet the agency's requirements (48 C.F.R. § 52.210-1); and (2) to incorporate commercial products and nondevelopmental items "as components of items to be supplied under this contract," to the "maximum extent practicable." (48 C.F.R. § 52.244-6(b)).

In other words, Percipient's Complaint clearly challenges the steps NGA took in TO 1 to ensure CACI would conduct market research, which is clearly in connection with the issuance of a task order. Here, Percipient is challenging the Agency's imposition of the requirement for market research as set forth in the SAFFIRE Contract and TO 1, which is directly connected to the issuance of TO 1. As in *22nd Century Technologies*, the "challenged action" – NGA's alleged failure to impose additional obligations on CACI to conduct market research in TO 1 – is directly and causally connected to the issuance of TO 1.

4. Percipient's Argument that the Hypothetical Issuance of a Future Task Order Could Increase the Scope of the IDIQ Contract is Speculative and Immaterial.

Percipient argues the "hypothetical" issuance of a hypothetical future task order could hypothetically increase the scope of the SAFFIRE IDIQ Contract, and therefore its protest is beyond the FASA task order bar. Pl. Br. at 49-50. Percipient's speculative protest ground is simply a threatened challenge to something that has not happened, *i.e.*, a future task order issued to CACI approving some further "decision" to develop the remaining CV System requirements in-house – as opposed to procuring a commercial or nondevelopmental option. Percipient assumes this hypothetical "decision" would violate the requirements of Section 3453(c)(1)(C) to conduct adequate market research prior to the issuance of a task order. In other words, Percipient is conceding, again, that the conduct of market research is directly and causally connected to the proposed issuance of that hypothetical order.

Further, Percipient suggests such a hypothetical task order essentially would codify the decision not to incorporate other commercial products into the CV System development, which Percipient alleges is being done in contravention of Section 3453(b)(2). Pl. Br. at 50. While entirely speculative, this too demonstrates the direct and causal relationship to the proposed issuance of a future task order, again barred by FASA.

### C. Percipient's Construction of Section 3453 Would Produce an Absurd and Unconscionable Result Where Section 3453 Does Not Expand the Court's Bid Protest Jurisdiction or Limit the Scope of the FASA Task Order Bar.

Percipient states its position regarding Section 3453 on page 26 of its Brief: "Section 3453 and related statutory and regulatory requirements impose ***ongoing*** obligations on the agency ***throughout procurements*** to ensure, 'to the maximum extent practicable' that agencies and their contractors procure commercial products and conduct necessary market research." Pl. Br. at 26 (emphasis added). It then extrapolates that this must mean it has an unfettered right to protest agency actions that occur throughout performance. Percipient's construction is wrong as a matter of statutory interpretation, and unfeasible as a matter of procurement practice.

10 U.S.C. § 3453 does not provide a broad, sweeping blank check for a third party selling commercial products to use the CFC's bid protest jurisdiction to challenge alleged non-compliances throughout the entire life cycle of a government contract. Section 3453 neither expanded the scope of the CFC's bid protest jurisdiction under the Tucker Act (28 U.S.C. § 1491(b)(1)), nor placed limitations on the scope of FASA's task order bar. Section 3453 creates no independent cause of action nor potential remedy for violations. As explained by the CFC in connection with the Cargo Preference Act "even if the Government failed to comply with the Act, the court has no jurisdiction to set aside the contract

at issue on the basis alone." *Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 545 (2008). Jurisdiction, if it exists here, only can be found within the confines of the Tucker Act (29 U.S.C. § 1491(b)(1)) as further limited by FASA, or the Contract Disputes Act of 1978 (the "CDA") (41 U.S.C. §§ 7101-09) (discussed in Section IV of the Argument, *infra*).

Furthermore, reading Section 3453 in such a broad manner would create an absurd result, requiring agencies perpetually to defend against protests during contract performance where there is a potential review of commercial alternatives after awarding a contract, or whenever a commercial vendor asserts it has built a better mousetrap – even if it did not participate in the underlying solicitation.[6] That is, whenever a commercial product or solution somehow – in terms of performance, cost, or state of deployment – allegedly is superior to that which the agency is receiving or will receive under an awarded contract, the agency must "stop the presses," placing contract performance on hold and disrupting performance while it evaluates a potential commercial alternative. During this hiatus, the agency – according to Percipient – would need to evaluate the produced product or solution without regard to any other consequences.

