# United States Court of Appeals for the Federal Circuit

———————————

**PERCIPIENT.AI, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, CACI, INC.-FEDERAL,**
*Defendants-Appellees*

———————————

2023-1970

———————————

Appeal from the United States Court of Federal Claims in No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink.

———————————

Decided: June 7, 2024

———————————

SAMUEL CHARLES KAPLAN, Boies Schiller Flexner LLP, Washington, DC, argued for plaintiff-appellant. Also represented by HAMISH HUME, ERIC J. MAURER, GINA ALICIA ROSSMAN.

RETA EMMA BEZAK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, CORINNE ANNE NIOSI.

ANNE PERRY, Sheppard Mullin Richter & Hampton LLP, Washington, DC, argued for defendant-appellee

CACI, Inc.-Federal.  Also represented by JONATHAN SCOTT
ARONIE, TOWNSEND BOURNE, LILLIA JO DAMALOUJI, ARIEL
ELIZABETH DEBIN.

---

Before TARANTO, CLEVENGER, and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Dissenting opinion filed by *Circuit Judge* CLEVENGER.

STOLL, *Circuit Judge*.

This case principally involves the question of whether
a prospective offeror of commercial items to a government
contractor may bring an action against the Government for
alleged procurement-related statutory violations under the
Tucker Act, 28 U.S.C. § 1491(b)(1) (allowing suit by "inter-
ested party objecting to . . . any alleged violation of statute
or regulation in connection with a procurement or a pro-
posed procurement"), where the allegations do not chal-
lenge a contract, proposed contract, or solicitation for a
contract between the Government and its contractor or the
issuance of a task order under such a contract.  Percipi-
ent.ai, Inc. appeals the decision of the United States Court
of Federal Claims granting the Government's and interve-
nor CACI, Inc.-Federal's (collectively, "Defendants") mo-
tions to dismiss for lack of subject matter jurisdiction under
Rule 12(b)(1) of the Rules of the U.S. Court of Federal
Claims.  The trial court erred in holding that the Federal
Acquisition Streamlining Act of 1994 (FASA) task order
bar, 10 U.S.C. § 3406(f)(1), applies to Percipient's protest,
thereby removing the case from coverage by the Tucker
Act.  Separately, we reject Defendants' alternative argu-
ments for affirming the trial court, which are based on the
Tucker Act itself, standing, and timeliness.  We thus re-
verse and remand.

BACKGROUND

The National Geospatial-Intelligence Agency (NGA) provides intelligence data to the federal government by analyzing images and geospatial information. NGA issued a solicitation, referred to as SAFFIRE, to sustain and improve its processes for obtaining and storing visual intelligence data, and integrating those capabilities with computer vision (CV), a form of artificial intelligence.[1] Percipient's complaint sets forth the relevant facts.

SAFFIRE sought a single award Indefinite Delivery, Indefinite Quantity (IDIQ) contract. This type of contract "allows an agency to issue a broad solicitation for a general procurement goal and then more detailed solicitations for individual task orders as specific needs arise." *See, e.g.*, *22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 996 (Fed. Cir. 2023). The SAFFIRE solicitation required, broadly, (1) "an enterprise repository backbone for storing, managing, and disseminating data," known as "SOM Enterprise Repository" or "SER"; and (2) a user-facing CV System. J.A. 38–39 ¶ 6. Task Order 1, solicited simultaneously with the SAFFIRE solicitation, directed the contractor to, among other things, develop and deliver the CV suite of systems. The NGA awarded both the SAFFIRE contract and the Task Order 1 to CACI.

Percipient offers a commercial CV platform, "Mirage," that could meet NGA's CV System requirements. But Percipient was unable to meet the SER component of the SAFFIRE solicitation. It also expected NGA and CACI to

---

[1]    The facts are largely taken from Percipient's complaint. When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016).

comply with 10 U.S.C. § 3453, which establishes a preference for commercial services, and consider Mirage for the CV System. With these expectations, Percipient did not bid for the SAFFIRE contract or challenge the SAFFIRE solicitation or award.

Percipient contacted NGA and explained that "in addition to being legally required [to consider commercial products under § 3453], using commercial software [like Mirage] would save hundreds of millions of dollars[ and] allow immediate mission impact potentially years ahead of government developed software." J.A. 71–72 ¶ 91. It also requested a meeting to discuss why NGA "appeared to be pursuing the development of government software without a thorough test and evaluation process of commercially available software." *Id.* NGA informed Percipient that if it wanted to take part in SAFFIRE, it could contact CACI. At the resulting meeting, Percipient asked CACI to evaluate Mirage for SAFFIRE and CACI responded: "That ship has sailed." J.A. 72 ¶ 93. Percipient then asked NGA to independently evaluate Mirage as a commercial solution for SAFFIRE's CV System. NGA confirmed that commercial products would be evaluated once CACI finished reviewing NGA's legacy system and that the "that ship has sailed" statement was an "unfortunate miscommunication." J.A. 74 ¶¶ 98–100.

About two months later, Percipient demonstrated Mirage to CACI, received positive feedback, and was told that CACI should do a more technical "deep dive" into Mirage— an analysis that never occurred. J.A. 76–77 ¶¶ 107–09. Instead, five months passed, and Percipient learned, at the 2021 GEOINT Symposium, that CACI intended to build its own software to meet SAFFIRE's requirements.

Percipient then approached NGA, sharing its concern about whether CACI could objectively evaluate Mirage's CV capabilities (given its stated intention to develop software itself) and requesting the opportunity to demonstrate

Mirage's capabilities to NGA directly.  NGA agreed to set up a demonstration, stated the agency's intent to evaluate commercial alternatives before building software inhouse, and asked that Percipient "ease up on the legal pressure." J.A. 79 ¶¶ 117–18.

In December 2021, Percipient demonstrated Mirage to NGA representatives, one of whom stated after the demonstration that Mirage "meets all of NGA's analytic transformation requirements."  J.A. 79–80  ¶¶ 119–20.  Over several months NGA and Percipient worked to reach an agreement for NGA to test Mirage with live data, which Percipient agreed to do for free.  After some back-and-forth about whether to use live data at all, NGA relented and finally finished its testing in October 2022.

But the testing, according to Percipient's complaint, was subpar—with NGA running only four searches on Mirage over a twelve-week testing period.  Percipient offered, free-of-charge, to extend the testing period.  But a month later NGA explained that it evaluated Mirage as a "Machine Learning (ML) Platform" rather than an "Analytical tool," which Percipient took as confirmation that NGA had "deliberately failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements," and thus failed to evaluate whether Mirage could be an alternative to CACI's development of SAFFIRE's CV System inhouse.  J.A. 85 ¶ 137.  NGA confirmed that there would be no broader evaluation of Mirage.  Percipient then filed an action in the Court of Federal Claims under what is commonly called the "bid protest" provision of the Tucker Act, 28 U.S.C. § 1491(b)(1).

In its complaint, Percipient asked the court to enjoin NGA's alleged violation of its obligations under 10 U.S.C. § 3453, titled "Preference for commercial products and commercial services," which requires heads of agencies to ensure their contractors conduct market research to determine if commercial or nondevelopmental items are

available that can meet the agency's procurement requirements. This procurement statute requires, "to the maximum extent practicable," a preference for commercial or nondevelopmental items or services. *See* 10 U.S.C. § 3453(a).

The Government and CACI filed motions to dismiss Percipient's complaint, arguing that (1) the Court of Federal Claims lacked subject matter jurisdiction based on the FASA task order bar and, separately, the Tucker Act; (2) Percipient lacked standing; and (3) Percipient's complaint was untimely.

The Tucker Act, in pertinent part, provides the Court of Federal Claims with jurisdiction:

> to render judgment on an action by an *interested party* objecting to [1] a solicitation by a Federal agency for bids or proposals for a proposed contract or to [2] a proposed award or the award of a contract or [3] *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphases added). Percipient asserted that it was an interested party and that the Court of Federal Claims had jurisdiction under the third prong of the Tucker Act provision.

The FASA task order bar provides that:

> (1) A protest is not authorized *in connection with the issuance or proposed issuance of a task or delivery order* except for —
>
>     . . . .
>
>     (B) a protest of an order valued in excess of $25,000,000.

(2) . . . [T]he Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).

10 U.S.C. § 3406(f) (emphasis added).[2]

While the trial court initially denied the motions to dismiss, *Percipient.ai, Inc. v. United States*, 165 Fed. Cl. 331, 340 (2023), it later vacated its opinion.[3] After additional briefing, the court held that the FASA task order bar applied and granted the motions to dismiss for lack of subject matter jurisdiction. *Percipient.ai, Inc. v. United States*, No. 23-28C, 2023 WL 3563093, at *3 (Fed. Cl. May 17, 2023).

Percipient appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## Discussion

"We review a decision by the [Court of Federal Claims] to dismiss a case for lack of subject matter jurisdiction de novo." *Diversified Grp. Inc. v. United States*, 841 F.3d 975, 980 (Fed. Cir. 2016). We may affirm the court's judgment on any ground supported by the record. *El-Sheikh v. United States*, 177 F.3d 1321, 1326 (Fed. Cir. 1999). And we assume all facts alleged in a complaint as true and draw

---

[2]     There is a FASA task order bar that applies to public contracts generally, 41 U.S.C. § 4106(f)(1), and one that applies to the Department of Defense in particular, 10 U.S.C. § 3406(f)(1). The text of the two provisions is similar, except for the different monetary thresholds over which task order protests may be heard by the Comptroller General. Here, 10 U.S.C. § 3406(f)(1) is applicable because NGA operates under the oversight of the Department of Defense.

[3]     The trial court's vacated opinion addressed subject matter jurisdiction, standing, and timeliness.

all reasonable inferences in favor of the plaintiff. *Henke v. United States*, 60 F.3d 795, 797, 799 (Fed. Cir. 1995).

Percipient argues that its protest is not "in connection with the issuance or proposed issuance of a task or delivery order" and thus falls outside the FASA task order bar. *See* Appellant's Br. 28–48. Defendants disagree, arguing that the trial court correctly determined that the FASA task order bar divests the Court of Federal Claims of jurisdiction over Percipient's protest. *See* Government's Br. 13–28; CACI's Br. 23–38. Defendants also assert alternative grounds for affirmance, including that the trial court lacks subject matter jurisdiction because Percipient's protest is not "in connection with a procurement or a proposed procurement," a requirement under the third prong of the Tucker Act. *See* Government's Br. 30–33; CACI's Br. 50–52. The Government also alternatively argues that we should affirm the trial court's dismissal because Percipient lacks standing and, separately, argues that one of Percipient's claims challenges terms of the SAFFIRE solicitation and is thus untimely. *See* Government's Br. 34–38. We address each issue in turn.

I

First, we turn to subject matter jurisdiction. For the Court of Federal Claims to have jurisdiction, Percipient's protest must be outside the FASA task order bar and within the jurisdictional limits of the Tucker Act. For the reasons below, we hold that the Court of Federal Claims has subject matter jurisdiction over Percipient's protest.

