No. 23-1970

# United States Court of Appeals for the Federal Circuit

PERCIPIENT.AI, INC.,

*Plaintiff-Appellant,*

v.

UNITED STATES, CACI, INC.-FEDERAL,

*Defendants-Appellees.*

Appeal from the United States Court of Claims
No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink

**EN BANC OPENING BRIEF OF PLAINTIFF-APPELLANT PERCIPIENT.AI, INC.**

Hamish P.M. Hume
Samuel C. Kaplan
Eric J. Maurer
Gina A. Rossman
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
emaurer@bsfllp.com
grossman@bsfllp.com

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF INTEREST

Counsel for Percipient.ai, Inc. certifies that:

1.    **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.

Percipient.ai, Inc.

2.    **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.    **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

None.

4.    **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Not applicable.

5.    **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6.    **Organizational Victims and Bankruptcy Cases.**  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

i

Dated:  January 21, 2025                    /s/ Samuel C. Kaplan
                                            Samuel C. Kaplan

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ v

GLOSSARY ............................................................................................... ix

STATEMENT OF RELATED CASES ....................................................... x

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF THE ISSUE ................................................................... 1

STATEMENT OF THE CASE ................................................................... 2

    I.  Legal Background ........................................................................... 2

        A. The 1994 FASA Commercial Product Preference Law ............ 2

        B.  The Administrative Dispute Resolution Act of 1996 ("ADRA") ............. 5

    II.  Factual Background ...................................................................... 7

        A. The NGA Solicitation, NGA's Need For Computer Vision, and Percipient's Computer Vision Commercial Product .................. 7

        B. The SAFFIRE Award to CACI and the Assurances that Market Research into Percipient's CV System Would Follow .............. 8

        C. NGA's Refusal to Require Procurement of Percipient's Product or Appropriate Market Research Into Its Ability To Meet SAFFIRE's CV Requirements. ................................................. 12

    III.Procedural Background .............................................................. 13

        A. Percipient's Complaint .......................................................... 13

        B. The CFC Decisions ................................................................ 14

        C. The Appeal and the Panel's Decision ...................................... 17

        D. The *En Banc* Petition and Order ............................................ 21

SUMMARY OF THE ARGUMENT ........................................................ 22

STANDARD OF REVIEW ......................................................................24

ARGUMENT ........................................................................................25

I.  The Term "Interested Party" Must Include Any Directly Injured Party
    Who Could Have Offered Its Product or Service To Meet The Needs
    Of The Agency But For That Agency's Alleged Legal Violation. ...............25

    A.  As Reflected In The Reasoning of the Panel Majority, The Text,
        Structure, and Purpose of ADRA Support This Standard........................27

    B.  The Panel Majority's Decision Is Consistent With *AFGE* And This
        Court's Other Decisions Articulating An "Interested Party" Test...........34

    C.  The Panel Majority's Decision Is Also Consistent With The Case
        Law Addressing "Subcontractor" Standing. .............................................42

    D.  The Remaining Objections of The Panel Dissent Do Not Provide A
        Basis For Rejecting The Panel Majority's Decision. ...............................45

II. While The Court Need Not Reach the Issue To Resolve This Case, It
    Would Be Correct To Adopt the Broader APA Test Articulated in
    *Validata Chemical v. U.S. Department of Energy* . ......................................47

CONCLUSION ......................................................................................54

JUDGMENT AND SUPPORTING OPINION ........................................................a

# <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>Cases</u>

*Acetris Health, LLC v. United States*,
    949 F.3d 719 (Fed. Cir. 2020) ................................................... 22, 37

*Acuity-CHS Middle E. LLC v. United States*,
    173 Fed. Cl. 788 (2024) ................................................................45

*Am. Fed'n of Gov't Emps., AFL–CIO v. United States*,
    258 F.3d 1294 (Fed. Cir. 2001) ............................................. passim

*Bausch & Lomb, Inc. v. United States*,
    148 F.3d 1363 (Fed. Cir. 1998) ....................................................30

*Blue Water Env't, Inc. v. United States*,
    60 Fed. Cl. 48 (2004) ...................................................................44

*CCL, Inc. v. United States*,
    39 Fed. Cl. 780 (1997) .................................................................40

*CGI Fed. Inc. v. United States*,
    779 F.3d 1346 (Fed. Cir. 2015) ....................................................37

*Distributed Sols., Inc. v. United States*,
    539 F.3d 1340 (Fed. Cir. 2008) .......................................... 24, 30, 37

*Eagle Design & Mgmt., Inc. v. United States*,
    62 Fed. Cl. 106 (2004) .................................................................44

*Electra-Med. Corp. v. United States*,
    140 Fed. Cl. 94 (2018), *aff'd*, 791 F. App'x 179 (Fed. Cir. 2019)....................40

*Elmendorf Support Servs. Joint Venture v. United States*,
    105 Fed. Cl. 203 (2012) ...............................................................40

*Emery Worldwide Airlines, Inc. v. United States*,
    264 F.3d 1071 (Fed. Cir. 2001) ....................................................33

*Henke v. United States*,
    60 F.3d 795 (Fed. Cir. 1995) .......................................................24

v

*Int'l Genomics Consortium v. United States,*
   104 Fed. Cl. 669 (2012) ................................................................44

*L-3 Commc'ns EOTech, Inc. v. United States,*
   85 Fed. Cl. 667 (2009) ..................................................................40

*LKQ Corp. v. GM Glob. Tech. Operations LLC,*
   102 F.4th 1280 (Fed. Cir. 2024) ...................................................42

*Matter of: Aerosage, LLC,*
   B-417289 (Apr. 24, 2019)..............................................................32

*McAfee, Inc. v. United States,*
   111 Fed. Cl. 696 (2013) ................................................................40

*MCI Telecomms. Corp. v. United States,*
   878 F.2d 362 (Fed. Cir. 1989) ......................................................44

*Palantir USG, Inc. v. United States,*
   904 F.3d 980 (Fed. Cir. 2018) ...................................................5, 16

*Percipient,*
   165 Fed. Cl. 331 (2023) ......................................................... 15, 43

*Percipient,*
   2023 WL 3563093 (Fed. Cl. May 17, 2023) ................................16

*Percipient.ai, Inc. v. United States,*
   121 F.4th 1311 (Fed. Cir. 2024) ...................................................22

*Percipient.ai, Inc. v. United States, CACI, Inc.-Fed.,*
   104 F.4th 839, 857 (Fed. Cir. 2024) ...................................... passim

*RAMCOR Servs. Grp., Inc. v. United States,*
   185 F.3d 1286 ................................................................................49

*S. Corp. v. United States,*
   690 F.2d 1368 (Fed. Cir. 1982) ....................................................42

*Savantage Fin. Servs., Inc. v. United States,*
   81 Fed. Cl. 300 (2008) ..................................................................40

vi

*Scanwell Lab'ys, Inc. v. Shaffer*,
   424 F.2d 859 (D.C. Cir. 1970) ............................................................... 6

*SEKRI, Inc. v. United States*,
   34 F.4th 1063 (Fed. Cir. 2022) ..................................................... 24, 37

*SRA Int'l, Inc. v. United States*,
   766 F.3d 1409 (Fed. Cir. 2014) ......................................................... 25

*Sys. Application & Techs., Inc. v. United States*,
   691 F.3d 1374 (Fed. Cir. 2012) ......................................................... 39

*Tinton Falls Lodging Realty, LLC v. United States*,
   800 F.3d 1353 (Fed. Cir. 2015) ......................................................... 39

*Validata Chemical Services v. United States Department of Energy*,
   169 F. Supp. 3d 69 (D.D.C. 2016) ............................................ passim

*Weeks Marine, Inc. v. United States*,
   575 F.3d 1352 (Fed. Cir. 2009) ..................................................... 28, 38

## Statutes

10 U.S..C § 2377 ........................................................................................ 5

10 U.S.C. § 3406 .................................................................... 15, 16, 17, 22

10 U.S.C. § 3453 ............................................................................... passim

28 U.S.C. § 1295 ........................................................................................ 1

28 U.S.C. § 1491 ............................................................................... passim

31 U.S.C. § 3551 ................................................................................. 32, 35

41 U.S.C. § 3307 ........................................................................................ 2

## Other Authorities

142 Cong. Rec. S11849 (Sept. 30, 1996) ............................................... 51

H. Rep. No. 103-545(I), at 28 (1994), 1994 WL 261997 ......................... 3

N. Castellano, *Interested Party:  En Banc Reconsideration of Bid Protest Standing*, 39 Nash & Cibinic Rep. NL ¶ 2 (Jan. 2025).......................................................51

National Defense Authorization Act for Fiscal Year 2009 Pub. L. 110-417)...........4

S. Rep. No. 103-259, at 5 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2598............2

Shane Harris, *Palantir Wins Competition to Build Army Intelligence System*, The Washington Post, Mar. 26, 2019 .........................................................................5

## **Regulations**

10 U.S.C. § 3406(f)......................................................................................................2

28 U.S.C. § 1491(b) .....................................................................................................1

48 CFR § 212.212(1) ...................................................................................................5

## **Rules**

Fed. R. App. P.4(a)(1)(B) ............................................................................................1

# **GLOSSARY**

| | |
|---|---|
| ADRA | Administrative Dispute Resolution Act |
| APA | Administrative Procedure Act |
| CICA | Competition In Contracting Act |
| CV | Computer Vision |
| DDI | Data and Digital Innovation Office |
| DLA | Defense Logistics Agency |
| FAR | Federal Acquisition Regulation |
| FASA | Federal Acquisition Streamlining Act |
| GAO | Government Accountability Office |
| IDIQ | Indefinite Delivery Indefinite Quantity |
| ML | Machine Learning |
| NGA | National Geospatial-Intelligence Agency |
| SER | SOM Enterprise Repository |
| SOM | Structured Observation Management |

## **STATEMENT OF RELATED CASES**

There has been no prior appeal of the underlying case to this Court or any other appellate court.  Counsel is not aware of any pending actions that will directly affect, or be affected by, the Court's decision in this appeal.

## STATEMENT OF JURISDICTION

This is an appeal from the United States Court of Federal Claims (the "Court of Federal Claims" or "CFC").  The Court of Federal Claims had jurisdiction under 28 U.S.C. § 1491(b)(1).  The Court of Federal Claims entered final judgment on May 18, 2023.  Percipient.ai, Inc. ("Percipient") timely filed its notice of appeal on May 24, 2023.  Fed. R. App. P.4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(3).  On November 22, 2024, this Court ordered *en banc* review.

## STATEMENT OF THE ISSUE

The Court ordered the parties to address the following issue:

1.     Who can be "an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" under 28 U.S.C. § 1491(b)(1)?

1

## STATEMENT OF THE CASE

I.  LEGAL BACKGROUND

### A. The 1994 FASA Commercial Product Preference Law

As part of the Federal Acquisition Streamlining Act of 1994 ("FASA"), Congress enacted a statute that requires federal agencies to acquire "commercial products" or "nondevelopmental items" to meet their procurement needs "to the maximum extent practicable."  10 U.S.C. § 3453(b); *see also* 41 U.S.C. § 3307.

The purpose of this law was to address the waste, inefficiencies, and uncertainties inherent in the kinds of long-term, developmental contracts that government agencies (especially in the defense sector) have been historically prone to use.  S. Rep. No. 103-259, at 5 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2598. Such contracts lead to cost overruns, wasted resources, unnecessary delay, and use of inferior and outdated technology.  *Id.*  The Senate Committee on Government Affairs found that the "purchase of proven products such as commercial and nondevelopmental items can eliminate the need for research and development, minimize acquisition lead time, and reduce the need for detailed design specifications or expensive product testing."  S. Rep. No. 103-258, at 5 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2561.  Likewise, the House Committee on Government Operations stated that "the Federal Government must stop 're-inventing the wheel' and learn to depend on the wide array of products and

2

services sold to the general public on a routine basis." H. Rep. No. 103-545(I), at 28 (1994), 1994 WL 261997.

The panel majority recognized that "[b]y its express terms, the statute is meant to ensure that, 'to the maximum extent practicable,' agencies provide offerors of commercial services an opportunity to compete in procurements, and to give a preference for commercial products and commercial services." *Percipient.ai, Inc. v. United States, CACI, Inc.-Fed.,* 104 F.4th 839, 857 (Fed. Cir. 2024) ("*Percipient*"). First, the "head of an agency shall ensure that, to the maximum extent practicable," the agency's requirements are defined so that commercial products "may be procured to fulfill such requirements" and offerors of commercial products "are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a). It next directs agency heads to "ensure that procurement officials in that agency, to the maximum extent practicable" (1) "acquire" commercial products; (2) "modify requirements" in appropriate cases to ensure that the requirements can be met by commercial products; and (3) "state specifications in terms that enable and encourage bidders and offerors" to supply commercial products. *Id.* § 3453(b)(1), (3), (4).

The statute also requires agencies to conduct market research into the availability of commercial products (1) "before developing new specifications for a procurement by that agency"; (2) "before soliciting bids or proposals for a contract

3

in excess of the simplified acquisition threshold"; and (3) "before awarding a task order or delivery order in excess of the simplified acquisition threshold." *Id.* § 3453(c)(1). Agency heads must use the results of the market research to determine whether there are commercial products available that could (1) "meet the agency's requirements"; (2) "be modified to meet the agency's requirements"; or (3) "meet the agency's requirements if those requirements were modified to a reasonable extent." *Id.* § 3453(c)(2).

The statute also requires agencies to ensure "to the maximum extent practicable" that prime contractors and subcontractors incorporate commercial products "as components of items supplied" to the agency. *Id.* § 3453(b)(2). It also mandates that agencies must ensure that prime contractors engage "in such market research as may be necessary" to meet the requirements of § 3453(b)(2) for purchases over $5,000,000 made "for or on behalf of the Department of Defense." *Id.* § 3453(c)(5).

