No. 2023-1970

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

PERCIPIENT.AI, INC.,

*Plaintiff-Appellant,*

*v.*

UNITED STATES, CACI, INC.-FEDERAL,

*Defendants-Appellees.*

On Appeal from the United States Court of Federal Claims,
No. 1:23-cv-00028-EGB, Judge Eric G. Bruggink

**CORRECTED BRIEF FOR *AMICUS CURIAE* PALANTIR
TECHNOLOGIES INC. IN SUPPORT OF PLAINTIFF-APPELLANT
PERCIPIENT.AI, INC.**

ANDREW E. SHIPLEY
BARRY J. HUREWITZ
JARROD R. CARMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

*Attorneys for Amicus Curiae
Palantir Technologies Inc.*

February 5, 2025

# CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* Palantir Technologies Inc. certifies the following:

**1.      Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Palantir Technologies Inc.

**2.      Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.      Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.      Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

None.

**5.    Related Cases**.  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)    ☐ No    ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  Please do not duplicate information.  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6.    Organizational Victims and Bankruptcy Cases**.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  February 5, 2025

/s/ Andrew E. Shipley
ANDREW E. SHIPLEY
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .................................................................. i

TABLE OF AUTHORITIES ................................................................... iv

INTEREST OF *AMICUS CURIAE* ........................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT .................................................................................... 5

I.    THE DEFINITION OF "INTERESTED PARTY" IS INFORMED BY THE
      NATURE OF THE CHALLENGE BROUGHT .......................................... 5

II.   CICA'S "ACTUAL OR PROSPECTIVE OFFEROR" REQUIREMENT
      FITS WITHIN THE APA'S ZONE OF INTEREST TEST FOR
      §1491(B)(1)'S FIRST TWO PRONGS ............................................. 10

III.  THE RISKS OF AN OVERLY NARROW TEST FOR STANDING ARE
      REAL AND PRESENT ................................................................ 14

CONCLUSION ................................................................................ 19

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Aero Spray, Inc. v. United States*,
  156 Fed. Cl. 548 (2021) ...................................................................6

*American Federation of Government Employees, AFL-CIO v. United States (AFGE)*,
  258 F.3d 1294 (Fed. Cir. 2001) ..............................................7, 8, 11

*Bausch & Lomb, Inc., v. United States*,
  148 F.3d 1363 (Fed. Cir. 1998) .......................................................9

*CACI Inc.-Federal v. United States*,
  67 F.4th 1145 (Fed. Cir. 2023)..................................................13, 14

*CCL, Inc. v. United States*,
  39 Fed. Cl. 780 (1997) ............................................................3, 5, 8

*Distributed Solutions, Inc. v. United States*,
  539 F.3d 1340 (Fed. Cir. 2008) .......................................................7

*ITServe Alliance, Inc. v. United States*,
  122 F.4th 1364 (Fed. Cir. 2024).....................................................6, 9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012).......................................................................10

*Palantir USG, Inc. v. United States*,
  904 F.3d 980 (Fed. Cir. 2018) .........................................................2

*Percipient.ai, Inc. v. United States*,
  104 F.4th 839 (Fed. Cir. 2024).................................11, 12, 15, 19

*RAMCOR Services Group, Inc., v. United States*,
  185 F.3d 1286 (Fed. Cir. 1999) .......................................................6

*SRA International, Inc., v. United States Department of Energy*,
  766 F.3d 1409 (Fed. Cir. 2014) .......................................................5

*TRW Inc. v. Andrews*,
 534 U.S. 19 (2001) ............................................................................................9

*Validata Chemical Services v. United States*,
 169 F. Supp. 3d 69 (D.D.C. 2016) ................................................................8, 9

**STATUTES**

10 U.S.C. §3453 ................................... 1, 2, 4, 5, 11, 14, 15, 16, 17, 18, 19

28 U.S.C. §1491(b)(1) ....................... 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 18, 19

31 U.S.C. §3551(1) ...........................................................................................7, 8

**OTHER AUTHORITIES**

United States Army, Draft Performance Work Statement (PWS) for
 Modern Software Delivery (MSD), dated December 2024,
 *available at* https://sam.gov/api/prod/opps/v3/opportunities/
 resources/files/b922b075d6274417ac951cb72ec624f1/download?
 &token= ..........................................................................................................18

