No. 2023-1970

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## PERCIPIENT.AI, INC.
### *Plaintiff-Appellant*

v.

## UNITED STATES, CACI, INC.-FEDERAL
### *Defendants-Appellees*

Appeal from the United States Court of Federal Claims
No. 1:23-Cv-00028-EGB
Senior Judge Eric G. Bruggink

## EN BANC BRIEF FOR DEFENDANT-APPELLEE,
## CACI, INC.-FEDERAL

Dated: April 4, 2025

Anne B. Perry
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel:  202.747.1900
Fax:  202.747.1901
Email: aperry@sheppardmullin.com

*Attorney of Record for Defendant-Appellee
CACI, Inc. – Federal*

*Of Counsel*:
Jonathan S. Aronie
Townsend L. Bourne
Ariel E. Debin Collinsworth
Lillia J. Damalouji

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee, CACI, Inc.-Federal, certifies the following:

1.     The full name of every party represented by me is: **CACI, Inc.-Federal**.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **Not Applicable.**

3.     All parent corporations and publicly held companies that own 10 percent or more of stock of the party represented by me are: **CACI International Inc**.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or that are expected to appear in this court (and who have not or will not enter an appearance in this care) are: **None**.

5.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are: **None**.

Respectfully submitted,

Dated: April 4, 2025          ___/s/ Anne B. Perry_____
                              ANNE B. PERRY
                              *Attorney of Record for Defendant-Appellee*
                              *CACI, Inc. – Federal*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF RELATED CASES ................................................. ix

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE................................................................2

   I.   Background of the Commercial Preference. ...................................2

   II.  Factual Background .......................................................................6

       A.    The SAFFIRE Solicitation and Contract Award to CACI....................6

       B.    Performance of the SAFFIRE Contract and CV Requirement. ............7

       C.    Procedural Background. .......................................................9

SUMMARY OF THE ARGUMENT ....................................................13

ARGUMENT .....................................................................................14

   I.   Standard Of Review.................................................................14

   II.  The Term "Interested Party" Is Properly Interpreted In Line With The Competition In Contracting Act, As Recognized By This Court's Binding Precedent In *AFGE*.......................................................................15

       A.    The Court In *AFGE* Properly Considered Congressional Intent And The Legislative History Of The ADRA, Correctly Interpreting "Interested Party" Under CICA, Not The APA. ...........................................16

       B.    The Court's Ruling In *AFGE* Applies Equally To All Three "Prongs" Of Section 1491(b)(1).....................................................................21

       C.    There Is No Logical Reason To Distinguish This Court's Standing Precedent In *AFGE* Or *Distributed Solutions* From The Facts Of This Case…....................................................................................23

III. Nothing In The Nature Of 10 U.S.C. § 3453 Justifies Establishing Unique Standing Rules For Offerors Of Commercial Products.................................28

    A.    The CFC Is A Court Of Limited Jurisdiction, And Any Waivers Of The CFC's Sovereign Immunity Must Be Construed Narrowly...................28

    B.    Adopting Percipient's Standing Standard Would Greatly Expand The Pool Of Potential Protestors, Even Outside Of 10 U.S.C. § 3453. ..............32

IV. Even If The Court Adopted Percipient's Definition Of "Interested Party" Percipient Fails To Prove Standing In This Case.........................................38

V. Remedies Still Exist To Enforce FASA Without Expanding Standing Or The CFC's Jurisdiction Beyond Congressional Intent. .......................................43

CONCLUSION .......................................................................................46

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aero Corp. v. Dep't of the Navy,*
  558 F.Supp. 404 (D.D.C. 1983) ............................................................18

*Am. Fed. of Gov't Emps., AFL-CIO v. United States,*
  258 F.3d 1294 (Fed. Cir. 2001) ................................................... passim

*Blue & Gold Fleet, L.P. v. United States,*
  492 F.3d 1308 (Fed. Cir. 2007) ...........................................................10

*CACI, Inc.-Federal v. United States,*
  67 F.4th 1145 (Fed. Cir. 2023) ............................................................14

*Comm'r v. Keystone Consol. Indus., Inc.,*
  508 U.S. 152, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993) .......................21

*Control Data Sys., Inc. v. United States,*
  32 Fed. Cl. 520 (1994) .........................................................................16

*Craft Bearing Company, Inc.,*
  B-418685, June 22, 2020, 2020 CPD ¶ 202 .......................................35

*CUNA Mut. Life Ins. Co. v. United States,*
  169 F.3d 737 (Fed. Cir. 1999) .............................................................21

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) .....................22

*Digitalis Educ. Sols., Inc. v. United States,*
  664 F.3d 1380 (Fed. Cir. 2012) ...........................................................14

*Distributed Sols., Inc. v. United States,*
  539 F.3d 1340 (Fed. Cir. 2008) .................................................. passim

*Eagle Design & Mgmt., Inc. v. United States,*
  62 Fed. Cl. 106 (2004) .........................................................................41

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005) ...........................................................29

*Fluor Intercontinental, Inc. v. United States*,
147 Fed. Cl. 309 (2020) ......................................................................43

*Frazier v. United States*,
79 Fed. Cl. 148 (2007), aff'd, 301 F.Appx 974 (Fed. Cir. 2008) ................ 34, 40

*Free Air Corp. v. FCC*,
130 F.3d 447 (D.C. Cir. 1997) ..............................................................18

*Gray v. Bell*,
712 F.2d 490 (D.C. Cir. 1983) ..............................................................45

*Guardian Moving & Storage Co., Inc. v. United States*,
657 Fed.Appx. 1018 (Fed. Cir. 2016) ....................................................15

*Gustafson v. Alloyd Co., Inc.*,
513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ...........................21

*Harmonia Holdings Grp., LLC v. United States*,
157 Fed. Cl. 292 (2021) ......................................................................40

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) ............................................................15

*Int'l Eng'g Co. v. Richardson*,
512 F.2d 573 (D.C. Cir. 1975) ..............................................................18

*Int'l Genomics Consortium v. United States*,
104 Fed. Cl. 669 (2012) ......................................................................41

*Lane v. Pena*,
518 U.S. 187 (1996) ............................................................................29

*MCI Telecoms. Corp. v. United States*,
878 F.2d 362 (Fed. Cir. 1989) ..............................................................37

*mLINQS, LLC v. United States,*
No. 22-1351, 2023 WL 2366654 (Fed. Cl. Mar. 6, 2023) ....................................3

*Motorola, Inc. v. United States,*
988 F.2d 113 (Fed. Cir. 1993) ............................................................................16

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,*
260 F.3d 1365 (Fed. Cir. 2001) ..........................................................................21

*Orff v. United States,*
545 U.S. 596, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005) ....................................29

*Palantir USG v. United States,*
904 F.3d 980 (Fed. Cir. 2018) ..................................................................... 41, 44

*Percipient.ai, Inc. v. United States, CACI, Inc.-Fed.,*
104 F.4th 839 (Fed. Cir. 2024) .................................................................. passim

*Prima Tek II, L.L.C. v. A-Roo Co.,*
222 F.3d 1372 (Fed. Cir. 2000) ..........................................................................15

*Scanwell Lab'ys, Inc. v. Shaffer,*
424 F.2d 859 (D.C. Cir. 1970) ............................................................................17

*SEKRI, Inc. v. United States,*
34 F.4th 1063 (Fed. Cir. 2022) ...........................................................................31

*Soriano v. United States,*
352 U.S. 270 (1957) ............................................................................................29

*Southfork Sys., Inc. v. United States,*
141 F.3d 1124 (Fed. Cir. 1998) ..........................................................................19

*Sys. Application & Techs., Inc. v. United States,*
691 F.3d 1374 (Fed. Cir. 2012) ..........................................................................29

*TransUnion LLC v. Ramirez,*
594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ....................................22

*US West Commc'ns Servs., Inc. v. United States*,
  940 F.2d 622 (Fed. Cir. 1991) ..................................................40

*Winter v. FloorPro, Inc.*,
  570 F.3d 1367 (Fed. Cir. 2009) ...............................................29

## Statutes

10 U.S.C. § 3453 .................................................................. passim

15 U.S.C. § 637 ..........................................................................36

19 U.S.C. § 2501, *et seq* ...........................................................35

28 U.S.C. § 1295 ....................................................................1, 14

28 U.S.C. § 1491 ................................................................ passim

28 U.S.C. § 2680 ..........................................................................45

41 U.S.C. § 8301, *et seq.* ...........................................................33

41 U.S.C. §§ 7101-7109 ..............................................................44

5 U.S.C. § 702 ............................................................................17

## Other Authorities

142 Cong. Rec. S11848 (Sept. 30, 1996)....................................17

142 Cong. Rec. S11849-50 (Sept. 30, 1996) .............................17

Brief for Plaintiffs-Appellants, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) (No. 00-5090), 2000 WL 34401893 ......24

Executive Order 14005, "Ensuring the Future is Made in America by All of America's Workers," 86 Fed. Reg. No. 7475 (Jan. 28, 2021) ............................33

Federal Acquisition Streamlining Act of 1994, Sec. 1004, Pub. L. 103-355, 108 Stat. 3243 (Oct. 13, 1994) ..................................................................30

Pub. L. No. 104-320, § 12(d); 110 Stat. 3870 (1996)................................17

Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Sec. 885, H.R. 5009 ....................................30

*To Revise and Streamline the Acquisition Laws of the Federal Government, and for Other Purposes: Hearing on S. 1587 Before the S. Comm. on Governmental Affs. and the S. Comm. on Armed Servs.*, 103rd Cong. 293 (1994)..............................31

## Rules

Fed. Cir. R. 28 ...........................................................................................1

Fed. Cir. R. 47.5 .........................................................................................x

Fed. R. App. P. R. 28 ................................................................................1

## Regulations

48 C.F.R. § 10.003 .....................................................................................4

48 C.F.R. § 19.702 ...................................................................................36

48 C.F.R. § 44.403 .....................................................................................5

48 C.F.R. § 52.210-1...............................................................................4, 8

48 C.F.R. § 52.244-6...................................................................................5

48 C.F.R. § 7.102 .......................................................................................6

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule ("Fed. Cir. R.") 47.5(a)(1), counsel for Defendant-Appellee, CACI, Inc.-Federal ("CACI"), is not aware of any other appeal in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court.