---

[6] The admonition of the Supreme Court regarding the test for patentability is apt here: "He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Office." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 19 (1966).

A favorable review (exactly what evaluation criteria would apply for that determination is left to the imagination) then would trigger a chain reaction, starting with modification of the contract to eliminate the terms for the original (now inferior) product or solution, negotiation of changes with the contractor, negotiation of a sole source subcontract with the commercial vendor, and revision to the performance schedule. And the agency would do this without regard to the collateral consequences of this disruption, including urgency of completion, cost increases, changes to other components of the contract caused by the substitution, value of the change to the performance, and related aspects of performance. In other words, Percipient would have Section 3453 trump all other statutory, regulatory, and contractual provisions governing post-award contract performance. That, CACI respectfully submits, is an absurd result.

It is impossible to believe that Congress, in adopting Section 3453, intended to create such a bewildering and opaque process that could cause contract performance to grind to a halt. Solicitation requirements that flow into an awarded contract as requirements would become meaningless, as during performance the contract requirements are subject to ceaseless change, particularly when spurred by a bid protest by a commercial vendor. Percipient's wished-for construct would impose on agencies an endless quest for commercial substitutes at the expense of all other considerations. Percipient's approach would allow commercial vendors to

sit out competitive procurements, but then throw sand in the gears of contract performance with claims of the proverbial better – or even just commercial – mousetrap. And if those efforts are unsuccessful, then the commercial vendor could protest that agency decision. This state of affairs, Percipient submits, flows inexorably from the primacy of 10 U.S.C. § 3453. This statute, so the theory goes, requires ceaseless agency review **during contract performance** of the content of every government contract. Significantly, this theory has eluded Congress, government agencies and – most of all – disgruntled contractors, since Section 3453's implementation almost thirty years ago.

It is well established that the Court should avoid a statutory construction that produces absurd results. *See Sebelius v. Cloer*, 569 U.S. 369, 377 n.4 (2013); *McNeill v. United States*, 563 U.S. 816, 822 (2011); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 245-46, 252 (2010); *United States v. Turkette*, 452 U.S. 576, 580 (1981); *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940); *Holy Trinity Church v. United States*, 143 U.S. 457, 460 (1892); *Frazier v. McDonough*, 66 F.4th 1353, 1358 (Fed. Cir. 2023); *Dupuch-Carron v. Sec'y of Health & Human Servs.*, 969 F.3d 1318, 1329-30 (Fed. Cir. 2020); *Pitsker v. Off. of Pers. Mgmt.*, 234 F.3d 1378, 1383-84 (Fed. Cir. 2000). Rather than accept Percipient's invitation to compete with Rube Goldberg in crafting complicated things to perform simple tasks, the Court should adopt a construction of Section

3453 that is consistent with the language of the statute and the universe of government procurement statutes and regulations. *Dupuch-Carron,* 969 F.3d at 1330 ("When construing a statutory term or phrase to avoid an absurd result, or when the term or phrase is "ambiguous," it "must be read in [its] context and with a view to [its] place in the overall statutory scheme." (citations omitted)).

Properly understood, protest challenges relating to an agency's perceived failures under Section 3453 are limited to the pre-award performance period, which this Court and the CFC have effectively recognized in *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, *aff'd* 904 F.3d 984 (Fed. Cir. 2018) and *mLINQS LLC v. United States*, No.22-1351, 2023 WL 2366654 (Fed. Cl. Mar. 6, 2023).

In *Palantir*, plaintiff brought a *pre-award* protest alleging that the Army failed to perform its legal obligations under FASA to determine whether the Army's needs could be met by the use of commercial products *before issuing the solicitation in question*. *Palantir*, 129 Fed. Cl. at 221. Although the court in *Palantir*, and later this Court, understandably held that Section 3453 could be raised in a protest when directly challenging a solicitation pre-award, neither the CFC nor this Court held that Section 3453 creates an independent cause of action and jurisdiction outside the statutory grant of authority – as Percipient has asked the CFC and this Court to do in this matter. Rather, *Palantir* merely confirms the utterly unsurprising proposition that an agency's solicitation must adhere to

applicable statutes, and that a failure in this regard is challengeable by an offeror, or potential offeror, because it is *in connection with* a then-existing procurement.