A

We begin by addressing the FASA task order bar and whether the Court of Federal Claims erred by dismissing Percipient's complaint for raising claims in connection with the issuance of a task order. FASA provides that a "protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C.

§ 3406(f)(1). Consistent with the statutory focus on "issuance" and this court's decision in *SRA International, Inc. v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014), we interpret this language to mean that a protest is barred if it challenges the issuance of the task order directly or by challenging a government action (*e.g.*, waiver of an organizational conflict of interest) whose wrongfulness would cause the task order's issuance to be improper. To determine whether the Court of Federal Claims erred in dismissing Percipient's complaint, we analyze each of the claims in the complaint. In doing so it becomes clear that the FASA task order bar does not preclude the Court of Federal Claims from exercising jurisdiction over Percipient's protest, which does not assert the wrongfulness of, or seek to set aside, any task order.

In Count One, Percipient alleges that NGA violated, and will continue to violate, 10 U.S.C. § 3453 and related regulations by refusing to ensure that its contractor for the ongoing SAFFIRE procurement incorporates commercial or nondevelopmental items "to the maximum extent practicable." J.A. 94–96. There is no mention of—or challenge to—the issuance of the task order. Rather, drawing all reasonable inferences in favor of Percipient, *Henke*, 60 F.3d at 799, we conclude that the claim is directed to NGA's violation of § 3453 and related regulations after issuance of the task order. In particular, the claim asserts that "Percipient has specifically requested on several occasions that NGA and SAFFIRE's contractor evaluate Mirage for integration into the SAFFIRE procurement, but both have refused to do so in favor of launching a developmental effort . . . . NGA therefore has failed to meet its obligation[s]" under § 3453. J.A. 95 ¶ 165. Continuing, the claim asserts that "[i]f NGA complies with its legal obligations and conducts a full and fair evaluation of Mirage's capabilities, it and its contractor will conclude—or at a minimum are substantially likely to conclude—that Mirage can meet their CV System needs for SAFFIRE and should be

incorporated into the SAFFIRE procurement." J.A. 96
¶ 167. In Count One, Percipient thus seeks NGA's compli-
ance with § 3453 and related regulations to ensure that
NGA's contractor incorporates commercial or nondevelop-
mental items "to the maximum extent practicable," with-
out challenging the issuance of Task Order 1 to CACI.

Count Two likewise involves allegations that "NGA is
violating 10 U.S.C. § 3453 and related regulations by refus-
ing to take steps to require its contractor to engage in mar-
ket research and make determinations as to whether its
needs could be met by commercial or nondevelopmental
items." J.A. 96–98 (cleaned up). Percipient cites
§ 3453(c)(1)(C) and (c)(5), which require the agency head to
"conduct market research . . . before awarding a task or-
der," and "take appropriate steps to ensure that any prime
contractor of a contract (or task order or delivery or-
der) . . . engages in such market research as may be neces-
sary to carry out the requirements of subsection (b)(2)"—
*i.e.*, "to incorporate commercial services . . . or nondevelop-
mental items" to the "maximum extent practicable."
10 U.S.C. § 3453(b)(2). The phrase "task order" is present
in Count Two. And the language "conduct market re-
search . . . before awarding a task order or delivery order"
could in some cases be interpreted as "in connection with
the issuance or proposed issuance of a task or delivery or-
der." But that's not the allegation here.

Rather, Percipient's allegation is that NGA violated
10 U.S.C. § 3453 because of its failure to require CACI, its
contractor, to engage in market research. The claim
states: "NGA's contractor failed to conduct the necessary
market research before proceeding to launch an effort to
develop the CV system . . . ." J.A. 97 ¶ 173. This alleged
inaction is not in connection with NGA's issuance or

proposed issuance of the task order.[4]  Rather, the focus is on CACI's actions after issuance of Task Order 1 and its failure to evaluate Mirage for integration into the SAFFIRE's CV system.

In Count Three, Percipient alleges that "NGA improperly delegated inherently governmental authority" by allowing its contractor to build software to meet SAFFIRE's computer vision software requirements before conducting market research.  J.A. 98–99 (cleaned up).  Specifically, Percipient alleges that NGA improperly allowed CACI to decide agency policy for developing artificial intelligence technology. J.A. 99 ¶¶ 179–80.  Again, Percipient does not challenge the Government's issuance of Task Order 1 to CACI.  Task Order 1 is not mentioned; nor does this allegation more broadly relate to NGA's issuance of Task Order 1.

Lastly, Percipient alleges in Count Four that "NGA engaged in arbitrary, capricious, and unlawful conduct by resisting innovation, by insisting on the wasteful approach of software development, and by engaging in bad faith conduct."  J.A. 99–101 (cleaned up).  Specifically, Percipient alleges that while NGA knows that Mirage meets the CV System requirements, it "is deliberately failing to conduct whatever additional evaluation it claims to be necessary to confirm Mirage's ability to meet SAFFIRE's CV System requirements."  J.A. 100 ¶ 185.  And Percipient details the related representations and actions by NGA that it alleges are evidence of "malicious, bad faith conduct toward

---

[4]    *See also* Oral Arg. at 2:30–3:16 (Percipient's attorney stating that "[t]here may be an allusion in our complaint" to insufficient market research prior to the issuance of the task order, "but our complaint, our claims don't depend on that" insufficient market research), https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1970_11082023.mp3.

Percipient." J.A. 100–01. None of these allegations relates to the issuance of a task order, or even mention task orders.

In sum, none of Percipient's counts is "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). Percipient does not challenge the issuance of Task Order 1 to CACI. Moreover, no allegation asserts that the language of Task Order 1 was deficient or forced the alleged statutory violations to occur. Only one Count mentions the phrase "task order," but no allegation deals with how NGA worded, issued, or proposed to issue its task order. *See also* Oral Arg. at 0:30–0:58 (Percipient's attorney saying, "We do not challenge the task or delivery order. We do not seek to set aside a task or delivery order that's been issued. We do not challenge an action that directly or immediately led to a task or delivery order. We do not challenge an action on which the validity of a task or delivery order depends . . . .").

The Government disagrees because it interprets the language "in connection with" in § 3406(f) to bar all protests that relate to work performed under a task order. *See* Government's Br. 16. It argues that whatever results from, i.e., follows or comes after, a task order falls under the task order bar. *Id.* To support its interpretation, the Government relies on a sentence in *SRA*, 766 F.3d at 1413, which described the challenged waiver of an organizational conflict of interest as an action that was "directly and causally connected to issuance of [a task order]" in holding that the challenge to that waiver (which if accepted would have undermined the task order) came within the task order bar and therefore was outside the Court of Federal Claims' jurisdiction. *See* Government's Br. 14, 21–22. The dissent agrees with the Government, asserting that "in connection with the issuance or proposed issuance of a task or delivery order" means anything that stems from, is tied to, or results from the issuance of a task order, including challenges to work performed under Task Order 1. We are unpersuaded.

We find the Government's interpretation far too broad. The statutory language refers to protests "in connection with the issuance or proposed issuance" of a task order. As Percipient notes, the Government's interpretation gives no meaning to the words "issuance or proposed issuance." Specifically, the Government reads the statute as if it broadly bars all protests made in connection with a task order—including work performed by a proper awardee after issuance of a proper task order—rather than just those protests made "in connection with the *issuance or proposed issuance of* a task" order. Reply Br. 6 (citing 10 U.S.C. § 3406(f)) (emphasis added). This flouts the well-established principle that "we should construe the statute, if at all possible, to give effect and meaning to all the terms." *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998). In our view, the plain meaning of § 3406(f) precludes the Government's interpretation, which casts a far larger net than what the statute prescribes.

We also find the Government's interpretation unsupported by precedent. The *SRA* opinion cited by the Government and the dissent does not support the Government's broad interpretation.[5] The "directly and causally connected to issuance of [a task order]" language in *SRA* is narrower than the interpretation sought by the Government and, moreover, must be understood in light of the facts at issue there. *See, e.g., Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) ("Chief Justice Marshall[] sage[ly] observ[ed] that 'general

---

[5] The dissent misunderstands our language here. We do not "see[] the 'directly and causally connected to issuance' test as 'far too broad,'" generally. Dissent Op. at 10. Rather, as is clear from our language, it is our position that the Government's and dissent's interpretation of the "directly and causally connected to issuance" language in *SRA* is far too broad.

expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.'" (citation omitted)); *R.A.V. v. St. Paul*, 505 U.S. 377, 386–87 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on [a] point conclusively resolved by broad language in cases where the issue was not presented or even envisioned."). Read in context, we understand *SRA's* reference to "directly and causally connected to issuance of [a task order]" to refer to government action in the direct causal chain sustaining the issuance of a task order, not to all actions taken under or after issuance of a proper task order.

SRA filed a bid protest in the Court of Federal Claims alleging that the General Services Administration (GSA) violated various laws when it waived an organizational conflict of interest (OCI) after awarding a task order to Computer Sciences Corporation (CSC). *SRA*, 766 F.3d at 1410–11. There, unlike here, SRA asked the Court of Federal Claims to set aside the issuance of the task order to CSC because of CSC's OCI. This is a significant difference. Here, Percipient does not challenge the issuance of Task Order 1 to CACI.

Notwithstanding its specific challenge to the issuance of the task order to CSC, SRA asserted that the task order bar did not apply. SRA's principal argument against the application of the task order bar was a temporal one. SRA acknowledged that had GSA waived the alleged OCI *before* issuance of the task order, the task order bar would apply. *Id.* at 1413. But because GSA executed the waiver *after* issuing the task order, SRA argued that the task order bar did not apply because the alleged violation was "temporally separated" from issuance of the task order. *Id.* at 1412. Addressing SRA's argument on appeal, we held that "the OCI waiver was directly and causally connected to issuance

of [the task order], despite being executed after issuance"
because "GSA issued the waiver in order to go forward with
CSC on [the task order]." *Id.* at 1413. We explained that
"although a temporal disconnect may, in some circum-
stances, help to support the non-application of the FASA
bar, it does not help SRA here." *Id.* We further explained
that GSA's delay in executing the waiver was "inconse-
quential" since (1) the delay occurred because GSA was un-
aware of the organizational conflict earlier; (2) GSA "could
have executed a waiver prior to awarding [the task order]";
and (3) "SRA acknowledges that, had GSA waived the al-
leged OCI prior to issuance, FASA would have barred its
protest." *Id.* Read in context, the court's statement that
the OCI waiver was "directly and causally connected to is-
suance" does not broadly refer to work performed under, or
events caused by the task order as asserted by the Govern-
ment here. Indeed, if the Government's view of the *SRA*
language were right, the court would have found the be-
fore-after distinction not even worth the trouble of explain-
ing away as it did. Instead, the language refers to an actual
challenge to the issuance of the task order regardless of
whether the alleged violation occurred after issuance of the
task order.[6]

Here, Percipient does not challenge the issuance or pro-
posed issuance of a task order. Percipient's requested relief
would not alter NGA's issuance of Task Order 1 to CACI.
Rather, Percipient largely challenges the failure of NGA

---

[6]    Our decision in *22nd Century Technologies, Inc.
v. United States*, 57 F.4th 993 (Fed. Cir. 2003), is con-
sistent. There, we affirmed the Court of Federal Claim's
holding that the task order bar applied "because 22nd Cen-
tury's challenge is to the alleged failure of the task order to
require bidders to recertify as small businesses." *22nd
Century*, 57 F.4th at 999–1000. The challenge was to the
language of the task order itself.

and its contractor to properly review its Mirage product and thereby conduct the necessary research required by statute before developing the CV system. We thus reverse the trial court's decision that the FASA task order bar applies.