In 2009, Congress reinforced these requirements in the areas of computer software and artificial intelligence by requiring defense agencies to identify and evaluate "opportunities for the use of commercial computer software and other non-developmental software in accordance with Section 803 of the National Defense Authorization Act for Fiscal Year 2009 Pub. L. 110-417)." 48 CFR

§ 212.212(1). This duty applies "at all stages of the acquisition process (including

concept refinement, concept decision, and technology development)." *Id.*

This Court first enforced the requirements of 10 U.S.C. § 3453 (when it was

codified at 10 U.S.C § 2377) by affirming the decision of the CFC to invalidate an

Army solicitation for a developmental project in *Palantir USG, Inc. v. United*

*States*, 904 F.3d 980 (Fed. Cir. 2018). Following this Court's decision, the Army

field-tested commercial alternatives to development, including Palantir's

product. The Army ultimately decided to procure Palantir's commercial product to

meet its needs. *See* Shane Harris, *Palantir Wins Competition to Build Army*

*Intelligence System*, The Washington Post, Mar. 26, 2019.[1]

## B. The Administrative Dispute Resolution Act of 1996 ("ADRA")

Prior to 1996, no statute expressly governed the jurisdiction of courts over

bid protests. The CFC exercised jurisdiction over pre-award protests under its

general Tucker Act jurisdiction over breaches of implied contracts, and the district

courts exercised jurisdiction over post-award protests under the Administrative

Procedure Act ("APA"). *Percipient*, 104 F.4th at 853; *Am. Fed'n of Gov't Emps.,*

*AFL–CIO v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001) ("*AFGE*").

Under this pre-1996 system, the district courts exercised jurisdiction over all

---

[1] Available at https://www.washingtonpost.com/world/national-security/palantir-wins-competition-to-build-army-intelligence-system/2019/03/26/c6d62bf0-3927-11e9-aaae-69364b2ed137_story.html.

claims by persons who had standing under the APA. *See Scanwell Lab'ys, Inc. v. Shaffer*, 424 F.2d 859, 865–66 (D.C. Cir. 1970) (describing the basis for such pre-ADRA review under the APA).

In 1996, Congress amended this system by enacting ADRA, which vested full jurisdiction over all bid protests (pre- and post- award) in both the CFC and the district courts, but with district court jurisdiction set to sunset after five years. Pub. L. No. 104-320, § 12(d), 110 Stat. 3870, 3875 (1996) (codified at 28 U.S.C. § 1491 note). ADRA amended the Tucker Act to provide that the CFC "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

The legislative history to ADRA makes clear that, initially, both the CFC and the district courts "would exercise jurisdiction over the full range of bid protest cases previously subject to review in either system," and then after the sunset provision took effect, the CFC would have "exclusive judicial jurisdiction over procurement protests." 142 Cong. Rec. S11849–50 (statement of Sen. Levin); *AFGE*, 258 F.3d at 1300. Nothing suggests that the CFC jurisdiction would be in any way narrower than the jurisdiction previously exercised by the district courts

6

under the APA.  Further, ADRA made the APA standard of review the applicable

standard of review for all bid protest cases.  28 U.S.C. § 1491(b)(4); *AFGE*, 258

F.3d at 1300.

## II.   FACTUAL BACKGROUND

### A. The NGA Solicitation, NGA's Need For Computer Vision, and Percipient's Computer Vision Commercial Product

The National Geospatial-Intelligence Agency (NGA) issued the SAFFIRE

solicitation in 2020.  Appx57.[2]  It generally sought to satisfy two needs.  First,

NGA seeks to improve its production, analysis, and storage of data through what it

calls "Structured Observation Management" ("SOM").  *Id.*  The solicitation sought

bids to build and operate a "SOM Enterprise Repository," or "SER," which will be

the enterprise backbone for storing, disseminating, and regulating access to data.

Appx58.  Percipient does not have the capabilities to perform this SER portion of

the solicitation.  Appx43.

The second need addressed in the solicitation is to develop a user-facing

Computer Vision technology for use by NGA personnel.  "Computer Vision"

("CV") is a type of artificial intelligence technology that trains and uses computers

to interpret the visual world.  Appx56.  Percipient has a fully-developed and

proven commercial product that meets NGA's CV needs as set forth in the

---

[2] "Appx" refers to the Joint Appendix (ECF No. 30) filed in this case.

7

solicitation.  Indeed, Percipient's entire corporate mission since its founding in 2017 has been to develop the world's leading CV platform, employing state-of-the-art technology and expertise to meet precisely the CV needs that NGA is seeking to fulfill.  Appx59–60.

In issuing the SAFFIRE solicitation, NGA did not seek bids solely to meet its CV needs, did not solicit commercial products that meet its CV needs, and did not undertake market research to determine if commercial products existed that meet its CV needs.  Instead, it solicited bids for a prime contractor to manage the combined SER and CV effort, and assured Percipient that market research would be done in the future regarding its ability to meet the CV needs on a commercial product basis.  Appx43–44.  For these reasons, Percipient could not and did not bid on the SAFFIRE contract.  Instead, it awaited the market research where it could demonstrate its ability to meet NGA's CV needs with its fully-developed commercial product.  Yet that market research never happened.

## B. The SAFFIRE Award to CACI and the Assurances that Market Research into Percipient's CV System Would Follow

On January 14, 2021, NGA awarded SAFFIRE as a single award, Indefinite Delivery Indefinite Quantity (IDIQ) five-year contract to intervenor CACI, Inc.-Federal (CACI).  Appx70.  Task Order 1 (which was attached to the solicitation) was awarded a week later.  Consistent with NGA's prior representations, this task order suggested that commercial products would be examined and used to meet the

8

CV requirements of the SAFFIRE project. *See id.* (requiring contractor to augment "user capability with automated detections of observations *by leveraging the rapidly maturing commercial computer vision technology*" (emphasis added)).

NGA also gave specific assurances to Percipient that its CV product would be evaluated for the SAFFIRE project. While the SAFFIRE solicitation was being considered, NGA was working with Percipient to develop a prototype for other, related CV needs. *Id.* The NGA senior analyst supervising that project told Percipient that SAFFIRE was "plug and play" designed, and that "Mirage might be asked to be integrated into the larger SAFFIRE construct." Appx68.

Percipient asked the NGA personnel involved in SAFFIRE to schedule an evaluation where it could demonstrate its product's ability to meet SAFFIRE's CV requirements. Appx71. NGA told Percipient to contact CACI. But when Percipient did so, a CACI representative told Percipient "that ship has sailed," suggesting that CACI intended to launch a software development project no matter the capabilities of Percipient's existing product. Appx71–72. Alarmed by this response, Percipient sent a detailed letter to NGA explaining the ability of its product to meet SAFFIRE's CV requirements. Appx72–73. The letter attached a crosswalk showing how its Mirage product met each of the NGA's CV System requirements. Appx73; *see also* Appx112–116. It further stated that NGA's obligations to consider commercial and nondevelopmental items did not stop at the

9

time of the contract's award.  Appx108–109.  Rather, it was NGA's obligation to

ensure a full and fair evaluation of Mirage and any other commercial or

nondevelopmental item before developing software to meet its requirements.

Appx119–120.

NGA subsequently assured Percipient that it and CACI had made no

decisions about Mirage or the capability of commercial and nondevelopmental

products to meet SAFFIRE's CV requirements.  For example, NGA informed

Percipient that:

- CACI's comment that the "ship" had "sailed" was an "unfortunate miscommunication."  Appx74.

- NGA had made no decision as to the ability of commercial products to meet SAFFIRE's requirements, including the ability of Mirage and its geospatial module to meet SAFFIRE's CV requirements.  *Id.*

- "Non-developmental solutions are a key to SAFFIRE's success and CACI has assured NGA that it will consider commercial products prior to developing new software."  Appx122.

- There "will be opportunities for percipient.ai and other commercial vendors to submit their products for review."  *Id.*

- "NGA will implement this process through numerous Performance Work Statement requirements for CACI to leverage commercial technology, conduct test and evaluation activities, employ a modular open systems architecture, and otherwise support the integration of commercial technology."  *Id.*

Percipient performed a brief demo of Mirage's capabilities for CACI

representatives and an NGA Contracting Officer's Representative.  Appx76.  The

demo was met with great enthusiasm by those present who agreed that the next logical step was a "deep dive." *Id*. The promised deep dive, however, never occurred. *Id.* Despite active follow-up and inquiries as to when the evaluation of its product would occur, both NGA and CACI failed to provide Percipient with any update on the status of the evaluation over the next several months. Appx76–78.

On September 7, 2021, NGA said it had "not had an opportunity to complete its review of CACI's evaluation, or determine next steps with regard to Mirage." Appx133. NGA never informed Percipient of any decision it had made with respect to use of its product. Instead, NGA told Percipient to expect more delay, stating that funding concerns "at the outset of FY22," may "delay any action taken under SAFFIRE, including actions related to Mirage." *Id.*

In October 2021, Percipient learned from an informal conversation with CACI that CACI intended to develop software to meet NGA's requirements. Appx78–79. Percipient then approached NGA's Associate Director of Capabilities Phillip Chudoba who agreed to receive a demo of Mirage's capabilities. Appx79. This demo took place on December 1, 2021. Appx79–80. Following it, Mr. Chudoba stated that "Mirage meets all of NGA's analytic transformation requirements." Appx80.

11

**C. NGA's Refusal to Require Procurement of Percipient's Product or Appropriate Market Research Into Its Ability To Meet SAFFIRE's CV Requirements.**

On July 25, 2022, NGA entered into a bailment agreement with Percipient to "test and evaluate Mirage platform Geospatial Module (GSM) capabilities." Appx80; Appx83. Percipient devoted over $1 million of time and resources in negotiating and implementing the bailment agreement. Appx44. But when the testing period concluded on October 23, 2022, Percipient realized that NGA had failed to evaluate Mirage as promised. Appx83-84. Percipient thus offered to extend the no-cost testing period to allow for a full and fair evaluation. Appx84. NGA rejected Percipient's offer on November 23, 2022, stating the evaluation addressed "NGA's operational needs for an enterprise Machine Learning (ML) Platform as identified by DDI" but that it "was not an evaluation of the ML models generated and inferenced in Mirage, *nor of Mirage as an Analytic tool*." Appx85 (emphasis added). Given that SAFFIRE's central component is a CV System that would provide users with advanced analytic capabilities, this response confirmed that NGA had deliberately failed to evaluate Mirage's ability to meet SAFFIRE's CV System requirements. *Id.*

Further, even this limited evaluation supported the conclusion that Mirage could serve as the core CV System platform. Appx85–86. NGA's testers concluded that "Percipient's commercial capability performed as described in

12

meetings, correspondence, and in the documentation provided to support the assessment." *Id.* Given that Percipient had repeatedly emphasized Mirage's ability to meet all of SAFFIRE's enterprise CV requirements in all meetings and correspondence with NGA, this statement would appear to have acknowledged Mirage's ability to do so. Appx86. However, NGA confirmed that there would be no broader evaluation of Mirage to meet SAFFIRE's requirements. Appx85.

On December 9, 2022, Percipient sent a letter to NGA reiterating this background and asking that NGA comply with its obligations under 10 U.S.C. § 3453. Appx87–89. NGA provided its written response on January 3, 2023. Appx88–91. It ignored the substance of Percipient's allegations and focused on procedural defenses it intended to offer. *Id.* This bid protest followed on January 9, 2023.

## III.  PROCEDURAL BACKGROUND

### A. Percipient's Complaint

Percipient's complaint alleged that NGA had violated the law "in connection with a procurement or a proposed procurement." Appx46. Among other things, the complaint alleges that NGA had violated multiple provisions in the commercial product preference statute, including (a) the requirement to ensure that its prime contractor also undertake necessary market research and make determinations as to the availability of commercial products that could meet SAFFIRE's requirements,

Appx97, (b) the requirement that it procure commercial products "to the maximum extent practicable," Appx94, and (c) the requirement that it require its contractors to "incorporate commercial services, commercial products, or nondevelopmental items other than commercial products as requirements of items supplied to the agency," Appx94–96.

Percipient's complaint also alleges that "Percipient is an interested party because it offers state-of-the-art software as a commercial or nondevelopmental item that meets and even exceeds the requirements of SAFFIRE's CV System requirements and that is substantially likely to be acquired by NGA or its contractor if NGA were required to comply with its obligations under § 3453 and the other provisions of law invoked in this Complaint." Appx46. It contains extensive allegations about the capabilities of Percipient's CV product, Mirage, and its ability to meet NGA's needs for a CV System in connection with the SAFFIRE project. Appx 59–66.

## B. The CFC Decisions

The Government and intervenor-defendant moved to dismiss Percipient's complaint, advancing numerous arguments, including lack of subject matter jurisdiction, lack of standing, and untimeliness. The CFC initially denied the motion. It ruled that it had jurisdiction under the Tucker Act because Percipient had properly alleged a violation of law "in connection with a procurement."