United States Army, Draft Request for Proposal, Multiple Award
 Indefinite Delivery Indefinite Quantity Contract for Modern
 Software Deliver (MSD), dated Defember 13, 2024, *available at*
 https://sam.gov/api/prod/opps/v3/opportunities/resources/files/dfea
 34ed24ef4cddbf2a83cc9b57da63/download?&token= ......................................17

United States Army, Memorandum re: Army Directive 2024-02
 (Enabling Modern Software Development and Acquisition
 Practices), dated March 11, 2024, *available at*
 https://web.archive.org/web/20240315232442/https:/armypubs.arm
 y.mil/epubs/DR_pubs/DR_a/ARN40433-ARMY_DIR_2024-02-
 000-WEB-1.pdf..........................................................................................15, 16

United States Army, Memorandum re: Army Directive 2024-02
 (Enabling Modern Software Development and Acquisition
 Practices), dated December 19, 2024, *available at*
 https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN42696-
 ARMY_DIR_2024-02-000-WEB-1.pdf...........................................................17

# INTEREST OF *AMICUS CURIAE*[1]

Palantir Technologies Inc. ("Palantir") is a leading U.S. commercial software company that, from its founding in 2003, set out to create the world's best data analysis software products. Palantir began by supporting United States Government customers in the intelligence and defense space. Today, Palantir provides its cutting-edge commercial decision-making software products to commercial enterprises and non-profit organizations as well as public institutions, revolutionizing the way they analyze data. The United States Government continues to be one of Palantir's major customers.

The question posed by this Court—who may bring an action for violations of a statute or regulation in connection with a procurement—arises from the appellant Percipient.ai's ("Percipient") allegation that the Government violated the commercial item preference mandate in 10 U.S.C. §3453. This mandate directs the Department of Defense, the Coast Guard, and the National Aeronautics and Space Administration to define its requirements for supplies or services, to the maximum extent practicable, so that commercial services, commercial products, or to the extent that commercial products suitable to meet the agency's needs are not available, non-developmental items other than commercial products may be procured to fulfill such

---

[1] This brief is filed pursuant to the Court's Order dated November 22, 2024. No party's counsel authored this brief in whole or part, and nobody other than Palantir and its counsel funded this brief. Fed. R. App. P. 29(a)(4)(E).

- 1 -

requirements. 10 U.S.C. §3453(a)(2). The statute further directs agencies to ensure, again to the "maximum extent practicable," that offerors of commercial products such as Palantir "are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. §3453(a)(3). The seminal case interpreting the scope and effect of this statute involved a Palantir commercial software product. *See Palantir USG, Inc. v. United States*, 904 F.3d 980 (Fed. Cir. 2018). Palantir continues to have a robust interest in ensuring that the Government abides by the requirements of 10 U.S.C. §3453 and that it and other providers of commercial software products have standing to challenge violations of this and any other procurement-related statute or regulation that directly affect their economic interests.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Administrative Dispute Resolution Act of 1996 ("ADRA") vests the Court of Federal Claims with jurisdiction over actions in which an "interested party" objects to any one of three different Federal procurement related events: i) a solicitation; ii) a proposed or actual contract award; or iii) any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. 28 U.S.C. §1491(b)(1).

The question posed by this Court—who is an interested party under the third prong listed above—essentially asks whether standing can be conferred upon a party who would ***not*** be an interested party under either of the first two prongs, i.e., does

standing exist under the third prong for parties that are not "actual or prospective offerors." The answer is *yes*. Because the waiver of sovereign immunity provided by §1491(b)(1) rests on two interconnected elements—the government action being objected to and the identity of the objecting party—"[t]he standing question cannot be divorced entirely from the precise nature of the challenge brought … ." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 789 (1997). Accordingly, the nature of the differences among the three prongs reasonably bears on the question of who may bring actions under them.