Pursuant to Fed. Cir. R. 47.5(a)(2), counsel for CACI is not aware of any case that is pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# INTRODUCTION

Pursuant to the Federal Rules of Appellate Procedure ("FRAP") Rule 28 and the Court's November 22, 2024 Order on Petition for Rehearing En Banc, Defendant-Appellee, CACI, Inc.-Federal ("CACI"), respectfully submits this brief in response and in opposition to Plaintiff-Appellant's, Percipient.ai, Inc. ("Percipient"), En Banc Opening Brief, dated January 21, 2025. As set forth herein, CACI respectfully requests that the Court apply the term "interested party" under 28 U.S.C. § 1491(b)(1) in accordance with the Court's precedent in *Am. Fed. of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) (hereinafter "*AFGE*") and affirm the Court of Federal Claims ("CFC") dismissal of Percipient's protest on the grounds that it lacks the requisite standing to bring a bid protest under 28 U.S.C. § 1491(b)(1).[1]

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3), which provides for an appeal from a final decision of the United States Court of Federal Claims. However, CACI disagrees with Percipient's

---

[1]    Pursuant to Fed. Cir. R. 28(b), CACI's "statements of jurisdiction, the issues, the case and facts, and the standard of review must be limited to specific areas of disagreement with" Percipient's. Thus, CACI addresses only those specific areas of disagreement with Percipient's En Banc Opening Brief, or where additional discussion or clarification is necessary on material issues. CACI does not concede any of the general characterizations made by Percipient or allegations made relating to matters that are immaterial to the narrow issue in this review.

assertion and the Panel Majority's June 7, 2024 opinion granting Percipient's

appeal that the CFC had jurisdiction over any aspect of Percipient's allegations.

*See* Pl. Br.[2] at 1.

<u>**STATEMENT OF THE ISSUES**</u>

The Court ordered the parties to address the following limited issue:

A.    Who can be "an interested party objecting to…any alleged violation

of statute or regulation in connection with a procurement or a proposed

procurement" under 28 U.S.C. § 1491(b)(1)?

<u>**STATEMENT OF THE CASE**</u>

Although CACI respectfully disagrees with many of the unsupported

statements and characterizations made in Percipient's En Banc Opening Brief,

CACI will limit its Statement of the Case to addressing key facts relevant to this

limited *en banc* review.

**I.    BACKGROUND OF THE COMMERCIAL PREFERENCE.**

10 U.S.C. § 3453 creates a preference for agencies to procure "commercial

services, commercial products, or nondevelopmental items other than commercial

products," to the "maximum extent practicable" so long as the products meet the

agency's needs. 10 U.S.C. § 3453(b). This is not a mandate to procure commercial

offerings, but rather a preference where such products are available and can meet

---

[2]    Citations to "Pl. Br." herein refer to Percipient's latest filed En Banc
Opening Brief, Document No. 60, filed on January 21, 2025, in this case.

the agency's procurement needs. *See, e.g.*, *mLINQS, LLC v. United States*, No. 22-1351, 2023 WL 2366654 at *26 (Fed. Cl. Mar. 6, 2023).

Section 3453 largely governs Department of Defense ("DOD") procurement actions *prior* to contract performance. *See, e.g.*, 10 U.S.C. § 3453(c)(1)(A)-(C) ("Preliminary Market Research" requirements to be conducted (1) "before developing new specifications for a procurement," (2) "before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold," and (3) "before awarding a task order or delivery order in excess of the simplified acquisition threshold."); 10 U.S.C. § 3453(a)(2)-(3) (relating to the drafting of requirements for a solicitation and drafting of specifications, ensuring commercial offerors are provided sufficient opportunities to compete and fill an agency's requirements upfront); 10 U.S.C. § 3453(b)(1) (requiring agencies "to the maximum extent practicable…*acquire* commercial services, commercial products, or nondevelopmental items…to meet the needs of the agency.") (emphasis added); 10 U.S.C. § 3453(b)(3) (requiring agencies to "*modify requirements* in appropriate cases to ensure that the requirements can be met by" commercial offerors, thus giving commercial offerors the option to compete for such awards in the first place) (emphasis added); 10 U.S.C. § 3453(b)(4) (requiring agencies to "state

*specifications* in terms that enable and encourage bidders and offerors to supply"

commercial products "*in response to the agency solicitations*.") (emphasis added).[3]

In all of the forgoing requirements, agencies are instructed to take certain

actions *before* entering into an agreement with a contractor to perform work, and

often before issuing a solicitation.

10 U.S.C. § 3453 also includes two (2) provisions that relate to an agency's

oversight of contractor performance post-award. *See, e.g.*, 10 U.S.C. § 3453(b)(2)

(prime contractors and subcontractors "to the maximum extent practicable" must

"incorporate commercial services, commercial products, or nondevelopmental

items…as components of items supplied to the agency."); 10 U.S.C. § 3453(c)(5)

(agencies must "take appropriate steps to ensure that any prime contractor of a

contract (or task order or delivery order)…for the procurement of products other

than commercial products or services…engages in such market research as may be

necessary…before making purchases for or on behalf of the [DOD].").

Agencies satisfy these oversight requirements, for example, by incorporating

mandatory Federal Acquisition Regulation ("FAR") terms and conditions into

prime contracts. *See, e.g.*, 48 C.F.R. § 52.210-1 (required in all "solicitations and

contracts over $6 million," (48 C.F.R. § 10.003), and requiring prime contractors

---

[3]    10 U.S.C. § 3453(b)(5) and (b)(6) relate to requirements to revise internal
agency policies and required training for personnel. Neither are relevant to this
Appeal or the underlying protest.

"[b]efore awarding subcontracts for other than commercial acquisitions" to "conduct market research to…[d]etermine if commercial products…are available that – (i) Meet the agency's requirements; (ii) Could be modified to meet the agency's requirements; or (iii) Could meet the agency's requirements if those requirements were modified to a reasonable extent" and to consider "the extent to which commercial products…could be incorporated at the component level."); 48 C.F.R. § 52.244-6 (required in all non-commercial prime contracts (48 C.F.R. § 44.403), and directing prime contractors "[t]o the maximum extent practicable," to "incorporate, and require its subcontractors at all tiers to incorporate, commercial products, commercial services, or non-developmental items as components of items to be supplied under this contract.").

Federal agencies thus comply with Section 3453's commercial preference throughout a contract's lifecycle by taking action pre-award to ensure adequate participation by commercial offerors, through incorporating commercial preference terms into their prime contractors' agreements (as the Government did here, *see* Appx797; Appx857),[4] and through monitoring prime contractor performance against those contract terms throughout performance.

---

[4] References to "Appx" refers to the Confidential Joint Appendix filed in this case.

## II.   FACTUAL BACKGROUND

### A.   The SAFFIRE Solicitation and Contract Award to CACI.

The National Geospatial-Intelligence Agency ("NGA") created the

SAFFIRE program to provide the development, integration, and deployment of

two key components: a Structured Observation Management ("SOM") capability,

and a Computer Vision ("CV") system capability. Appx23; Appx38-39; Appx58.

To that end, NGA conducted market research from May 2018 to May 2019 to

gather the information necessary to plan the SAFFIRE procurement, including

releasing two (2) Requests for Information ("RFI"), hosting industry days, and

preparing a Market Research Report in August 2019. Appx571; *see also*, *e.g.*,

Appx567, Appx572-73, Appx907. Contrary to Percipient's assertion that market

research did not occur (Pl. Br. at 8), NGA conducted its market research in

accordance with FAR 7.102, requiring agencies to "perform acquisition planning

and conduct market research…for all acquisitions in order to promote and provide

for," *inter alia*, the "Acquisition of commercial products…to the maximum extent

practicable." 48 C.F.R. § 7.102(a)(1); Appx569.