Percipient also places unreasonable emphasis on passing statements made in *mLINQs* for the sweeping proposition that "courts have recognized that determinations made pursuant to 10 U.S.C. § 3453 are analytically distinct from the issuance of task orders even where, unlike here, the violations preceded the issuance of the task order." Pl. Br. at 39. Even assuming that the CFC in *mLINQS* correctly found jurisdiction, the case, again, is factually distinguishable from Percipient's claims. The plaintiff in *mLINQS* brought a *pre-award* protest challenging the Air Force's decision to cancel a Request for Proposals, instead issuing a task order without conducting either a Rule of Two analysis or commercial market research. *E.g.*, *mLINQS* at *1. The CFC in *mLINQS* relied primarily on the holdings in *BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493 (2012), *MORI*, 102 Fed Cl. 33, and *Tolliver*, 151 Fed. Cl. 70, in reaching its conclusion, recognizing that in all three "the relevant agencies cancelled solicitations and proposed to procure or procured the services under a different procurement vehicle involving task orders." *mLINQS* at *15. According to the CFC, in those cases, the protests predominantly related to the decision to cancel solicitations, which courts have confirmed "can be 'a discrete procurement decision and one which could have been the subject of a separate protest.'" *Id.*

(quoting *BayFirst Sols.*, 104 Fed. Cl. 493). Again, as in *Palantir*, the plaintiff in *mLINQS* brought its challenges pre-award. *See generally*, *mLINQS*, 2023 WL 2366654.

Accordingly, both cases relied on by Percipient to draw sweeping conclusions that violations of Section 3453 can be protested *at any time* through contract performance, even by entities that did not participate in the underlying procurement, are cases that involved challenges to the sufficiency of agency market research required to be conducted *pre-solicitation* and *pre-award*. NGA made its decision to procure the integrated CV System platform when it issued the SAFFIRE Solicitation. NGA did not specify the CV System had to be a commercial product (as the plaintiffs alleged in *Palantir* and *mLINQS*), and Percipient did not challenge the terms of the Solicitation – and, in fact, has repeatedly conceded so. *See, e.g.*, Appx238. It was not until years after NGA made the decision to issue TO 1 to CACI that Percipient alleged in court that Defendants failed to conduct adequate market research. Pl. Br. at 15, 24, 25, 26; Appx39. Percipient's Complaint thus places its market research allegations in direct connection with the issuance of this task order,[7] and not NGA's actions prior to

---

[7] Count Two of Percipient's Complaint directly raises challenges under 10 U.S.C. § 3453(c)(1)(C), requiring NGA to "conduct market research appropriate to the circumstances…before awarding a task or delivery order in excess of the simplified acquisition threshold." Appx96 (Complaint) (ellipses in original).

issuing the SAFFIRE Solicitation. As a clear and direct challenge to the issuance of a task order, Percipient's protest is thus barred under FASA.

The CFC's protest jurisdiction is confined by the waiver of sovereign immunity under the Tucker Act (28 U.S.C. § 1491(b)(1)), and further restricted by the FASA task order bar (10 U.S.C. § 3406(f)). If Congress intended any private, third-party, non-bidder entity to be able to raise bid protest allegations any time it disagreed with an agency's decision regarding the use of commercial items during the performance of a contract, it would have so stated in the text of 10 U.S.C. § 3453. Congress did not take this approach. Thus, an alleged failure to comply with 10 U.S.C. § 3453 alone is thus insufficient to independently grant the CFC bid protest jurisdiction or thwart the FASA task order bar.

### D. Percipient Failed Adequately to Allege that TO 1 Exceeds the Scope of the SAFFIRE Contract.

Despite Percipient's best efforts to muddy the facts of this case, the CFC correctly held that TO 1 "directed CACI to develop and deliver a computer vision system." Appx26. As explained *supra*, both the SAFFIRE Contract and TO 1 contemplated CACI's role in the development and delivery of the CV System and CACI's obligation to conduct market research into the use of commercial and

nondevelopment items. *See* Section III.B. of the Statement of the Case, and Section III.B.1 of the Argument *supra*.[8]

Percipient has failed to demonstrate how a task order, even a hypothetical task order, permitting CACI to do the very work stated in its SAFFIRE Contract would encompass "materially different duties" or "significantly alter[] the type of work to be performed under the contract." Pl. Br. at 50 (quoting *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559 (2004)). In fact, Percipient has failed to cite a single relevant case in support of this argument. The one lone case upon which it relies, *CW Government Travel*, is a CDA case involving a dispute over improper modifications beyond the scope of a contract completely unrelated to the issues in this matter.