## B

Next, we turn to whether the statutory and regulatory violations alleged by Percipient fall within the Court of Federal Claims' jurisdiction under the Tucker Act. Percipient asserted jurisdiction under the third prong of the Tucker Act: "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). We hold that Percipient's protest—alleging a violation of 10 U.S.C. § 3453 and related regulations, which establish a preference for commercial services—is in connection with the SAFFIRE procurement, and thus falls within the Court of Federal Claims' jurisdiction.

Defendants argue that Percipient's protest falls outside the third prong because it is not "in connection with a procurement or a proposed procurement." Government's Br. 30–33; CACI's Br. 50–52. To this end, they characterize Percipient's protest as challenging contract performance and administrative activities. Specifically, the Government argues that the only "procurement" actions after the issuance of an IDIQ contract are "the issuance of a task order and the acquisition-related decisions that are connected to the issuance of that task order." Government's Br. 33. Everything else is contract administration or performance. *Id.* And because the IDIQ contract incorporates Federal Acquisition Regulation (FAR) 52.244-6, J.A. 857, which mirrors 10 U.S.C. § 3453, Defendants also argue that Percipient's complaint is about CACI's adherence to the contract terms, i.e., its performance. *See* Government's Br. 33; CACI's Br. 52. We are not persuaded.

We have held that "in connection with a procurement or proposed procurement" involves "a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'" *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1346 (Fed. Cir. 2008). As we have previously explained, "in connection with" is "very sweeping in scope." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). And "procurement" encompasses "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols.*, 539 F.3d at 1345–46 (quoting 41 U.S.C. § 403(2))[7]. Naturally, the definition includes stages between issuance of a contract award and contract completion, i.e., actions *after* issuance of a contract award. Accordingly, "in connection with a procurement or proposed procurement" encompasses more than "the issuance of a task order and the acquisition-related decisions that are connected to the issuance of that task order," the narrowed subset Defendants would like us to adopt. This is important in the context of § 3453, whose requirements to maximize acquisition of commercial items suitable to meet the agency's needs continue and can be violated well after the contract's award. Defendants' argument would allow agencies to ignore § 3453 by deferring decisions about commercial products until after the contract award.

We also reject Defendants' argument that because the SAFFIRE contract incorporates FAR 52.244-6, which mirrors § 3453, Percipient's protest is tethered to contract performance and excludes Tucker Act jurisdiction. The Tucker Act allows for "*any* alleged violation of statute or regulation in connection with a procurement or a proposed

---

[7] In 2011, 41 U.S.C. § 403(2) was recodified at 41 U.S.C. § 111.

procurement." 28 U.S.C. § 1491(b)(1) (emphasis added). Percipient alleges a violation of 10 U.S.C. § 3453, a statute, in connection with the SAFFIRE procurement. This directly conforms with the stated requirements of the third prong of the Tucker Act. We decline Defendants' invitation to carve limitations untethered to the statute's plain text into 28 U.S.C. § 1491(b)(1).

In sum, Percipient's protest is "in connection with a procurement" because Percipient alleges NGA violated 10 U.S.C. § 3453 and related regulations, which establish a preference for commercial services, in connection with the SAFFIRE procurement's CV System. We thus hold that Percipient's protest falls within the jurisdiction of the Court of Federal Claims under the Tucker Act.

## II

We now turn to standing under 28 U.S.C. § 1491(b)(1). To have standing under the statute, a plaintiff must be an "interested party."[8] As discussed above, an "interested party" can challenge: (1) a solicitation by a federal agency; (2) a proposed award or the award of a contract; or (3) any alleged violation of statute or regulation in connection with a procurement or proposed procurement. *See* 28 U.S.C. § 1491(b)(1). Our court has defined "interested party" when the alleged harm-causing government action is a solicitation, an award, or a proposed award—i.e., when the challenge is to a solicitation or award under prongs one and/or two (with or without an additional prong three challenge to the solicitation or award). *See, e.g.*, *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1356, 1359–60 (Fed. Cir. 2009) (challenged harm-causing action was the solicitation); *Am. Fed'n of Gov't Emps., AFL–CIO v. United*

---

[8] This requirement is a matter of statutory standing, and thus not jurisdictional. *See CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

*States (AFGE)*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (challenged harm-causing action was a contract award).

This case presents the different question of who qualifies as an "interested party" only under prong three, where the challenged harm-causing action is *not* the solicitation, the award, or the proposed award of a contract. More specifically, this case addresses whether a prospective offeror of commercial items may assert procurement-related illegalities where the assertions do *not* challenge a contract or proposed contract between the Government and its contractor or a solicitation for such a contract. We hold that, in the context of this case involving alleged violations of 10 U.S.C. § 3453, an interested party includes an offeror of commercial or nondevelopmental items whose direct economic interest would be affected by the alleged violation of the statute. Specifically, we hold that where a plaintiff, invoking only prong three of the jurisdiction under 28 U.S.C. § 1491(b)(1), asserts a violation of 10 U.S.C. § 3453 without directly or indirectly challenging a solicitation for or actual or proposed award of a government contract, the plaintiff is an interested party if it is an offeror of a commercial product or commercial service that had a substantial chance of being acquired to meet the needs of the agency had the violation not occurred.

A brief history of the statue is instructive. Section 1491(b) was enacted as part of the Administrative Disputes Resolution Act of 1996 (ADRA). P.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996). Before ADRA, the Court of Federal Claims had jurisdiction over *pre*-award protests and federal district courts had jurisdiction over *post*-award protests. *See AFGE*, 258 F.3d at 1300. The district courts' review, as explained in *Scanwell Laboratories, Inc. v. Shaffer*, was conducted under the Administrative Procedure Act (APA). *See Scanwell*, 424 F.2d 859, 865–66 (D.C. Cir. 1970). In § 1491(b), ADRA sought to invest the Court of Federal Claims with the exclusive jurisdiction to review government contract protest actions, allowing for

concurrent jurisdiction with federal district courts to hear "the full range of bid protest cases previously subject to review in either system," before a sunset provision ended the federal district court's jurisdiction. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1081 (Fed. Cir. 2001) (quoting 142 Cong. Rec. S11849 (daily ed. Sept. 30, 1996) (statement of Sen. Levin)); *see also Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1243 (Fed. Cir. 2010). ADRA also expressly made the APA standard of review applicable for all actions under § 1491(b). *See* 28 U.S.C. § 1491(b)(4). It did not similarly define the standard for standing.

This court first construed "interested party," and thus delineated a standard for standing, in *AFGE*. There, federal employees brought a protest challenging the award of the contract under both prongs two and three of § 1491(b). Specifically, appellants there filed suit to challenge the decision to award a contract to EG&G Logistics, Inc., a private company, instead of using government facilities and personnel. *AFGE*, 258 F.3d at 1297. In determining whether the federal employees had standing, we held that "interested party" should be construed according to the definition of that same term in a related statute, the Competition in Contracting Act (CICA). *Id.* at 1299. CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A). Notably, CICA's scope of protests does not include the third prong of § 1491(b)(1) ("alleged violation of statute or regulation in connection with a procurement or proposed procurement"). Rather, CICA limits protests to written objection to:

> (A) *A solicitation* or other request by a Federal agency for offers for a contract for the procurement of property or services.

(B) The cancellation of such a *solicitation* or other request.

(C) An *award or proposed award* of such a contract.

(D) A termination or cancellation of an *award* of such a contract, if the written objection contains an allegation that the termination or cancellation is based in whole or in part on improprieties concerning the award of the contract.

(E) Conversion of a function that is being performed by Federal employees to private sector performance.

31 U.S.C. § 3551(1) (emphases added).

In so construing "interested party" in 28 U.S.C. § 1491(b)(1), we recognized that the issue was difficult. The statue's plain language did not resolve the issue. *AFGE*, 258 F.3d at 1299–1300. Indeed, unlike in CICA, Congress did not define the term "interested party" in ADRA. And the legislative history does not reveal whether Congress sought to limit ADRA's claims to those "brought by disappointed bidders"—most cases brought in district courts pursuant to *Scanwell*—or any contract claim that could be brought in district court under the APA. *AFGE*, 258 F.3d at 1300–02. The latter, given the APA's broad language, would allow parties other than actual or prospective bidders to bring suit. *Id.* at 1301.

Our court identified three reasons for adopting the definition in CICA and thereby limiting the term "interested party" to disappointed bidders and offerors in *AFGE*. First, we observed the principle that "statutes which waive immunity of the United States from suit are to be construed strictly in favor of the sovereign." *See id.* at 1301 (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)). Second, legislative history described *Scanwell* as allowing a "contractor" to challenge a contract award. *Id.* at 1301–02 (quoting 142 Cong. Rec. S11848 (statement of Sen.

Cohen)). Relatedly, the court noted that courts have "nar-row[ly]" read standing under *Scanwell*. *Id.* at 1302. And third, that the language used by Congress ("interested party") does not mirror the broad APA language, but rather a term that is used in another government contract disputes statute, CICA. *Id.* at 1302.

The Government relies on *AFGE*'s interpretation of "interested party" to argue in this case that Percipient lacks standing. Government's Br. 34–37 (citing, e.g., *CACI, Inc.- Federal*, 67 F.4th at 1151). Percipient admits that it did not, nor could it, submit a bid on the SAFFIRE contract. Appellant's Br. 10. And this, the Government argues, is fatal because it means that Percipient is not an "actual or prospective bidder or offeror" as required under *AFGE*'s "interested party" standard. Government's Br. 35–36. Percipient responds that it is an interested party with a direct economic interest that is affected by the Government's failure to comply with 10 U.S.C. § 3453 because Percipient is a prospective offeror of a commercial product that satisfies SAFFIRE's CV System requirements and, had the Government complied with the statute, Percipient would have been a subcontractor. As support, Percipient cites the reasoning in the Court of Federal Claims' now-vacated decision holding that Percipient has standing. There, the trial court held that offerors of commercial products need not bid on the prime contract to have § 3453 standing. Percipient also identifies various cases that it describes as recognizing that "parties need not have submitted a bid in all circumstances to qualify as an actual or prospective offeror," including *SEKRI v. United States*, 34 F.4th 1063, 1071–73 (Fed. Cir. 2022), and *Distributed Solutions*, 539 F.3d at 1343–44. Appellant's Reply Br. 29.