*Percipient*, 165 Fed. Cl. 331, 336–37 (2023). It rejected the Government's characterization of the protest as a "contract administration dispute," as well as its invocation of the so-called task order bar set forth in 10 U.S.C. § 3406(f)(1). *Id.*

The CFC also found that Percipient had standing as an "interested party" under the Tucker Act. *Id.* at 337, 340. It recognized that the term "interested party" under the Tucker Act generally refers to "'actual or prospective bidders' who have a 'direct economic interest' in the award of the contract." *Id.* at 337 (citing and quoting *AFGE*, 258 F.3d at 1302). Regarding whether Percipient was an "actual or prospective bidder," the CFC first noted that Percipient "could not" bid on the SAFFIRE contract (since its product satisfies only the CV portion, not the SER portion of the procurement). *Id.* Nevertheless, relying on several decisions of this Court, the CFC found that "the requirement that a protestor have submitted a bid for it to be an interested party is anything but absolute." *Id.* at 337–38 (citing and discussing *SEKRI*, *Distributed Solutions*, *Electra-Med*, and *Navarro*) (full citations omitted)). It then went on to analyze the requirements of § 3453, and found that a violation of § 3453 "denies these commercial product owners an opportunity to compete that is guaranteed to them by the statute," and that its "guarantee would become illusory if offerors of commercial products could not sue under § 3453." *Id.* at 338 (citations omitted). Further, it recognized that "§ 3453 imposes an obligation on agencies that continues beyond the contract's

15

award," and therefore, since an agency can violate § 3453 after the contract award, "it is irrelevant whether the commercial product offeror bid on the prime contract." *Id.* The CFC likewise rejected as irrelevant the fact that Percipient could not perform the entire SAFFIRE project – pointing out that the plain text of the statute and this Court's decision in *Palantir* are both inconsistent with the notion that a commercial product offeror must be able to do everything in a solicitation. *Id.* at 338–39. In sum, the CFC held that "the appropriate question in this context is whether the protestor was prepared to offer its commercial product to the agency if the agency had complied with the statute." *Id.* at 339. Percipient's actions over the two years leading up to the case filing showed that "it was willing and ready to offer its commercial software." *Id.*

After the CFC denied Defendants' motion to dismiss, Defendants moved for reconsideration based on the task order bar of 10 U.S.C. § 3406 (f)(1). While the CFC had originally held that it need not analyze the task order bar because the procurement was for more than $25,000,000, *Percipient*, 165 Fed. Cl. at 337, Defendants showed this was not correct. The CFC granted the motion to reconsider and the motion dismiss by holding that the protest was "in connection with the issuance or proposed issuance of a task or delivery order." *Percipient*, 2023 WL 3563093, at *3 (Fed. Cl. May 17, 2023).

**C. The Appeal and the Panel's Decision**

Percipient appealed the decision, and a panel of this Court reversed the CFC's dismissal. *Percipient*, 104 F.4th at 859. The panel majority held that under 10 U.S.C. § 3406 (f)(1), a protest is barred only "if it challenges the issuance of the task order directly or by challenging a government action (*e.g.,* waiver of an organizational conflict of interest) whose wrongfulness would cause the task order's issuance to be improper." *Id.* at 847. The panel majority walked through each of Percipient's claims and showed that "none of Percipient's counts is 'in connection with the issuance or proposed issuance of a task or delivery order,'" that "Percipient does not challenge the issuance of Task Order 1 to CACI," and that "no allegation asserts that the language of Task Order 1 was deficient or forced the alleged statutory violations to occur." *Id.* at 849. Accordingly, because Percipient's protest "does not assert the wrongfulness of, or seek to set aside, any task order," it is not barred by § 3406(f)(1). *Id.* at 847, 849. The panel majority rejected the government's argument for a broader interpretation of § 3406(f)(1) that would preclude all claims that relate in any way to work performed under a task order. *Id.* at 849.

The panel majority also rejected Defendants' arguments for alterative grounds to affirm the CFC's dismissal. First, it rejected Defendants' jurisdictional argument by finding that Percipient's protest alleged a legal violation "in

connection with a procurement or proposed procurement" under 28 U.S.C. § 1491 (b)(1). *Id.* at 851–52. It likewise rejected the argument that Percipient's protest was somehow tied to "contract performance" in a way that fell outside Tucker Act jurisdiction. *Id.* at 852.

Finally, the panel majority rejected the argument that Percipient was not an "interested party" under the Tucker Act. *Id.* at 852–58. In an extensive analysis, the panel majority discussed this Court's prior precedents on the meaning of "interested party," and recognized that no case had previously addressed the meaning of that term where the protestor invoked only the third prong of § 1491(b)(1) – i.e., it alleged a violation of law "in connection with a procurement or proposed procurement," without challenging any solicitation, award, or proposed award. *Id.* at 855. In this context of a "third prong" only claim, the panel majority held that "an interested party includes an offeror of commercial or nondevelopmental items whose direct economic interest would be affected by the alleged violation of the statute." *Id.* at 853. In particular, the panel majority held that "the plaintiff is an interested party if it is an offeror of a commercial product or commercial service that had a substantial chance of being acquired to meet the needs of the agency had the violation not occurred." *Id.*

The panel majority's decision recounted the history of bid protest jurisdiction from before the enactment of ADRA through to the enactment of

18

ADRA and subsequent cases.  It explained that ADRA provided the CFC with the full bid protest jurisdiction exercised by the district courts under the *Scanwell* decision, which recognized such jurisdiction under the APA.  *Id.*  It likewise recognized that ADRA adopted the APA's standard of review.  *Id.*

The panel majority addressed the Competition in Contracting Act ("CICA") definition of "interested party," and its use by this Court's decision in *AFGE*.  The panel majority explained that CICA's definition does not address who is an interested party with standing to bring a claim under the third prong of the Tucker Act's bid protest jurisdiction—i.e., challenging a legal violation "in connection with a procurement or proposed procurement" that is *not* also a challenge to a solicitation, award, or proposed award.  *Id.* at 854–55.  Since CICA contains no analogous "third prong" type of claim, its definition of "interested party" does not address that context.  *Id.* at 853–55.  Likewise, the panel majority explained that *AFGE*'s use of the CICA definition was also not in a context where the protestor brought solely a third prong claim.  *Id.* at 855.  Thus, the panel majority concluded that "*AFGE* is controlling law for what it covers, but this case presents a different scenario than *AFGE*"—a protest that "is, and must be, based solely on the third prong."  *Id.* at 854–55.

The panel majority then identified "at least four reasons" to support its holding that "Percipient is an interested party because it offered a commercial

19

product that had a substantial chance of being acquired to meet the needs of the agency had the violations not occurred." *Id.* at 855. First, "the third prong of § 1491(b)(1) goes beyond the situations considered in CICA," and thus the CICA definition of "interested party" is "not fairly borrowed to apply to everything that comes under the third prong." *Id.* at 855–56. Second, '[t]he term 'interested party' must be understood in the context of the language of the third prong of 28 U.S.C. § 1491(b)(1), which imposes a broader scope for standing." *Id.* at 856. "On its face, this statutory language provides for an independent cause of action; that is, a plaintiff need not challenge either a solicitation for or the award or proposed award of a government contract." *Id.* That means that "the third prong covers actions that are necessarily broader than the solicitation or award of a contract stage," and "broader than any of CICA's five categories." *Id.* "We are obliged to interpret the term 'interested party' in the context of this broader third prong to give it independent import." *Id.* Third, "our analysis must be tailored to the specific facts here," which show that "§ 3453 could become illusory were parties like Percipient, under these facts, unable to protest." *Id.* The panel majority summarized this point as follows:

> If parties like Percipient, who offer significant commercial and nondevelopmental items likely to meet contract requirements but who cannot bid on the entire contract or a task order, are unable to challenge statutory violations in connection with procurements, the statute would have minimal bite—it would rely on an agency to self-regulate and on contractors like CACI to act against their own interest.

20

*Id.* at 857.

Fourth, the panel majority pointed to "the relative timing of the passage of FASA . . . and ADRA," and the proposition that it is "difficult to conclude that the very next Congress following passage of FASA would promulgate ADRA with the intention of eliminating any meaningful enforcement of the post-award preferences for commercial items in § 3453." *Id.*

The panel majority also noted that this Court has modified the general standing test of *AFGE* in its *Weeks Marine* decision addressing protests to solicitations. *Id.* It also recognized, more than once, that "we find persuasive Judge Moss's analysis of 28 U.S.C. § 1491(b)(1) in *Validata Chemical Services v. United States Department of Energy*, 169 F. Supp. 3d 69, 82 (D.D.C. 2016)." *Id.* at 855–56.

Judge Clevenger dissented from the panel's decision. The dissent disagreed with the panel's analysis of both the task order bar and the "interested party" definition under 28 U.S.C. § 1491(b)(1). *Id.* at 859–73. The dissent's analysis of the latter issue is addressed at length in Section I(D) of the Argument, below.

### D. The *En Banc* Petition and Order

On September 5, 2024, the government filed a petition for rehearing *en banc*. ECF No. 52 ("Petition"). The petition sought rehearing of the panel's decision on the interested party issue, the task order bar, and the underlying

21

jurisdiction under the third prong of § 1491(b)(1).  *Id.*  For the first time in multiple

rounds of briefing, the Government argued that this Court's decision in *AFGE* was

inconsistent with Percipient's claim to standing.  *Id.* at 1.

On November 22, 2024, this Court granted the Government's petition,

vacated the panel's decision, reinstated the appeal, and directed the parties to file

new briefs "which shall be limited to standing under 28 U.S.C. § 1491(b)(1) and

address the following question:  Who can be 'an interested party objecting to . . .

any alleged violation of statute or regulation in connection with a procurement or a

proposed procurement' under 28 U.S.C. § 1491(b)(1)?"  *Percipient*, 121 F.4th

1311, 1312 (Fed. Cir. 2024).[3]

## SUMMARY OF THE ARGUMENT

A plaintiff is an "interested party" that can bring a claim under the third

prong of § 1491(b)(1) if the Government's alleged legal violation injured that

plaintiff by directly preventing it from offering its goods or services to meet the

---

[3] The Court's order granting the petition vacated the panel's decision, but sought briefing only on the "interested party" issue. *Percipient*, 121 F.4th at 1312 (stating Court does not "require additional briefing" on the task order bar issue).  Percipient therefore understands the Court to have reversed, or be intending to adopt the panel's reversal of, that task order bar dismissal.  A decision only on the interested party issue would not address the basis for the CFC's dismissal and Percipient's appeal.  Likewise, there would be no need (and arguably no jurisdiction) to address the interested party issue (as a potential alternative ground for affirmance) unless this Court was reversing the CFC's dismissal based on the task order bar of 10 U.S.C. § 3406(f).

needs of a Government agency. That person has a direct competitive interest in challenging the alleged legal violation. Thus, such a person must be an interested party for purposes of bringing such a challenge.

It would violate the plain text of § 1491(b)(1) to require a person bringing a claim solely under the third prong of § 1491(b)(1) to show that they were an actual or potential bidder on a solicitation or for a contract. The plain text of § 1491(b)(1) makes clear that a plaintiff may bring a claim solely under the third prong of that statute, and thus may bring a claim that is not challenging a solicitation or contract award. When a plaintiff brings a claim that is not challenging a solicitation or contract award, it is inapt to ask whether that plaintiff did or could have submitted a bid for the solicitation or contract at issue, since there is no solicitation or contract being challenged. Instead, the relevant question is whether the plaintiff has a sufficient interest in challenging the alleged violation of law that is challenged under § 1491(b)(1)'s third prong. Where that violation blocked the plaintiff from providing its goods or services to meet the needs of an agency, that plaintiff has a direct interest in challenging that violation.

Adopting this simple test is consistent with the prior precedents of this Court, none of which address who is an interested party in cases brought solely under the third prong of § 1491(b)(1). This test is also consistent with prior cases denying standing to subcontractors under certain facts, as those cases do not

23

address fact patterns where the protestor has been directly injured by an alleged violation of law committed by the Government.

While the Court need go no further than the above to resolve this case, it could also correctly hold that any party who could demonstrate standing under the APA qualifies as an interested party who can bring a claim under § 1491(b)(1)'s third prong. That was the conclusion reached, after extensive analysis and persuasive reasoning, in *Validata Chemical Services v. United States Department of Energy*, 169 F. Supp. 3d 69 (D.D.C. 2016). Like the panel majority, plaintiff-appellant believes *Validata* was correctly decided, and it therefore could be adopted by this Court in answering the question posed for resolution.

## STANDARD OF REVIEW

This Court reviews determinations of standing under the Tucker Act *de novo*. *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1070 (Fed. Cir. 2022). It reviews factual determinations for clear error. *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1343 (Fed. Cir. 2008). This Court also assumes all facts alleged by plaintiff to be true and draws all reasonable inferences in plaintiff's favor. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

# **ARGUMENT**

I. **THE TERM "INTERESTED PARTY" MUST INCLUDE ANY DIRECTLY INJURED PARTY WHO COULD HAVE OFFERED ITS PRODUCT OR SERVICE TO MEET THE NEEDS OF THE AGENCY BUT FOR THAT AGENCY'S ALLEGED LEGAL VIOLATION.**

The Tucker Act provides jurisdiction over an action by an "interested party" "objecting to" (i) "a solicitation by a Federal agency for bids or proposals for a proposed contract," "or" to (ii) "a proposed award or the award of a contract," "or" to (iii) "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. §1491 (b)(1); *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1411 (Fed. Cir. 2014) (dividing the statute into three prongs). This Court has granted limited *en banc* review to address the following question: "Who can be 'an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement' under 28 U.S.C. § 1491(b)(1)"? *Percipient.ai, Inc.*, 121 F.4th at 1312 (ellipses in original).

The answer to the Court's question is that a protestor is an "interested party" under the third prong of § 1491(b)(1) when the protestor's ability to offer its product or service to meet the Government's needs has been directly thwarted by

25

the Government's alleged legal violation.[4]  As we explain below, this standard is supported by the text, structure, and purpose of ADRA as well as by the reasoning of the panel majority in concluding that Percipient is an interested party.