The claims described in Section 1491(b)(1)'s third prong are qualitatively different from and broader than the claims described in the first two prongs, which are expressly limited to objections to solicitations / requests for offers and proposed or actual contract awards, respectively. The third prong is not so confined, reaching wrongful procurement-related Government conduct that goes beyond problematic solicitations or award selection decisions. Indeed, the words "any" and "procurement" as well as the phrase "in connection with" are broad in scope. Thus, the most straightforward, common-sense and harmonious reading of §1491(b)(1)— indeed, the only reading that accords with basic principles of statutory construction—provides for "interested parties" under the third prong to be distinct from those who meet that definition under the first two prongs.

This reading does not require this Court to set aside precedent or create different legal standards among §1491(b)(1)'s three prongs.  Rather, the same legal standard—the "zone of interests" standard from the Administrative Procedure Act ("APA")—readily applies to all three prongs, with the "zone" for the first two prongs informed by the Competition in Contracting Act ("CICA") and the third prong similarly informed by the nature of the statutory or regulatory violation at issue.  The reading urged by the dissent in the instant case, on the other hand, effectively collapses §1491(b)(1)'s third prong into the first two and thus renders it superfluous.  Such an interpretation contravenes cardinal principles of statutory construction.

The dissent's dismissal of the risk posed by such a reading as "illusory" is not borne out by real world events.  To the contrary, in 2024 the Army issued a Directive regarding its software development and acquisition practices and a companion draft Request for Proposal that do not align comfortably with its mandate under 10 U.S.C. §3453 to meet its needs with commercial products to the maximum extent practicable.[2]  Absent the external check against procurement-related statutory violations enabled by §1491(b)(1)'s third prong, the Army would be free to sidestep its obligations under §3453 and disregard the availability of commercial software

---

[2] While the question posed by this Court is not limited to who may bring actions alleging violations of 10 U.S.C. §3453, this brief discusses that statute as illustrative of the harm caused by an artificially constrained definition of standing under 28 U.S.C. §1491(b)(1).

- 4 -

products that meet its needs in favor of non-commercial, bespoke "build from scratch" software. Such an outcome would ignore the plain reading of §1491(b)(1)'s third prong and render toothless the commercial item preference mandate set forth in 10 U.S.C. §3453.

## ARGUMENT

### I.  THE DEFINITION OF "INTERESTED PARTY" IS INFORMED BY THE NATURE OF THE CHALLENGE BROUGHT

The Administrative Dispute Resolution Act of 1996 ("ADRA") created a limited waiver of sovereign immunity that vests the Court of Federal Claims with jurisdiction over actions in which an "interested party" objects to:

   i)    A solicitation by a Federal agency for bids or proposals for a proposed contract;

   ii)    A proposed or actual contract award; or

   iii)    Any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. §1491(b)(1). *See SRA Int'l, Inc., v. United States Dep't of Energy*, 766 F.3d 1409, 1411 (Fed. Cir. 2014) (identifying the above three prongs).

As the plain language of the statute makes clear, §1491(b)(1) identifies two interconnected requirements: 1) the claim at issue must fall within one of the above three enumerated prongs; and 2) the claim must be brought by an "interested party." For that reason, "[t]he standing question cannot be divorced entirely from the precise nature of the challenge brought … ." *CCL, Inc. v. United States*, 39 Fed. Cl. 780,

789 (1997). As the Court of Federal Claims noted, "the answer to [who is an interested party] may vary based upon the precise nature of the action … ." *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 564 (2021).

Put simply, as §1491(b)(1) identifies both the types of claims it covers and who may bring them, the most straightforward, common-sense reading of the statute is to read these two requirements in harmony with each other, and not as disconnected, unrelated inquiries. "In statutory construction, we begin with the language of the statute. [W]e are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *ITServe Alliance, Inc. v. United States,* 122 F.4th 1364, 1369 (Fed. Cir. 2024)(internal citations omitted).

The nature of the prospective plaintiff's objections described in Section 1491(b)(1)'s third prong is qualitatively different from and broader than those identified in the first two prongs, which are expressly limited to solicitations and contract award decisions. The third prong is not so confined. It uses the all-encompassing word "any" to identify the types of alleged violations to which it applies, and the expansive phrase "in connection with a procurement" to delineate its scope. *See RAMCOR Servs. Grp., Inc., v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope."). Even the word "procurement" is expansively construed, stretching beyond

solicitations and contract awards to cover "*all stages* of the process of acquiring property or services, beginning with the process for determining a need for property or services and *ending with contract completion and closeout*.'" *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345-1346 (Fed. Cir. 2008) (internal citations omitted) (emphasis added).