NGA released Solicitation No. HM047620R0006 (the "SAFFIRE

Solicitation") on January 13, 2020, incorporating the CV System requirements.

Appx783. Percipient did not submit a proposal, (Pl. Br. at 8; Appx43), did not

respond to the agency's RFIs (Appx43), and did not challenge the inclusion of the CV System requirements in the solicitation. *See, e.g.*, Appx238.

NGA notified CACI it was awarded Contract No. HM047621D0004 on January 14, 2021 (the "SAFFIRE Contract" or the "Contract"). Appx70. Under the Contract, CACI is tasked with both the development and delivery of the SOM enterprise repository capabilities and the development and delivery of the CV System (Appx24), which CACI could complete by supporting the incorporation of commercially available, off-the-shelf ("COTS"), Government off-the-shelf ("GOTS"), Open Source, or custom software development to support system design, with Government approval. *See* Appx479-80.

## B.    Performance of the SAFFIRE Contract and CV Requirement.

To facilitate CACI's performance under the Contract, CACI has been awarded three task orders since 2021. Task Order 1, No. HM0476-21-F-0020, was issued on January 21, 2021, with a one-year base period followed by four 1-year option periods of performance ("TO 1"). Appx860; *see also* Appx1247. TO 1 initially directed CACI to evaluate and transition certain legacy government software into operational use. Appx470, Appx496. CACI then was directed, *inter alia*, to develop, deliver, and integrate the CV suite of systems. Appx24; Appx470.

The TO 1 Performance Work Statement ("PWS") contemplated CACI's role in the design (Appx479), software development (Appx481), and integration

-7-

(Appx483) aspects of the SAFFIRE program. *See also* Appx26. In designing the SAFFIRE program, CACI was instructed to support the incorporation of commercially available, off-the-shelf items ("COTS"), Government off-the-shelf ("GOTS") items, Open Source, or custom software development "as applicable to support system design, with Government approval." *See* Appx479-80. In the case of custom software development, CACI was to prioritize reusing existing code over creation of new software. *See* Appx480.

Nowhere in the text of TO 1 PWS is CACI directed to procure a commercial CV System, to contract with a commercial vendor for the CV System requirements, or to procure Percipient's Mirage offering. *See* Appx463-520 (TO 1 PWS). CACI complied with its contractual obligations to consider commercial offerors in performance of the SAFFIRE procurement (*see, e.g.*, Appx792; 48 C.F.R. § 52.210-1), including evaluating Percipient specifically in relation to the CV System capabilities. *See, e.g.*, Appx955-60; Appx963-68. CACI received a demonstration and overview of the Mirage platform on May 27, 2021 and conducted a follow-on assessment and evaluation of the system to assess whether Percipient's product could satisfy solutions to existing gaps in SAFFIRE CV capabilities consistent with program requirements. *See* Appx966. CACI's evaluation took into account the overview and demonstration provided by Percipient, as well as data from previous NGA efforts with Percipient. *See id.*

-8-

Contrary to Percipient's suggestion that SAFFIRE was "plug and play" as allegedly advised by an unnamed NGA Senior Analyst under an unrelated program, CACI found that Mirage did not address gaps in the CV capabilities and thus recommended against additional evaluation. *See* Appx964-68.[5]

### C.    Procedural Background.

Percipient waited until January 9, 2023 to file its bid protest with the CFC – three (3) years after NGA released its SAFFIRE Solicitation, and two (2) years after CACI was awarded both the SAFFIRE Contract and TO 1 in 2021. Appx34.

Percipient's Complaint alleged violations of the commercial preference obligations in 10 U.S.C. § 3453 in the performance and administration of the SAFFIRE Contract. Defendant-Appellees immediately moved to dismiss Percipient's bid protest on several grounds, including: (1) lack of subject matter jurisdiction, (2) lack of standing, and (3) timeliness. *See, e.g.*, Appx152-74, Appx175-99, Appx248-68, Appx269-89. As part of Defendant-Appellees' arguments relating to subject matter jurisdiction, Defendant-Appellees alleged, *inter alia*, (1) the CFC lacked bid protest jurisdiction over Percipient's complaint

---

[5] Percipient's referenced July 2022 Bailment Agreement is not relevant to this matter as the bailment agreement was not executed under or pursuant to the SAFFIRE Contract. Appx1024 (the bailment agreement was limited to "assist[ing] NGA in developing and describing *future* agency requirements by providing NGA and increased awareness of the current state of commercial technology.") (emphasis added).

because Percipient challenged issues of contract administration, which are not covered by the CFC's grant of bid protest jurisdiction under the Tucker Act (28 U.S.C. § 1491(b)(1)), and (2) even if Percipient's claims could properly be identified as a bid protest challenge, such allegations were jurisdictionally barred by the Federal Acquisition Streamlining Act ("FASA") task order bar, because the allegations are in connection with the issuance of the task order issued to CACI under the SAFFIRE Contract. *See, e.g.*, Appx157, Appx159, Appx164, Appx195-197. Defendant-Appellees also argued that Percipient, as a mere disappointed potential subcontractor, lacked standing to bring a bid protest at the CFC because it neither submitted a proposal nor protested the SAFFIRE Solicitation or the ensuing award to CACI. *See, e.g.*, Appx160-63; Appx186-91. Finally, Defendant-Appellees alleged that Percipient's Complaint should be dismissed as an untimely challenge to the terms of the SAFFIRE Solicitation, barred by this Court's precedent in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). *See, e.g.*, Appx170-72; Appx198.

The CFC released its full opinion on the motions on March 31, 2023, wherein the CFC made several statements that Defendant-Appellees viewed as contrary to law and precedent. *See, e.g.*, Appx1. Among those findings was the clear error in holding that "FASA's task order bar will not apply when, as here, a task order exceeds $25,000,000." Appx7. To correct this clear error of law,

Defendant-Appellees filed Motions for Reconsideration on April 25, 2023 asking the CFC to reconsider its holding that the CFC has jurisdiction over protests under FASA's task order bar. *See, e.g.*, Appx32, Appx1185-92, Appx1193-98. As a result of these filings, and a telephonic conference with all parties on April 26, 2023 (Appx32), the CFC vacated its earlier opinion, re-opening Defendant-Appellees' motions to dismiss on the specific question of the FASA task order bar. *See id.* On May 17, 2023, the CFC granted the Defendant-Appellees' renewed motions to dismiss for lack of subject matter jurisdiction, dismissing Percipient's protest in its entirety. Appx22-27.

In response to the CFC's rulings, Percipient filed a Notice of Appeal with this Court on May 24, 2023. Appx33. On appeal, two members of this Court reversed the CFC's dismissal, not only on the task order bar grounds, but also upon Defendant-Appellees' proposed alternative arguments that Percipient lacked standing to bring this bid protest under 28 U.S.C. § 1491.[6]

---

[6] Because the Court requested specific, narrow briefing on the issue of standing, we do not address the question of the task order bar in this briefing. However, consistent with Judge Clevenger's Dissent, we believe the Panel Majority likewise erred in ruling the task order bar does not prevent Percipient from pursuing this action. Accordingly, we respectfully request the Court confirm that the ruling in *Percipient.ai, Inc. v. United States, CACI, Inc.-Fed.*, 104 F.4th 839, 859 (Fed. Cir. 2024) is vacated in its entirety.

Judge Clevenger issued a dissenting opinion addressing the sweeping impact the Panel Majority's unprecedented opinion would have on Government contracting in the United States. *Percipient.ai, Inc. v. United States, CACI, Inc.-Fed.*, 104 F.4th 839, 859 (Fed. Cir. 2024) (J. Clevenger Dissent) ("In conflict with binding authority, and even absent that authority, the majority errs in significantly narrowing the existing scope of the task order bar…[and] in significantly broadening the existing scope of 'interested party' statutory standing in 28 U.S.C. § 1491(b)(1) by permitting potential subcontractors for the first time to bring suit…"). Relating to the question currently before the Court, Judge Clevenger explained this Court has "interpreted 'interested party' to 'limit standing under § 1491(b)(1)' to 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id*. at 866 (J. Clevenger Dissent). Furthermore, Judge Clevenger explained that while this Court has not faced a "§ 1491(b)(1) case presenting only a prong three protest. . .we have ruled on a § 1491(b)(1) case presenting a prong three protest along with a prong two protest." *Id*. at 865 (J. Clevenger Dissent). In that case, *AFGE*, the Court "dismissed both protests on the ground that the plaintiffs failed to meet the 'actual or prospective bidder' standing test, producing a binding precedent that the 'actual or prospective bidder' standing test applies to prong three protests." *Id*. at 865 (J. Clevenger Dissent).

-12-

Defendant-Appellee, the United States Government, acting through the
NGA (the "Government") filed a combined petition for rehearing and rehearing *en banc* on September 5, 2024, alleging, *inter alia*, that the Panel Majority's decision
was inconsistent with this Court's precedent regarding bid protest jurisdiction and
created an over expansive test for standing contrary to Federal Circuit precedent.
Dkt. No. 50.