Rather, the situation here is more akin to the CFC's decision in *Trident Technologies, LLC v. United States*, 118 Fed. Cl. 430 (2014). In *Trident*, the protester brought a post-award bid protest challenging the Navy's decision to issue

[8] Percipient claims that the inclusion of a draft of the TO 1 PWS with the SAFFIRE Solicitation shows that the FASA task order bar is immaterial. *See, e.g.*, Pl. Br. at 48 (citing *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309 (2009)). Percipient is wrong. In *Fluor Intercontinental*, the CFC held the FASA bar did not apply where the protests related to "disputes over the evaluation of offerors for the award of [IDIQ] contracts, not disputes in future task orders." 147 Fed. Cl. at 316. Here, Percipient repeatedly has made clear it is not challenging the SAFFIRE Solicitation or award to CACI, but rather the Defendants' performance under the SAFFIRE Contract and requirements in TO 1.

task order modifications. The CFC found it lacked jurisdiction under FASA because the issuance of such modifications did not alter the scope, period, or maximum value of any of the contracts: "The scope of the contract remained at all times an agreement to provide meteorological support services, both before and after the Navy's issuance of the new task orders." 118 Fed. Cl. at 433. Similarly here, the scope of the SAFFIRE IDIQ Contract always included the requirement to provide a CV System and always required CACI to evaluate and consider commercial products, in addition to nondevelopmental items, in designing and developing the software solution. No action of NGA or CACI has changed that scope.

Accordingly, because Plaintiff's allegations relate directly to the issuance or proposed issuance of a task order and Plaintiff has failed adequately to allege facts that any task order does or would increase the scope, period, or maximum value of the master contract, this case must be dismissed. *See Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452, 462 (2008) ("If 'the [IDIQ] contract itself has been obtained through full and open competition'…a protest of a task order issued under an IDIQ contract is only authorized if it alleges that a task order 'increases the scope, period, or maximum value of the [master IDIQ] contract under which the order is issued.'").

## IV. Even if the Task Order Bar Did Not Apply, the CFC's Ruling Should be Affirmed on Alternative Grounds Because the CFC Lacks Bid Protest Jurisdiction Over Contract Administration Claims.

Even assuming, for the sake of argument, that Percipient's protest is not barred by the FASA task order bar, there are other, independent legal bases upon which to uphold the CFC's ruling to dismiss Percipient's protest.[9] Primary among these arguments is the clear evidence – including Percipient's own admissions – demonstrating that this case, although brought under the guise of a bid protest, is nothing more than a challenge to NGA's administration of the SAFFIRE Contract brought by a mere disappointed vendor, who chose not to participate in the procurement. In other words, Percipient is asking this Court to call its Complaint a "bid protest," despite the contract being awarded over two years ago, despite Percipient not participating in the competition, despite Percipient not protesting the terms of the Solicitation or award to CACI, and despite Percipient challenging NGA's and CACI's performance under TO 1. However the issue is framed, the CFC does not have bid protest jurisdiction to hear this matter.

---

[9] These arguments were fully briefed at the CFC during the initial motion to dismiss phase. Appx163-70; Appx191-97; Appx231-38; Appx256-63; Appx283-87. Though Defendants' motions initially were denied (*see, e.g.*, Appx1-14), the CFC's opinion was vacated in its entirety on April 27, 2023. Appx32. Because these arguments present an alternative ground for affirming CFC's judgment dismissing Percipient's case, a cross-appeal is unnecessary and improper. *Bailey v. Dart Container Corp. of Michigan*, 292 F.3d 1360, 1362 (Fed. Cir. 2002).