*AFGE* is controlling law for what it covers, but this case presents a different scenario than *AFGE*. Specifically, unlike the plaintiffs in *AFGE*, Percipient does not challenge a solicitation for or an award or proposed award of a government contract, so its claim could not come within the first

two prongs of § 1491(b)(1).[9]  We have not previously addressed the meaning of "interested party" in such circumstances, when the protest actually presented is, and must be, based solely on the third prong—"any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  In other words, we have not previously considered whether a prospective offeror of commercial items may file an action raising procurement-related illegalities under § 3453 where the asserted illegalities do not challenge the contract between the Government and its contractor (either the award or proposed award of or a solicitation for such a contract).  In *AFGE*, the challenge made under the third prong of § 1491(b)(1) *did* challenge the contract award, and the third prong could not properly be applied to evade the constraint on standing under the first two prongs.  The present case involves no such overlap or potential evasion, and *AFGE* does not address this situation.  This is a crucial distinction in identifying why *AFGE* does not control here, and one that answers the contention of the dissent that *AFGE* controls this case.

We hold that, under the facts here, *AFGE*'s standing requirements do not control.  Said otherwise, on these facts, "an interested party" is not limited to "an actual or prospective bidder or offeror whose direct economic interest

———————————

[9]    For similar reasons, this case is distinguishable from other cases cited by the Government, including *Weeks Marine* and *SEKRI*.  In both cases, the challenged mechanism of harm was the solicitation.  *Weeks Marine*, 575 F.3d at 1354, 1356 (challenging that a solicitation violated 10 U.S.C. § 2304(a)(2)); *SEKRI*, 34 F.4th at 1069, 1071 (challenging an agency's procurement of ATAP through a competitive solicitation rather than through SEKRI, a qualified, mandatory source of ATAP).

would be affected by the award of the contract or by failure to award the contract." Rather, for this case involving only the third prong of § 1491(b)(1) and allegations of violations of 10 U.S.C. § 3453 that do not challenge the solicitation or contract, we hold that Percipient is an interested party because it offered a commercial product that had a substantial chance of being acquired to meet the needs of the agency had the violations not occurred. We hold so for at least four reasons, and we find persuasive Judge Moss's analysis of 28 U.S.C. § 1491(b)(1) in *Validata Chemical Services v. United States Department of Energy*, 169 F. Supp. 3d 69, 82 (D.D.C. 2016).

First, the third prong of § 1491(b)(1) goes beyond the situations considered in CICA. As noted above, CICA limits protests by an interested party to written objections to solicitations, awards or proposed awards of a contract, cancellation of a solicitation, termination, or cancelation of an award, and "[c]onversion of a function that is being performed by Federal employees to private sector performance." The third prong of § 1491(b)(1), covering a challenge to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," in no way resembles CICA; it is not defined with reference to the foregoing specific types of government action, but instead is defined by the legal source of wrongfulness (statutory or regulatory violation) across the full range of actions connected with an actual or proposed procurement. *Compare* 31 U.S.C. § 3551(1), *with* 28 U.S.C. § 1491(b)(1). *See RAMCOR*, 185 F.3d at 1289. This lack of correspondence demonstrates that the definition of "interested party" in CICA is not fairly borrowed to apply to everything that comes under the third prong—and specifically not for conduct challengeable only under the third prong.

Second, the statutory language in prong three defines an "interested party" as more than actual or prospective bidders. The term "interested party" must be understood in context of the language of the third prong of 28 U.S.C.

§ 1491(b)(1), which imposes a broader scope for standing. The third prong gives the Court of Federal Claims jurisdiction in cases filed "by an interested party objecting to . . . *any* alleged violation of statute or regulation *in connection with a procurement or a proposed procurement.*" *See* 28 U.S.C. § 1491(b)(1) (emphases added). On its face, this statutory language provides for an independent cause of action; that is, a plaintiff need not challenge either a solicitation for or the award or proposed award of a government contract. A procurement, as already explained, is a broad term and includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111. As such, the third prong covers actions that are necessarily broader than the solicitation or the award of a contract stage, the first two Tucker Act prongs. It is also broader than any of CICA's five categories. We are obliged to interpret the term "interested party" in the context of this broader third prong to give it independent import. *See, e.g.*, *Bausch*, 138 F.3d at 1367 (explaining that we must construe a statute, if possible, to give meaning and effect to all its terms). Stated differently, the phrase "interested party"—which appears in other federal statutes and regulations without a standard meaning—ought to be interpreted based on the relevant statutory context of prong three. *See Validata*, 169 F. Supp. 3d at 82 (citing various statutes, rules, and regulations, with the phrase "interested party").

Third, our analysis must be tailored to the specific facts here: an alleged violation of 10 U.S.C. § 3453 and related regulations, which establish the preference for commercial products and commercial services for agency procurements. In the Article III context, the Supreme Court has explained that "a plaintiff must demonstrate standing for each claim he seeks to press." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The same should be true for statutory standing. And here the statutory guarantees

under § 3453 could become illusory were parties like Percipient, under these facts, unable to protest. As the Court of Federal Claims recognized in its now-vacated decision, "the interested party requirements have . . . been relaxed when their rigid application would make statutory guarantees illusory." *Percipient*, 165 Fed. Cl. at 337–38 (discussing cases like *SEKRI*, where we declined to treat mandatory sources of commodities the same as other potential interested parties based on, in part, Congress's intent behind a statute, *see SEKRI*, 34 F.4th at 1072–73).

Here, § 3453 provides, in part, that the "head of an agency shall ensure" that "offerors of commercial services, commercial products, and nondevelopmental items other than commercial products are provided an opportunity to compete in any procurement to fill such requirements" of the agency with respect to procurement of supplies or services "to the maximum extent practicable." 10 U.S.C. § 3453(a)(1), (3). The statutory text does not limit this requirement to the award of the entire contract, but rather the statute's obligations apply even to "components of items supplied to the agency." *Id.* § 3453(b)(2). Section 3453(b)(2) provides that agencies must "require prime contractors and subcontractors . . . to incorporate commercial services [and] commercial products . . . as components of items supplied to the agency." *Id.* By its express terms, the statute is meant to ensure that, "to the maximum extent practicable," agencies provide offerors of commercial services an opportunity to compete in procurements, and to give a preference for commercial products and commercial services. *Id.* § 3453(a). If parties like Percipient, who offer significant commercial and nondevelopmental items likely to meet contract requirements but who cannot bid on the entire contract or a task order, are unable to challenge statutory violations in connection with procurements, the statute would have minimal bite—it would rely on an agency to self-regulate and on contractors like CACI to act against their own interest.

Lastly, the relative timing of the passage of FASA, codified in part in 10 U.S.C. § 3453, and ADRA, codified in part in 28 U.S.C. § 1491, supports our view. FASA was passed in 1994 and required each executive agency head to procure commercial items to meet agency needs. *See* P.L. No. 103–355, §§ 8001, 8104, 8203, 108 Stat. 1587, 3390–91, 3394–96 (1994) (defining "commercial item" broadly and adding "[p]reference for acquisition of commercial items"). This prominent legislation had significant impact on government procurement, imposing duties on "contractors and subcontractors at all levels under the agency contracts" to incorporate commercial items to meet the needs of the agency even after award of a contract.[10] *See, e.g.*, 10 U.S.C. § 3453(b)(2). Just two years later, Congress passed ADRA—seeking to consolidate bid protest jurisdiction in the Court of Federal Claims. *See* P.L. No. 104–320, 110 Stat. 3870 (1996). We find it difficult to conclude that the very next Congress following passage of FASA would promulgate ADRA with the intention of eliminating any meaningful enforcement of the post-award preferences for commercial items in § 3453.

In addition, we note that this is not the first time this court has modified the general standing test adopted in *AFGE* to address factual circumstances not present there. In *Weeks Marine*, we modified the general standing test to address standing in solicitation protests (i.e., under prong one). Relying on the specific language in prong one, we held that the appropriate standing test in pre-award solicitation protests is "whether [a plaintiff] has demonstrated

---

[10]    *See* 140 Cong. Rec. 24864, 24865 (1994) ("This legislation makes sweeping reforms to the Federal Procurement System."); *id.* at 24869 ("Purchasing commercial products should abolish the current practice of buying expensive, specially designed products, when off-the-shell, less expensive commercial products would suffice.").

a 'non-trivial competitive injury which can be addressed by judicial relief" and that "in some cases the injury stemming from a facially illegal solicitation may in and of itself be enough to establish standing." *Weeks Marine*, 575 F.3d at 1362. Thus, contrary to the dissent's suggestion, our precedent supports interpreting "interested party" in light of the different prongs in 28 U.S.C. § 1491(b)(1).

The dissent's reliance on the legislative history of other statutes does not persuade us otherwise. The dissent does not cite legislative history for the statute at issue, 28 U.S.C. § 1491(b)(1). And the dissent's reliance on the legislative history of CICA—including that Congress initially sought to include subcontractors as interested parties in CICA—is not helpful. First, as noted above, any parallel between CICA and ADRA breaks down where a plaintiff's protest falls under prong three of ADRA without objecting to a solicitation or award, and thus any rationale for adopting CICA's definition of "interested party"—or relying on the legislative history of CICA—does not apply to prong three. CICA is a different statute governing the bid-protest jurisdiction of the U.S. Government Accountability Office and does not include prong three.

Furthermore, the legislative history of the now-repealed Brooks Act cited by the dissent indicates that Congress was concerned that establishing a subcontractor's right to protest in the now-repealed Brooks Act would "establish precedent that privity of contract exists between the government and subcontractors." *To Revise and Streamline the Acquisition Laws of the Federal Government, and for Other Purposes: Hearing on S. 1587 Before the S. Comm. On Governmental Affs. & the S. Comm. On Armed Servs.*, 103rd Cong. 293 (1994). This legislative history confirms the connection between privity and the general unavailability of standing for would-be subcontractors when the subject of a challenge *is a contract* (or proposed contract or solicitation for a contract) between the Government and a prime contractor. Here, there is no challenge

to a contract (or proposed contract or solicitation for a contract) between the Government and a prime contractor. The subject of the challenge is an alleged violation of statute in connection with a procurement. The concern with to respect privity does not apply to cases like this one because Plaintiff's allegation of procurement related illegalities, i.e., a prong three case, does not suggest that privity of contract exists between the Government and subcontractors. By contrast, prong one and prong two cases challenge a contract (or proposed contract or solicitation for a contract) between the Government and a prime contractor, so granting standing to a subcontractor might be viewed to suggest that subcontractors would have privity with the Government.

For all these reasons, we hold that, in the context of this case involving alleged violations of 10 U.S.C. § 3453 without challenging the contract, an interested party includes an offeror of commercial or nondevelopmental services or items whose direct economic interest would be affected by the alleged violation of the statute. Here, Defendants do not dispute Percipient's direct economic interest. Percipient offers a commercial product that is plausibly alleged to satisfy the agency's needs, has plausibly alleged *inter alia* that the agency violated the requirements of § 3453 by not evaluating its product for integration into the SAFFIRE procurement, has plausibly alleged that but for this violation of the statute its Mirage product would be incorporated into the SAFFIRE procurement, and has offered NGA and CACI its product. Under these facts, we hold that Percipient has standing to challenge the agency's alleged violation of § 3453.