Percipient easily meets this standard.  As the panel majority recognized, Percipient is an interested party because it alleges that the Government's violations of 10 U.S.C. § 3453 have directly prevented Percipient from offering its commercial product to meet the CV System requirements of NGA's SAFFIRE procurement.  Percipient's injury is direct because it is not derivative of the harm caused to any other private party.  To the contrary, Percipient is a provider of a commercial product who is directly harmed by the Government's violation of a statute designed to ensure acquisition of commercial products wherever practicable.  Moreover, the prime contractor is not injured by NGA's violation but instead is *benefited* because the violation, if left uncorrected, will cause NGA to

---

[4] As discussed in Section II, a potentially broader test would be to adopt an interpretation of "interested party" that is equivalent to the standard for determining standing under the APA.  That was the view articulated by Judge Moss in *Validata Chemical Services v. United States Department of Energy*, 169 F. Supp. 3d 69, 82, 84 (D.D.C. 2016).  Because Percipient clearly satisfies the standard discussed in Section I above, it is not necessary for the Court to decide in this case whether to adopt the *Validata* test.  Nevertheless, like the panel majority, Percipient believes the *Validata* reasoning is correct, and the Court could correctly adopt it in answer to the general question it has posed for *en banc* resolution.

pay that prime contractor substantial amounts to develop a CV system to meet requirements that Percipient's product already meets.[5]

In Section I(A), we show that, as reflected in the reasoning of the panel majority, this test is supported by the text, structure, and purpose of § 1491(b)(1). In Section I(B), we show that this result is consistent with the "interested party" test articulated in *AFGE* and other decisions of this Court—though at the end of that section, we also address how the Court could clarify that prior holding.  In Section I(C), we show that the result is also consistent with prior cases addressing subcontractor standing.  In Section I(D), we address the remaining objections from the dissent and show they do not warrant rejecting the standard articulated here and applied by the panel majority's decision.

## A. As Reflected In The Reasoning of the Panel Majority, The Text, Structure, and Purpose of ADRA Support This Standard.

Section 1491(b)(1) provides the CFC with jurisdiction over cases brought by an "interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  As the panel majority explained, this Court has never addressed the question of who is an "interested party" under § 1491(b)(1) in a case where the

---

[5] It is immaterial whether the Government, in the absence of the legal violation, would choose to license Percipient's product itself or to order its prime contractor to do so. What matters is that Percipient, not the prime contractor, is the party whose interest is directly injured by the Government's alleged violation of law.

27

protestor brought a claim solely under the third prong of § 1491(b)(1). *Percipient*,

104 F.4th at 855.  In prior cases, this Court has addressed the scope of the term

"interested party" in contexts where the protestor was challenging a solicitation or

a contract award, and thus was invoking prongs one or two of § 1491(b)(1).  *See*

*AFGE*, 258 F.3d at 1297 (addressing "interested party" where protestor challenged

decision "to award the contract to EG&G," invoking both prongs one and three);

*Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1354, 1359 (Fed. Cir. 2009)

(addressing "interested party" in pre-award protest involving challenge to

solicitation).  Thus, since this Court has never addressed who is an "interested

party" under a "prong three only" claim, it can decide this case by adopting the

panel majority's analysis without disturbing any prior precedent of this Court.

Whether a protestor is an "interested party" with standing to bring a protest

necessarily depends upon what that party is challenging.  In a challenge brought

*solely* under the third prong of § 1491(b)(1), the protestor is not challenging a

solicitation, an award, or a potential award.  Thus, the plain text of § 1491(b)(1)

makes clear that there is such a thing as "an interested party" in cases that do *not*

challenge a solicitation and do *not* challenge any actual or proposed contract

award.  For that reason, the person who is an "interested party" for bringing a

"third prong only" challenge is not going to be determined by asking either (a) who

would bid on a solicitation? or (b) who actually bid on the contract?  Those

questions are inapt in the context of a protest that is not to a solicitation or to a contract award, but instead is solely a challenge to a separate alleged violation of law in connection with a procurement. *Percipient*, 104 F.4th at 855.

Instead, whether someone is an "interested party" in challenging an action that is not a solicitation or a contract award requires examining their interest in the *alleged violation*. Where the alleged violation directly harms a person by preventing them from offering their goods or services to meet the needs of an agency, that person must be an "interested party" with respect to that violation. No other party has a more direct interest than one who has been directly prevented from offering its goods or services to meet the needs of an agency by the Government's alleged legal violation. Further, the party who is directly harmed by the alleged legal violation has an interest that is functionally equivalent to the interest of a disappointed offeror or bidder in the context of a prong one or prong two protest. Such protestors must therefore be interested parties. That was the conclusion of the panel majority, *Percipient*, 104 F.4th at 858, and the *en banc* Court should affirm that conclusion.

Relying on CICA and cases involving challenges to contracts or solicitations, the Government has asked this Court to rule that the only people who can bring claims under the third prong of § 1491(b)(1) are those who can show

they would be able to bring challenges to a solicitation or award under the first two prongs. Petition at 3–6. That is wrong for multiple reasons.

*First*, the plain text of § 1491(b)(1) goes well beyond challenges to contracts and solicitations to encompass challenges to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Under the Government's view, the only viable challenges would be challenges to solicitations or contract awards, and there would accordingly be no role to play for prong three. That would render the third prong superfluous in violation of basic canons of statutory construction. *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) (holding that a statute must be construed "if at all possible, to give effect and meaning to all the terms").

The panel majority correctly recognized this, holding that the third prong "provides for an independent cause of action; that is, a plaintiff need not challenge either a solicitation for or the award or proposed award of a government contract." *Percipient*, 104 F.4th at 856. It also recognized that this Court's definition of "procurement"—which includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout"— means that the third prong "covers actions that are necessarily broader than the solicitation or the award of a contract stage." *Id.* (quoting *Distributed Sols.*, 539

30

F.3d at 1345). The "interested party" standard under the third prong must therefore reflect the third prong's language. *Id.* at 856 (Court is "obliged to interpret the term 'interested party' in the context of this broader third prong to give it independent import.").

*Second*, the Government's argument relies on this Court's use of the CICA definition of "interested party" in *AFGE*, Petition at 2–4, but both *AFGE* and the CICA definition are inapplicable to this case. As the panel majority shows, *AFGE* involved a challenge to a contract award, and thus did not address a third prong only claim. *Percipient*, 104 F.4th at 855. Likewise, the panel majority correctly explained that the CICA definition adopted by *AFGE* defines "interested party" only "with respect to a contract or a solicitation or other request for offers." *Id.* § 3551(2)(A); *Percipient*, 104 F.4th at 855. CICA does not purport to define who is an "interested party" with respect to the third prong of 28 U.S.C. § 1491(b)(1), which expressly allows for challenges to alleged legal violations "in connection

with a procurement" that are *not* challenges to a solicitation or contract award. *Compare* 31 U.S.C. § 3551(1) *with* 28 U.S.C. § 1491(b)(1).[6]

As the panel majority explained, the third prong "in no way resembles CICA; it is not defined with reference to the foregoing specific types of government action, but instead is defined by the legal source of wrongfulness (statutory or regulatory violation) across the full range of actions connected with an actual or proposed procurement." *Percipient*, 104 F.4th at 855 (citations omitted). "This lack of correspondence demonstrates that the definition of 'interested party' in CICA is not fairly borrowed to apply to everything that comes under the third prong—and specifically not for conduct challengeable only under the third prong." *Id.* at 855-56.

*Third*, the Government's argument is inconsistent with the congressional intent underlying both FASA and ADRA. The commercial product preference rule enacted in FASA imposes post-award obligations on the Government, and the violation of those obligations can directly injure parties (like Percipient) that could

---

[6] CICA specifies who is an "interested party" for bringing protests before the U.S. Government Accountability Office ("GAO"). 31 U.S.C. § 3551 (2)(A). That CICA's definition of "interested party" is inapplicable to claims brought under the third prong of § 1491(b)(1) is confirmed by the GAO's refusal to hear any such "third prong only" claims. *See, e.g.*, *Matter of: Aerosage, LLC*, B-417289 (Apr. 24, 2019) (holding that a protestor asserting one type of third prong claim (alleging violation of an "automatic stay" provision) must bring its claim in "a court of competent jurisdiction-currently the U.S. Court of Federal Claims.").

otherwise offer their commercial products to meet the needs of government agencies. As the panel majority recognized, "the statutory guarantees under § 3453 could become illusory were parties like Percipient, under these facts, unable to protest." *Percipient*, 104 F.4th at 856. "If parties like Percipient, who offer significant commercial and nondevelopmental items likely to meet contract requirements but who cannot bid on the entire contract or a task order, are unable to challenge statutory violations in connection with procurements, the statute would have minimal bite—it would rely on an agency to self-regulate and on contractors like CACI to act against their own interest." *Id.* at 857.

Further, if this Court were to eliminate CFC jurisdiction over third prong claims, protestors may seek to bring such claims in district court under the APA. The district courts may not agree they have jurisdiction over such clams, *see Validata*, 169 F. Supp. 3d at 90, which would further block the purposes of FASA. By contrast, if district courts were to accept jurisdiction to hear such FASA claims, that would thwart the purpose of ADRA, which was to vest exclusive jurisdiction over procurement-related cases in the CFC (after the brief sunset provision for concurrent district court jurisdiction). *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) ("It is clear that Congress's intent in enacting the ADRA with the sunset provision was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest

actions.").  Under that scenario, pre-award § 3453 challenges would have to be

brought in the CFC, whereas challenges to post-award legal violations would have

to be brought in the federal district courts—contradicting the purpose of ADRA.

*Fourth*, as the panel pointed out, given that FASA was enacted in 1994 and

ADRA in 1996, it is "difficult to conclude that the very next Congress following

passage of FASA would promulgate ADRA with the intention of eliminating any

meaningful enforcement of the post-award preferences for commercial items in §

3453." *Percipient*, 104 F.4th at 857.

## B. The Panel Majority's Decision Is Consistent With *AFGE* And This Court's Other Decisions Articulating An "Interested Party" Test.

Ruling in Percipient's favor in this case is consistent with this Court's prior

case law, and does not require overruling any of this Court's prior precedents.

*First*, contrary to the arguments of the Government and the dissenting panel

member, *AFGE* did not address the meaning of "interested party" in a claim

brought solely under the third prong of § 1491(b)(1).  While it is true that the

plaintiffs in *AFGE* invoked both the second and third prongs of § 1491(b)(1), the

plaintiffs challenged the decision of the Appeal Authority of the Defense Logistics

Agency ("DLA") to uphold DLA's decision "***to award the contract to EG&G***."

*AFGE*, 258 F.3d at 1297 (emphasis added).  The challenge in *AFGE* was thus

focused on overturning that contract award.  The case does not mention any action

that is challenged other than that contract award.  Thus, the panel decided the

34

"interested party" issue in that case by looking to CICA and the need to be an offeror or bidder on the contract whose award is being challenged. *Id.* at 1302.

By contrast, Percipient does not challenge any contract award (or proposed award), but instead brings a challenge "based ***solely*** on the third prong" of § 1491(b)(1). It alleges that NGA has violated the commercial product preference law "in connection with" the SAFFIRE procurement by failing to procure that product "to the maximum extent practicable," failing to require its prime contractor to perform necessary market research and make associated determinations as to the ability of Percipient's product to meet NGA's CV needs, and failing to require its prime contractor "to the maximum extent practicable" to incorporate commercial products "as components of items supplied to the agency." Those violations are directly harming Percipient by preventing it from offering its commercial product to meet NGA's CV needs. As discussed above, the panel majority correctly held that *AFGE* is "controlling law for what it covers, but this case presents a different scenario than *AFGE*." *Percipient*, 104 F.4th at 854–55.

*Second*, CICA's definition applies by its terms "***with respect to*** a contract or a solicitation or other request for offerors." *AFGE*, 258 F.3d at 1299-1300 (citing 31 U.S.C. § 3551(2)) (emphasis added). It does not address who is an interested party "with respect to" the third prong under § 1491(b)(1), and in its use of the words "with respect to," makes clear that it is only intending to provide the

35

standard for challenging particular type of actions.  Thus, to apply the CICA

approach to defining "interested party" for a third prong only claim requires

looking to who is an interested party "with respect to" a legal violation that is "in

connection with a procurement," but is not manifested in a contract award or a

solicitation.  This would identify the functional equivalent of a CICA interested

party, and would plainly include those who, like Percipient, are directly injured by

an alleged legal violation.  Just as a contract bidder is an "interested party" "with

respect to a contract", and a "prospective bidder" is an "interested party" "with

respect to . . . a solicitation," Percipient is an "interested party" "with respect to" its

claim that it has been thwarted from offering its commercial product by the

violation of statutes designed to maximize acquisition of commercial products.  Its

interest is functionally identical to those whom *AFGE* holds to be interested parties

for challenging contract awards or solicitations.

     *Third*, adopting the panel majority's analysis is also consistent with

numerous cases where this Court has adapted the "interested party" standard in

common-sense ways to account for the relationship between the particular action

being challenged and the injury sustained.  For example, this Court has modified

the first part of the *AFGE* "interested party" test—whether the protestor is an

"actual or prospective bidder"—to account for situations where the protestor filed a

protest in lieu of a proposal, and the solicitation period ended while the protest was

still pending (without the protestor having ever submitted a bid). *See CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1351 (Fed. Cir. 2015) (rejecting the Government's restrictive interpretation of "prospective bidder" because "it would create a chasm between an actual bidder and a prospective bidder in terms of the review rights accorded to each").

As another example, in *SEKRI*, this Court allowed a protestor to enforce an agency's compliance with the Javits-Wagner-O'Day Act, even though the protestor had failed to submit a bid. 34 F.4th at 1071. The Javits-Wagner-O'Day Act mandates a preference for supplies from nonprofits that employ the blind or significantly disabled. *Id.* at 1066. In light of the statute's mandatory language and congressional intent, this Court held that qualified suppliers of a mandatory source were "interested parties" with standing to challenge the agency's unlawful action. *Id.* at 1072*; see also Distributed Sols.*, 539 F.3d at 1344–45 (despite the absence of a solicitation, protestors were interested parties who had a "direct economic interest" because they were "deprived of the opportunity to compete"); *Percipient*, 104 F.4th at 854 (citing *SEKRI* and *Distributed Solutions* as cases where this Court has recognized that "parties need not have submitted a bid in all circumstances to qualify as an actual or prospective offeror"); *Acetris Health, LLC v. United States*, 949 F.3d 719, 727–28 (Fed. Cir. 2020) (protestor was interested party and a "prospective bidder" to challenge agency's interpretation of Trade

37

Agreements Act and the FAR because the Government's position would exclude
the protestor from "future procurements for other products on which it is a likely
bidder").