Because the first two prongs are limited to objections to solicitations and contract award decisions, it makes sense that for such actions, the Federal Circuit borrows the definition of "interested party" from the Competition in Contracting Act of 1984 ("CICA"), as CICA expressly defines "interested party" for these very types of actions.[3]  ADRA does not, however, explicitly invoke or otherwise compel the application of CICA's "actual or prospective offeror" test to any of §1491(b)(1)'s three prongs, let alone all three.  *See American Fed'n of Gov't Emps., AFL-CIO v. United States (AFGE)*, 258 F.3d 1294, 1299 (Fed. Cir. 2001) ("the plain language of the statute does not resolve [the definition of 'interested party'] issue …").  Rather, the use of CICA's "actual or prospective offeror" test for ADRA purposes is a judicially fashioned outcome informed by certain parallels between the two statutes.

---

[3] Specifically, CICA defines "interested party" with respect to the following enumerated set of events: a) a solicitation or other request by a Federal agency for contract offers; b) the cancellation of such solicitation or other request; c) an award or proposed award of such a contract; d) a termination or cancellation of an award of such a contract; and e) conversion of a function performed by Federal employees to private sector performance.  31 U.S.C. §3551(1), (2).

*Id*. at 1302 ("The term Congress did choose to define standing under §1491(b), "interested party," is a term that is used in another statute that applies to government contract disputes, the CICA.").

Importantly, CICA does not address and is irrelevant to actions within the ambit of §1491(b)(1)'s third prong. Rather, "the relevant language of CICA concerns only challenges by a disappointed bidder to the federal government's solicitation, award, or termination of a contract, and ***it does not include any language paralleling the third clause of ADRA, which is all that is at issue here*** … ." *Validata Chemical Servs. v. United States*, 169 F. Supp. 3d 69, 81 (D.D.C. 2016) (emphasis added).

Because of the partial but not identical overlap in the jurisdictional scopes of CICA and §1491(b)(1),

> it makes sense to use [CICA's] definition as a means of informing the discussion, [but] it does not follow that it necessarily represents the four corners of potential standing under [§1491(b)(1)].
>
> ***Hesitation is warranted for two reasons. The first is obvious. The GAO enforces a different statute*** … .
>
> ***The second reason is that the language enforced by GAO is not identical.*** The GAO is permitted to hear protests as defined in 31 U.S.C. §3551(1). The preamble to ***the GAO definition limits the term*** to use in connection with contracts, solicitations, or requests for offers.

*CCL, Inc.* at 789-790 (emphases added) (internal citations omitted).

Given the third prong's more expansive reach, there is no reasonable basis for applying to it the purposefully constrained definition of "interested party" used in CICA. Indeed, to limit standing under §1491(b)(1)'s third prong to "actual and prospective offerors" would effectively collapse it into the first two prongs limited to awards and solicitations, respectively, rendering it superfluous. Such an interpretation contravenes the "cardinal principle of statutory construction that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *ITServe*, 122 F.4th at 1370, quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see also Bausch & Lomb, Inc., v. United States*, 148 F.3d 1363, 1367 (Fed. Cir. 1998) (statutes are to be construed, "if at all possible, to give effect and meaning to all the terms.").

As the *Validata* court noted, "If [the third prong] were read to apply only to disappointed bidders, it is difficult to imagine what work the 'in connection with' clause would perform beyond the first two prongs of ADRA's 'objecting to' test, which already permits challenges by those 'objecting to' federal contract solicitations or awards." *Validata*, 169 F. Supp. 3d at 82.

In sum, there is neither a mandatory nor a logical basis for squeezing the test for standing under §1491(b)(1)'s third prong into an ill-fitting test designed for other purposes. As discussed below, however, there is a readily available and more

- 9 -

reasonable reading that, consistent with the traditional rules of statutory construction, harmoniously aligns both tests.