After briefing from both Percipient and the Government, this Court granted
the Government's petition on November 22, 2024 (Dkt. No. 59), vacating the
Panel's decision and reinstating Percipient's appeal. Percipient filed its En Banc
Opening Brief on January 21, 2025.

## SUMMARY OF THE ARGUMENT

The Court requested that the parties answer the question "Who can be 'an
interested party objecting to …any alleged violation of statute or regulation in
connection with a procurement or a proposed procurement.'" We respectfully
submit that in order to be an interested party under 28 USC § 1491(b)(1), a party
must be an actual or prospective bidder with a direct economic interest in the
procurement, as recognized by this Court's binding precedent. *AFGE*, 258 F.3d at
1298. Further, to demonstrate a "direct economic interest," a protestor must show
(1) pre-award, it suffered a "non-trivial competitive injury which can be addressed
by judicial relief," or (2) post-award, that it had a "substantial chance" of winning

the *contract. Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 384 (Fed. Cir. 2012); *CACI, Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

In this case, there is only one procurement with one "contract"– the SAFFIRE Contract, which required CACI to deliver a SER and a CV System. Percipient readily admits it had no interest in competing for the SAFFIRE Contract, could not have competed for the SAFFIRE Contract, and is not challenging the award of the SAFFIRE Contract. As a result, Percipient is not an actual or prospective bidder, has no chance of winning the contract at issue (which already has been awarded and substantially performed), and therefore lacks a direct economic interest in that contract. Percipient's arguments to the contrary ignore the rules of statutory construction, legislative history, and years of jurisprudence that prospective subcontractors lack the requisite direct economic interest in the contract required to qualify as an interested party when alleging a violation of statute or regulation in connection with a procurement or a proposed procurement.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

"The Court of Appeals for the Federal Circuit has jurisdiction over an appeal from the Court of Federal Claims under 28 U.S.C. § 1295(a)(3)." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330 (Fed.

Cir. 2001). This Court reviews "the Claim's Court's findings of fact for clear error

and. . . the Claims Court's determination on the legal issue…without deference."

*Guardian Moving & Storage Co., Inc. v. United States*, 657 Fed.Appx. 1018, 1023

(Fed. Cir. 2016) (internal citations omitted). Specifically, "[w]hether a party has

standing to sue is a question that this court reviews *de novo*." *AFGE*, 258 F.3d at

1298 (*quoting Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir.

2000)) (italics in original).

## II.    THE TERM "INTERESTED PARTY" IS PROPERLY INTERPRETED IN LINE WITH THE COMPETITION IN CONTRACTING ACT, AS RECOGNIZED BY THIS COURT'S BINDING PRECEDENT IN *AFGE*.

In *AFGE*, the Federal Circuit directly addressed the "interested party"

requirement of Section 1491(b)(1) as a matter of first impression. In doing so, this

Court undertook an extensive analysis of several possibilities for determining

Congress' intent behind adopting the undefined "interested party" test, including

an interpretation in line with the Competition in Contracting Act ("CICA"), as well

as an interpretation in line with the Administrative Procedures Act ("APA")

standard as adopted by the so-called "*Scanwell* Decisions" of the Federal District

Courts. *AFGE*, 258 F.3d at 1302. Relying primarily on legislative history and

"guided by the principle that waivers of sovereign immunity…are to be construed

narrowly," the Court ultimately adopted the CICA standing test for "interested

party," noting that "standing under § 1491(b)(1) is limited to actual or prospective

bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract" at issue. *Id*. In doing so, the Court expressly rejected the arguments now being brought forth by Percipient to adopt a broader standard for standing. Further, the Court gave no indication, as it has not done in the decades since, that the term "interested party" could or should have different interpretations depending on the type of protest brought before the CFC. Indeed, to do so would be in clear contradiction of common canons of statutory interpretation. The Court has never deviated from its standing test, and Percipient offers no valid explanation for why it should do so now.

A.    **The Court in *AFGE* Properly Considered Congressional Intent and the Legislative History of the ADRA, Correctly Interpreting "Interested Party" under CICA, not the APA.**

Prior to the enactment of the Administrative Dispute Resolution Act ("ADRA"), CFC jurisdiction was based on the Tucker Act, which authorized the CFC to "render judgment upon any claim against the United States founded upon…any express or implied contract." 28 U.S.C. § 1491(a)(1) (1994). Accordingly, it is well recognized that only pre-award protests were available under the Tucker Act. *See Motorola, Inc. v. United States*, 988 F.2d 113, 114 (Fed. Cir. 1993); *Control Data Sys., Inc. v. United States*, 32 Fed. Cl. 520, 524 (1994). That is, post-award challenges to procurement decisions (such as protesting the award of a contract to a competitor) were not within the scope of the CFC's

jurisdiction. Conversely, the Federal District Courts *only* heard post-award bid protest challenges to procurement decisions under the waiver of sovereign immunity provided in the APA. *Percipient*, 104 F.4th at 853; *id.* at 866 (J. Clevenger Dissent); *AFGE*, 258 F.3d at 1300; *see also*, *Scanwell Lab'ys, Inc. v. Shaffer*, 424 F.2d 859, 865-66 (D.C. Cir. 1970). Under the APA, a person has standing if they are "a person…adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

In enacting the ADRA, Congress intended to resolve the issue of divided jurisdiction between the CFC and the District Courts, noting inefficiencies and lack of uniformity. *See* 142 Cong. Rec. S11848 (Sept. 30, 1996) (statement of Sen. Cohen). The enacted version of the ADRA initially gave concurrent jurisdiction at both the CFC and the Federal District Courts under the Tucker Act, but with a five-year sunset period for the District Courts' jurisdiction. Pub. L. No. 104-320, § 12(d); 110 Stat. 3870 (1996). Thus consolidating jurisdiction, Congress' original intent was to give the CFC "the full range of bid protest cases previously subject to review in either system." 142 Cong. Rec. S11849-50 (Sept. 30, 1996) (statement of Sen. Levin). As explained in *AFGE*, this consolidation ultimately resulted in CFC jurisdiction over both *pre-award* (prior CFC Tucker Act jurisdiction) and *post-award* (prior *Scanwell* jurisdiction) bid protests – not necessarily jurisdiction over any challenge otherwise allowable under the APA.

-17-

This Court in *AFGE* undertook an exhaustive analysis considering whether the concept of "*Scanwell* jurisdiction" encompassed "complaints brought by disappointed bidders only," or the broader APA jurisdiction. *AFGE*, 258 F.3d at 1301. In so determining "*Scanwell* jurisdiction" necessarily encompassed the narrower interpretation, the Court made several key findings that dispose of Percipient's standing arguments here.

In favor of a narrow reading, the Court reasoned that "[t]he vast majority of cases brought pursuant to *Scanwell* were brought by disappointed bidders. *Scanwell* itself involved a disappointed bidder, and the Court of Appeals for the D.C. Circuit has characterized *Scanwell* as holding 'that a ***disappointed bidder*** on a government contract was a person aggrieved under the APA and had standing to seek a limited review of the ***contract award***.'" *AFGE*, 258 F.3d at 1301 (quoting *Int'l Eng'g Co. v. Richardson*, 512 F.2d 573, 579 (D.C. Cir. 1975)); *see also Free Air Corp. v. FCC*, 130 F.3d 447, 450 (D.C. Cir. 1997) (explaining the *Scanwell* holding as "sufficiently viable runners-up in a procurement process have standing to allege that an illegality in the process caused the contract to go to someone else."); *Aero Corp. v. Dep't of the Navy*, 558 F.Supp. 404, 409 (D.D.C. 1983) (holding that *Scanwell* applies to APA challenges to "procurement decisions," including the government's decision in that case to grant a contract on a "sole-source" basis without competition). The Court also noted that the Federal Circuit

itself had previously described *Scanwell* standing narrowly. *AFGE* 258 F.3d at

1301; *Southfork Sys., Inc. v. United States*, 141 F.3d 1124 (Fed. Cir. 1998) ("The

essence of 'the *Scanwell* doctrine'… is that an unsuccessful bidder has standing to

challenge a proposed contract award….").

In contrast, considering standing in *Scanwell* itself was based on the APA

standard, the Court also considered whether "Congress could have intended to give

the [CFC] jurisdiction over any contract dispute that could be brought under the

APA," which is what Percipient now asks this Court to hold. *AFGE*, 258 F.3d at

1301. However, recognizing (1) that waivers of sovereign immunity should be

construed narrowly, and (2) that Congress explicitly chose *not* to cite the APA as

the standard for standing in the same statute where it expressly adopted the APA

standard of review, the Court properly found that adoption of the broader APA

standard for standing would be beyond Congress' intent. *AFGE*, 258 F.3d at 1302;

*see also* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts

shall review the agency's decision pursuant to the standard set forth in section 706

of title 5."). The Court explained "we interpret the references in the legislative

history to the '*Scanwell* jurisdiction' of the district courts as references to the

district courts' jurisdiction over bid protest cases brought under the APA by

disappointed bidders, like the plaintiff in *Scanwell*," reemphasizing the actual

bidder standard. *AFGE*, 258 F.3d at 1301.