At best, Percipient's challenge is to the Defendants' administration of the SAFFIRE Contract, including TO 1. The SAFFIRE Contract was awarded to CACI over two years ago. TO 1 was awarded to CACI over two years ago, and CACI has been performing its contractual obligations under TO 1 for over two years. The conduct challenged by Percipient relates to CACI's performance of TO 1 and the NGA's administration of the SAFFIRE Contract and its task orders.

It is well settled law that the CFC lacks protest jurisdiction over issues of contract administration. *See Int'l Genomics Consortium v. United States*, 104 Fed. Cl. 669, 678 (2012) (citing *Alliant Techsys., Inc. v. United States*, 178 F.3d 1260, 1264-65 (Fed. Cir. 1999); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1445-47 (Fed. Cir. 1997)). Once a contract has been awarded, any disputes relating to the performance of the contract itself fall outside the CFC's protest jurisdiction and instead are governed by the CDA. *See* 41 U.S.C. §§ 7101-09; *Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 770 (2014) (holding protester's challenge was not within the Court's protest jurisdiction, "but instead involves questions of contract administration that must be brought under the CDA."); *see also Int'l Genomics Consortium*, 104 Fed. Cl. at 678 (citing *Alliant Techsys., Inc.*, 178 F.3d at 1264–65).

Percipient alleges Defendants failed to comply with their contractual obligations to conduct market research and, ultimately, to procure commercial

products "to the maximum extent practicable." Pl. Br. at 2, 15, 31. As explained in detail above, both the SAFFIRE Contract and the TO 1 PWS required CACI to evaluate and consider commercial products, in addition to nondevelopmental items, in providing an integrated solution under the SAFFIRE Contract. CACI's contract even incorporates FAR 52.210-1, Market Research, which requires CACI "[b]efore awarding subcontracts for other than commercial acquisitions" to conduct market research to determine if commercial products are available to meet the agency's requirements. Appx792 (Solicitation); 48 C.F.R. § 52.210-1. Additionally, FAR 52.210-1 requires CACI to consider "the extent to which commercial products…could be incorporated at the component level." 48 C.F.R. § 52.210-1; *see also* 48 C.F.R. § 52.244-6.

Whether CACI complied with these obligations – including whether CACI conducted market research (Pl. Br. at 15), and whether CACI's market research was reasonable and/or sufficient (Pl. Br. at 18) – are matters of contract administration. Percipient's protest seeks judicial review and interpretation of the terms of TO 1 issued under the SAFFIRE Contract, and, ultimately, a determination of whether CACI's performance and NGA's assessment thereof were reasonable and consistent with the terms of TO 1. This is a clear-cut case of contract administration, over which the CFC lacks bid protest jurisdiction.

## CONCLUSION

It is clear that each of the actions Percipient challenges in its "bid protest" were taken in connection with the issuance or proposed issuance of a task order. As a result, the CFC lacked jurisdiction over Percipient's claims either pursuant to the FASA task order bar, or because Percipient challenges issues of contract administration that fall beyond the CFC's bid protest jurisdiction. Accordingly, the judgement of the CFC should be affirmed.

Respectfully submitted,

Dated: July 24, 2023

____/S/ Anne B. Perry__________________

ANNE B. PERRY
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
E-Mail: aperry@sheppardmullin.com
*Attorney of Record for CACI, Inc. – Federal*

*Of Counsel*:
Jonathan S. Aronie
Townsend L. Bourne
Ariel E. Debin
Lillia Damalouji
*Attorneys for CACI, Inc. - Federal*

## CERTIFICATE OF COMPLIANCE

1. This Brief complies with the type-volume limitation of the FRAP 32(a)(7), as amended by Fed. Cir. R. 32(b), because:

> This Brief contains 11,910 words and less than 1,300 lines of text, excluding exempted parts of the Brief. In making this certification, I have relied upon the word count function in Microsoft Word.

2. This Brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) because:

> This Brief has been prepared in proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

Dated: July 24, 2023

/s/ Anne B. Perry

ANNE B. PERRY
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
E-Mail: aperry@sheppardmullin.com
*Attorney of Record for CACI, Inc. – Federal*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with the United States Postal Service for delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated: July 24, 2023

/S/ Anne B. Perry

ANNE B. PERRY
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
E-Mail: aperry@sheppardmullin.com
*Attorney of Record for CACI, Inc. – Federal*