## III

Lastly, we address timeliness of Percipient's claim that NGA unlawfully delegated government authority to its contractor, Count Three in Percipient's complaint. We have held that "a party who has the opportunity to object

to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). The Government argues that, to the extent Percipient alleges NGA "permitted CACI to determine whether to utilize commercial or developmental products to create the SAFFIRE solution, and, in doing so, unlawfully delegated inherently governmental functions," such a claim is untimely under *Blue & Gold*. Government's Br. 37 (citing J.A. 98–99). But the plaintiff in *Blue & Gold* was challenging the terms of the solicitation. Percipient is not.

Percipient's complaint focuses on post-award delegations, not defects in the solicitation. *See* J.A. 98–99; Reply Br. 30. *Compare* J.A. 99 ¶ 179 (alleging that NGA delegated inherently government authority by "allow[ing] its contractor to develop computer vision software . . . without requiring adherence to 10 U.S.C. § 3453"), *with* Government's Br. 38 (the SAFFIRE solicitation, requiring offerors to submit as part of their proposal "a process to identify, evaluate and implement opportunities from the Government and commercial industry as part of each planning increment to satisfy requirements faster, reduce or avoid cost and increase system performance" (quoting J.A. 844)). Said otherwise, the solicitation allows for NGA to adhere to the statutory obligations in § 3453 and thus there is no "patent error" in the solicitation. Accordingly, Percipient did not have to protest before the close of the bidding process and did not waive its ability to protest.

## CONCLUSION

We have considered Defendants' remaining arguments and find them unpersuasive. For the reasons above, we reverse the trial court's dismissal and hold that it has subject matter jurisdiction over Percipient's protest. We also hold that Percipient has standing, and its claims are

timely.  We thus reverse and remand for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

### COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**PERCIPIENT.AI, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, CACI, INC.-FEDERAL,**
*Defendants-Appellees*

---

2023-1970

---

Appeal from the United States Court of Federal Claims in No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink.

---

CLEVENGER, *Circuit Judge*, dissenting.

This is a very important government contract case. In conflict with binding authority,[1] and even absent that authority, the majority errs in significantly narrowing the existing scope of the task order bar in 10 U.S.C. § 3406(f)(1), by reinterpreting the statute to bar only protests focused on a task order, not protests more broadly made in connection with the issuance of a task order. It also likewise errs

---

[1]    "In this Circuit, a later panel is bound by the determinations of a prior panel, unless relieved of that obligation by an en banc order of the court or a decision of the Supreme Court." *Deckers Corp. v. United States*, 752 F.3d 949, 959 (Fed. Cir. 2014).

in significantly broadening the existing scope of "interested party" statutory standing in 28 U.S.C. § 1491(b)(1) by permitting potential subcontractors for the first time to bring suit under § 1491(b)(1). For the reasons set forth below, I respectfully dissent.

The SAFFIRE contract has two interrelated parts, one of which is a CV System. Percipient alleges that its Mirage product satisfies the requirements for the CV System but admits that it cannot supply the other component. Consequently, Percipient is not qualified to bid on the SAFFIRE contract. At most, Percipient is a wishful potential subcontractor hoping that CACI, on its own or by direction of NGA, will subcontract with it to purchase its Mirage product.

The government must comply with 10 U.S.C. § 3453,[2] which requires government contracting agencies "to the maximum extent practicable" to ensure that government contracts use existing products, rather than products to be developed under a contract, and to that end, requires the government and actual contractors to conduct market research to determine if commercial products are available.

NGA solicited the base SAFFIRE contract and Task Order 1 together and awarded both to CACI at the same time in January 2021. Task Order 1 authorized CACI to begin performance on the CV System portion of the contract. For two years after the issuance of Task Order 1, both CACI and NGA, fully aware of and exercising their various § 3453 responsibilities, conducted extensive tests of Percipient's Mirage product, and ultimately concluded that Mirage was not suitable. Dissatisfied with NGA's assessment of Mirage, Percipient on January 9, 2023, filed suit in the United States Court of Federal Claims ("Claims

---

[2] This statute covers military procurements. Its counterpart for public contracts is 41 U.S.C. § 3307.

Court") under 28 U.S.C. § 1491(b)(1), alleging violation of § 3453 by NGA for failing to police § 3453 properly after issuance of Task Order 1.

### The Task Order Bar

The relevant statute, 10 U.S.C. § 3406(f)(1), provides that a "protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order," thus depriving the Claims Court of jurisdiction over an otherwise proper 28 U.S.C. § 1491(b)(1) complaint.[3] The statute is commonly called the "task order bar."

In this case, the Claims Court dismissed Percipient's complaint under the task order bar. In doing so, the Claims Court applied what it understood to be the interpretation of the task order bar set forth in our previous decision in *SRA International, Inc. v. United States*, 766 F.3d 1409, 1413–14 (Fed. Cir. 2014): the task order bar is satisfied when the alleged violation is "directly and causally connected to issuance" of a task order. The Claims Court found as a matter of fact that Percipient's alleged violation of 10 U.S.C. § 3453 is "directly and causally related to the agency's issuance of Task Order 1" because the alleged violation occurred after issuance of "Task Order 1, which directed CACI to develop and deliver a [CV] system" and "without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this § 3453 violation." *Percipient.ai, Inc. v. United States*, No. 23-28C, 2023 WL 3563093, at *3 (Fed. Cl. May

---

[3]     As the majority notes, *see* Majority Op. at 7 n.2, the task order bar of 41 U.S.C. § 4106(f)(1) for public contracts is essentially the same, for statutory interpretation purposes, as 10 U.S.C. § 3406(f)(1) for Department of Defense contracts. The majority's interpretation of § 3406(f)(1) no doubt will apply to 41 U.S.C. § 4106(f)(1) cases.

17, 2023).   Because the alleged violation of § 3453 is directly and causally related to the issuance of Task Order 1, the Claims Court opined that were Percipient to prevail on the merits, the court would be required to partially suspend or discontinue performance under the task order even though Percipient did not ask to have Task Order 1 withdrawn.  *Id.*

The majority holds that the interpretation of the task order bar applied by the Claims Court is incorrect, and that the correct interpretation is that the bar is only invoked if a protest "challenges the issuance of the task order directly or by challenging a government action (*e.g.*, waiver of an organizational conflict of interest) whose wrongfulness would cause the task order's issuance to be improper."  Majority Op. at 9.  The majority applies its interpretation of the task order bar by examination of the contents of Percipient's complaint.  The question is whether the majority fails to apply *SRA* correctly, and in any event whether the majority's interpretation of the statute is correct.  The majority errs in both regards.[4]

*SRA* involved a contract, like the one in this case, to be performed through issuance of task orders.  The government issued the ISC–3 task order procurement to a competitor of SRA, and SRA protested on the ground that its competitor should have been disqualified due to an organizational conflict of interest.  The government resolved the matter by issuing a waiver of the organizational conflict of interest, thus permitting the competitor to proceed with performance of the contract.  SRA filed a protest in the Claims Court, arguing that the grant of the waiver violated various laws.  The Claims Court rejected the government's

---

[4]    If the Claims Court read the decision in *SRA* correctly, the majority does not disagree with the Claims Court's findings of fact that Percipient's complaint is task order barred.

invocation of the task order bar for two reasons: first, because the waiver was granted after the issuance of the task order, thus creating a "temporal disconnect" between the issuance of the task order and the alleged violation; and second, because the grant of the waiver was a discretionary act by the agency. The Claims Court thus held that there was no "direct, causal relationship" of the allegedly illegal grant of the conflict of interest waiver to the issuance of the task order. *SRA Int'l, Inc. v. United States*, 114 Fed. Cl. 247, 256 (2014) (quoting *MORI Assocs., Inc. v. United States*, 113 Fed. Cl. 33, 38 (2013)).

On appeal to this court, SRA and the government disagreed on the correct interpretation of the task order bar. Like Percipient in this case, and the majority, SRA interpreted the statute to bar only protests that challenge the task order itself, arguing that:

> [A]ll of the alleged violations of statute and regulation were in connection with the ISC-3 procurement, but none were in connection with the issuance (or proposed issuance) of the ISC-3 task order. Thus, the [Claims Court] had jurisdiction over all of SRA's Complaint. . . . None [of SRA's five counts] concern the already-concluded issuance of the ISC-3 task order and therefore none are excluded by FASA.

Brief for Plaintiff-Appellant at 28–29, *SRA Int'l, Inc. v. United States*, 766 F.3d 1409 (Fed. Cir. 2014) (No. 14-5050), 2014 WL 1319680, at *28–29.

The government strongly disagreed with SRA's interpretation of the task order bar, instead invoking the interpretation set forth by the Claims Court in *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 756 (2010), that the statute bars protests that have a direct and causal relationship to the issuance or proposed issuance of a task order. Brief for Defendant-Appellee United States at 16, *SRA Int'l, Inc. v. United States*, 766 F.3d 1409 (Fed. Cir. 2014) (No. 14-5050),

2014 WL 1882366, at *16. The analysis and interpretation from *DataMill* proposed to the *SRA* court by the government specifies:

> Turning to the phrase "in connection with," the court notes that "in" means "[w]ith the aim or purpose of." *American Heritage Dictionary* 698 (4th ed.2004). A "connection" is defined as "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another." *Oxford English Dictionary* 747 (2d ed.1989); *see also American Heritage Dictionary, supra*, at 303 (defining "connection" as "[a]n association or relationship"). The word "with" means "[i]n relationship to." *American Heritage Dictionary, supra*, at 1574. Taken together, the phrase "in connection with" references something designed to possess a logical or sequential relationship to or be bound up with or directly involved in something else. In other words, the phrase "in connection with" means that there is a direct and causal relationship between two things that are mutually dependent. It is therefore apparent that the phrase "in connection with" encompasses those occurrences that have a direct and causal relationship to the "issuance" or "proposed issuance" of a delivery order.

*DataMill*, 91 Fed. Cl. at 756.

In response, SRA disagreed with the government's broader interpretation of the statute, asserting again that "[o]n the question of jurisdiction, Defendants' position fails because SRA does not challenge the 'issuance or proposed issuance' of a task order but the separate and distinct Government actions that violate statutes and regulations." Reply Brief for Plaintiff-Appellant at 3–4, *SRA Int'l, Inc. v.*

*United States,* 766 F.3d 1409 (Fed. Cir. 2014) (No. 14-5050), 2014 WL 2175563, at *3–4.

Our decision in *SRA* held that "neither the discretionary nature of the OCI waiver nor the temporal disconnect between it and the issuance of ISC 3 removes it from FASA's purview," 766 F.3d at 1413, and held that SRA's protest fell within the task order bar because it was "directly and causally connected to issuance of ISC 3 . . . ." *Id.* In *SRA,* as in this case, the protest had nothing to do with any alleged flaws in the task order, and the only connection between issuance of the task order and the alleged violation was that the task order permitted SRA's competitor to continue performance of the contract notwithstanding the agency's alleged violation of law. SRA's protest was that its competitor was allowed to enjoy performance of a government contract in the face of an alleged violation of law that should have prevented the competitor from performing the contract.