The Court has also refined the meaning of the second element of the *AFGE*
test, "direct economic interest," by varying the plaintiff's burden depending upon
the procurement stage and the nature of the challenges.  For example, in *Weeks
Marine*, the Court articulated two different standards for establishing "economic
interest" depending on whether the protest is post- or pre-award: (i) if post-award,
a protestor must show that it had a "substantial chance" of receiving the contract,
575 F.3d at 1359; (2) but if pre-award, a protestor need only show that it suffered a
"non-trivial competitive injury which can be addressed by judicial relief," *id.* at
1362.[7]

In so ruling, the Court recognized that in a pre-award challenge to a
solicitation, it was "difficult for a prospective bidder/offeror to make the showing

---

[7] It is unnecessary to determine which "direct economic interest" test applies to a
challenge like the one Percipient brings here because the CFC and panel majority
correctly determined that Percipient met the more stringent test.  *Percipient*, 104
F.4th at 855 (Percipient offers a "commercial product that had a substantial chance
of being acquired to meet the needs of the agency had the violations not
occurred"); *see also Percipient*, 165 Fed. Cl. at 339 (stating "the parties do not
seriously dispute Percipient's economic interest" and citing *Info. Tech. &
Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003), which
applied the "substantial chance" test).

of prejudice that we have required in post-award bid protest cases." *Id.* at 1361. The Court explained that without the submissions of bids or offers, there was "no factual foundation for a 'but for' prejudice analysis." *Id.* Again, the Court rejected the Government's attempt to limit standing with a rigid approach in favor of a more pragmatic approach that recognizes the specific facts of the case and practical matters of adjudication. *See id.* at 1363 (noting the "anomalous" result were the Court to apply the more-stringent test asserted by the Government); *see also Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (rejecting application of heightened standard where the protestor had no chance of an award under the original solicitation, but the factual record showed that the protestor could compete for a reopened bid); *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012) ("protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'").

In short, this Court has repeatedly applied a flexible test and rejected undue formalism where such rigidity would thwart a statute's purpose or prevent redress of harm to persons directly harmed by wrongful conduct connected to a procurement.

The CFC cases are in accord.  As Judge Bruggink explained in his decision

below, CFC case law recognizes the pragmatic nature of the standard, as follows:

> [T]he judicial review of procurement methods should not be thwarted
> through the wooden application of standing requirements.  In other
> words, those requirements should be sensitive to a protestor's specific
> claim and should not deny standing to those who otherwise have a
> sufficient personal stake in the outcome of the controversy.

*Percipient*, 165 Fed. Cl. at 338 (internal citations omitted).[8]

*****

Accordingly, it is not necessary to overrule *AFGE* or any other case to reach

the correct result in this case.  Nevertheless, it may be beneficial for the Court to

clarify *AFGE*'s statement that it was construing the term "interested party" in

§ 1491(b)(1) "in accordance with the CICA," and "that standing under §

---

[8] *See McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 708–10 (2013) (software
provider had standing to challenge agency's software standardization decision even
though it was not eligible to compete for task order which implemented the
agency's decision); *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300,
305–306 (2008) (same); *see also Electra-Med. Corp. v. United States*, 140 Fed. Cl.
94, 103 (2018), *aff'd*, 791 F. App'x 179 (Fed. Cir. 2019) (contractors can be
interested parties without bidding when they challenge an agency action that denies
them the opportunity to compete); *Elmendorf Support Servs. Joint Venture v.
United States*, 105 Fed. Cl. 203, 208-09 (2012) (incumbent contractor need not be
a bidder for standing); *L-3 Commc'ns EOTech, Inc. v. United States*, 85 Fed. Cl.
667, 673 (2009) (manufacturer had standing to challenge the government's
decision to add work to a sole-source contract where vendor could only receive "a
portion" of the award); *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997)
(even though the plaintiff was not a bidder or prospective bidder, it is sufficient if
it shows that it "likely would have competed for the contract" had the government
followed the law).

40

1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *AFGE*, 258 F.3d at 1302.  Since that test cannot logically apply to a third prong only claim, the Court can readily clarify that the holding of *AFGE* is limited to cases that involve a challenge to a solicitation or to an actual or potential contract award, and does not govern third prong only claims.

Further, while not necessary to do so, the Court could very readily articulate a global test that covers both the *AFGE* test (for challenges to contract awards or solicitations) and the test applied by the panel majority in this case for third prong only claims.  That global "interested party" test could be described as a requirement that the protestor have a "direct competitive interest."  The word "competitive" means that *but for* the alleged violation, the protestor would be competing to offer its product or service to meet the needs of a government agency.  The word "direct" would mean that the interested party's competitive harm is caused by the violation and is not derivative of harm to any other party. This test accurately captures the case law addressing "interested party" in all contexts—both those addressed in past cases, and that which is addressed in this case.

Finally, while Percipient does not think it is necessary to do so, the *en banc* Court obviously has the power to overrule *AFGE*, in whole or in part.[9] If, contrary to the views of the Percipient and the panel majority, the *en banc* Court concludes it is necessary to overturn the reasoning of *AFGE* to adopt the panel's holding in this case, it should do so.[10]

## C. The Panel Majority's Decision Is Also Consistent With The Case Law Addressing "Subcontractor" Standing.

The Government has attempted to portray the panel majority and Percipient's understanding of "interested party" as opening the door more broadly to "subcontractor" standing. Petition at 8, 11. That is incorrect for multiple reasons.

*First*, nothing about Percipient's challenge would require it to be a subcontractor. To the contrary, the Government could just as easily rectify its

---

[9] The *en banc* Court may overturn past precedent of the Court upon "appropriate explication of the factors compelling removal of that holding as precedent." *S. Corp. v. United States*, 690 F.2d 1368, 1370 n.2 (Fed. Cir. 1982) (en banc); *see also LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1293 (Fed. Cir. 2024) (en banc).

[10] The result in *AFGE* has already been addressed by statute. *See* Pub L. No. 110-181, Div. A, Title III, sec. 326(c), 122 Stat. at 63 (codified at 28 U.S.C. § 1491(b)(5)). Putting that aside, the actual result in *AFGE* would not change simply by virtue of replacing the rationale in that case with a more tailored rationale that expressly left open the need for a different test for claims brought only under prong three of § 1491(b)(1).

violation by licensing Percipient's product directly and ordering its contractor to
incorporate it.

*Second*, the Government ignores the special nature of the obligations
imposed by 10 U.S.C. § 3453—in particular, that they apply post-award, and that
the statute is designed to maximize the ability of commercial product offerors like
Percipient to offer their products. As the panel majority recognized, the "statutory
text does not limit this requirement to the award of the entire contract, but rather
the statute's obligations apply even to 'components of items supplied to the
agency.'" *Percipient*, 104 F.4th at 856 (quoting § 3453(b)(2)). Judge Bruggink
likewise found that § 3453 "uniquely expresses a significant preference for
commercial products," that "manifests itself throughout the statute by imposing
obligations that require agencies to consider commercial products at nearly every
stage of the procurement." *Percipient*, 165 Fed. Cl. at 339. The Government has
yet to identify, in the multiple rounds of briefing, any other statute or regulation
that imposes similar post-award obligations. The rarity of such post-award
obligations undermines the concern that recognizing Percipient as an "interested
party" will open the door to unlimited "subcontractor" protests.

*Third*, this case does not implicate the concerns that have counseled against
finding subcontractors to be "interested parties" in other cases. Subcontractors
have been barred for two reasons. In the first category of cases, the protestor's

interest was derivative of the prime contractor, and so it lacked the requisite

"direct" interest.  *See, e.g.*, *MCI Telecomms. Corp. v. United States*, 878 F.2d 362,

365 (Fed. Cir. 1989) (protestor "deliberately chose to be only a subcontractor and

not to submit its own proposal"); *Eagle Design & Mgmt., Inc. v. United States*, 62

Fed. Cl. 106, 108 (2004) (protestor "admits that it was not an actual offeror in its

own right and does not claim that it would have, itself, become a prospective

offeror were the Court to correct SBA's alleged erroneous size determination with

respect to [the prime contractor]").

In the second category, the subcontractor was challenging conduct by the

prime contractor, rather than a violation by the Government.  *See, e.g.*, *Int'l

Genomics Consortium v. United States*, 104 Fed. Cl. 669, 674 (2012) (agency gave

"management of the entire program" to the prime contractor); *Blue Water Env't,

Inc. v. United States*, 60 Fed. Cl. 48, 54 (2004) (no purchasing agent relationship

between agency and the prime contractor).  Here, there is no question that the

Government is involved because Percipient's injury derives directly from the

***Government's failure*** to meet its own statutory and regulatory obligations.

Challenges under 10 U.S.C § 3453 are therefore fundamentally different

from the typical cases that have been brought by subcontractors in the past.  In fact,

applying the panel majority's reasoning in *Percipient*, the CFC has already rejected

one subcontractor's attempt to qualify as an "interested party."  In *Acuity-CHS*

44

*Middle E. LLC v. United States*, 173 Fed. Cl. 788, 800–801 (2024), the CFC held

that a potential subcontractor did not have standing to challenge an agency's one-

time determination of an organizational conflict of interest because, unlike this

case (and among other reasons), there was no continuing legal obligation on the

agency that applied post-task order award.  That holding is consistent with the

holding of the panel majority which it cites, and illustrates the absence of any

legitimate concern over opening the floodgates to subcontractor cases.

**D. The Remaining Objections of The Panel Dissent Do Not Provide A Basis For Rejecting The Panel Majority's Decision.**

The reasons discussed above explain why, respectfully, the dissent's

objections to the majority's conclusion are incorrect.  The dissent argues that

*AFGE* controls the result in this case, and blocks any party from bringing a third

prong only claim unless that party is also challenging a contract award or

solicitation.  That is inconsistent with the plain text of § 1491(b)(1) and with the

facts of *AFGE*, as shown in Sections I(A) & (B), above.

The dissent likewise asserts that "interested party" status should be limited

to the CICA definition, asserting that there can be no "genuine difference in

substance between prong one/two and prong three protests" and thus the same

criteria should apply to prong three protests.  *Percipient*, 104 F.4th at 869

(Clevenger, J., dissenting).  We explain above in Section I(A) why that is incorrect.

45

Likewise, in Section I(C), we address the dissent's concern that the proposed standard would open the door more generally to subcontractor protests.

The dissent's discussion further fails to address two related points from the majority opinion. First, the dissent fails to address the panel majority's point that limiting third prong protests to those with standing to challenge a contract award or solicitation would render the third prong superfluous. *Id.* at 873. Second, the dissent does not address the conflict between a narrow "interested party" rule and the goal of ADRA to consolidate procurement-related protests in the Court of Federal Claims. *Id.*

Finally, the dissent asserts that legislative history favors denying "interested party" status to Percipient and limiting it to prospective and actual bidders. *Id.* at 870. Specifically, it points to the fact that in enacting CICA and the now-repealed Brooks Act, Congress considered giving standing to potential subcontractors to protest procurements and elected not to do so. *Id.* But those statutes address challenges to contract awards and solicitations and do not inform what Congress intended in enacting the broader prong three in § 1491(b)(1). The third prong (i) necessarily encompasses challenges that go beyond challenges to actual and proposed contracts and solicitations and (ii) evinces an intent to consolidate all procurement-related challenges in the CFC.

The dissent further points to the fact that (i) absent third-party beneficiary status, subcontractors are denied standing to sue under the Contract Disputes Act because of a lack of privity with the Government, and (ii) Congress was concerned that giving subcontractors standing to sue under the Brooks Act would "create a false privity of contract where none exists." *Id.* at 871–72. But Percipient is not seeking to raise a challenge under the Contract Disputes Act, nor does "Plaintiff's allegation of procurement related illegalities" by the Government "suggest that privity of contract exists between the Government and subcontractors." *Percipient*, 104 F.4th at 858 (majority op.). Instead, Percipient bases its challenge on the Government's violation of statutes and regulations that apply directly to the Government, in which Percipient has a direct competitive interest, and that directly require the Government to ensure the procurement of commercial items post-award "to the maximum extent practicable." 10 U.S.C. § 3453(b).

## II.    WHILE THE COURT NEED NOT REACH THE ISSUE TO RESOLVE THIS CASE, IT WOULD BE CORRECT TO ADOPT THE BROADER APA TEST ARTICULATED IN *VALIDATA CHEMICAL V. U.S. DEPARTMENT OF ENERGY*.

In *Validata*, Judge Moss extensively analyzed the history and purpose of ADRA and found that entities with standing under the APA are "interested parties" to challenge a violation that "implicates only the third prong of ADRA's 'objecting to' test." 169 F. Supp. 3d at 81, 84. The district court reached this conclusion as a basis for rejecting jurisdiction over a claim that could be brought in the CFC under

the third prong of § 1491(b)(1), which meant it was a claim over which the CFC had exclusive jurisdiction.

This APA test is likely broader than the test discussed in Section I, above. While the Court would be justified in adopting it, it need not decide whether to do so in order to resolve this case (as shown above). *See Percipient*, 104 F.4th at 855 (panel majority found "persuasive Judge Moss's analysis of 28 U.S.C. § 1491(b)(1)" but did not specifically adopt that test because there was no need to do so). In its order, however, the *en banc* Court specifically asked the parties to address "who is an interested party", not just whether Percipient is an interested party. To ensure that we fully answer the Court's question, we explain herein that the Court would be justified in adopting the APA-based test if it chooses to reach that issue. We also explain herein that whether or not the Court chooses to address the broader test, various aspects of *Validata*'s reasoning provide additional support for why the term "interested party," at a minimum, encompasses those with a direct competitive interest as described in Section I, above.