## II.    CICA'S "ACTUAL OR PROSPECTIVE OFFEROR" REQUIREMENT FITS WITHIN THE APA'S ZONE OF INTEREST TEST FOR §1491(B)(1)'S FIRST TWO PRONGS

In addressing the Court's question—who may bring a claim under §1491(b)(1)'s third prong—the panel in the instant case divided over the applicability of this Court's decision in *AFGE*.  In *AFGE*, two Federal employees protested the government's decision to award a contract for depot services based on a cost study showing it would be cheaper to have the work performed by a private contractor.  The trial court dismissed the action for lack of standing after concluding that the plaintiffs lacked standing under the Administrative Procedure Act's ("APA") "zone of interests"[4] test, reasoning that because ADRA gave the Court of Federal Claims concurrent jurisdiction with U.S. District Courts over post-award bid protest cases, it should adopt the APA test for standing used by the District Courts for such cases.

This Court affirmed the trial court's dismissal but on a different basis, adopting the "actual or prospective offeror" definition from CICA as the appropriate

---

[4] *See e.g., Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) ("A person suing under the APA must satisfy not only Article III's standing requirements, but an additional test:  The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated.") (citations omitted).

means to determine standing.  The Court acknowledged that "the ADRA expressly made the APA standard of review applicable to all bid protest actions," but distinguished that issue from "whether Congress intended to expand the class of parties who can bring bid protest actions in the Court of Federal Claims." *AFGE*, 258 F.3d at 1300.  The Court observed that §1491(b)(1) uses the term "interested party," which is also found in CICA, and decided to "construe the term [ ] in §1491(b)(1) in accordance with the CICA, and hold that standing under §1491(b)(1) is limited to actual or prospective bidders, or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id*. at 1302.

The panel majority in the instant case found no fault in *AFGE*'s reasoning but concluded that it applied CICA's "actual or prospective offeror" test for standing only to §1491(b)(1)'s first two prongs.  Because Percipient alleged a statutory violation of 10 U.S.C. §3453, thereby placing its claim under §1491(b)(1)'s third prong, the panel majority concluded that *AFGE* was inapplicable.  *Percipient.ai, Inc. v. United States*, 104 F.4th 839, 855-856 (Fed. Cir. 2024).  Thus, rather than looking to whether Percipient was an actual or prospective offeror, the majority determined that Percipient had standing because it had a direct economic interest that would be affected by the alleged statutory violation.

The dissent asserts that *AFGE*'s test for standing applies to the entirety of §1491(b)(1), maintaining that the three prongs differ only with respect to the "various stages of a government contract" they attack. *Percipient.ai*, 104 F.4th at 868. The dissent bases its argument that only a temporal difference, not a substantive one, separates §1491(b)(1)'s third prong from the other two on the premise that "any challenge to a solicitation or award is based on some alleged error in law or regulation." *Id.* The dissent further states that the third prong "is only broader [than the first two prongs] in that it will reach beyond the early stages of a contract." *Id*.

The dissent's reading does not square with the plain language of the statute. For example, the third prong expressly includes statutory violations in connection with "a proposed procurement." A proposed procurement, such as one might find described in a solicitation, is not yet a contract (and may never be one), let alone a contract that has progressed beyond its early stages. The dissent's expansive reading of the first two prongs and minimalist reading of the third renders the latter superfluous and contravenes the basic tenet of statutory interpretation discussed *supra* requiring that the statute's two jurisdictional elements (the nature of the claim and the identity of the party bringing it) cohere. It also assumes that *AFGE* treats the APA and CICA tests as mutually exclusive across all three prongs of §1491(b)(1).

Palantir submits that the APA and CICA tests need not be viewed as mutually exclusive across any of §1491(b)(1)'s prongs. Rather, Palantir suggests that the "actual or prospective offeror" test from CICA is better understood as an appropriate way to determine whether the plaintiff's interests fall within the "zone of interests" for claims brought under §1491(b)(1)'s first two prongs. Because the contours of a zone depend on what is being zoned, the broader substantive and temporal reach of the third prong, which goes beyond solicitations and contract awards, fully warrants drawing a zone that includes interests beyond those of "actual or prospective offerors."