Thus, *AFGE* correctly determined that "[t]he ADRA gave the [CFC] jurisdiction over post-award protests" and that "[t]he ADRA clearly conferred the [CFC] with 'Scanwell jurisdiction' inasmuch as it permitted the [CFC] to hear post-award protests" in addition to pre-award protests. *AFGE*, 258 F.3d at 1300. The Court then decided that the CICA standing test should apply, noting that CICA – a statute likewise dealing with bid protest jurisdiction that had existed for close to a decade at the time – utilized the same "interested party" test. *Id.* at 1302.

To hold that a broader interpretation should be applied to the term "interested party" is thus clearly contrary to the legislative history of the ADRA, Congress' intent, and this Court's precedent. Congress had the opportunity to utilize the broader APA standing threshold in drafting Section 1491(b)(1), but expressly chose not to do so. Rather, Congress adopted a phrase that had for years been utilized in another bid protest fora under CICA. Where the majority of *Scanwell* cases related to a post-award challenge to an award by an actual, disappointed bidder, there is no justification for now vastly expanding standing to encompass parties who affirmatively chose not to participate in the Government's direct procurement process. Percipient has provided no justification to adopt such a broad standard in clear contradiction of Congress' intent.[7]

---

[7] The Court in *AFGE* expressly rejected the arguments raised by the D.C. District Court in *Validata Chemical Serv's v. United States Dep't of Energy*, 169 F.Supp.

**B.**    **The Court's Ruling in *AFGE* Applies Equally to all Three "Prongs" of Section 1491(b)(1).**

1.    *Canons of Statutory Interpretation Require the Term "Interested Party" to be Consistently Interpreted Throughout the Text of Section 1491.*

Normally "identical words used in different parts of the same act are intended to have the same meaning." *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1379 (Fed. Cir. 2001) (*quoting Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)); *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 741 (Fed. Cir. 1999) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993)). "This rule has even greater force where…the identical words are in the same statutory section." *CUNA*, 169 F.3d at 741.

Where the Court must give consistent interpretations to an identical term used in the same statutory section, it would be illogical, as Percipient requests here, to give a single phrase different meanings as applied to different parts of the same *sentence* within the act. Yet according to the Panel Majority and Percipient, although the term "interested party" is used in one sentence to describe CFC jurisdiction, that term should be given a different meaning depending on what "prong" a protest challenge is brought. Such a result would defy Congressional

---

3d 69 (D.D.C. 2016). Where the *Validata* opinion is contrary to binding precedent, this Court should give no weight to the non-binding dicta or the arguments therein.

intent where Congress did not adopt or draft different standing tests for the different "prongs" in Section 1491(b)(1). The term "interested party" is used once in Section 1491(b)(1) and its meaning must be consistent in application. Thus, the Court's interpretation of "interested party" in *AFGE,* which was consistently applied to all "prongs" of Section 1491(b)(1), should be followed.

2.   *Standing Must be Established Individually for All Claims Raised in a Complaint.*

Both Percipient and the Panel Majority attempt to dismiss the holding of *AFGE* by essentially arguing the challenge in *AFGE* involved a "prong two" challenge, therefore justifying the actual or prospective bidder test. *Percipient.ai, Inc.*, 104 F.4th at 858; Pl. Br. at 29. What they overlook, however, is that standing must be established "for each claim [a plaintiff] seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2 737 (2008) (internal quotations removed); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431,141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) ("standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek").

The Panel Majority was therefore incorrect to suggest that "interested party" under Section 1491(b)(1) can and should be applied differently in a case dealing only with "prong three allegations." Where plaintiffs are required to prove standing for each claim brought in a complaint, the Court in *AFGE* unequivocally applied

its interpretation of an "interested party" to claims brought under both "prong two" and "prong three" of Section 1491(b)(1) equally.

Accordingly, there is no basis for assuming the Court in *AFGE* limited its interested party determination only to the "prong two" allegation.

### C.    There is No Logical Reason to Distinguish this Court's Standing Precedent in *AFGE* or *Distributed Solutions* from the Facts of this Case.

Both the Panel Majority and Percipient have attempted to distinguish this case from the Court's precedent, noting that no other cases have dealt purely with a "prong three" bid protest action. *Percipient*, 104 F.4th at 858; Pl. Br. at 28. However, in doing so both make an arbitrary distinction that is contrary to norms of statutory interpretation, which generally require the term "interested party" to have a consistent interpretation when used in the same statutory provision.

The distinction is further arbitrary where, as emphasized by Judge Clevenger in the Dissent, the facts underlying the challenges brought in *AFGE* demonstrate that the plaintiffs in that case were challenging first and foremost the government's violation of law or statute under "prong three" of Section 1491(b)(1). *Percipient*, 104 F.4th at 866 (J. Clevenger Dissent) (noting the majority "fails to appreciate that the primary thrust of the case was the prong three allegation of error by misapplication of the OMB Circular A-76 cost evaluation standard.").

-23-

In *AFGE* the plaintiffs were federal employees and their unions, who challenged the Defense Logistics Agency's ("DLA") cost comparison analysis under OMB Circular No. A-76, which required DLA to "perform cost comparison analyses to determine whether a commercial product or service should be provided by the agency or by a private sector source." *AFGE*, 258 F.3d at 1296. Specifically, plaintiffs argued first and foremost "that the DLA had failed to conduct a proper price comparison as required by OMB A-76" – *e.g.*, that DLA had violated the laws and regulations of OMB A-76, Section 2 of the Federal Activities Inventory Reform ("FAIR") Act, and 10 U.S.C. § 2462(b) in connection with the procurement at issue. *AFGE*, 258 F.3d at 1297. As Judge Clevenger noted in his Dissent, "Plaintiffs' complaint and briefs in the case focused almost entirely on the alleged regulatory violations, asserting only in passing as an adjunct that the award of the contract was illegal because of the regulatory violations." *Percipient*, 104 F.th at 866 (J. Clevenger Dissent). Judge Clevenger also noted that plaintiffs' briefs in *AFGE* further "emphasized multiple times that the plaintiffs 'were clearly 'interested parties' objecting to an 'alleged violation of statute or regulation in connection with a procurement.'" *Id*. (J. Clevenger Dissent) (quoting Brief for Plaintiffs-Appellants at 20–21, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) (No. 00-5090), 2000 WL 34401893, at 12-23)). That an agency *procurement* decision, to tentatively award the contract to

-24-

EG&G Logistics, Inc. because of the "wrongful" cost comparison, also was

involved in the protest does not alter the predominant crux of the plaintiffs'

complaint. *See id*. at 873 (J. Clevenger Dissent).

The same can be said for the plaintiffs in *Distributed Solutions, Inc. v.

United States*, 539 F.3d 1340 (Fed. Cir. 2008), who again first and foremost were

challenging the agencies' violation of CICA by utilizing a task order to circumvent

competition requirements under "prong three."

In *Distributed Solutions*, the Court considered a protest brought by two

software vendors alleging the Government had circumvented federal procurement

laws and regulations by its decision to cancel a software procurement and instead

award an order to an existing contractor with the direction to award subcontracts

for the software in question. *Distributed Sols.*, 539 F.3d at 1342-43. Dismissed at

the CFC as a protest brought by mere disappointed subcontractors, on appeal, the

protestors clarified they were not contesting the award of any subcontract, but

rather "the government's decision to task SRA with awarding subcontracts for the

purchase of software instead of procuring the software itself through a direct

competitive process" as required by CICA. *Id*. at 1343-44.

The Court emphasized that the plaintiffs' suit was brought "in connection

with a procurement or proposed procurement," because they "alleged a number of

*statutory and regulatory violations* by the government in choosing to forego the

direct competitive procurement process…" *Distributed Sols.*, 539 F.3d at 1345 (emphasis added). In finding protestors to be interested parties to bring this "prong three" challenge, the Court held that a protestor must establish: (1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest – as required by *AFGE*. *Id.* at 1344. Because the protestors in *Distributed Solutions* had actually participated in the original Request for Information ("RFI"), and demonstrated their intent to continue participating in the procurement process by competing for the award of a contract directly by the government prior to the agencies' cancellation, the Court reasoned protestors were prospective bidders with standing to challenge the agencies' decisions in violation of CICA.

That the plaintiffs in both *AFGE* and *Distributed Solutions* also brought claims challenging actual procurement decisions in addition to challenges involving violations of procurement law – for *AFGE*, the decision to conduct a procurement rather than use federal employees, and for *Distributed Solutions*, the decision to cancel a competitive acquisition process and award a non-competitive task order – does not justify deviating from their standing rulings. Rather, it further demonstrates the intent behind Congress' adoption of the ADRA – that the CFC would have jurisdiction over bid protests, including agency acquisition decisions and challenges to how the agency actually procures something, and not how the agency monitors and administers its contracts during performance.