This case is as close to *SRA* as the law school "on all fours case" can get. In both cases, no challenge is made to any aspect of the task order in any count of the complaint, or otherwise; the relationship between the issuance of the task order and the alleged violation of law is that performance of the task order is allowed to proceed notwithstanding violations of law by the agency following issuance of the task order; and the task order would be upset if the plaintiff prevailed on the merits. The same interpretation of the task order bar that the majority here adopts was presented to and not adopted by the *SRA* court. Indeed, if the majority's interpretation of the task order bar is correct, *SRA* was wrongly decided, and is overruled, and a legion of cases has been wrongly decided by the Claims Court—cases like this one and *SRA,* in which the protest raised no allegation of error with regard to the task order and only challenged

subsequent agency action resulting from the issuance of the task order.[5]

Given this court's rule that a later panel is bound by preceding precedent, it is fair to ask how the majority can sidestep away from *SRA* to create and apply a significantly different interpretation of the task order bar in this case.

As justification, the majority asserts that:

Read in context, the court's statement that the OCI waiver was "directly and causally connected to issuance" does not broadly refer to work performed under, or events caused by the task order as asserted by the Government here. Indeed, if the Government's view of the *SRA* language were right, the court would have found the before-after distinction not even worth the trouble of explaining away as it

---

[5]    *See, e.g.*, *Unison Software, Inc. v. United States*, 168 Fed. Cl. 160 (2023); *MORI Assocs., Inc. v. United States*, 113 Fed. Cl. 33 (2013); *DataMill, Inc. v. United States*, 91 Fed. Cl. 740 (2010); *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126 (2006). Since this court's 2014 decision in *SRA*, the Claims Court has consistently read *SRA* as the binding precedent on the interpretation of § 3406(f)(1) and § 4106(f)(1)—that the task order bar applies if a protest is directly and causally connected to the issuance or proposed issuance of a task order—including most recently in *FYI - For Your Info., Inc. v. United States*, 170 Fed. Cl. 601, 614 (2024) (noting, in response to plaintiff's attempt to avoid *SRA*'s "directly and causally connected to issuance" task order bar test, that any change to the *SRA* test would have to come from an en banc decision by this court). The majority's holding that the task order bar is limited to challenges focused on a task order will come as a surprise to the Claims Court and the government contract bar.

did.  Instead, the language refers to an actual chal-
lenge to the issuance of the task order regardless of
whether the alleged violation occurred after issu-
ance of the task order.

Majority Op. at 15.

This justification for the majority's sidestep away from
*SRA* lacks merit.  The "directly and causally connected to
issuance" words in *SRA* do not refer to any "actual chal-
lenge to the issuance of the task order," because there was
no challenge to the issuance of the task order in *SRA,* and
the events caused by the task order, i.e., work performed
under the task order despite alleged violations of law after
issuance of the task order, is the basis for the connection
between the protest and the issuance of the ISC–3 task or-
der.  In sum, the majority's claim that the "'directly and
causally connected to issuance of [a task order]' language
in *SRA* is narrower than the interpretation sought by the
Government and, moreover, must be understood in light of
the facts at issue there," Majority Op. at 13, is undone by
the facts in *SRA*, as I have demonstrated.

As a matter of statutory construction (assuming the
majority is free to reinterpret the task order bar), the ma-
jority argues that the government's interpretation gives no
meaning to the words "issuance or proposed issuance," be-
cause the government's view bars protests concerning
"work performed by a proper awardee after issuance of a
proper task order—rather than just those protests made 'in
connection with the *issuance or proposed issuance of* a task'
order." Majority Op. at 13.  But the majority overlooks that
allegedly illegal conduct under the "directly and causally
connected to" test can stem from, be tied to, and result from
the issuance (or proposed issuance) of a task order.  "Di-
rectly and causally connected to" does not read "issuance or
proposed issuance" out of § 3406(f)(1).  By reading the stat-
ute to bar only protests focused on a task order itself, the

majority effectively reads the full meaning of "in connection with" out of the statute.

If Congress intended the reach of § 3406(f)(1) to be limited to protests involving deficiencies in a task order, as proposed or issued, it would not have included the language "in connection with," and instead would have barred only protests challenging the task order.[6]  Instead, Congress clearly meant the task order bar to reach beyond protests focused on the task order.

The majority sees the "directly and causally connected to issuance" test as "far too broad." Majority Op. at 13.  The majority overlooks that *SRA* expressly confronted and resolved the policy implications of its broad interpretation of the statute:

> Even if the protestor points to an alleged violation of statute or regulation, as SRA does here, the court still has no jurisdiction to hear the case if the protest is in connection with the issuance of a task order.  We acknowledge that this statute is somewhat unusual in that it effectively eliminates all judicial review for protests made in connection with a procurement designated as a task order—perhaps even in the event of an agency's egregious, or even criminal, conduct.  Yet Congress's intent to ban protests on the issuance of task orders is clear from FASA's unambiguous language.

*SRA*, 766 F.3d at 1413.

---

[6]    *See DataMill*, 91 Fed. Cl. at 756 ("If Congress intended to bar protests involving the actual 'issuance' or 'proposed issuance' of a delivery order, then it could have drafted the FASA accordingly.  It did not.").  *DataMill* involved a delivery order.

In footnote 5, the majority suggests two versions of the "directly and causally connected to issuance" test. First, the "far too broad" one that the government and the dissent refer to, and a second and narrower version: "We do not see[] the 'directly and causally connected to issuance' test as 'far too broad,' generally." Majority Op. at 13 n.5 (cleaned up). The "directly and causally connected to issuance" test which the majority finds "far too broad" was presented to the court by the government in *SRA* as an alternative to the test proposed by SRA, which would have limited the scope of the task order bar to protests focused on the task order itself, i.e., the test the majority now interprets as defining the entire scope of the task order bar. Nothing in the words of the *SRA* decision support the view that the court applied a less broad version of the test than actually proposed by the government, and the court's explanation of the consequences of the breadth of its decision, quoted above, belies any thought that the court actually applied a less broad version of the test.

Since *SRA*, this court has repeated that "FASA's unambiguous language categorically bars jurisdiction over bid protests . . . made in connection with a procurement designated as a task order—perhaps even in the event of an agency's egregious, or even criminal, conduct." *22nd Century Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023) (internal quotes omitted and citation omitted).

In sum, this court in binding precedent has already held that the unambiguous language of § 3406(f)(1) bars a protest that is directly and causally connected to the issuance of a task order. The majority's contention that the plain meaning of the statute only bars protests focused on a task order is incorrect, both as a matter of failure to follow binding precedent and as a matter of initial statutory interpretation.

The judgment of the Claims Court dismissing Percipient's complaint as barred by § 3406(f)(1) should be affirmed.

### 28 U.S.C. § 1491(b)(1)

As the majority states, 28 U.S.C. § 1491(b)(1) provides the Claims Court with jurisdiction to render judgment on an action by an interested party objecting (1) to a solicitation by a Federal agency for bids or proposals for a proposed contract, (2) to a proposed award or the award of a contract, or (3) to any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.[7]

We have interpreted "interested party" to "limit standing under § 1491(b)(1)" to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001*)* ("*AFGE*").

The majority appreciates that as a potential subcontractor Percipient cannot meet the *AFGE* standing test, and it understands that it is bound by *AFGE*. But the majority says that *AFGE* does not apply because this case "presents a different scenario than *AFGE*." Majority Op. at 22. The difference, according to the majority, is that unlike the scenario in *AFGE*, where the plaintiffs raised prong two and prong three protests, Percipient raises only a prong three protest. Considering itself free to disregard *AFGE* entirely, and in the interest of promoting compliance with § 3453, the majority creates a standing test

---

[7] The majority and I refer to the statute as having three prongs, each relating to defined stages of the procurement process.

exclusively for potential subcontractor § 1491(b)(1) prong three protests alleging a violation of § 3453:

> Specifically, we hold that where a plaintiff, invoking only prong three of the jurisdiction under 28 U.S.C. § 1491(b)(1), asserts a violation of 10 U.S.C. § 3453 without directly or indirectly challenging a solicitation for or actual or proposed award of a government contract, the plaintiff is an interested party if it is an offeror of a commercial product or commercial service that had a substantial chance of being acquired to meet the needs of the agency had the violation not occurred.

Majority Op. at 19.

As I explain below, the majority's sidestep away from *AFGE* is as incorrect as its sidestep away from *SRA* on application of the task order bar to this case. It may be true that this court has not faced a § 1491(b)(1) case presenting only a prong three protest, but we have ruled on a § 1491(b)(1) case presenting a prong three protest along with a prong two protest. And in that case, we necessarily dismissed both protests on the ground that the plaintiffs failed to meet the "actual or prospective bidder" standing test, producing a binding precedent that the "actual or prospective bidder" standing test applies to prong three protests. That case is *AFGE*.

There is no clear daylight between this case and *AFGE*, as the majority contends, and thus no room for the majority to cast *AFGE* aside and fashion a new, relaxed standing test that allows potential subcontractors, for the first time, to challenge government contracts under § 1491(b)(1). But if this panel were free to adopt a special standing test for prong three protests, for the reasons set forth below I would not interpret "interested party" to include potential subcontractors.

Under *AFGE*, Percipient should be denied standing under § 1491(b)(1), assuming it could escape from the task order bar of § 3406(f)(1).

### *AFGE*

The plaintiffs in *AFGE* were government agency employees (and their union representatives) who alleged violation of laws by their employer agency in connection with the agency's procurement of services from a private entity. The statute and regulations at issue in *AFGE* were the Federal Activities Inventory Reform Act of 1998 ("FAIR") and OMB Circular No. A–76. The statute required agencies to identify activities that are not inherently governmental services. When an agency considered contracting with a private sector source for performance of an identified activity, FAIR required the agency to select a source using a competitive process that includes a realistic and fair cost comparison to identify the government and private sector costs to perform the activity. OMB Circular A–76 provided the relevant cost comparison process.