*Validata* first explains why the third prong of § 1491(b)(1) should not be limited to the definition of "interested party" set forth in CICA. As the *Validata* court explains, and as this Court has recognized, the third prong of § 1491(b)(1) is "very sweeping" inasmuch as it "covers *any* alleged violation of statute or regulation *in connection with* a procurement or proposed procurement." 169 F.

48

Supp. 3d at 81 (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289). This means it "covers even non-traditional disputes arising from the procurement process as long as the violation is 'in connection with a procurement or proposed procurement.'" *Id.* at 87 (citation omitted). [11]

By contrast, "the relevant language of CICA concerns only challenges by a disappointed bidder to the federal government's solicitation, award, or termination of a contract, and it does not include any language paralleling the third clause of ADRA." *Id.* at 82 ("the third prong of ADRA's 'objecting to' test . . . goes beyond CICA and does not require that the plaintiff be a 'disappointed bidder'—it merely requires that the plaintiff be an 'interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement'"). Because the CICA definition contains no analogue to that "very sweeping" prong, it necessarily does not limit who may bring challenges under it. *Id*. at 84 ("any arguable parallel between CICA and ADRA breaks down" where "the plaintiff's cause of action falls under the third prong of ADRA's 'objecting to'

---

[11] The *Validata* court stated that it was "not convinced" that *AFGE* adopts the CICA definition of "interested party" for claims brought solely under the third prong of § 1491(b)(1), 169 F. Supp. 3d at 81, but further explained that if *AFGE* is construed in that manner, it was wrongly decided, *id.* at 81-82 ("even if" *AFGE* is construed in that manner, "the Court is not persuaded that this is a tenable view of Congress's intent in enacting ADRA."); *see also id.* at 84.

test, which does not require that the plaintiff object to a federal contract solicitation or award").

The *Validata* court further recognized that viewing the third prong as limited to challenges to contracts and solicitations would render it superfluous in violation of the basic canon of statutory construction that favors giving meaning to all words in a statute. *Id*. As *Validata* explains, "it is difficult to imagine what work the 'in connection with' clause would perform beyond the first two prongs of ADRA's 'objecting to' test, which already permits challenges by those 'objecting to' federal contract solicitations or awards." *Id*.

*Validata* also contains an extensive and careful review of the legislative history and purpose of ADRA, showing that the APA standard for determining "interested party" status fulfills the purpose of the statute. It explains that *Scanwell* jurisdiction "extended to all disputes involving government procurements where a party with APA standing alleged a violation of a federal statute or regulation," including even "challenges by subcontractors to subcontract procurements." 169 F. Supp.3d at 85. It recounts how the legislators who sponsored ADRA made clear that purpose was to give the CFC jurisdiction "over *the full range of procurement protest cases* previously subject to review in the federal district courts." *Id*. at 85 (citing and quoting H.R. Conf. Rep. 104-841, at 10 (1996)) (emphasis in *Validata*); *see also id.* (ADRA was to give CFC jurisdiction "to consider all protests that can

50

presently be considered by any district court") (citing 142 Cong. Rec. S11849

(Sept. 30, 1996) (statement of Sen. Cohen)). Since ADRA intended to give the

CFC jurisdiction over all procurement cases that previously could be brought in

district court under the APA, and since *Scanwell* jurisdiction extended to all

protestors who would have standing under the APA, it follows logically that

ADRA intended anyone with standing under the APA to have standing to bring a

procurement challenge in the CFC.

Viewing "interested party" standing as coextensive with the APA also would

advance ADRA's purpose of "consolidating jurisdiction in the Court of Federal

Claims to develop a uniform national law on bid protest issues and end the

wasteful practice of forum shopping." *Id.* at 84 (cleaned up). "ADRA's legislative

history focuses on repeal of the Federal district courts' *Scanwell* jurisdiction and

the concentration of jurisdiction over bid protest actions in a single court." *Id.*

(quoting 142 Cong. Rec. S11848 (Sept. 30, 1996) (statement of Sen. Cohen)). It

would contradict ADRA's purpose to limit "interested party" to challenges to

contract awards or solicitations while leaving the federal district courts to consider

all other procurement-related challenges to violations of statutes and regulations.

*See* N. Castellano, *Interested Party: En Banc Reconsideration of Bid Protest*

*Standing*, 39 Nash & Cibinic Rep. NL ¶ 2 (Jan. 2025) (citing cases "recognizing

that where ADRA does not apply, a would-be protester can seek judicial review in

district court under the APA" and explaining that "a narrow definition of 'interested party' under ADRA may serve to push more protest-like cases into district court, ultimately undermining the uniformity that ADRA was intended to provide").

*Validata* also properly rejects other objections to a narrow jurisdictional rule. It explains that "the premise that waivers of sovereign immunity should be construed narrowly" has no bearing because the "relevant question is not whether" but instead "where" a party must bring challenges to procurement-related violations of statutes or regulations that do not involve challenges to contract awards or solicitations. *Id.* at 84. "The difference between the two constructions is simply whether jurisdiction over some claims remains in the district courts or whether all such claims must now be brought in the Court of Federal Claims." *Id.*; *see also* N. Castellano, *supra* (explaining that the Supreme Court has "moved away from an early jaundiced attitude toward waivers of statutory immunity and has taken a path marked with greater respect for legislative pledge of relief to those harmed by their government").

Finally, the *Validata* court also properly recognizes that the broader rule is consistent with precedent on subcontractor standing. Cases rejecting subcontractor standing to challenge the award of a prime contract are irrelevant to protests brought solely under the third prong of § 1491(b)(1), and which thus do not

involve a challenge to a contract award or solicitation. *Validata*, 169 F. Supp. 3d at 85-86.

Further, adopting the APA standard would not alter existing precedent on subcontractor standing because principles of APA and Article III standing would generally preclude a subcontractor from bringing a challenge that advances the rights of the prime contractor. *Id*. at 85 ("the proper plaintiff to challenge the government's actions with respect to a *prime* contract is generally the prime contractor because the standing doctrine embraces the general prohibition against a litigant's raising another entity's legal rights" (cleaned up)).

Likewise, a line of cases addressing standing to challenge subcontracts "stems from the plain language of the Brooks Act and CICA and from legislative history specific to those statutes." *Id.* at 86. It therefore is "of little value in interpreting the distinct language and purposes of the ADRA." *Id*. At the same time, adopting the APA test would not generally open the door to challenges by disappointed subcontractors to subcontract awards because of the requirement that the Government have sufficient involvement in the violation. *See* Section I(C), above. Here, there is no such issue because the Government violated specific statutory and regulatory provisions requiring it, "to the maximum extent practicable," to ensure that its contractors research and procure commercial products.

## CONCLUSION

For the reasons set forth above, Percipient respectfully requests that this Court hold that Percipient has standing to bring this bid protest as an "interested party" under 28 U.S.C. § 1491(b)(1), while also adopting the panel majority's holding and reasoning on the issues of the task order bar, subject matter jurisdiction under 28 U.S.C. § 1491(b)(1), and timeliness of claims under *Blue & Gold*, and remanding this case to the CFC for further proceedings.

Respectfully Submitted,

By: /s/ Hamish Hume
Hamish P.M. Hume
Samuel C. Kaplan
Eric J. Maurer
Gina A. Rossman
Boies Schiller Flexner LLP
1401 New York Ave., NW
Washington, DC 20005
(202) 237-2727 (t)
(202) 237-6131 (f)
hhume@bsfllp.com
skaplan@bsfllp.com
emaurer@bsfllp.com
grossman@bsfllp.com

Dated:  January 21, 2025

*Counsel for Plaintiff-Appellant Percipient.ai, Inc.*

54

## CERTIFICATE OF SERVICE

I certify that I served the foregoing on counsel of record on January 21, 2025 by use of the Court's CM/ECF system.

Dated:  January 21, 2025                          /s/ Hamish Hume
                                                  Hamish P.M. Hume

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a) and Federal Circuit Rule 28(a)(14), the foregoing Brief was prepared in MS Word, is proportionally spaced, has a typeface of 14-point Times New Roman, and contains 12,691 words, excluding those sections identified in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

Dated:  January 21, 2025                          /s/ Hamish Hume
                                                  Hamish P.M. Hume

# **JUDGMENT AND SUPPORTING OPINION**

# ADDENDUM

| Filing Date | Doc. No. | Description | Page No. |
|---|---|---|---|
| 04/07/2023 | 44 | Opinion | Appx1 |
| 05/18/2023 | 61 | Judgment | Appx21 |
| 05/19/2023 | 62 | Opinion | Appx22 |

# In the United States Court of Federal Claims

No. 23-28C
(Filed: March 31, 2023)
(Re-filed: April 7, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

PERCIPIENT.AI, INC.,

                       *Plaintiff,*

v.

THE UNITED STATES,

                       *Defendant,*

and

CACI, INC. – FEDERAL,

                       *Intervenor.*

* * * * * * * * * * * * * * * * * * * * * * * *

    *Samuel C. Kaplan,* Washington, DC, for plaintiff, Percipient.ai, with whom were *Hamish P.M. Hume*, *Eric J. Maurer*, and *Gina A. Rossman*, of counsel.

    *Reta E. Bezak*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director, for defendant. *Graham Day*, National Geospatial-Intelligence Agency, of counsel.

    *Anne B. Perry*, Washington, DC, for intervenor, CACI, Inc. – Federal, with whom was *Jonathan S. Aronie* and *Ariel E. Debin*, of counsel.

---

[1] This opinion was originally issued under seal to give the parties an opportunity to propose redactions. Because the parties agreed that none were necessary, the opinion appears in full.

OPINION

This is a post-award bid protest of the National Geospatial-Intelligence Agency's alleged violation of 10 U.S.C. § 3453, a statute that requires agencies to procure commercial or non-developmental products "to the maximum extent practicable." Both the United States and the intervenor, CACI, Inc. – Federal, move to dismiss the protest for lack of subject-matter jurisdiction.

The matter is fully briefed, and oral argument was held on March 6, 2023. We denied the motions to dismiss in an order issued on March 9, 2023. This opinion more fully explains our reasoning.

BACKGROUND[2]

The National Geospatial-Intelligence Agency (NGA) obtains and analyzes images and other geospatial information to provide the federal government with intelligence data. Supplying this kind of intelligence on a global scale is a burdensome analytical task and cannot be done effectively without the help of advanced computer technology. One of those advanced technologies is computer vision, a form of artificial intelligence that "trains and uses computers to interpret the visual world." Compl. ¶ 55. With computer vision, users can more efficiently compile and analyze geospatial intelligence.

Hoping to benefit from this technology, NGA, more than three years ago, issued the SAFFIRE solicitation—which was an indefinite delivery, indefinite quantity contract containing two parts. The first was a data repository that would store and disseminate geospatial intelligence "across various large organizations." Compl. ¶ 60. The second, which is at the heart of this dispute, would integrate a computer vision system to enhance the

---

[2] When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). These undisputed facts are drawn from the complaint, the attached materials, and the administrative record.

2

agency's ability to produce, review, and classify intelligence from "millions" of images. Compl. ¶ 58.

The plaintiff, Percipient, is a technology company that developed a computer vision software called "Mirage." Mirage is an open architecture software that works alongside other computer systems and can detect equipment, vehicles, and faces—each of which is a critical aspect of geospatial intelligence. More than that, though, Mirage's tools also allow users to narrow the computer's focus to specific objects, patterns, or geographical areas, and it can even learn to anticipate its users' needs over time. Despite these features and capabilities, Percipient did not bid on the SAFFIRE contract because its software could only fulfill SAFFIRE's computer vision requirements, not the entire contract. For that reason, Percipient relied on what it viewed as the agency's statutory obligation to consider incorporating commercial products and hoped to be part of NGA's SAFFIRE efforts.

In January 2021, NGA awarded the SAFFIRE contract to CACI and informed Percipient that if it wanted to participate in SAFFIRE, it needed to speak with CACI. This eventually led to a meeting between Percipient and CACI in March 2021. At this meeting, CACI expressed significant interest in partnering with Percipient on future projects, but explained that, as for working together on SAFFIRE, "that ship" had already "sailed." Compl. ¶ 93.

Alarmed by this revelation, Percipient asked NGA if it would independently evaluate Mirage as a possible commercial solution for SAFFIRE's computer vision system. NGA responded several weeks later and reassured Percipient of its commitment to using commercial products. NGA further explained that CACI's "ship has sailed" statement was an "unfortunate miscommunication" that did not reflect the agency's position. Compl. ¶ 100. Instead, the agency had not yet decided whether it needed to incorporate a commercial product because CACI was still reviewing NGA's legacy systems. NGA confirmed that commercial products would be evaluated once CACI finished.

Another two months went by before Percipient finally secured a meeting with CACI to demonstrate Mirage, although CACI's Program Manager—the individual largely responsible for deciding whether to

3

incorporate a commercial product—left the meeting after only 20 minutes. Still, Mirage received positive feedback, and CACI promised to evaluate Mirage more fully. This "deep dive" into Mirage never happened, however. Compl. ¶ 108.

Several months later, Percipient learned at the 2021 GEOINT Symposium that CACI would be developing a computer vision system for SAFFIRE when CACI employees visited Percipient's symposium booth. Surprised by the news, and no longer believing that CACI could fairly evaluate Mirage, Percipient met with NGA and asked to set up a demonstration. NGA agreed but requested that Percipient "ease up on the legal pressure." Compl. ¶ 118. Percipient then demonstrated Mirage's abilities to several NGA representatives in December 2021, at the end of which NGA concluded that Percipient's software met "all of NGA's analytical transformation requirements." Compl. ¶ 120.