In short, the APA's "zone of interests" standard can be applied to all three prongs, with the "zone" for the first two prongs understandably informed by CICA and the third prong similarly informed by the nature of the alleged statutory or regulatory violation at issue. Consistent with the panel majority's reasoning, such a reading does not require that the decision in *AFGE* be discarded, merely that it be respected as appropriately restricting the "zone of interests" for §1491(b)(1)'s first two prongs to "actual or prospective bidders." Indeed, this Court implicitly employed such a reading in *CACI Inc.-Federal v. United States*, 67 F.4th 1145 (Fed. Cir. 2023), a protest from a disappointed bidder arising under §1491(b)(1)'s second prong since it involved an objection to an Army contract award decision. The *CACI* Court characterized the "actual or prospective offeror" / "interested party" inquiry

as an issue of statutory standing, and further commented that statutory standing is "***occasionally referred to as the zone-of-interests requirement*** … ."  *CACI Inc.*, 67 F.4th at 1151 (emphasis added).

Palantir submits that this Court should explicitly adopt what it implicitly acknowledged in the *CACI* case.  Such an outcome would resolve the unnecessary confusion that arises from treating the CICA and APA tests as necessarily incongruous with each other and put an end to the misnomer that the third prong of §1491(b)(1), like the first two prongs, is limited to "bid protests."  It would also protect the Congressional intent underlying 10 U.S.C. §3453 and other procurement-related statutes and regulations by affording those directly harmed by violations thereof a forum in which such violations can be challenged.

## III.   THE RISKS OF AN OVERLY NARROW TEST FOR STANDING ARE REAL AND PRESENT

It would undermine Congressional intent for this Court to construe ADRA's waiver of sovereign immunity in a way that would:  1) strip the Court of Federal Claims of the jurisdiction that §1491(b)(1) expressly confers upon it; 2) deprive plaintiffs of the ability to challenge violations of procurement law directly harmful to their economic interests; and 3) allow the government to avoid its statutory obligations with impunity and without consequence or means of redress.

The risks inherent in construing the "actual or prospective offeror" test as applicable to matters arising only under §1491(b)(1)'s third prong are real and not,

as the dissent suggests, illusory. *Percipient.ai*, 104 F.4th at 869. Such risks can arise without any intentional misconduct or malfeasance by the Government. The simple truth is that procurement officials make mistakes and can transgress procurement laws and regulations while acting in what they believe to be the Government's best interests. This tension is illustrated by the Army's evolving plan to establish a pool of software development contractors to address yet to be defined requirements for yet to be defined projects while acknowledging its mandate under 10 U.S.C. §3453 to prefer commercially available products.[5]

By way of background, on March 11, 2024, the United States Army published Directive 2024-02 (Enabling Modern Software Development and Acquisition Practices) (the "March 2024 Acquisition Practices Directive") to "establish[ ] policy and assign[ ] responsibilities for the Army's adoption of modern software development and acquisition practices."[6] The March 2024 Acquisition Practices Directive states that "[g]iven the rapid and iterative nature of agile software development, *requirements should not be overly prescriptive or detailed. Software*

---

[5] 10 U.S.C. §3453 expressly obligates Federal agencies to "ensure that, to the maximum extent practicable … offerors of … commercial products … are provided an opportunity to compete in any procurement to fill such requirements." Moreover, the statute obligates agencies, again "to the maximum extent practicable," to state their requirements "in terms of- (A) functions to be performed; (B) performance required; or (C) essential characteristics."

[6] https://web.archive.org/web/20240315232442/https://armypubs.army.mil/epubs/ DR_pubs/DR_a/ARN40433-ARMY_DIR_2024-02-000-WEB-1.pdf.

*capability requirements will be written at a high-level*, concise, focused on operational issues, and *refined iteratively* over time based on functional sponsor and user community input during capability development and delivery." (emphasis added). This open-ended, broadly scoped directive does not fit comfortably with the mandate in 10 U.S.C. §3453 to prefer commercial products to the "maximum extent practicable," and to define requirements by functions to be performed, performance required, or essential characteristics.

Indeed, the March 2024 Acquisition Practices Directive directly undermined §3453's commercial item preference mandate through its guidance on contract vehicle type, decreeing that "[f]irm fixed price-type clauses"—the type used for the sale of commercial software products—were to be minimized, while "[c]ost-reimbursement-type, labor hour, incentive and/or hybrid contract clauses"—the types used for custom software development—were to be "used to the maximum extent practicable." March 2024 Acquisition Practices Directive at 6. The March 2024 Acquisition Practices Directive also announced that "[c]ustomization to commercial software solutions will be minimized … ." *Id*. In short, the March 2024 Acquisition Practices Directive sent a clear message to both industry and Army procurement officials that commercial software solutions and the commercial vendors that provide them would be disfavored in future procurements.