In both *AFGE* and *Distributed Solutions*, the term "interested party" was interpreted in accordance with CICA for *all* claims alleged by the plaintiffs. In *AFGE*, the Court determined the plaintiffs at issue were not actual or prospective bidders or offerors and therefore could not challenge DLA's failure "to conduct a proper price comparison as required by OMB A-76, by § 2(e) of the FAIR, and by 10 U.S.C. § 2462(b)" under "prong three" of Section 1491(b)(1). *AFGE*, 258 F.3d at 1297. In contrast, because the plaintiffs in *Distributed Solutions* had submitted a response to the RFI and intended to submit a proposal for the anticipated procurement, the Court determined they were prospective bidders and therefore could challenge the agency's alleged violations of CICA, the SBA, and the FAR under "prong three" of Section 1491(b)(1). *Distributed Sols.*, 539 F.3d at 1344-45 ("Assuming that the June RFI was part of the challenged procurement process, the contractors have established themselves as prospective bidders in that they submitted qualifying proposals in response and, according to their complaint, were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued."). In both cases the Court adopted the same standard for all challenges brought under Section 1491(b)(1), including the "prong three" allegations, the primary essence of the challenges.

-27-

This standard should apply equally here – where Percipient concedes it is
not an actual or prospective bidder on the SAFFIRE Contract, Percipient lacks
standing to challenge any acquisition decisions relating to the SAFFIRE Contract
under the Tucker Act, regardless of the "prong" under which the challenge is
brought.

III.    **NOTHING IN THE NATURE OF 10 U.S.C. § 3453 JUSTIFIES
ESTABLISHING UNIQUE STANDING RULES FOR OFFERORS OF
COMMERCIAL PRODUCTS.**

Percipient has and continues to assert that the supposed "unique" nature of
the commercial preference justifies adopting a revised approach to standing in
situations like those here. Pl. Br. at 27-34. These arguments should be given little
weight for multiple reasons. First, such an interpretation clearly would be contrary
to Congressional intent and its limited waiver of sovereign immunity when
granting the CFC jurisdiction over bid protests. Second, Percipient overestimates
the "uniqueness" of the commercial preference. In either event, nothing in 10
U.S.C. § 3453 suggests Congress intended to vastly expand the potential pool of
bid protestors under the Tucker Act as Percipient asks the Court to do here.

A.    **The CFC is a Court of Limited Jurisdiction, and any Waivers of
the CFC's Sovereign Immunity must be Construed Narrowly.**

The Court has recognized that "the Tucker Act expressly waives sovereign
immunity for claims against the United States in bid protests" pursuant to Section
1491(b). *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380

(Fed. Cir. 2012). Importantly, the Tucker Act is not a broad waiver of the Government's sovereign immunity, but only applies to the specified categories of actions that can be brought under 28 U.S.C. § 1491(b). *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005); *see also, e.g.*, *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009) (any "waiver of sovereign immunity must be strictly construed in favor of the sovereign") (quoting *Orff v. United States*, 545 U.S. 596, 601-02, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005)) (quotations omitted); *id.* ("[s]uch a waiver must be unequivocally expressed in the statutory text and will not be implied.") (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)) (citations omitted).

Although we recognize that "statutory standing" under the Tucker Act is not a jurisdictional issue, we submit that to interpret "interested party" status in line with the Panel Majority's ruling and Percipient's arguments would broaden the scope of potential plaintiffs beyond Congress' intent when it consolidated jurisdiction for bid protests under ADRA as discussed above, resulting in innumerable "bid protest" challenges that would far exceed Congress' express waiver of sovereign immunity under the Tucker Act. *Soriano v. United States*, 352 U.S. 270, 277 (1957) ("[T]his Court can enforce relief against the sovereign only with the limits established by Congress.").

Congress has never intended for the waiver of sovereign immunity for bid protest challenges to allow for any individual without a direct interest in the

contract or involvement in a procurement action to bring a challenge to such actions in court. In fact, Congress has taken affirmative steps to reduce the CFC's bid protest jurisdiction over concerns with delays and disruptions to the federal procurement process. *See* Federal Acquisition Streamlining Act of 1994, Sec. 1004, Pub. L. 103-355, 108 Stat. 3243, 3249 (Oct. 13, 1994) (prohibiting protests "in connection with the issuance or proposed issuance of a task or delivery order."); Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Sec. 885, H.R. 5009 (increasing the task order bar from $25 million to $35 million for DOD procurements, therefore reducing the pool of protests challenging task order awards); *see also Percipient*, 104 F.4th at 871 (J. Clevenger Dissent) ("Certain Brooks Act possible amendments that would have opened the door to Brooks Act protests by subcontractors were rejected, and the reasons for excluding subcontractor standing were recognized in hearings on S. 1587, the final version of FASA, including § 3453. For example, these hearings noted that '[e]stablishing a subcontractor's right to protest would greatly expand the number of protests and, consequently the delays in the procurement process[, and i]t would also establish precedent that privity of contract exists between the government and subcontractors, thereby opening the possibility for direct subcontractor claims under the Contract Disputes Act.'") (quoting *To Revise and Streamline the Acquisition Laws of the Federal*

*Government, and for Other Purposes: Hearing on S. 1587 Before the S. Comm. on*

*Governmental Affs. and the S. Comm. on Armed Servs.*, 103rd Cong. 293 (1994)).

Further, nothing in 10 U.S.C. § 3453 grants commercial offerors the right to

an independent cause of action or otherwise suggests Congress intended for FASA

to broaden the CFC's jurisdiction or allow more potential plaintiffs to bring bid

protest challenges – as is recognized for certain "mandatory sources." As explained

in the amicus briefing filed by the National Industries for the Blind ("NIB") and

the Court in *SEKRI, Inc. v. United States*, 34 F.4th 1063 (Fed. Cir. 2022), certain

"mandatory sources" under government contracts have expressly been exempted

and removed from standard government contracts laws. *SEKRI*, 34 F.4th at 1072-

73 (explaining that AbilityOne Program sources were affirmatively removed from

regulatory and statutory competition processes, and therefore not required to be an

actual or prospective bidder in order to challenge a procurement that violates the

Javits-Wagner-O'Day Act of 1938). The holding in *SEKRI* is logical given the

context and history of the AbilityOne Program – where a group of contractors have

been categorically exempted from competition requirements, it would be illogical

to require those plaintiffs to be an actual or prospective bidder in order to have

standing. Rather, as *mandatory* sources, they, in effect, are actual or prospective

offerors for all procurements that include their products or services.

Here, 10 U.S.C. § 3453 creates only a "preference" for the Government to utilize commercial products and services "to the maximum extent practicable." It is clear that this FASA commercial preference is wholly distinguishable from these statutorily "mandated sources" that have been granted unique exclusions from the procurement process. Commercial offerors under 10 U.S.C. § 3453 are *not* mandatory sources. Although they are granted some preferences and opportunities for streamlined acquisition processes, they are not mandatory or exempted from competition requirements as are offerors in the AbilityOne Program. Commercial offerors still are subject to CICA and must undergo competition and otherwise comply with applicable procurement law.

To adopt a standing test here that would greatly expand the number of potential protests by broadly allowing any company who chose not to participate in the procurement process, but who wanted to be a subcontractor, to bring a bid protest certainly would be contrary to Congress' continued actions to limit bid protests actions and preclude potential subcontractor protests, and contrary to the express but limited waiver of sovereign immunity.

**B.    Adopting Percipient's Standing Standard would Greatly Expand the Pool of Potential Protestors, even Outside of 10 U.S.C. § 3453.**

Percipient argues that "the Government ignores the special nature of the obligations imposed by 10 U.S.C. § 3453 – in particular, that they apply post-award, and that the statute is designed to maximize the ability of commercial

product offerors like Percipient to offer their products." Pl. Br. at 43.

Notwithstanding the fact that most of the requirements under 10 U.S.C. § 3453

govern agency conduct pre-award (*see* Statement of the Case, Section I, *supra*),

Percipient overemphasizes the "unique" nature of this preference, and, in doing so,

underemphasizes the impact the Panel Majority's holding and Percipient's

arguments would have on the federal procurement process.

There are numerous statutory preferences and requirements that "apply post-

award" and are "designed to maximize the ability" of certain offerors to offer their

products to the Government.

The Buy American Act ("BAA"), 41 U.S.C. § 8301, *et seq.*, for example,

imposes a statutory preference for the Government to procure products produced

domestically. These requirements apply post-award – indeed, the contractor, at

every stage of the procurement is required to provide BAA-compliant products,

whether produced in-house or procured from a third-party supplier. *See* 41 U.S.C.

§ 8301, *et seq*. These requirements are also "designed to maximize the ability" of

offerors with domestic manufacturing facilities and domestically sourced goods to

participate in the procurement process for the benefit of the Government and

taxpayers. *See, e.g.*, Executive Order 14005, "Ensuring the Future is Made in

America by All of America's Workers," 86 Fed. Reg. No. 7475 (Jan. 28, 2021) ("It

is the policy of my Administration that the United States Government should,

-33-

consistent with applicable law, use terms and conditions of Federal financial

assistance awards and Federal procurements to maximize the use of goods,

products, and materials produced in, and services offered in, the United States. The

United States Government should, whenever possible, procure goods, products,

materials, and services from sources that will help American businesses compete in

strategic industries and help America's workers thrive.").