The majority recognizes that *AFGE* involved challenges to the procurement under prongs two and three, but it fails to appreciate that the primary thrust of the case was the prong three allegation of error by misapplication of the OMB Circular A–76 cost evaluation standards. Plaintiffs' complaint and briefs in the case focused almost entirely on the alleged regulatory violations, asserting only in passing as an adjunct that the award of the contract was illegal because of the regulatory violations. In particular, the plaintiffs' briefs to this court argued that the "violation of statute or regulation" jurisdiction prong of § 1491(b)(1) is "wholly separate and independent from the contract award prong," Brief for Plaintiffs-Appellants at 20–21, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) (No. 00-5090), 2000 WL 34401893, at *20–21, and emphasized multiple times that the plaintiffs "were clearly 'interested parties' objecting to an 'alleged violation

of statute or regulation in connection with a procurement.'"
*Id.* at 12–23 (citing the language of prong three). While the
plaintiffs did object to the award of the contract, their
prong three allegation of regulatory violations dominated
their case.[8]

Our decision in *AFGE* explained that the purpose of the
Administrative Disputes Resolution Act of 1996 ("ADRA")
was to vest the Claims Court with exclusive jurisdiction
over the full range of procurement protest cases, and ADRA
did so though § 1491(b)(1). Before ADRA, the Claims Court
had jurisdiction over pre-award protest cases, and the
United States District Courts had jurisdiction over post-
award cases, the latter described as a group as "*Scanwell*"
cases. As the *AFGE* decision explains, the vast majority of
pre-ADRA *Scanwell* cases were brought by disappointed
bidders, and the Court of Appeals for the District of Colum-
bia Circuit had understood standing in *Scanwell* cases to
be limited to disappointed bidders. But, as the *AFGE* deci-
sion further explained, because the *Scanwell* cases were
based on the Administrative Procedure Act ("APA"), Con-
gress in writing § 1491(b)(1) "could have intended to give
the Court of Federal Claims jurisdiction over any contract
dispute that could be brought under the APA." *AFGE*, 258
F.3d at 1301. And because the standing test in the APA[9]
is quite broad, the *AFGE* decision surmised that "parties

---

[8]  The opening brief in *AFGE*, including the com-
plaint, is publicly available for any reader needing assur-
ance that *AFGE* presents an independent prong three
protest. *See* 2000 WL 34401893. For the government's
brief, *see* 2000 WL 34401354; for the plaintiffs' reply brief,
*see* 2000 WL 34401355.

[9]  "A person suffering legal wrong because of agency
action, or adversely affected or aggrieved by agency action
within the meaning of a relevant statute" has APA stand-
ing. 5 U.S.C. § 702.

other than actual or prospective bidders" might be able to
bring suit as interested parties under § 1491(b)(1).  *Id.*

In *AFGE*, the government argued for the disappointed
bidder test for "interested party," offering a specifically
worded test taken from a related statute, the Competition
in Contracting Act, 31 U.S.C. §§ 3551–56 ("CICA"): "inter-
ested party . . . means an actual or prospective bidder or of-
feror whose direct economic interest would be affected by
the award of the contract or by failure to award the con-
tract."

The issue before the *AFGE* court was the choice be-
tween the CICA test and the broader APA standing test,
and *AFGE* clearly chose the narrower standard of actual or
prospective bidders.  *Id.* at 1302.

Congress had the APA on its mind when it promul-
gated § 1491(b), because it borrowed the APA standard of
review for § 1491(b)(1) cases, *see* 28 U.S.C. § 1491(b)(1)(4),
but it did not adopt the APA standing test for such cases.
Congress instead adopted the "interested party" term from
CICA, which restricted government contract challenges to
actual or prospective bidders.  These facts of legislative his-
tory are overlooked by the majority, but these facts con-
vinced the court in *AFGE* that the "interested party" in
§ 1491(b)(1) is the same "interested party" as in CICA.
*AFGE*, 258 F.3d at 1302.

The majority understands that it is bound by *AFGE* but
argues that the standing test of *AFGE* is inapplicable here
because "this case presents a different scenario than
*AFGE*."  Majority Op. at 22.  The only material difference
between this case and *AFGE* is that *AFGE* included a
prong two protest as an adjunct to its primary prong three
protest and this case presents only a prong three protest.
But in order to dismiss the complaint in *AFGE*, the court
had to find that plaintiffs lacked standing for their inde-
pendent prong three protest, as well as their prong two pro-
test.  The *AFGE* decision clearly applies the CICA standing

test to both protests raised by the plaintiffs. The majority
does not challenge that the decision in *AFGE* dismissed the
prong three protest as well as the adjunct prong two protest
under the CICA standing test. As for the "crucial distinc-
tion in identifying why *AFGE* does not control here, and
one that answers the contention of the dissent that *AFGE*
controls" here, the majority states:

> In *AFGE*, the challenge made under the third
> prong of § 1491(b)(1) *did* challenge the contract
> award, and the third prong could not properly be
> applied to evade the constraint on standing under
> the first two prongs.

Majority Op. at 23.

This attempt to justify the majority's refusal to follow
*AFGE* lacks merit. First, the majority errs in assuming the
plaintiffs mixed the prong two and prong three challenges,
rather than asserting the challenges independently—as
the plaintiffs clearly did. There was no question before the
*AFGE* court of the plaintiffs' use of prong three "to evade
the constraint on standing under the first two prongs." Be-
fore the decision in *AFGE*, there was no constraint on
standing under the first two prongs to evade. What the
majority seems to be saying is that in another future case
a potential subcontractor might protest a procurement un-
der all three prongs, and in *that* case, the potential subcon-
tractor should not be able to evade the constraint of *AFGE*
on the prong one and two issues by gaining standing under
prong three. Such a situation did not exist in *AFGE* or in
this case. The majority's "crucial distinction" reason for
thinking "*AFGE* does not control here" is unsuccessful. *Id.*
Thus, we have already held that a prong three protest is
governed by the "actual or prospective bidder" interpreta-
tion of "interested party."

There is more in our case law to the same effect. The
now repealed Brooks Act (40 U.S.C. § 759 (repealed 1996))
previously allowed bid protests related to Automated Data

Processing Equipment (ADP) procurements by "an interested party." The Brooks Act included the same statutory definition for an "interested party" as in CICA. In 1989, this court held that this "interested party" definition excludes subcontractors in the Brooks Act context. *See MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989). Subsequently in *Rex*, this court held that "in light of the interrelatedness between . . . CICA and section 1491(b)(1) of the Tucker Act, as established by *AFGE*, and *MCI* and its progeny, the definition of 'interested party' in the Brooks Act applies to the Tucker Act with equal force." *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). To be clear: subcontractors were denied "interested party" standing under the Brooks Act, and this court held that the Brooks Act definition of "interested party" applies with equal force to § 1491(b)(1). This court's observation that "mere 'disappointed subcontractors'" are not "interested parties" for § 1491(b)(1) surely is correct. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).

The majority's attempt to distinguish *AFGE* lacks merit, and Percipient has no standing under *AFGE*.[10]

———————————————

    [10]   The majority errs in thinking that our decision in *Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009) supports its unwillingness to apply the *AFGE* standing test to Percipient's prong three protest. *Weeks Marine* involved a pre-award challenge to a contract, brought by a prospective bidder who could not show a likelihood of winning the contract at the solicitation stage, and hence could not meet the "direct economic interest" component of the *AFGE* standing test. *Weeks Marine* held that in that instance "direct economic interest" can be shown by a "non-trivial competitive injury which can be redressed by

THE MAJORITY'S RATIONALES

The majority cannot point to any statute or regulation, or case law authority, that compels or supports creation of an additional standing test within § 1491(b)(1) for a limited subcontractor class of § 1491(b)(1) protest cases. Instead, it offers four insufficient reasons to justify granting statutory standing to potential subcontractors alleging a violation of § 3453 under prong three of § 1491(b)(1).

The majority's first reason is that prong three adds jurisdiction for protests that would not lie under CICA, i.e., allegations of law violations occurring during the life of a government contract after the solicitation and award stages. But any challenge to a solicitation or award is based on some alleged error in law or regulation: a "legal source of wrongfulness," Majority Op. at 24, underlies any CICA protest and any protest under prongs one and two of § 1491(b)(1), and the various protests overlap and correspond because each depends on some allegation of legal error. The various protests differ materially only in that they attack various stages of a government contract and from case to case will raise different sources of wrongfulness. That a protest will focus on a different stage of a contract is hardly a reason to have differing standing tests for differing stages of a contract.

The majority's second reason is a restatement of its first reason: prong three "covers actions that are necessarily broader than the solicitation or the award of a contract stage, the first two Tucker act prongs." Majority Op.

---

judicial relief." *Id.* at 1362. *Weeks Marine* only modified the "direct economic interest" component. It did not alter the requirement that standing requires a bidder or prospective bidder. *Weeks Marine* is not support for rejecting the bidder or prospective bidder standing test and replacing it with a potential subcontractor standing test.

at 25. What makes a prong three challenge "broader" than a prong one or two challenge? A prong three challenge need not raise substantially broader issues than would be raised under prongs one and two. A prong three protest is only broader in that it will reach beyond the early stages of a contract.

The majority's first two reasons are facially unpersuasive. The majority can point to no genuine difference in substance between prong one/two and prong three protests. Surely protests to solicitations are invaluable for the government contract process because it is during the solicitation stage that the specifics of a contract are tested and improved. This observation has been acknowledged by this court. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007). If there are errors in a solicitation, having them called out before performance begins benefits all concerned, and the same is true with protests of proposed or actual contract awards. Equally surely, calling out errors in the later stages of contract performance is important for all concerned, although it could be argued that calling out error at the earlier stages is preferable, as remedy for error later on in a contract's life may be more costly than remedy for error earlier caught, and will significantly delay receipt by the government of the product or services for which it contracted.

The majority's attempt to use statutory construction in its first two reasons is unconvincing. Unlike our decision in *AFGE*, which used conventional statutory interpretation tools to find that Congress limited "interested party" in § 1491(b)(1) to bidders or prospective bidders, the majority has no such interpretative analysis to support its belief that Congress in ADRA carved out a special standing test solely for protests brought by potential subcontractors specifically alleging § 3453 violations under the third prong of the statute. Furthermore, the majority is mistaken when it asserts that the phrase "interested party" appears in other federal statutes without a standard meaning,

Majority Op. at 25, thus giving it license to fashion different meanings for "interested party" within § 1491(b)(1). The Brooks Act and CICA, the two most relevant statutes, use "interested party" as the standing test, and under both statutes "interested party" excludes subcontractors.

The majority's third reason for its failure to follow *AFGE* is its real reason, and likely the reason that underpins its unwillingness to follow *SRA* and enforce the task order bar against Percipient. The real reason is § 3453, which importantly establishes and seeks to enforce the preference for commercial products and services in agency procurements across the entire landscape of government contracts. Unless potential subcontractors are allowed to bring § 3453 protests under prong three, the majority predicts that the goals of § 3453 will be "illusory," Majority Op. at 26, and the statute will have "minimal bite" because contractors (like CACI) will not "act against their own interest," and the government cannot be trusted to enforce the law. Majority Op. at 26.

Prospective and disappointed actual bidders clearly have a significant interest to police possible violations of § 3453 by the party which won a contract, as they might succeed in achieving cancelation and resolicitation of the contract on the ground that full compliance by the contract winner and agency is lacking. Our precedent already confirms that prospective bidders are capable of enforcing compliance with § 3453. *See CGI Federal, Inc. v. United States*, 779 F.3d 1346, 1349, 1354 (Fed. Cir. 2015) (prospective bidder's protest under § 1491(b)(1) successfully challenges compliance with § 3453's sister statute, 41 U.S.C. § 3307). The majority has no factual support for its dispositive worry that § 3453's goals are illusory, and that the statute cannot be properly enforced unless potential subcontractors are granted standing to bring § 3453 prong three protests. It points to no evidence, anecdotal or empirical, that the statute is widely disregarded by agencies or contractors, and Percipient makes no such charge. The

majority cannot deny that prospective and disappointed bidders have real motives to bring § 3453 protests, as indeed has happened. I, like Congress, am not so doubting in the interest of private parties and of agencies to enforce compliance with §§ 3453 and 3307 that I would open the protest door to potential subcontractors.