Over the next several months, the parties worked to reach an agreement that would allow NGA to test Mirage with live data, something that Percipient agreed to do at no cost. Just before signing an agreement to that effect, however, NGA changed its tune. Citing legal and security complexities, NGA would no longer use live data and would instead use previously released and publicly available images. Percipient pushed back, claiming that these images would not allow NGA to test Mirage's geospatial module or some of its unique features, like its ability to alert changes over time. After significant delay, NGA relented and allowed the use of live data.

NGA completed its testing of Mirage in October 2022. Based on the results, Percipient suspected that NGA was not assessing Mirage as a possible commercial solution for SAFFIRE's computer vision requirements because, among other reasons, Percipient could only identify four NGA searches over the 12-week testing period. Thus, Percipient offered to extend the testing period, again at no cost, so NGA could more fully evaluate Mirage as a computer vision system. Percipient's suspicions appeared to be confirmed, though, when NGA explained one month later that it had evaluated Mirage as "an enterprise Machine Learning Platform," and not "as an Analytical tool." Compl. ¶ 137.

After Percipient's efforts to be incorporated into SAFFIRE proved unfruitful, it filed this protest. In its complaint, Percipient alleges that the

4

agency violated its statutory and regulatory obligations by wastefully pursuing a development solution when a possible commercial solution existed. It also alleges that the agency unlawfully delegated inherent government authority when it allowed its contractor, CACI, to determine agency policy on commercial technology. Finally, Percipient believes that the agency acted arbitrarily in handling the SAFFIRE project. In response, the government and CACI have moved to dismiss for lack of subject matter jurisdiction.

DISCUSSION

## I. Subject Matter Jurisdiction

Like all federal courts, we possess limited jurisdiction, with ours being defined mainly by the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). Under the Tucker Act, we have jurisdiction over non-frivolous allegations of statutory or regulatory violations "in connection with a procurement or a proposed procurement." *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).

First, Percipient has alleged a non-frivolous violation of 10 U.S.C. § 3453, which provides, in short, that defense agencies and their contractors must acquire "commercial products" "to the maximum extent practicable." § 3453(b)(1)-(2). To that end, the statute requires agencies to conduct market research throughout the procurement process—including before each task order award—to identify commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(1)-(2). In addition, offerors of commercial products must be given an opportunity to compete. § 3453(a)(3).

While the parties may dispute the merits of Percipient's claim, no party has argued Percipient's allegations are frivolous. Indeed, Percipient alleges specific facts that, if true, may violate §3453. Percipient alleges that it owns a commercial product that could fulfill NGA's computer vision

5

requirements and that NGA ignored whether a commercial solution existed before it allowed CACI to develop a solution.[3]

Second, to invoke our bid-protest jurisdiction, a protestor must allege a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2018). The statute's "operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Group v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999). The phrase encompasses any statutory violation connected to a procurement, and a procurement includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Distributed Sols.*, 539 F.3d at 1345 (quoting 41 U.S.C. § 111).

With this in view, NGA's alleged violation of §3453 has a connection to a procurement. That is because §3453 is itself a procurement statute and establishes a preference for commercial products and services. A violation of a statute that sets out what an agency can lawfully acquire has a connection to a procurement. *RAMCOR*, 185 F.3d at 1289 (holding that a violation has a connection with a procurement when an agency's actions under that statute affect the award or performance of the contract).

The government disagrees and argues that Percipient's protest is not in connection with a procurement and is instead a challenge to NGA's administration of the SAFFIRE contract. In reaching that conclusion, the government reasons that Percipient's protest cannot be in connection with a procurement because it alleges a post-award statutory violation that relates to NGA's oversight of CACI's performance.

We reject the government's characterization of Percipient's protest. A protest does not become a contract administration dispute simply because the agency's statutory violation occurs after the contract award. Indeed, the Tucker Act "does not require an objection to the actual contract procurement"—only an objection to a statutory violation with a connection to a procurement. *RAMCOR*, 185 F.3d at 1289. Nothing in the Tucker Act

---

[3] On the current record, we know that CACI will at least develop portions of the computer vision system, but it has not decided yet whether it will develop the entire system. Tr. 25:6–15.

suggests that those violations must occur before the contract award for the court to have jurisdiction.

Next, as a matter of statutory construction, the government invokes sovereign immunity to argue that we should narrowly construe the Tucker Act's jurisdictional grant to exclude post-award procurement violations. But the "sovereign immunity canon is just that—a canon of construction." *Richlin Sec. Serv. v. Chertoff*, 553 U.S. 571, 589 (2008). It does not "displace[] the other traditional tools of statutory construction" and, like all canons of construction, applies only when ambiguity exists. *See id.* at 590. No ambiguity exists here, however, as we simply apply the Federal Circuit's interpretation of the Tucker Act in this protest. *Distributed Sols.*, 539 F.3d at 1345.

Finally, CACI turns to the Federal Acquisition Streamlining Act's (FASA) task order bar, which excludes from our jurisdiction any protest "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). It argues that we lack jurisdiction over Percipient's protest because its development of a computer vision system is being performed under a task order and therefore falls outside this court's jurisdiction. All of that may be true, but FASA's task order bar will not apply when, as here, a task order exceeds $25,000,000. § 3406(f)(1)(B). Thus, we conclude that we have subject matter jurisdiction over Percipient's protest, which alleges a non-frivolous violation of a statute "in connection with a procurement."

## II. Standing

Even though we may have subject matter jurisdiction, we can only exercise our jurisdiction when a plaintiff has established that it has standing to bring its claim. *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Standing ensures that plaintiffs who seek review in federal court have a sufficient "personal stake in the outcome of the controversy." *Baker v. Carr*, 369 U.S. 186, 204 (1962). Although we are an Article I court, we apply Article III standing requirements. *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003).

When it comes to bid protests, a plaintiff must do more than establish Article III standing. That is because Congress, through the Tucker Act,

7

provided that only an "interested party" has standing to challenge a procurement. 28 U.S.C. § 1491(b)(1) (2018). The phrase "interested party" "imposes more stringent standing requirements than Article III," *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009), and limits claims "to actual or prospective bidders" who have a "direct economic interest" in the award of the contract, *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).

The government mostly disputes the first standing requirement, which requires a protestor to be an actual or prospective bidder. As all the parties agree, Percipient did not (and could not) bid on the SAFFIRE contract. That failure, in the government's view, is fatal to Percipient's protest and reveals that Percipient is simply a "disappointed subcontractor" without standing.

Normally, a protestor is an actual or prospective bidder if it either submitted a proposal in response to a solicitation, or it is "expecting to submit an offer" before the solicitation closes. *MCI Telecomm. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (emphasis omitted). But the requirement that a protestor have submitted a bid for it to be an interested party is anything but absolute. For example, *SEKRI v. United States* refused to apply the actual or prospective bidder requirement to a challenge brought under a mandatory source statute because doing so would thwart Congress's intent behind the statute. 34 F.4th 1063, 1072–73 (Fed. Cir. 2022). *Distributed Solutions* allowed contractors to challenge an agency's noncompetitive procurement vehicle without bidding because they "were prepared to submit bids" if the agency had solicited them. 539 F.3d at 1345. *Elmendorf Support Services v. United States* held that an incumbent contractor need not be a bidder for it to challenge an agency's in-sourcing decision because it had an obvious interest in "maintaining its incumbency." 105 Fed. Cl. 203, 208–09 (2012). *Electra-Med Corporation v. United States* determined that contractors can be interested parties without bidding when they challenge an agency action that denies them the opportunity to compete. 140 Fed. Cl. 94, 103 (2018); *see also McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 708–09 (2013). And finally, the interested party requirements have even been relaxed when their rigid application would make statutory guarantees illusory. *See Navarro Rsch. & Eng'g v. United States*, 94 Fed. Cl. 224, 230 (2010).

8

What these cases make clear is that the "judicial review of procurement methods should not be thwarted through the wooden application of standing requirements." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790 (1997). In other words, those requirements should be sensitive to a protestor's specific claim and should not deny standing to those who otherwise have a sufficient "personal stake in the outcome of the controversy." *Baker*, 369 U.S. at 204.

With that in mind, we turn to the statute at issue. Under §3453, the critical issue is whether offerors of commercial products have standing. We conclude that they do and that §3453 does not require an offeror of a commercial product to have bid on the prime contract.

First, unlike most procurement statutes, §3453 contemplates that offerors of commercial products have rights under the statute. Specifically, §3453 provides that agencies must give offerors of commercial products "an opportunity to compete in any procurement to fill [the agency's] requirements." § 3453(a)(3). And this clause guarantees more than just a right to compete by bidding on the contract because the statute expressly distinguishes between bidders and offerors of commercial products. § 3453(b)(4) (requiring agencies to state their specifications "in terms that enable and encourage bidders *and offerors* to supply commercial services or commercial products" (emphasis added)); *see also Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) ("[D]ifferences in language . . . convey differences in meaning."). A violation of §3453 therefore denies these commercial product owners an opportunity to compete that is guaranteed to them by the statute, *see Electra-Med*, 140 Fed. Cl. at 103; *cf. Distrib. Sols.*, 539 F.3d at 1345, and that guarantee would become illusory if offerors of commercial products could not sue under §3453, *Navarro Rsch. & Eng'g*, 94 Fed. Cl. at 230.

Second, §3453 imposes an obligation on agencies to incorporate commercial products that continues beyond the contract's award. For example, agencies must conduct market research even before "awarding a task order or delivery order." § 3453(c)(1)(C). They must then use the results of that research to identify any commercial products that (1) "meet the agency's requirements," (2) "could be modified to meet the agency's requirements," or (3) "could meet the agency's requirements if those requirements were modified to a reasonable extent." § 3453(c)(2). So, putting

9

this all together, an agency must conduct market research even after the contract award and then, depending on the results, need to incorporate a commercial product. This means that an agency can still violate §3453 after the contract award and is why—unlike most other protests—it is irrelevant whether the commercial product offeror bid on the prime contract.

The government emphasizes Percipient's inability to perform the entire contract and appears to suggest that standing under §3453 is limited to those offerors whose commercial product can meet every requirement in a solicitation. But the statutory text does not support this conclusion as it provides in at least one part that agencies must "require prime contractors and subcontractors . . . to incorporate commercial services [and] commercial products . . . as *components of items supplied* to the agency." § 3453(b)(2) (emphasis added). The word "component" means a "part or element of a larger whole" and contradicts a requirement that commercial products satisfy every agency requirement. New Oxford American Dictionary (3d ed. 2010).

Because the text's meaning is plain, we could stop there. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). But relevant caselaw further suggests that this ability of a commercial product to meet every agency requirement is unnecessary for standing under §3453. In *Palantir USG v. United States*, the Federal Circuit held that the Army violated §3453 when it failed to use market research results to identify possible commercial solutions, but it reached that conclusion without deciding whether Palantir's product could satisfy every Army requirement. *See* 904 F.3d 980, 990–91, 993 (Fed. Cir. 2018).

Third, the statute uniquely expresses a significant preference for commercial products. That preference manifests itself throughout the statute by imposing obligations that require agencies to consider commercial products at nearly every stage of the procurement. This preference then culminates in Congress encouraging agencies to sacrifice their own requirements if doing so would allow the agency to incorporate a commercial product or service. § 3453(b)(3), (c)(2)(C). It would thwart Congress's intent behind §3453 if offerors of commercial products could not bring challenges under the statute. *SEKRI*, 34 F.4th at 1072–73.

We thus hold that offerors of commercial products need not bid on the prime contract to have §3453 standing. Instead, the appropriate question in

10

this context is whether the protestor was prepared to offer its commercial product to the agency if the agency had complied with the statute. In this case, Percipient's actions over the last two years make clear that it was willing and ready to offer its commercial software.

On a different note, CACI contends that offerors of commercial products do not have §3453 standing because procurement violations, like the one alleged here, can be prevented through congressional oversight. No doubt, Congress has the power to oversee federal procurements, yet Congress vested this court with exclusive bid protest jurisdiction and surely had in mind that we would remedy procurement violations. And again, *Palantir* upheld a protestor's §3453 challenge even though Congress had taken some remedial steps of its own. *See, e.g.*, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 113, 220 (2016).

The government's final salvo is to once again argue that offerors of commercial products cannot challenge a post-award violation of §3453 because these disputes become challenges to the government's contract administration. Just as we rejected this argument as a jurisdictional defense, we reject it here too. For one thing, requiring these challenges to be brought before contract award makes little sense when §3453's requirements continue beyond the contract's award and can still be violated afterward. But for another, that limitation would also allow agencies to ignore §3453 with impunity as long as they defer decisions about commercial products until after the contract award. That result would be untenable, especially when Congress enacted this statute to stem wasteful and inefficient agency spending.[4]

---

[4] *See, e.g.*, *Formula for Action: A Report to the President on Defense Acquisition by the President's Blue Ribbon Commission on Defense Management* at 23–24 (April 1986); H.R. Rep. No. 103-545, at 21 (1994); S. Rep. No. 103-258, at 6 (1994); H.R. Rep. No. 103-712, at 233 (1994) (Conf. Rep.); S. Rep. No. 112-173, at 162–63 (2012); *Hearing to Receive Testimony on the Current Readiness of U.S. Forces in Review of the Defense Authorization Request for Fiscal Year 2014 and the Future Years Defense Program: Hearings Before the Subcomm. on Readiness and Management Support, Comm. on Armed Services*, 113th Cong., 1st Sess. 24–27 (2013) (statement of Sen. McCaskill); *Hearing to Receive Testimony in Review of the Defense Authorization Request for Fiscal Year 2016 and the Future Years*

11

Finally, the parties do not seriously dispute Percipient's economic interest. A protestor has a direct economic interest if, "but for the alleged error in the procurement process," it would have received an award. *Info. Tech. & Applications v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The only argument advanced against Percipient's economic interest is its failure to bid on the SAFFIRE contract. But Percipient is an offeror of a commercial product under §3453 and is prepared to offer NGA its product. Viewed in that light, Percipient has an economic interest in that opportunity. Thus, Percipient has standing to challenge the agency's alleged violation of §3453.