Apparently recognizing that the plain language of the March 2024 Acquisition Practices Directive contravened 10 U.S.C. §3453's mandate to prefer commercial solutions, the Army issued a revised version of the Directive on December 19, 2024 (the "December Acquisition Practices Directive"). The December Acquisition Practices Directive expressly states that the Army intends to comply with 10 U.S.C. §3453.[7] It should be a given that the Army will comply with procurement law, so the very fact that it needed to issue a revised version of its Acquisition Practices Directive to say what it is already obligated to do highlights the inherent tension between the Army's planned approach to software acquisition and §3453's mandates.

This tension is further reflected in the Army's December 13, 2024, draft Request for Proposal ("RFP") describing its plan to establish a pool of software developers, with details regarding the projects to be performed and the requirements to be met to spelled out later in the task orders.[8] The Performance Work Statement that accompanied the draft RFP provides that "***Contractors shall provide custom software development that supports the creation and delivery of software that meet***

---

[7] https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN42696-ARMY_DIR_2024-02-000-WEB-1.pdf.

[8] *See* Section C.2. at https://sam.gov/api/prod/opps/v3/opportunities/resources/files/dfea34ed24ef4cddbf2a83cc9b57da63/download?&token=.

***Army requirements*** and are tailored to meet unique expectations, needs, objectives, innovations and operational challenges ***utilizing the writing of new code***."[9]

Palantir and other Original Equipment Manufacturers would be ineligible for an IDIQ contract award under this RFP since they provide proprietary commercial products to meet their customers' needs; they are not outsourcing firms that sell software engineering services by labor category on a custom project basis. Absent the external check against procurement-related statutory violations afforded by §1491(b)(1)'s third prong, the Army could easily overlook its obligations under §3453 and miss the availability of commercial software products that meet its needs in favor of the non-commercial, bespoke "build from scratch" software contemplated by the draft RFP.

Such an outcome would contravene both the plain language of §1491(b)(1)'s third prong and frustrate the Congressional intent underlying 10 U.S.C. §3453 to save time and money by mandating that the Government's requirements be "defined so that … commercial products … may be procured to fulfill such requirements," and that "offerors of … commercial products … are provided an opportunity to compete in any procurement to fill such requirements."  10 U.S.C. §3453(a)(2), (3). The panel majority recognized this, explaining that unless "interested party" status

_____

[9] *See* §2.1.3 at https://sam.gov/api/prod/opps/v3/opportunities/resources/files/ b922b075d6274417ac951cb72ec624f1/download?&token= (emphasis added).

was accorded to contractors directly harmed by violations of the statute, "the statutory guarantees under §3453 could become illusory … the statute would have minimal bite—it would rely on an agency to self-regulate … ." *Percipient.ai*, 104 F.4th at 856.

In short, the only way to invest 28 U.S.C. §1491(b)(1) and procurement-related statutes such as 10 U.S.C. §3453 with the meaning their plain wording accords them is to ensure that plaintiffs whose direct economic interests are harmed by violations of such statutes (or regulations) are deemed interested parties with the standing to object to those violations.

## CONCLUSION

For the foregoing reasons, Palantir respectfully requests that, with respect to the question, "who may bring an action for violations of a statute or regulation in connection with a procurement?" this Court hold that the answer is not limited to CICA's "actual or prospective offeror" but instead, given the plain language of §1491(b)(1)'s third prong, includes any party whose direct economic interest is harmed by any alleged procurement-related statutory or regulatory violation.

Respectfully submitted,

/s/ Andrew E. Shipley
ANDREW E. SHIPLEY
BARRY J. HUREWITZ
JARROD R. CARMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

*Attorneys for Amicus Curiae Palantir
Technologies Inc.*

February 5, 2025

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.    The filing has been prepared using a proportionally-spaced typeface and includes 4,358 words.

2.    The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Andrew E. Shipley
ANDREW E. SHIPLEY
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 663-6000

February 5, 2025