Yet, if the Panel Majority and Percipient's arguments were to prevail, any

manufacturer of a BAA-compliant product could bring a suit under Section

1491(b)(1) at any time during contract performance where it believes a prime

contractor is not complying with its BAA obligations, or where it believes it offers

an alternative BAA-compliant product. This is true even if that third-party

manufacturer did not participate in the underlying solicitation, did not challenge

the solicitation, did not challenge the award of the contract or the prime

contractor's ability to comply with the contract's BAA requirements, and had

products that were assessed by the prime contractor and determined to be

noncompliant with the requirements of the underlying contract – despite these

clearly being challenges to the administration of the executed contract. *See Frazier*

*v. United States*, 79 Fed. Cl. 148, 160 (2007) ("[P]ure contract claims are not

appropriate in a bid protest, even if clothed in the guise of a protest of an alleged

statutory violation occurring in relation to a procurement."), *aff'd*, 301 F.Appx 974

(Fed. Cir. 2008); *see also, e.g.*, *Craft Bearing Company, Inc.*, B-418685, June 22, 2020, 2020 CPD ¶ 202 (hearing a protest challenging a prime contractor's failure to comply with the BAA and finding "whether or not [prime contractor] performs in accordance with certain clauses or provisions contained in the contract is a matter of contract administration we will not review.").

Thus, despite Percipient's sweeping claims that the requirements of 10 U.S.C. § 3453 are unique in that they implicate Government action throughout the procurement process, the BAA and other statutory preferences likewise require post-award conduct by both the Government and the prime contractor. As an additional example, the Trade Agreements Act ("TAA"), 19 U.S.C. § 2501, *et seq*., similarly requires the Government to treat products, services, and suppliers from certain U.S. trade allies with the same procurement preferences afforded domestic suppliers. Further, where applicable, contractors are required to provide only TAA-compliant products in performance of their contract, whether produced by the prime contractor or a third-party supplier. The obligation to ensure the contractor complies with these requirements falls squarely on the shoulders of the Government.

Moreover, the preferences granted to Small Business concerns under federal procurement law likewise apply at almost every stage of the procurement. "It is the policy of the United States that small business concerns…shall have the maximum

practicable opportunity to participate in the performance of contracts let by any
Federal agency, including contracts and subcontracts for subsystems, assemblies,
components, and related services for major systems." 15 U.S.C. § 637(d). The
FAR implements this policy by requiring that "[a]ny contractor receiving a
contract with a value greater than the simplified acquisition threshold [to] agree in
the contract that small business…concerns will have the maximum practicable
opportunity to participate in contract performance consistent with its efficient
performance." 48 C.F.R. § 19.702. Where an acquisition is expected to exceed
$750,000 and has subcontracting possibilities, prime contractors must also "submit
an acceptable subcontracting plan," and "any contractor failing to comply in good
faith with the requirements of the subcontracting plan is in material breach of its
contract." *Id*.; 15 U.S.C. § 637(d)(9). Thus, any small businesses who believe they
are deserving of a subcontract versus, for example the prime contractor performing
the effort, would, under Percipient's theory, have standing to file a protest at any
time during contract performance.

Allowing uninvested third parties, or mere potential subcontractors, of this
kind to bring challenges at any time during contract performance would bring
federal procurement efforts to a grinding halt. By merely offering a BAA- or TAA-
compliant product, or being a small business, anyone could challenge an agency or
contractor's failure to comply with a preference, even where they followed proper

procedures to conduct market research (*see, e.g.*, Appx567, 571) and determined

the product or supplier in question did not meet the requirements of the underlying

contract (*see, e.g.*, Appx907). *See also*, *Percipient*, 104 F.4th at 860 (J. Clevenger

Dissent) ("For two years after the issuance of Task Order 1, both CACI and NGA,

fully aware of and exercising their various § 3453 responsibilities, conducted

extensive tests of Percipient's Mirage product, and ultimately concluded that

Mirage was not suitable."). This type of standing has been categorically rejected by

Congress, this Court, and the CFC. *See, e.g.*, *Percipient*, 104 F.4th at 871 (J.

Clevenger Dissent); *MCI Telecoms. Corp. v. United States*, 878 F.2d 362 (Fed. Cir.

1989) (finding subcontractor did not have standing under the Brooks Act because

subcontractors are not actual bidders); *see also Distributed Sols.*, 539 F.3d at 1344

(recognizing "[t]here is no question that the contractors here are interested parties

*and not mere 'disappointed subcontractors' without standing*.") (emphasis added).

In sum, there are numerous statutory and regulatory requirements imposed

on the U.S. procurement system that mandate action be taken at all stages of the

procurement process – actions that require the Government and prime contractors

to evaluate the ability to use certain types of products or suppliers in order to

comply with Congressional mandates. In contrast to certain "mandatory sources,"

nothing about the FASA commercial preference is unique in that regard. To allow

a company that affirmatively chose not to participate in the procurement process

(Pl. Br. at 8; Appx3, 8) to bring these types of challenges after award and after performance had been ongoing for a not-insignificant amount of time far exceeds Congress' intent. Where statutory construction requires interpreting a statute with a narrow view of waiver of sovereign immunity, to hold otherwise would be illogical.

**IV.    EVEN IF THE COURT ADOPTED PERCIPIENT'S DEFINITION OF "INTERESTED PARTY" PERCIPIENT FAILS TO PROVE STANDING IN THIS CASE.**

Percipient argues that an interested party under "prong three" should exist "when the protestor's ability to offer its product or service to meet the Government's needs has been directly thwarted by the alleged legal violation." Pl. Br. at 25-26. According to Percipient, "the Government's violations of 10 U.S.C. § 3453 have directly prevented Percipient from offering its commercial product to meet the CV System requirements," and "Percipient's injury is direct because it is not derivative of the harm caused to another private party." Pl. Br. at 26.

Putting aside the extensive breadth of who would qualify as an interested party under this theory – to include any potential supplier at any tier – Percipient's definition of an "interested party" still recognizes the need for some Government procurement action to be part of the challenge – it still recognizes there needs to be an "actual" or "prospective" bidder for an acquisition decision made by the Government. For if there is no contract opportunity by which to provide your

products or services to the Government, or a protestor does not actually or try to participate in such an opportunity, how else would a plaintiff's "ability to offer [a] product or service to meet the Government's needs [be] *directly* thwarted"?

Percipient contends the "procurement action" in this case was the Government's decision to not use Percipient for the CV System requirements of the SAFFIRE Contract. But this procurement decision occurred when the Government determined to craft the SAFFIRE Contract to encompass the CV System requirements, rather than issuing a standalone procurement for which Percipient could have competed. The contract between CACI and the Government incorporating the same SAFFIRE requirements that were part of the solicitation ultimately flowed the decision down to CACI – as is the Government's prerogative – to conduct market research, evaluate commercial offerors, and incorporate compliant commercial products into the overall SAFFIRE system to the greatest extent practicable. Appx860-64. Put another way, after award of the contract to CACI, the Government did not intend to make any further procurement actions or decisions relating to the CV System because those decisions already had been made and the requirements properly included in CACI's contract.

As recognized by the Court, the Government's efforts to monitor CACI's performance to ensure compliance with its contractual obligations – such as compliance with its obligations to evaluate commercial vendors for inclusion in the

SAFFIRE system – is not a protestable *agency* action. *Frazier*, 79 Fed. Cl. at 160

("[P]ure contract claims are not appropriate in a bid protest, even if clothed in the

guise of a protest of an alleged statutory violation occurring in relation to a

procurement."), *aff'd*, 301 F.Appx 974 (Fed. Cir. 2008); *see also Harmonia*

*Holdings Grp., LLC v. United States*, 157 Fed. Cl. 292, 299 (2021) ("If the claim is

a matter of contract administration, the plaintiff cannot avoid the CDA simply by

alleging violations of statutory or regulatory provisions."); *see also US West*

*Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 626 (Fed. Cir. 1991)

(analyzing GSBCA jurisdiction under the Brooks Act – allowing protests by "an

interested party in connection with a procurement" – and finding the "statute gives

protest jurisdiction to the board only over a procurement of a federal agency, *i.e.*,

where a potential contractor with a federal agency is the protestor," to review

decisions by a CO, and therefore "the plain language of the statute does not support

the board's holding that its jurisdiction covers a subcontract procurement by a

prime government contractor.").

Unlike the plaintiffs in *Distributed Solutions*, who took affirmative steps to

participate in the underlying procurement, here Percipient admits it chose not to

participate in the only direct procurement "decision" at issue (the SAFFIRE

Solicitation) as an actual or prospective bidder (Pl. Br. at 8; Appx3, 8) – nor did

Percipient preserve its rights by challenging the solicitation to have a portion set

aside for commercial vendors as the plaintiffs successfully did in *Palantir USG v. United States*, 904 F.3d 980 (Fed. Cir. 2018).