As the relevant statutory history of CICA and the Brooks Act described below shows, Congress twice has measured the pros (more would-be law enforcers) and cons (disruption of the procurement process) of giving standing to potential subcontractors to protest procurements, and has even given explicit consideration to granting such standing, only to deny protest standing to subcontractors.

The majority's fourth reason invokes legislative history, arguing that having enacted § 3453 as part of FASA with its "significant impact on government procurement," it is "difficult to conclude" that Congress, two years later, would have promulgated ADRA "with the intention of eliminating any meaningful enforcement" of § 3453 by excluding potential subcontractors from the definition of "interested party" in § 1491(b)(1). Majority Op. at 27. The majority overlooks that in promulgating CICA, and in promulgating FASA, Congress actually looked at the question of providing subcontractors with standing to protest procurements and decided to deny them such standing. Nothing in ADRA's legislative history suggests that Congress was concerned with inadequate enforcement of § 3453 and a need for potential subcontractor standing to enforce § 3453. A comprehensive view of the relevant statutory history undermines the majority's fourth rationale, and argues forcefully against potential subcontractor standing under all three prongs of § 1491(b)(1).

First, Congress initially sought to include subcontractors as interested parties in CICA. *See* H.R. 5184, 98th Cong. § 204(g)(2) (1984) ("the term 'interested party' means a person whose direct economic interest would be affected

as contractor or *subcontractor* by the award or nonaward of the contract." (emphasis added)). In the end, Congress excluded subcontractors as interested parties. *See US W. Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 628 (Fed. Cir. 1991) ("the CICA, as enacted, provided for protest 'to a solicitation by a Federal agency' and all references that would have permitted subcontractors to protest were deleted.").

Next, in 1991 proposed amendments to the Brooks Act, which included the same "actual or prospective bidder" CICA definition of "interested party," Congress expressly considered and rejected the proposition of giving subcontractors standing to challenge ADP procurements. Specifically, the House of Representatives proposed amending the definition of "interested party" in the Brooks Act to permit "[p]rotests by subcontractors" because of concerns that "restrictive specifications may sometimes go unchallenged . . . when prospective prime contractors have no incentive to protest. . . . A potential subcontractor . . . would be harmed by the restrictive specification, but, under current law, would not have standing to protest." H.R. Rep. No. 102-364, at 32 (1991). However, the report also recognized that "[b]y increasing the number of possible protestors, [the bill] would further complicate ADP procurements, and in all likelihood, increase the opportunity for delay." H.R. Rep. No. 102-364, at 80. The report further explained that "the proposed definition of 'interested party' would allow potential subcontractors . . . to challenge an agency's procurement decisions[, and w]e believe that the grant of such a right is wholly unnecessary, given that current law authorizes the filing of a protest by 'an actual or prospective bidder or offeror.'" H.R. Rep. No. 102-364, at 80–81.

Congress's consideration of possible Brooks Act amendments occurred at the same time Congress considered draft statutes for a "Preference for Acquisition of Commercial Items" and associated "Market Research" which were later

incorporated in FASA, resulting in § 3453. H.R. Rep. No. 102-364, at 6. Certain Brooks Act possible amendments that would have opened the door to Brooks Act protests by subcontractors were rejected, and the reasons for excluding subcontractor standing were recognized in hearings on S. 1587, the final version of FASA, including § 3453. For example, these hearings noted that "[e]stablishing a subcontractor's right to protest would greatly expand the number of protests and, consequently the delays in the procurement process[, and i]t would also establish precedent that privity of contract exists between the government and subcontractors, thereby opening the possibility for direct subcontractor claims under the Contract Disputes Act." *To Revise and Streamline the Acquisition Laws of the Federal Government, and for Other Purposes: Hearing on S. 1587 Before the S. Comm. on Governmental Affs. and the S. Comm. on Armed Servs.*, 103rd Cong. 293 (1994).

Regarding the legislative history of ADRA, this court in *AFGE* extensively relied on the statute's legislative history to support adoption of CICA's standing test for § 1491(b)(1). *See AFGE*, 258 F.3d at 1299–1302. Rather than quote four pages of the *AFGE* opinion, it is enough here to note that the legislative history confirmed that contractors (not potential subcontractors) should have § 1491(b)(1) standing and that to construe the statute more broadly would violate the sovereign immunity canon. ADRA consolidated pre-award and post-award contract litigation in the Claims Court and created a contractor standing test for the new statute. Congress did its ADRA work fully aware of its experience in enacting CICA and the Brooks Act, in which it created a contractor standing test that expressly excluded potential subcontractors from standing. To use the majority's test, isn't it difficult to conclude that Congress in ADRA meant to open the door to protests by potential subcontractors in § 1491(b)(1) when it knowingly closed that door in CICA and the Brooks Act, especially when there's no evidence that Congress was

concerned with lax enforcement of § 3453 when enacting ADRA?

The majority's reference to the legislative history of the now repealed Brooks Act deserves comment. The majority references the part of the legislative history that I have highlighted, in which Congress pointed out that granting standing to subcontractors under the Brooks Act might be viewed to suggest that subcontractors would have privity with the government for direct subcontractor claims under the Contract Disputes Act—despite the general view that such privity is required to sue the government under the Tucker Act. *See Merritt v. United States*, 267 U.S. 338, 340–41 (1925).

Privity is a matter of fact, and under our precedent actual subcontractors are absolutely denied standing to sue the government under the Contract Disputes Act. *See Winter v. Floorpro, Inc.*, 570 F.3d 1367 (Fed. Cir. 2009). Actual subcontractors are also denied standing under 28 U.S.C. § 1491(a) unless the subcontractor can establish that it is a third-party beneficiary to the underlying prime contract with the government. *See G4S Tech. LLC v. United States*, 779 F.3d 1337 (Fed. Cir. 2015).

Thus, it is not surprising that Congress was concerned that granting standing to subcontractors to protest under the Brooks Act would allow a nonparty to a contract to sue the government and thus create a false privity of contract where none exists. Interestingly, the majority sees this legislative history as supporting denial of standing to potential subcontractors for protests under prongs one and two of § 1491(b)(1), while at the same time having no effect on standing for potential subcontractor protests under prong three of the statute. Majority Op. at 28–29. The majority reasons that because prong one and two protests by potential subcontractors challenge a contract, proposed contract or solicitation, it makes sense to insist on privity and thus deny potential subcontractor standing under prongs one

and two.  But because prong three protests do not directly challenge terms of a contract, proposed contract or solicitation, and instead challenge unlawful conduct arising in performance of a contract, the majority argues that privity concerns evaporate.  This does not make sense.  The requirement of privity does not care about the nature of the challenge a nonparty wishes to bring against the government on one of its contracts.  Privity in government contract law exists to prevent nonparties from challenging the government regarding the contracts it forms with parties.  A challenge to performance of a contract is no less a challenge to a contract than a specific challenge to a particular line item in a solicitation.  Suits brought under the CDA and § 1491(a) challenge performance under a contract, and privity of contract bars actual subcontractor standing to sue under those provisions.  The majority's attempt to argue that privity concerns are neutral for potential subcontractor standing under prong three while prohibiting standing under prongs one and two is unconvincing.

It is clear that Percipient, as a potential subcontractor, is not in privity of contract with the government.  The parties have not argued that we need to consider privity of contract to decide Percipient's standing under § 1491(b)(1), but to the extent that privity concerns lurk in the background, those concerns clearly suggest that Percipient should be denied standing under all three prongs of the statute.

In sum, Congress considered the legislation resulting in § 1491(b)(1) in the light of its previous experience in enacting CICA, the Brooks Act, and FASA.  Congress understood the benefits and detriments of subcontractor standing and considered subcontractor standing "wholly unnecessary, given that current law authorizes the filing of a protest by 'an actual or prospective bidder or offeror.'"  H.R. Rep. No. 102-364, at 80–81.  Congress enacted ADRA's "interested party" standing test knowing it had already used the same "interested party" standing test in CICA and the Brooks Act, in each instance with the

intention of barring subcontractor standing.  The majority points to no evidence that Congress, in enacting ADRA, meant to allow standing for potential subcontractors specifically to bring § 3453 prong three protests, while barring standing for other potential subcontractor protests under prongs one and two.

Other than its unfounded prediction that the goals of § 3453 are illusory and that the statute will be unenforced unless potential subcontractors are granted standing to bring prong three protests, the majority has no reason to sidestep away from *AFGE* and create potential subcontractor standing for prong three § 3453 protests.  Were Percipient to survive the task order bar, the court should apply the *AFGE* standing test to this case and deny Percipient statutory standing for its complaint.

CONCLUSION

The decision in this case will have an enormous impact on government procurements.

For government contracts implemented through issuance of task or delivery orders, the decision significantly narrows the existing reach of the task order bar, which defeats Tucker Act jurisdiction for otherwise permissible § 1491(b)(1) protests.  The majority interprets the task order bar to be limited to protests that allege legal flaws in the task order, but does so by discarding the binding decision in *SRA*, which interpreted the task order bar to reach broader alleged violations of law arising in connection with the issuance of a task order.  Whether the *SRA* interpretation of the scope of the task order bar is "far too broad" as a policy matter, as the majority asserts, can be addressed by the court sitting en banc, but this panel is bound by *SRA*, and under its test, Percipient's protest is task order barred.

For protests under § 1491(b)(1), the majority grants potential subcontractors standing to protest for the first time

in Tucker Act history. That the majority limits potential subcontractor standing to prong three protests involving alleged violations of § 3453 may suggest to some that the decision is not a big deal. But § 3453 and its sister statute 41 U.S.C. § 3307 apply to all government contracts for products and services, so it is fair to expect that potential subcontractors will soon flood the Claims Court with § 1491(b)(1) protests. Think of all the products and services that go into government contracts for a battleship, or airplane, or new headquarters for an agency, and the vast number of potential subcontractors who can so easily allege possession of a suitable off-the-shelf product or service and inadequate agency attention to § 3453's requirements. And further, the majority's driving rationale, i.e., that some laws are so important (here, § 3453) that they require relaxed standing tests to promote compliance, will in time likely apply to alleged violations of other important laws, requiring specially tailored standing requirements. The majority accomplishes its goal of enhancing vigilance for § 3453 by discarding the *AFGE* precedent as irrelevant to this case. As I have demonstrated above, *AFGE* binds this panel, and Percipient lacks standing under § 1491(b)(1). And as a matter of independent consideration, there is no support for the majority's new prong three standing test, and there is ample statutory history evidence that Congress would object to granting potential subcontractors § 1491(b)(1) standing of any kind. As with the task order bar issue in this case, the court sitting en banc might consider additional standing tests for § 1491(b)(1) beyond *AFGE's,* but this panel cannot.

For the many reasons set forth above, I respectfully dissent.