## III. Timeliness

The government and CACI assert two timeliness defenses, both of which we reject. First, the government invokes *Blue & Gold Fleet v. United States*, which held that a protestor waives its right to protest if it "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process." 492 F.3d 1308, 1313 (Fed. Cir. 2007). In the government's view, Percipient's protest is essentially a challenge to the solicitation and is therefore waived under *Blue & Gold*.

We disagree: In the limited record we have, nothing in the solicitation appears to violate §3453. The solicitation was flexible enough to allow for a development solution, but it did not require one. And that approach is entirely consistent with §3453, which allows for development solutions when a commercial one is impracticable or nonexistent. Likewise, NGA's actions here only confirm that the solicitation did not require a development solution as NGA repeatedly explained to Percipient that there would be opportunities for Percipient to offer its commercial product. Thus, Percipient's protest is not barred by *Blue & Gold*.

Second, CACI argues that Percipient's complaint is barred by the doctrine of laches. In essence, laches is "a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby*

---

*Defense Program: Before the Subcomm. on Airland of the S. Comm. on Armed Servs.*, 114th Cong. 60–62 (2015) (statement of Sen. Cotton).

*Prods.*, 580 U.S. 328, 333 (2017). CACI maintains that laches applies because Percipient's protest should have been brought in March 2021 when, according to CACI, Percipient first learned of a potential §3453 violation.

We cannot apply the doctrine of laches to defeat Percipient's cause of action on a motion to dismiss. Of course, a party's delay in suit is relevant when deciding whether to grant a permanent injunction, which requires us to consider, among other things, "whether the balance of hardships leans in the plaintiff's favor." *Fed. Acquisition Servs. Team v. United States*, 124 Fed. Cl. 690, 708 (2016). But the Supreme Court has long held that laches is not an affirmative defense when a statute of limitations exists. *United States v. Mack*, 295 U.S. 480, 489 (1935). A statute of limitations is a "congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted." *SCA Hygiene*, 580 U.S. at 334–35. Thus, applying laches to a claim brought within the statute of limitations violates "separation-of-powers principles" because it would "give judges a 'legislation-overriding' role that is beyond the Judiciary's power." *Id.* at 335 (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 680 (2014)).

In this case, Congress has established a six-year statute of limitations for any claim in this court, 28 U.S.C. § 2501, and we "are not at liberty to jettison Congress' judgment on the timeliness of suit," *SCA Hygiene*, 580 U.S. at 335. Therefore, because Percipient's suit was brought within six years, its claim is timely, and laches is no defense.

13

CONCLUSION

In sum, we have subject matter jurisdiction over Percipient's non-frivolous allegation of a statutory violation in connection with the SAFFIRE procurement. In addition, Percipient, as an offeror of a commercial product, has standing under §3453 because it was prepared to offer its product to NGA, and it had a direct economic interest in that opportunity. Therefore, the motions to dismiss for lack of subject matter jurisdiction are denied.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

14

# In the United States Court of Federal Claims

**No. 23-28 C**
**Filed: May 18, 2023**

PERCIPIENT.AI, INC.
        Plaintiff


        v.                                                        **JUDGMENT**


THE UNITED STATES
        Defendant

        and

CACI, INC. - FEDERAL
        Defendant-Intervenor


Pursuant to the court's Opinion, filed May 17, 2023, granting defendant's and defendant-intervenor's motions to dismiss,

IT IS ORDERED AND ADJUDGED this date, that plaintiff's complaint is dismissed for lack of subject-matter jurisdiction.   No costs.


                                        Lisa L. Reyes
                                        Clerk of Court

                        By:     **s/** Debra L. Samler

                                        Deputy Clerk



<u>NOTE</u>: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of <u>all plaintiffs</u>. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 23-28C
(Filed: May 17, 2023)
(Re-filed: May 19, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

PERCIPIENT.AI, INC.,

　　　　　　　　　　*Plaintiff*,

v.

THE UNITED STATES,

　　　　　　　　　　*Defendant*,

and

CACI, INC. – FEDERAL,

　　　　　　　　　　*Intervenor*.

* * * * * * * * * * * * * * * * * * * * * * * *

Bid protest; post-award bid protest; motions to dismiss for lack of subject matter jurisdiction; Tucker Act; Federal Acquisition Streamlining Act; task order bar.

　　*Samuel C. Kaplan,* Washington, DC, for plaintiff, Percipient.ai, with whom were *Hamish P.M. Hume*, *Eric J. Maurer*, and *Gina A. Rossman*, of counsel.

　　*Reta E. Bezak*, Senior Trial Counsel, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Corinne A. Niosi*, Assistant Director, for defendant. *Graham Day*, National Geospatial-Intelligence Agency, of counsel.

　　*Anne B. Perry*, Washington, DC, for intervenor, CACI, Inc. – Federal, with whom was *Jonathan S. Aronie* and *Ariel E. Debin*, of counsel.

---

[1] This opinion was originally issued under seal, and the parties were given an opportunity to propose redactions of any protected material. The parties agreed that none were necessary, so it appears in full.

OPINION

This is a post-award bid protest of the National Geospatial-Intelligence Agency's alleged violation of 10 U.S.C. § 3453, a statute that requires agencies to procure commercial or non-developmental products "to the maximum extent practicable." Both the United States and the intervenor, CACI, Inc. – Federal, move to dismiss the protest for lack of subject-matter jurisdiction. For the reasons below, we grant the motions to dismiss.

BACKGROUND[2]

The National Geospatial-Intelligence Agency (NGA) obtains and analyzes images and other geospatial information to provide the federal government with intelligence data. Supplying this kind of intelligence on a global scale is a burdensome analytical task and cannot be done effectively without the help of advanced computer technology. One of those advanced technologies is computer vision, a form of artificial intelligence that "trains and uses computers to interpret the visual world." Compl. ¶ 55. With computer vision, users can more efficiently compile and analyze geospatial intelligence.

Hoping to benefit from this technology, NGA, more than three years ago, issued the SAFFIRE solicitation—which was for an indefinite delivery, indefinite quantity contract containing two parts. The first was a data repository, which would store and disseminate geospatial intelligence "across various large organizations." Compl. ¶ 60. The second, which is at the heart of this dispute, would integrate a computer vision system to enhance the agency's ability to produce, review, and classify intelligence from "millions" of images. Compl. ¶ 58.

The plaintiff, Percipient, is a technology company that developed a computer vision software called "Mirage." Mirage is an open architecture software that works alongside other computer systems and can detect

---

[2] When a party moves to dismiss for lack of subject matter jurisdiction, the court assumes that the undisputed facts in the complaint are true and draws reasonable inferences in the plaintiff's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016). These undisputed facts are drawn from the complaint, the attached materials, and the administrative record.

2

equipment, vehicles, and faces—each of which is a critical aspect of geospatial intelligence. More than that, though, Mirage's tools also allow users to narrow the computer's focus to specific objects, patterns, or geographical areas, and it can even learn to anticipate its users' needs over time. Despite these features and capabilities, Percipient did not bid on the SAFFIRE contract because its software could only fulfill SAFFIRE's computer vision requirements. For that reason, Percipient relied on what it viewed as the agency's statutory obligation to consider incorporating commercial products and hoped to be part of NGA's SAFFIRE efforts.

In January 2021, NGA simultaneously awarded the SAFFIRE contract to CACI and issued Task Order 1, which directed CACI, among other things, to "develop and deliver the Computer Vision (CV) suite of systems." AR 3030. The agency then informed Percipient that, if it wanted to participate in SAFFIRE, it needed to speak with CACI. This eventually led to a meeting between Percipient and CACI in March 2021. At this meeting, CACI expressed significant interest in partnering with Percipient on future projects, but explained that, as for working together on SAFFIRE, "that ship" had already "sailed." Compl. ¶ 93.

Alarmed by this revelation, Percipient asked NGA if it would independently evaluate Mirage as a possible commercial solution for SAFFIRE's computer vision system. NGA responded several weeks later and reassured Percipient of its commitment to using commercial products. NGA further explained that CACI's "ship has sailed" statement was an "unfortunate miscommunication," which did not reflect the agency's position. Compl. ¶ 100. Instead, the agency had not yet decided whether it needed to incorporate a commercial product because CACI was still reviewing NGA's legacy systems. NGA confirmed that commercial products would be evaluated once CACI finished.

Another two months went by before Percipient finally secured a meeting with CACI to demonstrate Mirage, although CACI's Program Manager—the individual largely responsible for deciding whether to incorporate a commercial product—left the meeting after only 20 minutes. Still, Mirage received positive feedback, and CACI promised to evaluate Mirage more fully. This "deep dive" into Mirage never happened, however. Compl. ¶ 108.

3

Several months later, Percipient learned at the 2021 GEOINT Symposium that CACI would be developing a computer vision system for SAFFIRE when CACI employees visited Percipient's symposium booth. Surprised by the news, and no longer believing that CACI could fairly evaluate Mirage, Percipient met with NGA and asked to set up a demonstration. NGA agreed but requested that Percipient "ease up on the legal pressure." Compl. ¶ 118. Percipient then demonstrated Mirage's abilities to several NGA representatives in December 2021, at the end of which NGA concluded that Percipient's software met "all of NGA's analytical transformation requirements." Compl. ¶ 120.

Over the next several months, the parties worked to reach an agreement that would allow NGA to test Mirage with live data, something that Percipient agreed to do at no cost. Just before signing an agreement to that effect, however, NGA changed its tune. Citing legal and security complexities, NGA would no longer use live data and would instead use previously released and publicly available images. Percipient pushed back, claiming that these images would not allow NGA to test Mirage's geospatial module or some of its unique features, such as its ability to alert changes over time. After significant delay, NGA relented and allowed the use of live data.

NGA completed its testing of Mirage in October 2022. Based on the results, Percipient suspected that NGA was not assessing Mirage as a possible commercial solution for SAFFIRE's computer vision requirements because, among other reasons, Percipient could only identify four NGA searches over the 12-week testing period. Thus, Percipient offered to extend the testing period, again at no cost, so NGA could more fully evaluate Mirage as a computer vision system. Percipient's suspicions appeared to be confirmed, though, when NGA explained one month later that it had evaluated Mirage as "an enterprise Machine Learning Platform," and not "as an Analytical tool." Compl. ¶ 137.

After Percipient's efforts to be incorporated into SAFFIRE proved unfruitful, it filed this protest. In its complaint, Percipient alleges that the agency violated its statutory and regulatory obligations by wastefully pursuing a development solution when a possible commercial solution existed. It also alleges that the agency unlawfully delegated inherent government authority when it allowed its contractor, CACI, to determine agency policy on commercial technology. Finally, Percipient believes that

4

**Appx25**

the agency arbitrarily handled the SAFFIRE project. In response, the government and CACI have moved to dismiss for lack of subject matter jurisdiction, arguing that Percipient's protest is barred by the Federal Acquisition Streamlining Act's (FASA) task order bar.

DISCUSSION

Like all federal courts, we possess limited jurisdiction, with ours being defined mainly by the Tucker Act. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). Under the Tucker Act, we have jurisdiction over bid protests that allege a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Even if a protest falls within the Tucker Act's jurisdictional grant, it may still be barred by FASA. Through FASA, Congress effectively eliminate[d] all judicial review for protests made in connection with a procurement designated as a task order." *22nd Cent. Techs., Inc. v. United States*, 57 F.4th 993, 999 (Fed. Cir. 2023). In particular, FASA excludes from our jurisdiction any protest "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 3406(f)(1). An agency's challenged action is "in connection with the issuance" of a task order if there is a direct and causal relationship between the two. *SRA Int'l v. United States*, 766 F.3d 1409, 1413 (Fed. Cir. 2014).

Here, Percipient's protest is directly and causally related to the agency's issuance of Task Order 1. Specifically, Percipient alleges that—*after* the agency issued Task Order 1, which directed CACI to develop and deliver a computer vision system—the agency violated §3453 because it failed to consider whether Percipient's product could meet those same requirements. That challenge is barred by FASA.

First, it is unclear whether §3453 requires an agency to consider commercial products after it issues a task order—an issue we need not decide. But even if it does, that task order would be the "direct and immediate cause" of the agency's statutory obligation to consider those commercial products. *See Mission Essential Pers. v. United States*, 104 Fed. Cl. 170, 178 (2012) (holding that FASA barred a protest because an agency's challenged action was the "direct and immediate cause" of the issued task order). In other

5

words, without the task order, the work that Percipient is challenging would not be taking place and Percipient could not allege this §3453 violation. Second, the agency's alleged procurement decision not to consider commercial products is not "logically distinct" from its decision to procure that same computer system through a task order. *See 22nd Cent. Techs., Inc. v. United States*, 157 Fed. Cl. 152, 157 (2021) (holding that FASA applies unless a procurement decision is "logically distinct" from the issuance of a task order). Instead, that decision would be in direct response to the task order that the agency had already issued.

In short, the protest cannot be abstracted away from CACI's performance under a task order. And certainly, if Percipient prevailed on the merits, any meaningful relief would require this court to partially suspend or discontinue performance under that task order, which further evidences the connection between the challenge and the task order. *See SRA*, 766 F.3d at 1414 (explaining that a protestor's requested relief can support the application of FASA's task order bar). We hold that Percipient's protest is "in connection with the issuance" of a task order and is therefore barred by FASA from being brought in this court.

CONCLUSION

In sum, we lack subject matter jurisdiction over Percipient's protest. Its challenge to the agency's actions under §3453 is "in connection with the issuance of a task order" and is barred by FASA. Thus, the motions to dismiss for lack of subject matter jurisdiction are granted. The Clerk of Court is directed to enter judgment accordingly. No costs.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

6