Furthermore, to the extent Percipient challenges CACI's decision to not award a subcontract to Percipient as the relevant "procurement decision" made, precedent makes clear Percipient has no standing under Section 1491(b)(1). It is well-settled case law at the CFC that mere disappointed subcontractors – let alone mere disappointed *potential* subcontractors – are not "interested parties" with standing to bring suit under Section 1491(b)(1), because they lack the requisite direct economic interest in the contract awarded by the Government. *See, e.g., Eagle Design & Mgmt., Inc. v. United States*, 62 Fed. Cl. 106, 109 (2004) ("Here, Eagle Design's admission that it had not submitted and does not intend to submit a proposal is fatal to its claim to be an interested party. . . Eagle Design as a subcontractor to an offeror in this procurement is not itself an actual or prospective offeror, and thus not an interested party. Eagle Design lacks standing to bring this post-award bid protest."). As the CFC explained in *Int'l Genomics Consortium v. United States*, "a 'disappointed subcontractor' does not confer upon it the standing that it otherwise conspicuously lacks." 104 Fed. Cl. 669, 674 (2012). The Federal Circuit likewise has acknowledged the notion that subcontractors lack standing under Section 1491(b)(1), looking favorably on this notion in *Distributed Solutions*. 539 F.3d at 1344 (in overturning the CFC's dismissal, the Court noted

"[t]here is no question that the contractors here are interested partes *and not mere 'disappointed subcontractors' without standing*.") (emphasis added); *see also, e.g.*, *MCI Telecomm. Corp.*, 878 F.2d at 365 ("Since the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends, MCI's stated intention to submit a proposal in response to any resolicitation, and its efforts to secure resolicitation by filing a protest, can do nothing to create the necessary interested party status.").

To the extent any action by the Government "thwarted" or "prevented" Percipient from "competing" for the CV System requirements (Appx66), this action necessarily occurred at the procurement inception stage when the Government created and competed its consolidated requirements in one solicitation for the award of one contract. The Government is under no legal obligation – and, in fact, is statutorily prevented under CICA from doing– to now enter into a directed, non-competed contract with Percipient for the CV requirements in breach of its contract with CACI. Where there is no obligation for the Government at this stage to consider Percipient's products for the SAFFIRE Contract, and no legal means for the Government to issue Percipient a sole source award, it would be illogical to find that the Government's decisions to honor its contractual obligations with CACI somehow created a "protestable" ground for Percipient to bring this action. Percipient had the opportunity to challenge the SAFFIRE

Solicitation and preserve its rights to protest but chose not to do so. Where no agency procurement opportunity exists, it cannot be said that an entity's desire to be a subcontractor was *directly* thwarted by the Government.

## V.  REMEDIES STILL EXIST TO ENFORCE FASA WITHOUT EXPANDING STANDING OR THE CFC'S JURISDICTION BEYOND CONGRESSIONAL INTENT.

The Congressional intent behind establishing the bid protest system for the CFC was not to create an all-encompassing right of enforcement, waiving the Government's sovereign immunity for every mistake or misstep in an acquisition. *AFGE*, 258 F.3d at 1301 ("waivers of sovereign immunity…are to be construed narrowly…."). Rather, the purpose behind bid protests was to allow private parties to challenge a procurement process when believed to be unfair or unlawful. *See, e.g.*, *Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 315 (2020) (explaining the law "provides *disappointed bidders* with an avenue through which they can challenge arbitrary and irrational government decisions, where *disappointed bidders* effectively act as 'private attorney generals,' keeping the system under perpetual scrutiny, ferreting out mistakes, and bringing to light bad government practices that impact their chances of receiving contract awards.") (emphasis added).

The Panel Majority and Percipient argue that without the right to protest at this stage of the procurement cycle, the requirements of 10 U.S.C. § 3453 would

have "minimal bite." *Percipient*, 104 F.4th at 857; Pl. Br. at 20. This argument

ignores, however, that enforcement in the formative phases of the contract, *e.g.*,

through a protest of the solicitation terms if they do not properly require

compliance with the statute, provides very meaningful enforcement of the

requirements. *Palantir USG v. United States*, 904 F.3d 980 (Fed. Cir. 2018).

Further, after a contract has been duly and properly competed, executed, and

performance commenced, there still are means available to ensure both parties are

complying with their obligations. For example, under the Contract Disputes Act

(41 U.S.C. §§ 7101-7109 (2012)), both the Government and the prime contractor

have the right to legally enforce the compliance obligations of their contracts. In

such instances, sovereign immunity has been waived, allowing the prime

contractor – who sits in privity of contract with the government – to sue for

breaches of the Government's obligations. Similarly, the Government may use its

enforcement rights to challenge a contractor's failure to comply with the clear

terms of its agreement, such as for failing to properly and adequately consider the

use of commercial offerors in performance.

Where a third party believes they have been improperly excluded from

participating in an opportunity, common law contract theory would provide

available remedies between the prime contractor and the prospective subcontractor,

such as through claims of tortious interference with business opportunities. Where

the third party does not sit in privity of contract with the Government, though, and the Government has expressly *not* waived sovereign immunity for such contractual and tortious claims, the third party may be unable to sue the Federal Government, but that does not mean enforcement mechanisms do not exist. Congressional oversight and investigations are the primary tool for monitoring agency compliance with statutory requirements, including inspector general investigations into such conduct.

That outside of these remedies the FASA may not be "enforceable" under Section 1491(b)(1) by a third party with no privity of contract with the Government, and during the performance of a contract, does not justify crafting a standing test that far exceeds the Government's waiver of sovereign immunity.[8] Where Congress has not expressly granted third parties the right to enforce contractual requirements between the Government and its prime contractors, and

---

[8] There are innumerable instances where private actors do not have standing to sue the Federal Government to enforce their rights and/or protect their interests. The Federal Torts Act, for example, waives sovereign immunity for only *some* types of claims. *See, e.g.*, 28 U.S.C. § 2680(a)-(f), (h)-(n) (preserving sovereign immunity for more than a dozen categories of claims, including "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation…or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."); *See also Gray v. Bell*, 712 F.2d 490, 506 (D.C. Cir. 1983) (explaining in enacting the FTCA, Congress was concerned about "unwarranted judicial intrusion[s] into areas of governmental operations and policymaking.").

the text of FASA did not so waive sovereign immunity, this Court cannot now create a new cause of action to allow enforcement where Congress has not approved.

## **CONCLUSION**

For the reasons set forth herein, CACI respectfully requests that this Court hold that (1) to be an "interested party objecting to…any alleged violation of statute or regulation in connection with a procurement or a proposed procurement" under 28 U.S.C. § 1491(b)(1) requires a plaintiff to be an actual or prospective bidder with a direct economic interest in the procurement; (2) mere disappointed subcontractors do not have standing to bring a challenge under Section 1491(b)(1) because they lack the requisite direct economic interest in the agency's actions; and (3) Percipient lacks standing to bring this bid protest as an interested party under Section 1491(b)(1) because it is neither an actual or prospective contractor, nor does it have the requisite direct economic interest. In doing so, we request this Court overturn the Panel Majority's holding and reasoning in *Percipient*.

Dated: April 4, 2025   Respectfully submitted,

<u>/S/ Anne B. Perry</u>
ANNE B. PERRY
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
E-Mail: aperry@sheppardmullin.com
*Attorney of Record for CACI, Inc. – Federal*

*Of Counsel*:
Jonathan S. Aronie
Townsend L. Bourne
Ariel E. Debin Collinsworth
Lillia J. Damalouji
*Attorneys for CACI, Inc. - Federal*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This Brief complies with the type-volume limitation of the FRAP

32(a)(7), as amended by Fed. Cir. R. 32(b), because:

> This Brief contains 10,580 words and less than 1,300
> lines of text, excluding exempted parts of the Brief. In
> making this certification, I have relied upon the word
> count function in Microsoft Word.

2.      This Brief complies with the typeface requirements of FRAP 32(a)(5)

and the type style requirements of FRAP 32(a)(6) because:

> This Brief has been prepared in proportionally spaced
> typeface using Microsoft Word in Times New Roman,
> 14-point font.

Dated: April 4, 2025          /S/ Anne B. Perry
                              ANNE B. PERRY
                              2099 Pennsylvania Avenue, NW, Suite 100
                              Washington, D.C. 20006-6801
                              Tel: 202.747.1900
                              Fax: 202.747.1901
                              E-Mail: aperry@sheppardmullin.com
                              *Attorney of Record for CACI, Inc. – Federal*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 4, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with the United States Postal Service for delivery to the Clerk, United States Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, D.C. 20439.

Dated: April 4, 2025

<u>/S/ Anne B. Perry</u>
ANNE B. PERRY
2099 Pennsylvania Avenue, NW, Suite 100
Washington, D.C. 20006-6801
Tel: 202.747.1900
Fax: 202.747.1901
E-Mail: aperry@sheppardmullin.com
*Attorney of Record for CACI, Inc. – Federal*