# United States Court of Appeals for the Federal Circuit

---

**PERCIPIENT.AI, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, CACI, INC.-FEDERAL,**
*Defendants-Appellees*

---

2023-1970

---

Appeal from the United States Court of Federal Claims in No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink.

---

Decided: August 28, 2025

---

HAMISH HUME, Boies Schiller Flexner LLP, Washington, DC, argued for plaintiff-appellant. Also represented by SAMUEL CHARLES KAPLAN, ERIC J. MAURER, GINA ALICIA ROSSMAN.

GALINA I. FOMENKOVA, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by RETA EMMA BEZAK, EMMA E. BOND, PATRICIA M. MCCARTHY, CORINNE ANNE NIOSI, YAAKOV ROTH.

ANNE PERRY, Sheppard, Mullin, Richter & Hampton

LLP, Washington, DC, argued for defendant-appellee CACI, Inc.-Federal. Also represented by JONATHAN SCOTT ARONIE, TOWNSEND BOURNE, ARIEL DEBIN COLLINSWORTH, LILLIA JO DAMALOUJI.

---

Before MOORE, *Chief Judge*, LOURIE, DYK, PROST, REYNA, TARANTO, CHEN, HUGHES, STOLL, CUNNINGHAM, and STARK, *Circuit Judges*.[1]

Opinion for the court filed by *Circuit Judge* HUGHES, in which *Circuit Judges* DYK, PROST, REYNA, CHEN, CUNNINGHAM, and STARK join.

Dissenting Opinion filed by *Circuit Judge* STOLL, in which *Chief Judge* MOORE and *Circuit Judges* LOURIE and TARANTO join.

HUGHES, *Circuit Judge*.

This en banc proceeding asks us to resolve the question of who can be an "interested party" objecting to any alleged violation of statute or regulation in connection with a procurement or a proposed procurement under 28 U.S.C. § 1491(b)(1). Because we hold that an interested party is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract, regardless of the type of challenge brought, we affirm the Court of Federal Claims' dismissal of Percipient.ai's protest for lack of standing.

---

1 Circuit Judge Newman did not participate.

# I

## A

In 2020, the National Geospatial-Intelligence Agency (NGA) issued the SAFFIRE[2] solicitation seeking to improve its collection, interpretation, and storage of visual intelligence data. J.A. 57.[3] The solicitation sought bids to build and operate a "[Structured Observation Management] Enterprise Repository" (SER) to store, disseminate, and regulate access to data. J.A. 58. NGA also sought "Computer Vision" (CV) capabilities; CV is a type of artificial intelligence technology that trains and uses computers to derive geospatial intelligence data from imagery. J.A. 56.

NGA awarded the SAFFIRE contract to CACI, Inc.-Federal in January 2021. J.A. 70. The contract was a single-award indefinite delivery/indefinite quantity contract that defined a general procurement goal and contemplated the issuance of multiple task orders and the use of subcontractors to handle specific tasks related to the goal. J.A. 38. The contract also incorporated the clause found in the Federal Acquisition Regulation (FAR) at section 52.244-6, which required CACI to use commercial or non-developmental items to the maximum extent practicable in executing its contractual obligations. J.A. 38, 857. NGA simultaneously issued Task Order 1 under the

---

[2] SAFFIRE stands for the Structured Observation Management, Automation, Augmentation and Artificial Intelligence Framework for Integrated Reporting and Exploitation. J.A. 38.

[3] Because this case was dismissed by the trial court at the motion to dismiss stage, we assume all undisputed facts in the complaint are true and draw all reasonable inferences in the non-movant, Percipient's, favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016).

SAFFIRE contract, which directed CACI to develop and deliver the CV systems described in the solicitation. J.A. 24.

Percipient offers a commercial CV platform that it contends could have met NGA's CV requirements. Appellant's Opening Br. 7–8; J.A. 59–60. But Percipient did not have the capabilities to meet the SER component of the solicitation. Appellant's Opening Br. 7; J.A. 43. Percipient states that, for this reason, it "could not and did not bid on the SAFFIRE contract." Appellant's Opening Br. 8. Percipient also does not allege that it attempted to team up with another company to submit an offer. Percipient states that it instead "awaited the market research where it could demonstrate its ability to meet NGA's CV needs." *Id.*

After the contract was awarded to CACI, Percipient reached out to NGA and asked for an evaluation of Percipient's commercial CV product for the SAFFIRE contract. J.A. 71. NGA directed Percipient to contact CACI. J.A. 72. After Percipient's initial demonstration of its CV product and much back and forth between NGA, CACI, and Percipient, CACI did not follow up regarding further evaluation. *See* J.A. 130. Percipient then reached out to NGA, and NGA entered into a bailment agreement with Percipient to evaluate Percipient's product's capabilities. J.A. 80. Percipient alleges that NGA only tested Percipient's product as a machine learning platform, but not as an analytical tool—which is what the SAFFIRE contract required. J.A. 85. Percipient concluded that NGA "deliberately failed" to evaluate Percipient's product to meet the SAFFIRE CV system requirements. *Id.*; Appellant's Opening Br. 12. NGA then communicated that there would be no further evaluation of Percipient's product. J.A. 85.

Percipient contacted NGA and "ask[ed] that NGA comply with its obligations under [10 U.S.C.] § 3453," J.A. 88, which is entitled "Preference for commercial products and commercial services" and requires agency heads to "acquire commercial services, commercial products, or

nondevelopmental items other than commercial products to meet the needs of the agency" "to the maximum extent practicable," 10 U.S.C. § 3453(b)(1). Percipient states that NGA's response "ignored the substance of Percipient's allegations." Appellant's Opening Br. 13.

In January 2023, Percipient filed its bid protest in the Court of Federal Claims contending, as relevant to this en banc proceeding, that NGA had violated its obligations under § 3453. J.A. 94. Percipient alleged that the trial court had jurisdiction over this challenge to the ongoing SAFFIRE procurement under § 1491(b)(1). J.A. 46. The government and intervenor-defendant CACI moved to dismiss Percipient's complaint on multiple grounds, including for lack of subject matter jurisdiction and lack of standing. J.A. 152–73, 175–99. The trial court initially denied the motion to dismiss, *Percipient.ai, Inc. v. United States*, 165 Fed. Cl. 331, 340 (2023), but then granted the appellees' motion for reconsideration and dismissed the case,[4] *Percipient.ai, Inc. v. United States*, No. 23-28C, 2023 WL 3563093, at *3 (Fed. Cl. May 17, 2023). Percipient appealed.

A panel of this court reversed and remanded to the trial court with a dissent by Judge Clevenger arguing that the panel's holding as to 28 U.S.C. § 1491(b)(1) was inconsistent with the text, history, and purpose of the statute. *Percipient.ai, Inc. v. United States*, 104 F.4th 839

---

[4] The trial court granted the motion to dismiss because it determined that the Federal Acquisition Streamlining Act of 1994 (FASA) task order bar, 10 U.S.C. § 3406(f)(1), applied to Percipient's protest and removed the case from coverage by the Tucker Act. This task order bar ruling exceeds the scope of the rehearing that was granted, and we accordingly do not address it in this opinion. *See Percipient.ai, Inc. v. United States.*, 121 F.4th 1311, 1312 (Fed. Cir. 2024).

(Fed. Cir.), *reh'g en banc granted, opinion vacated*, 121 F.4th 1311 (Fed. Cir. 2024). The government petitioned for rehearing en banc, and we invited a response to the petition from Percipient. *Percipient.ai, Inc*, 121 F.4th at 1312. We granted the government's petition and ordered briefing and argument on the following standing issue: "Who can be 'an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement' under 28 U.S.C. § 1491(b)(1)?"[5] *Id.* We received two amicus briefs and heard oral argument on June 9, 2025. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

B

We begin with a review of the relevant history underlying § 1491(b)(1). Our predecessor court, the United States Court of Claims,[6] first recognized a type of bid

---

[5] We noted that we would "not revisit [or] . . . require additional briefing on the issues of task bar under the Federal Acquisition Streamlining Act of 1994 (FASA), 10 U.S.C. § 3406(f); subject matter jurisdiction under 28 U.S.C. § 1491(b)(1); and timeliness of claims under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007)." *Percipient.ai*, 121 F.4th at 1312.

[6] When Congress enacted the Federal Courts Improvement Act of 1982, Congress abolished the Court of Claims and the Court of Customs and Patent Appeals and replaced them with our court, the United States Court of Appeals for the Federal Circuit, which inherited the appellate jurisdiction of the predecessor courts, and the United States Claims Court (later renamed the United States Court of Federal Claims) which inherited the trial jurisdiction of the Court of Claims. Matthew H. Solomson, *Court of Federal Claims: Jurisdiction, Practice, and Procedure* ch. 1, § VII (2022) (ebook). The holdings of the Court of

protest cause of action in *Heyer Products Co. v. United States*, 140 F. Supp. 409 (Ct. Cl. 1956). In that case, the plaintiff, Heyer, had submitted a bid on a government contract, but the government awarded the contract to a different bidder who had submitted a higher bid. Heyer believed that the government's failure to award the contract to Heyer was the result of deliberate retaliation against Heyer. The government moved to dismiss the petition for lack of standing. The Court of Claims acknowledged that the law at the time recognized no cause of action in bid protest cases, stating:

> It has been settled beyond controversy that most statutes governing the awarding of bids by governmental agencies are enacted for the benefit of the public who are served by these agencies, and not for the benefit of the bidders, and, therefore, that bidders have no right to sue on the ground that the provisions of such an Act have been violated, in that the contract had not been let to the lowest bidder. . . . [I]t is only the public who has a cause for complaint, and not an unsuccessful bidder.

*Id.* at 412 (collecting cases). But the court nonetheless recognized a cause of action arising out of an implied contract theory, over which it has jurisdiction pursuant to the Tucker Act. *Id.* at 412–13; 28 U.S.C. § 1491(a). The court explained that "[i]t was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted." *Heyer*, 140 F. Supp. at 412. Because

---

Claims and the Court of Customs and Patent Appeals are binding as precedent on this court. *S. Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

the implied contract was broken, Heyer could maintain an action for damages for its breach. *Id.* at 413.

The Court of Claims imposed certain restrictions on this type of cause of action, limiting recovery to instances in which there was clear and convincing proof that there had been a fraudulent inducement for bids and that the government intended to disregard all the bids except from the parties to which it had intended to give the contract. *Id.* at 414. Essentially, a plaintiff had to show that the bids "were not invited in good faith." *Id.*

A cause of action in the district courts was first recognized in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C. Cir. 1970). There, the United States Court of Appeals for the District of Columbia Circuit considered, as a matter of first impression, "[w]hether a frustrated bidder for a government contract has standing to sue, alleging illegality in the manner in which the contract was let." *Id.* at 861. The court examined early landmark federal standing cases and determined that Congress had legislatively reversed the Supreme Court's decision in *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940), "in which the Public Contracts Act was interpreted to be an enactment for the protection of the government rather than for those contracting with the government," with the enactment of the Administrative Procedure Act. *Scanwell*, 424 F.2d at 866–67. The court held that "one who makes a prima facie showing alleging [arbitrary or capricious abuses of discretion] on the part of an agency or contracting officer has standing to sue under section 10 of the Administrative Procedure Act." *Id.* at 869.

Soon thereafter, the Court of Claims similarly expanded its own interpretation of its bid protest jurisdiction in *Keco Industries, Inc. v. United States*, 428 F.2d 1233 (Ct. Cl. 1970). The court stated: "[A]s a result of *Scanwell* a party, who can make a prima facie showing of arbitrary and capricious action on the part of the Government in the

handling of a bid situation, does have standing to sue." *Id.* at 779. The court also determined that *Heyer* was not limited to instances where "there was strong evidence of bad faith and intentional fraud on the part of the Government;" instead, it stated a "broad general rule which is that every bidder has the right to have his bid honestly considered by the Government, and if this obligation is breached, then the injured party has the right to come into court to try and prove his cause of action." *Id.* at 779–80.

In 1982, Congress enacted the Federal Courts Improvement Act (FCIA), which amended the Tucker Act and gave the Court of Federal Claims the statutory authority to decide certain bid protest matters. Pub. L. No. 97-164, § 133, 96 Stat. 25, 40 (1982) (codified before repeal at 28 U.S.C. § 1491(a)(3)), *repealed by* Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, sec. 12, 110 Stat. 3870, 3874–76. Specifically, "[t]o afford complete relief on any contract claim brought *before the contract is awarded*," the Court of Federal Claims was granted "*exclusive jurisdiction* to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief." *Id.* (emphases added). But FCIA did not alter jurisdiction in the district courts to hear post-award challenges. The House Committee Report stated: "It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action." H.R. Rep. No. 97-312, at 43 (1981).

This was the state of bid protest standing before the enactment of § 1491(b)(1). In the Court of Federal Claims, "disappointed bidders or their equivalents," *Motorola, Inc. v. United States*, 988 F.2d 113, 115 (Fed. Cir. 1993), in the "zone of active consideration," *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983), had standing to bring a bid protest in the pre-award context under an implied-in-contract theory, *Am. Fed'n. of Gov't. Emps.,*

*AFL-CIO v. United States*, 258 F.3d 1294, 1297–98 (Fed. Cir. 2001) (AFGE). In the federal district courts, "disappointed bidders could . . . challenge contract awards . . . for alleged violations of procurement laws or regulations, or for lack of rationality" in the post-award context under the APA. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331 (Fed. Cir. 2001); *see also, e.g.*, *Diebold v. United States*, 947 F.2d 787, 790 (6th Cir. 1991); *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir. 1987).

The disparate procedural pathways between the Court of Federal Claims and the district courts created jurisdictional non-uniformity in bid protests. In 1990, Congress directed the Department of Defense to establish an advisory panel and evaluate the acquisition laws applicable to the Department of Defense. National Defense Authorization Act for Fiscal Year 1991, Pub. L. 101-510, Title VIII, sec. 800, 104 Stat. 1485, 1587 (1990) (codified before repeal at 10 U.S.C. § 2301), *repealed by* Federal Acquisition Streamlining Act of 1994, Pub. L. 103-355, Title I, § 1501(a), 108 Stat. 3243, 3296. The resulting panel report and recommendations stated that "protests in the Court of Federal Claims have been enmeshed in an endless web of jurisdictional issues." Streamlining Defense Acquisition Laws, Report of the Acquisition Law Advisory Panel to the United States Congress, at 1-258 (1993) (Panel Report). The Panel Report highlighted two problems: (1) "whether the Court of Federal Claims has exclusive jurisdiction over pre-award bid protests or whether its pre-award jurisdiction is concurrent with the district courts"; and (2) "whether the Court of Federal Claims has jurisdiction over the type of agency wrongdoing for which the [Government Accountability Office (GAO)] and the [General Services Administration Board of Contract Appeals (GSBCA)] customarily grant relief." *Id.* As to the first issue, the Panel Report noted that there were "unresolved conflicts between the courts in different parts of the country on whether the

Court of Federal Claims is the exclusive judicial forum to consider pre-award bid protests." *Id.* As to the second issue, the GAO and GSBCA were two other venues that could hear bid protests, and it was unclear whether the Court of Federal Claims had concurrent jurisdiction to consider the types of cases heard by these forums too. *Id.* at 1-259.

The Competition in Contracting Act of 1984 (CICA) authorized an "interested party" to file some bid protests before the GSBCA (i.e., those under the Brooks Act) that challenged "any decision by a contracting officer alleged to violate a statute or regulation" "in connection with any procurement." Pub. L. No. 98-369, tit. VII, sec. 2713, 98 Stat. 1175, 1182–84 (amending the Brooks Act, Pub. L. No. 89-306, 79 Stat. 1127 (1965)) (codified with other amendments before repeal at 40 U.S.C. § 759(f)(1), definitions of "protest" and "interested party" codified at § 759(9)(A), (9)(B)), *repealed by* National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, sec. 5101, 110 Stat. 186, 680. CICA expressly defined "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* sec. 2713, 98 Stat. at 1183–84.

CICA also provided that an "interested party" could file protests with the GAO, and the Comptroller General had authority to decide "[a] protest concerning an alleged violation of a procurement statute or regulation." *Id.* sec. 2741, 98 Stat. at 1199–203 (codified at 31 U.S.C. §§ 3551–56). Here too, "interested party" was defined as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.*

The Panel Report noted that it was unclear whether the Court of Federal Claims had subject matter jurisdiction to consider the types of agency wrongdoing that the GSBCA and GAO could grant relief for. *See* Panel Report

at 1-259. It also noted that the jurisdiction of the Court of Federal Claims was "severely limited by the need to find that the Government breached [an] implied contract." *Id.* Because the implied contract arose only when bids or proposals were submitted, the Panel Report stated that many protests that were considered by other forums could not be heard by the Court of Federal Claims. *Id.* In an effort to reduce the complexities and delays arising out of having disparate judicial systems, the Panel Report recommended that the "[t]he Court of Federal Claims should be the single judicial forum with jurisdiction to consider all bid protests that can now be considered by any of the district courts or by the Court of Federal Claims." *Id.* at 1-261 (emphasis omitted). The Panel Report also recommended that the Court of Federal Claims' "jurisdiction should, as much as possible, parallel that of the GAO and the GSBCA in order to avoid both the forum shopping and type of confusion that has occurred in the past." *Id.* at 1-265. The Panel Report specifically recommended that "[t]he statute should be amended to provide that only interested parties, as defined by [CICA], can file protests." *Id.* at 1-266.

In 1996, Congress, aware of the Panel Report's recommendations, amended the Tucker Act again with the enactment of ADRA. Pub. L. No. 104-320, sec. 12, 110 Stat. at 3874; *see AFGE*, 258 F.3d at 1300. As part of the amendment, Congress enacted § 1491(b), which gave the Court of Federal Claims a new independent jurisdictional grant specifically for bid protest claims. ADRA sec. 12(a), 110 Stat. at 3874 (provision titled "Bid Protests"). ADRA provided the Court of Federal Claims and the district courts with concurrent jurisdiction over bid protest actions, *id.* sec. 12(a), § 1491(b)(1), 110 Stat. at 3874, but included a sunset provision so that the district courts' jurisdiction over bid protests would terminate on January 1, 2001, *id.* sec. 12(d), 110 Stat. at 3875. *See Impresa Construzioni*, 238 F.3d at 1332. It also eliminated the pre- and post-award dichotomy between the Court of Federal Claims and

the district courts by extending the Court of Federal Claims' jurisdiction "without regard to whether suit is instituted before or after the contract is awarded." ADRA, sec. 12(a), § 1491(b)(1), 110 Stat. at 3874.

Much of the language within § 1491(b) tracked the language in CICA, specifically allowing an "interested party" to challenge "a solicitation" or "a proposed award or the award of" a contract, CICA, sec. 2713, 98 Stat. at 1183–84, and mirroring the type of review available to the GSBCA and GAO, *id.* secs. 2713, 2741(a), 98 Stat. at 1183–84, 1199. Further, at the time of ADRA's enactment, the Brooks Act included language giving the GSBCA the authority to review "any decision by a contracting officer that is alleged to violate a statute, a regulation, or the conditions of a delegation of procurement authority," which is similarly reflected in the language of § 1491(b). Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, sec. 1432, 108 Stat. 3243, 3291 (codified before repeal at 40 U.S.C. § 759), *repealed by* National Defense Authorization Act for Fiscal Year 1996, sec. 5101, 110 Stat. at 680.

Senator Cohen, who offered the amendment, stated that the goal of the provision was to "expand the bid protest jurisdiction of the Court of Federal Claims," with a sunset provision allowing concurrent jurisdiction for a limited period, in order to remedy the "overlapping authority" issue between the Court of Federal Claims and the district courts that "led to forum shopping and . . . resulted in unnecessary and wasteful litigation over jurisdictional issues." 142 Cong. Rec. S11848–49 (daily ed. Sept. 30, 1996) (statement of Sen. William Cohen). He also quoted the recommendations from the Panel Report that urged adoption of one judicial system to consider bid protests. *Id.* at S11849. The goal of the amendment was therefore, in essence, to close a procedural loophole and consolidate both pre- and post- award bid protests into one forum—the Court of Federal Claims.

II

We review the "Court of Federal Claims' decisions *de novo* for errors of law, and for clear error on findings of fact." *Anaheim Gardens v. United States.*, 444 F.3d 1309, 1314 (Fed. Cir. 2006). Dismissals, both for lack of subject matter jurisdiction and for failure to state a claim, are reviewed de novo. *Taylor v. United States*, 959 F.3d 1081, 1086 (Fed. Cir. 2020). We can affirm a dismissal "on any ground supported by the record." *Wyandot Nation of Kan. v. United States*, 858 F.3d 1392, 1397 (Fed. Cir. 2017). "Whether a party has standing to sue is [also] a question that this court reviews *de novo*." *Prima Tek II, L.L.C. v. A–Roo Co.*, 222 F.3d 1372, 1376 (Fed. Cir. 2000).

III

"In construing a statute or regulation, we begin by reviewing its language to ascertain its plain meaning." *Am. Airlines, Inc. v. United States*, 551 F.3d 1294, 1299 (Fed. Cir. 2008). Section 1491(b)(1) reads:

> Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by *an interested party* objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (emphasis added).[7]

We have long held that the term "interested party" for bid protests should be limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract. In *AFGE*, we explained that, in enacting ADRA, "Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by *disappointed bidders*." 258 F.3d at 1302 (emphasis added). We see no reason to depart from this settled interpretation.

Even Percipient does not contend that "interested party" should be reinterpreted for § 1491(b) as a whole, but only for a part of the provision. Percipient argues that this statutory provision should be read as containing three "prongs" which each provide an independent basis for objection, namely: (i) a solicitation by a federal agency for bids or proposals for a proposed contract, (ii) a proposed award or the award of a contract, and (iii) any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Appellant's Opening Br. 25. Percipient contends that the definition of "interested party" should change based on the "prong" under which a party brings a challenge. *See id.* at 30–31, 34–35.

We disagree that the definition of "interested party" should change in this way. We see no statutory support for assigning a different meaning to this single term depending on how a claimant chooses to style or bring its claim.

---

[7] The sunset provision provided that "[t]he jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of title 28, United States Code (as amended by subsection (a) of this section) shall terminate on January 1, 2001 unless extended by Congress." ADRA, sec. 12(d), 110 Stat. at 3874–75.

Section 1491(b) is not written with multiple interested party provisions; it has one singular interested party. Percipient's construction would have the same term mean different things in the same sentence. That is not the way statutory construction is done. Our definition is supported by the plain text, statutory history, and longstanding interpretation of this term within the judicial system.

A plain reading counsels that a single term carries the same meaning throughout a single sentence. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("[T]here is a presumption that a given term is used to mean the same thing throughout a statute . . . ."). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barry v. McDonough*, 101 F.4th 1348, 1356 (Fed. Cir. 2024) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Congress could have indicated that "interested party" should be read differently and have different meanings throughout this single statutory sentence. But it did not. Without express guidance from Congress, it contradicts the plain text of the statute to alter the meaning of a single antecedent term within a single sentence in the way Percipient proposes.

Further, despite Percipient's wish to divide the statute into three "prongs," there is no indication that the statute is separable in this manner—especially since § 1491(b)(1) is not so divided. Congress used a single, unbroken, and undivided sentence. Dividing this single sentence and imparting different definitions for a single term within each artificial division contravenes the plain text of the statute. Additionally, Percipient's proposed interpretation is not supported by the statutory history.

## IV

"Where Congress employs a term of art obviously transplanted from another legal source, it brings the old

soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (cleaned up). "Congress was not writing on a blank slate when it enacted § 1491(b)(1)," Government's Response Br. 25, but against the backdrop of decades of government contract law developed by the Court of Federal Claims or its predecessor, the district courts, and relevant government agencies. The term "interested party" carries the context imparted by the history of bid protest cases and prior statutes.

In *AFGE*, we interpreted § 1491(b) and considered "whether Congress intended to expand the class of parties who can bring bid protest actions in the Court of Federal Claims," 258 F.3d at 1300, and determined that "interested party" carried forward the definition from CICA and is therefore limited to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* at 1302; *see id.* at 1301–02.

Indeed, the now-repealed Brooks Act, which was in effect while § 1491(b) was being drafted, gave the GSBCA jurisdiction over bid protests related to automated data processing equipment procurements by "an interested party in connection with any procurement . . . subject to this section," 40 U.S.C. § 759(f)(1) (repealed 1996), and included the same definition for "interested party" as in CICA, *compare id.* § 759(f)(9)(B) (repealed 1996) (defining "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."), *with* CICA, sec. 2741(a), § 3551(2), 98 Stat. at 1199 (same definition for purposes of bid protests before the GAO). This evinces a consistent usage of the term "interested party" throughout the statutory scheme as to the Court of Federal Claims and its predecessor the Court of Claims and indicates that the context of the term "interested party" had a specific understood meaning in the procurements sphere at the time that § 1491(b) was drafted.

The usage of the CICA definition of "interested party" in the Brooks Act reinforces that Congress understood and intentionally brought that specific definition into the Court of Federal Claims' jurisdiction. This is especially so in light of the Brooks Act's authorization for the GSBCA to "review . . . any decision by a contracting officer that is alleged to violate a statute [or] regulation" "in connection with any procurement that is subject to this section," 40 U.S.C. § 759(f)(1) (repealed 1996), which mirrors the language Congress used in the third part of § 1491(b)(1). This continuity shows that Congress had already permitted an "interested party," in at least one other statutory context, to challenge the violation of another statute or regulation in connection with a procurement—a decision they chose to make again in § 1491(b)(1). Absent any indication of alternative Congressional intent, the old term of art still means something, and this understood meaning should be conserved and carried forward into ADRA.[8] *See, e.g.*, *United States v. Davis*, 588 U.S. 445, 458 (2019) ("[W]e normally presume that the same language in related statutes carries a consistent meaning."); *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) ("This Court does not lightly

---

[8] Moreover, the dissent suggests that we "ignore" statutory language in so-called prong 3 by not extending the definition of "interested party" beyond its historical meaning. Dissent at 6–7. Not so. As we demonstrate above, that language (which mirrors Brooks Act language) provides different grounds to challenge procurement decisions. The dissent would conclude that even though Congress used the same statutory term, "interested party," coupled with almost identical language about statutory challenges lifted from the Brooks Act, that Congress sub silentio intended to change the long-standing definition of that term.

assume that Congress silently attaches different meanings to the same term in the same or related statutes.").

There is no indication that Congress, in enacting ADRA, intended to expand the types of *parties* who could bring a bid protest in the Court of Federal Claims. Instead, the history, *see supra* Section I.B, shows that there was jurisdictional confusion in where to bring a bid protest because of the different procedural pathways and pre- and post-award separation between the Court of Federal Claims and the district courts. There was a clear interest in consolidating *procedural* pathways—namely, to allow for post-award bid protest challenges in the Court of Federal Claims.

In fact, the statutory history indicates that Congress considered and rejected including subcontractors as interested parties in both CICA and the Brooks Act. With respect to CICA, Congress initially contemplated a broader definition of who could protest as an interested party, specifically "a person whose direct economic interest would be affected as contractor or *subcontractor*." H.R. 5184, 98th Cong. § 204(g)(2) (1984) (emphasis added). But ultimately, CICA as enacted did not include this language. *See* 40 U.S.C. § 759(f)(9)(B) (repealed 1996); *US W. Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 628 (Fed. Cir. 1991) ("CICA, as enacted, provided for protest 'to a solicitation by a Federal agency' and all references that would have permitted subcontractors to protest were deleted.").

Similarly, regarding the Brooks Act, it is particularly compelling that Congress specifically considered more expansive language that would align with Percipient's proposed definition and expressly rejected the expansion. In particular, the House of Representatives proposed amending the definition of "interested party" to permit protests by subcontractors because "[t]he Committee [on Government Operations] ha[d] become concerned in recent years that restrictive specifications may sometimes go

unchallenged, especially in [certain] procurements, when prospective prime contractors have no incentive to protest." H.R. Rep. No. 102-364, at 32 (1991). The proposed language would have added the following to the definition of "interested party": "a prospective subcontractor whose economic interest would be affected, as determined by the [GSBCA], by specifications in any solicitation or other request for bids, proposals, or offers subject to this section that are alleged to be restrictive of competition." *Id.* at 12; *see also id.* at 48 (observing that the proposed amendment would change the requirement that a party have a "direct economic interest" to the requirement that a party have an "'economic interest' that, 'as determined by the [GSBCA],' would be affected by (1) any action that could be the subject of a protest or (2) any relief that the Board could order, including, for example, resolicitation, in connection with a protest"). The House Report expressly noted that, under this expanded definition, "[a] vendor that is a prospective subcontractor would be an 'interested party' only if protesting restrictive specifications." *Id.* But the House Report also noted "concern[s] about the expansion of the definition of 'interested party' contained in the proposed amendments to the definitional section of the Brooks Act." *Id.* at 80. This portion of the report recognized that "increasing the number of possible protestors . . . would further complicate. . . procurements and . . . increase the opportunity for delay . . . because the legislation would grant a greater number of firms a legally recognized interest in any given . . . procurement." *Id.* It further noted that this "proposed expansion of the definition of 'interested party' would also *be inconsistent with existing procurement law*." *Id.* (emphasis added). And it concluded by stating that "the grant of such a right is wholly unnecessary, given that current law authorizes the filing of a protest by 'an actual or prospective bidder or offeror.'" *Id.* at 80–81 (quoting 40 U.S.C. § 759(f)(9)(B)).

The statutory history of these other provisions provides additional context as to Congress' intentions in enacting ADRA.[9] Congress had already considered, and rejected, the notion of allowing subcontractors to have standing in bid protests at the Court of Federal Claims and its predecessor court. Congress specifically chose to incorporate the term "interested party," which had a settled meaning within the government contracts space. And there is no indication in the statutory history of ADRA that Congress reversed course and decided to markedly expand the identities of the parties who could sue under its provisions. Indeed, it supports the conclusion that "interested party" carries not only the same meaning throughout the statutory sentence, but throughout an entire statutory scheme covering the jurisdiction of the Court of Federal Claims and its predecessor court.

Finally, Congress specifically chose to use the term "interested party" when defining the category of persons who have standing, which as demonstrated above, had a well-known meaning in procurement law. If Congress had intended to expand standing in the procurement context, it could have invoked the broad language of the APA and extended standing to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. But Congress did not.

[9] The dissent attempts to distinguish the extensive statutory history here regarding "interested party" and repeatedly emphasizes that "interested party," as used in CICA and the Brooks Act, only applied to contractors or proposed contracts. Dissent at 5. But that only reinforces our point. Congress enacted ADRA in the backdrop of a rich history, including the history of CICA and the Brooks Act, and repeatedly chose *not* to expand jurisdiction to subcontractors.

Instead, Congress explicitly invoked the APA only in defining ADRA's standard of review, but not for its party standing requirements. *See AFGE*, 258 F.3d at 1302 (quoting 28 U.S.C. § 1491(b)(4)) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in [APA] section 706 . . . .").

## V

The definition set forth by Percipient, which largely tracks the broader APA standard, is that the term "interested party" must include any directly injured party who could have offered its product or service to meet the needs of the agency but for that agency's alleged legal violation. Appellant's Opening Br. 25–26. That interpretation is countertextual, unsupported by the statutory history, and contravenes our long-standing precedent as to the Court of Federal Claims and its predecessor court.

### A

Despite Percipient's contention that a definition of "interested party" that limits standing to actual or prospective bidders or offerors "render[s] the third prong superfluous in violation of basic canons of statutory construction," Appellant's Opening Br. 30, many cases show that the so-called "third prong" has independent force.

The addition of the third part of the statutory sentence clarified that bid protest jurisdiction extends beyond challenges to just the solicitation and the award. *See OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113 (2005) ("[T]he first two categories of this court's bid-protest jurisdiction, a pre-award protest or a post-award protest, are well recognized and relatively standard proceedings. The third category of this court's bid-protest jurisdiction is more amorphous and indefinite . . . ."). This court and the Court of Federal Claims have noted repeatedly that the third part permits bid protests to challenges of statutes and regulations that do not fit neatly within the solicitation or award

boxes of the first two parts. For instance, in *RAMCOR Services Group, Inc. v. United States*, we recognized that the third part provided jurisdiction to consider challenges to GAO override decisions, because "[a]s long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction" under the third part. 185 F.3d 1286, 1289 (Fed. Cir. 1999) (further discussing that "[the override statute] fits comfortably in that broad category."). In *OTI*, the Court of Federal Claims stated that the third part of § 1491(b)(1) "is not limited to override cases." 68 Fed. Cl. at 114.

Similarly, we have recognized jurisdiction in protests involving challenges brought solely under the third part of the statutory sentence. For example, in *Distributed Solutions, Inc. v. United States*, we considered whether the contractors involved had standing to challenge the government's decision "to for[]go the direct competitive procurement process." 539 F.3d 1340, 1345 (Fed. Cir. 2008). The contractors alleged violations of CICA, the Small Business Act, 15 U.S.C. § 631(j)(3), and various Federal Acquisition Regulations. *Id.* Even though there was no solicitation to challenge, we concluded that "[t]here is no question that the contractors here are interested parties and not mere 'disappointed subcontractors' without standing" because the contractors were prospective bidders and "prepared to submit bids" in response to the anticipated request for quotation or proposal. *Id.* at 1344–45.

Indeed, there are many other cases where courts have applied the CICA definition of interested party standing to bid protests involving alleged regulatory or statutory violations. *See Acetris Health, LLC v. United States*, 949 F.3d 719, 727 (Fed. Cir. 2020) (discussing that "[the contractor] has standing because the government has taken a definitive position as to the interpretation of the [Trade Agreements Act of 1979] and the [Federal Acquisition Regulation] that would exclude [the contractor] from future procurements for other products on which it is a likely

bidder"); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1372–73, 1376 (Fed. Cir. 2024) (involving a challenge to an agency's resolution of an alleged Procurement Integrity Act violation or organizational conflict of interest determination); *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1357–58 (Fed. Cir. 2018) (involving a pre-award challenge to a sole-source determination based on an alleged violation of CICA); *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381–82 (Fed. Cir. 2012) (involving a challenge to the scope of an agency's corrective action based on "alleged violations of statutes and regulations governing the procurement process"); *Land Shark Shredding, LLC v. United States*, 842 F. App'x 589, 592 (Fed. Cir. 2021) (involving a challenge to the cancellation of a procurement based on an alleged violation of the Rule of Two under 38 U.S.C. § 8127(d)); *Labat–Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 148, 152–54 (D.D.C. 2004) (involving a challenge to agency decision to convert services to in-house personnel alleging a violation of Department of Defense procurement regulations and discussing that the clause in the third part of § 1491(b)(1) is broad and sweeping in scope); *Advanced Sys. Tech., Inc. v. Barrito*, No. CIV.A. 05-2080ESH, 2005 WL 3211394, at *6 (D.D.C. Nov. 1, 2005) (involving a challenge to Small Business Administration code designation that prevented contractor from bidding for two Army solicitations and finding that "APA jurisdiction over bid protests no longer exists and find[ing] that this case falls within the broad parameters of Court of Federal Claims jurisdiction established by the ADRA with respect to procurement disputes").

These cases demonstrate that the third part of § 1491(b) has independent force under the existing understood definition of who is an "interested party." Thus, there is no risk of superfluity in reinforcing that the definition of "interested party" remains consistent throughout the statutory sentence.

B

Percipient argues, however, that the amendments to § 1491 were designed to give the Court of Federal Claims the same jurisdiction as the district courts enjoyed under the *Scanwell* line of cases, and that those cases recognize subcontractor jurisdiction.

As discussed earlier, we recognize that there is a longstanding understanding that Congress legislates against the backdrop of preexisting law, unless the statute otherwise dictates. *See Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–323 (1992). But contrary to Percipient's suggestion that the district courts' former *Scanwell* jurisdiction under the APA was broad enough to encompass its claim, s*ee* Appellant's Opening Br. 6–7 ("Nothing suggests that the [Court of Federal Claims'] jurisdiction would be in any way narrower than the jurisdiction previously exercised by the district courts under the APA."), the *Scanwell* line of cases does not support reading subcontractor standing into § 1491(b)(1).[10] And to the extent that *Scanwell* could be interpreted to carry a broader interpretation, the extensive history described above is a strong indication that Congress did not intend to adopt the broader APA standard for standing.

*Scanwell* framed the pertinent legal question it addressed as "[w]hether a *frustrated bidder* for a government contract has standing to sue, alleging illegality in the

[10] Percipient also makes the argument that "nothing about [its] challenge would require it to be a subcontractor." Appellant's Opening Br. 42. But Percipient acknowledges that it did not bid on the SAFFIRE contract. Therefore, even if it is not a "subcontractor," Percipient is also not an actual or prospective bidder or offeror and consequently does not have standing.

manner in which the contract was let." *Scanwell*, 424 F.2d at 861 (emphasis added). There, the Federal Aviation Administration invited bids for the installation of instrument landing systems at airports. *Id.* at 860. The appellant, who was a contractor, had the second-lowest bid, and alleged that the contractor who had the lowest bid, and was subsequently awarded the contract, did not meet the requirements laid out in the procurement. *Id* at 860–61. The district court determined that the appellant had standing under the APA standard, even though it noted that "[t]he law of standing is fundamentally artificial to the extent that one who is in fact harmed by administrative action is held to lack standing to challenge the legality of the action." *Id.* at 873. Furthermore, *Scanwell* only recognized that a *frustrated bidder* had standing, not that mere *disappointed subcontractors* had standing.

And the line of cases in the district courts and regional circuits relying on *Scanwell* did not involve, or even discuss, disappointed subcontractors either. *See B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 718 (2d Cir. 1983) (referencing *Scanwell*'s discussion of the "pertinent legislative history of the APA which supported a frustrated bidder's standing to seek judicial review"); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1291, 1305 (D.C. Cir. 1971) (reversing the district court's permanent injunction preventing the agency from awarding a contract to any bidder other than the appellant contractor, but noting that "[w]e do not recede from our expression in *Scanwell* of the beneficial purposes served by frustrated bidders who, as 'private attorney generals,' can aid in furthering the public interest in the integrity of the procurement process"); *Mgmt. Sci. Am., Inc. v. Pierce*, 598 F. Supp. 223, 228–30 (N.D. Ga. 1984), *aff'd sub nom. Mgmt. Sci. v. Pierce*, 778 F.2d 792 (11th Cir. 1985) (discussing the line of "frustrated bidder" cases and differentiating them from causes of action involving a government contractor and stating that "the jurisdiction of the district courts which Congress

explicitly avoided disturbing in the FCIA extends only to frustrated bidder cases under *Scanwell*"); *Dial One Franklynn Pest Control Co., Inc. v. U.S. Dep't. of Navy*, No. CIV. A. 92-3223, 1993 WL 139430 at *4 (E.D. La. Apr. 28, 1993) (describing this case as a "frustrated bidder" case and noting that the plaintiff attempted to invoke the jurisdiction "limited to that exercised in the *Scanwell* line of cases regarding 'frustrated or disappointed bidders'"); *Env't. Tectonics Corp. v. Robinson*, 401 F. Supp. 814, 815 (D.D.C. 1975) (describing *Scanwell* as holding that "a frustrated bidder had standing to petition and the court to declare a contract null and void"); *Info. Sys. & Networks Corp. v. U.S. Dep't of Health & Hum. Servs.*, 970 F. Supp. 1, 6 (D.D.C. 1997) (differentiating the case at hand, which involved a plaintiff complaining of wrongful termination of its own contract, from "disappointed" or "frustrated" bidder actions involving contractors seeking to void the award of a contract to another).

To the extent that there are isolated cases in which subcontractors brought challenges to bid protests in district court, the courts' analysis focused on the closeness of the relationship between the government and the prime contractor and relied primarily on the consideration that the prime contractor was essentially an agent of the government, not that a subcontractor lacking privity with the government independently had standing to sue. *See, e.g.*, *Lombard Corp. v. Resor*, 321 F. Supp. 687, 690 (D.D.C. 1970) (focusing primarily on the fact that Chamberlain, the prime contractor, was "something more" than an independent contractor, and evidence suggesting that "Chamberlain considered itself an agent for at least some purposes while making the procurement"); *Am. Dist. Tel. v. Dep't of Energy*, 555 F. Supp. 1244, 1244 (D.D.C. 1983) (describing defendant Morrison-Knudsen Company as the agent of the Department of Energy and characterizing plaintiff American District Telegraph as a "disappointed bidder"); *see also Bayou State Sec. Servs., Inc. v. Dravo Util. Constructors,*

*Inc.*, 674 F.2d 325, 328–29 (5th Cir. 1982) (declining to address the subcontractor standing issue because the plaintiff's challenge was not meritorious).

There is no definitive authority that subcontractors could bring actions to challenge procurement decisions absent an agency-like relationship between the prime contractor and the government or greater government involvement in the selection of the subcontractor, such that the subcontractor was essentially acting like a prime. *See Amdahl Corp. v. Baldrige*, 617 F. Supp. 501, 505 (D.D.C. 1985) (adopting a test from the Comptroller General's opinion that subcontractor protests are only permitted in five situations: "(i) when the contractor acted as a purchasing agent of the government; (ii) where the government has caused or controlled the rejection or selection of a potential subcontractor; (iii) where agency bad faith or fraud in the approval of a subcontractor is demonstrated; (iv) where a contract was made 'for' the government; or (v) where the agency is entitled to an advance decision" and determining that the subcontractor involved did not have standing) (citing *Optimum Sys., Inc.,* 54 Comp. Gen. 767, 773–74 (Mar. 19, 1975)); *Rubber Millers, Inc. v. United States*, 596 F. Supp. 210, 213 (D.D.C. 1984) (finding no subcontractor standing because Rubber Millers was a "subcontractor [who] has never submitted a bid to the Navy," and all "[t]he statutory provisions cited by the plaintiff are directed exclusively at 'contractors' and bidders," not subcontractors); *Contractors Eng'rs, Int'l v. Dep't of Veterans Affs.*, 947 F.2d 1298, 1300–02 (5th Cir. 1991) (determining that the subcontractor did not have standing under the *Amdahl* test); *Info. Sys. & Networks Corp*, 970 F. Supp. at 8 (finding no standing for the subcontractor under *Ahmdahl*, and stating that "subcontractors are not intended for protection under CICA"); *see also Free Air Corp. v. F.C.C.*, 130 F.3d 447, 450 (D.C. Cir. 1997) (describing *Scanwell* and other cases as holding that "sufficiently viable runners-up in a procurement process have standing to allege that an

illegality in the process caused the contract to go to someone else"). Subcontractors had no independent standing to bring bid protests in district court under *Scanwell*; subcontractor standing was recognized in limited circumstances where there was an agency-like relationship between the contractor and the government or more direct government involvement.

Further, even if *Scanwell* could be read so broadly, the relevant statutory history strongly demonstrates that Congress intended interested parties to be defined more narrowly. *See supra* Section IV. And the history of both CICA and the Brooks Act also supports that Congress explicitly considered expanding standing to encompass subcontractors and expressly declined to do so. Congress was aware of how to invoke the APA standard, as it did for the standard of review. But Congress specifically chose the term "interested party" to define party standing. With that selection of a well-known term, we should not presume that Congress sub silentio intended to adopt the broader APA standard just because in § 1491(b) it merged the district court's prior *Scanwell* jurisdiction with that of the Court of Federal Claims.

C

Even if we were mistaken as to the scope of district court jurisdiction under the APA as reflected in the *Scanwell* line of cases, that would at most suggest that subcontractors could have an APA claim in district court to enforce § 3453, not an action in the Court of Federal Claims under § 1491. Percipient argues that such a district court action would defeat the Congressional purpose to place all bid protest jurisdiction in the Court of Federal Claims. While that may be a powerful argument as to why there is not district court APA jurisdiction as to subcontractors, such a policy argument does not support expanding the jurisdiction of the Court of Federal Claims beyond that provided by Congress.

In a related argument, Percipient contends that denying both district courts and the Court of Federal Claims jurisdiction to enforce § 3453 would leave subcontractors no remedy to enforce § 3453, and that just as prime contractors have a remedy to enforce that statute, *see Palantir USG, Inc. v. United States*, 904 F.3d 980 (Fed. Cir. 2018), so should subcontractors. This is again not a persuasive argument for expanding the jurisdiction of the Court of Federal Claims beyond what Congress has prescribed, and it is not for us to decide whether district courts have jurisdiction over an APA cause of action by subcontractors to enforce § 3453. We note only that there are other mechanisms for enforcing the statute as to subcontractors, such as through protests by prime contractors or joint bids with other subcontractors so that one would be the prime contractor, and the language of § 3453 does not compel a construction that subcontractors can enforce the statute.

## VI

We conclude that an "interested party" who has standing to bring a bid protest under § 1491(b) is an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract, regardless of the type of challenge brought. We therefore affirm the Court of Federal Claims' dismissal of Percipient's protest for lack of standing.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**PERCIPIENT.AI, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, CACI, INC.-FEDERAL,**
*Defendants-Appellees*

---

2023-1970

---

Appeal from the United States Court of Federal Claims in No. 1:23-cv-00028-EGB, Senior Judge Eric G. Bruggink.

---

STOLL, *Circuit Judge*, with whom MOORE, *Chief Judge,* and LOURIE and TARANTO, *Circuit Judges*, join, dissenting.

The question before the en banc court is simple: "Who can be 'an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement'" under the Tucker Act, 28 U.S.C. § 1491(b)(1)? *Percipient.ai, Inc. v. United States*, 121 F.4th 1311, 1312 (Fed. Cir. 2024) (omission in original). The majority holds that an "interested party" is limited to an actual or prospective bidder regardless of the subject matter of interest. Instead of considering who can be an interested party "objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," the majority borrows a definition of interested party that Congress included in a different statute, the Competition in Contracting Act

("CICA"). But that statute does not even include the subject matter of interest at issue here. Given this difference in scope between CICA and the Tucker Act, it is not surprising that Congress did not adopt that definition when enacting the Tucker Act. Respectfully, ignoring statutory language and adopting a definition that Congress chose not to adopt cannot be the proper statutory analysis.

Section 1491(b)(1) provides that the Court of Federal Claims has jurisdiction over an action by "an interested party objecting to [(1)] a solicitation by a Federal agency for bids or proposals for a proposed contract or to [(2)] a proposed award or the award of a contract or [(3)] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Section 1491(b)(1) thus sets forth three types of objections by an "interested party" over which the Court of Federal Claims has bid protest jurisdiction, and it does not define the phrase "interested party."

Our precedent supports interpreting "interested party" the same for all three types of objections; an "interested party" is one with a "direct economic interest [that] would be affected by the [challenged § 1491(b)(1) action]." *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("*AFGE*"). The majority admits that it defines "interested party" with no regard for the statutory language "objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." But this important contextual language should not be ignored. By not asking who qualifies as "*interested*" in "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," the majority fails to adequately consider and give meaning to the statutory language Congress purposefully chose.

Surely everyone can agree that context matters when interpreting statutes, *see Tyler v. Cain*, 533 U.S. 656, 662

(2001), especially one containing an undefined phrase like "interested party." To determine whether a party is an "interested party," the court must consider the subject of that party's interest.[1] *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 277–78 (2024); *Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151, 172–73 (1957). Under prong (1), an interested party is a party with an interest in a solicitation by a federal agency. Under prong (2), an interested party is a party with an interest in a proposed or actual award of a contract. Under prong (3), an interested party is a party with an interest in any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement. Logically, an interested party under one prong of § 1491(b)(1) might not qualify as an interested party under another prong.

The majority takes issue with this logical conclusion. Maj. Op. at 15. But even the Government agrees that who qualifies as an interested party depends on the type of objection made under § 1491(b)(1). The Government conceded that the group of people who would qualify as an "interested party" would differ for a challenge brought under prong (1) versus prong (2), for example. Oral Arg. at 48:19–49:31, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=23-1970_06092025.mp3 (the Government agreeing that more people could object to a solicitation than to an award). Indeed, if the challenged agency action is one specified in prong (1) ("a solicitation by a Federal agency for bids or proposals for a proposed contract") then an "interested party" is a would-be bidder. But if the challenged agency action is one specified in prong (2) ("a proposed award or the award of a contract") then an "interested party" is an actual bidder. The Government's concession directly contradicts the majority's one-size-fits-all

[1] Without consideration of the subject of interest, how would the court know whether a party is interested?

definition of "interested party." Maj. Op. at 2 (defining "interested party" as "an actual or prospective bidder or offeror . . . *regardless of* the type of challenge brought" (emphasis added)).

Our court has previously addressed the level of interest required to be an "interested party," and there is no dispute here regarding that requirement. We have held that an "interested party" must have a "direct economic interest [that] would be affected by the [challenged § 1491(b)(1) action]." *See AFGE*, 258 F.3d at 1302. As explained in *AFGE*, where a party challenges a solicitation or contract award, an "interested party" is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* That definition in that context makes sense. First, in challenges to a solicitation, proposed award, or award, only a would-be or actual bidder could have the requisite direct economic interest. Second, given that prongs (1) and (2) are transplants from CICA, CICA's definition of "interested party" ("an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2)(A)) is applicable for challenges to those agency actions.

The majority errs in this case, however, by borrowing CICA's definition of "interested party" for *all three* types of § 1491(b)(1) challenges, thereby limiting "interested party" for *all* circumstances to would-be bidders or would-be contractors. Not only did Congress not adopt that definition when enacting § 1491(b)(1), but that definition on its face does not apply to the full scope of challenges authorized by prong (3).

When Congress enacted the Administrative Disputes Resolution Act of 1996 (ADRA), CICA did not, and it still does not, contain an actual-or-prospective-bidder definition for all agency actions that violate a statute or regulation in

connection with a procurement or proposed procurement—the scope of prong (3). CICA's "interested party" definition expressly confines its application to—*i.e.*, the definition states it is "with respect to"—"a contract or a solicitation or other request for offers," 31 U.S.C. § 3551(2)(A), and thus is limited on its face to less than the class of challenges authorized by prong (3). *See also* 31 U.S.C. § 3551(1), (2) (1994 ed.) ("with respect to a contract or proposed contract described in paragraph (1)").[2] So, for the general category of agency actions that are covered only by prong (3), there was—and still is—nothing to borrow from CICA. Indeed, applying CICA's definition of "interested party" in challenges that can be made under just prong (3) would be incompatible with the evident breadth of the language of prong (3). This is critically important, as it effectively eliminates judicial review of alleged violations of the statutory provisions invoked by Percipient here, enacted by Congress just two years before ADRA. The majority's holding improperly reads the language from prongs (1) and (2) into prong (3). Had Congress intended for only a bidder or prospective bidder to be an interested party under prong (3), Congress could have written prong (3) to say something like "any alleged violation of statute or regulation *in connection with a proposed award or award of a contract*." Instead, it wrote prong (3) more broadly to include "any alleged violation of statute or regulation *in connection with*

[2] The majority asserts that the use of CICA's definition of "interested party" in the now-repealed Brooks Act (40 U.S.C. § 759 (repealed 1996)) reinforces that Congress intentionally brought that definition into ADRA. Maj. Op. at 17–18. We disagree. The Brooks Act defined "interested party" *only* "with respect to a contract or proposed contract." 40 U.S.C. § 759(f)(9)(A)–(B). Accordingly, as is true for CICA, the Brooks Act did not define who can be an "interested party" to bring all the claims authorized under prong (3) of § 1491(b)(1).

*a procurement or a proposed procurement*." 28 U.S.C. § 1491(b)(1) (emphasis added).

Under the plain language of § 1491(b)(1), an agency action that is not a solicitation for bids or a proposed or actual contract award may be challenged under prong (3) as a "violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.* Where that is so, the aforementioned justifications for limiting an "interested party" to an actual or would-be bidder do not apply. The language for prong (3) is not tied to a solicitation or contract, and thus an "interested party" for the third type of challenge under § 1491(b)(1) should not be limited to parties who would bid on a solicitation or be awarded the contract. Accordingly, for prong (3) cases like this one, instead of asking whether a party has a direct economic interest in a solicitation, proposed award, or award, the court must ask whether a party has a direct economic interest in the agency's violation of a statute or regulation in connection with a procurement or proposed procurement. Consistently defining "interested party" as someone with a "direct economic interest [that] would be affected by the [challenged § 1491(b)(1) action]," *see AFGE*, 258 F.3d at 1302, gives real and consistent meaning to the entire statutory phrase in § 1491(b)(1), not just prongs (1) and (2).[3]

The majority further errs by prioritizing legislative history of various statutes and ignoring the language of

[3] We agree with the majority that a single term generally carries the same meaning throughout a single sentence. Maj. Op. at 16. Here, the phrase "interested party" has one meaning—having a direct economic interest that would be affected by the challenged § 1491(b)(1) action. This definition properly recognizes that what constitutes such a direct interest differs according to what precise agency action is challenged.

§ 1491(b)(1). *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history . . . ."). Even so, the legislative history of § 1491(b)(1) supports a broader interpretation of "interested party" here.

Before ADRA, the Court of Federal Claims and federal district courts shared jurisdiction over bid protests, with the former having jurisdiction over pre-award protests and the latter having jurisdiction over post-award protests. "It [was] the intention of [ADRA's] Managers to give the Court of Federal Claims exclusive jurisdiction over the full range of procurement protest cases previously subject to review in the federal district courts and the Court of Federal Claims." H.R. Conf. Rep. No. 104-841, at 10 (1996). As explained in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C. Cir. 1970), the district courts assessed statutory standing under the Administrative Procedure Act (APA). The *Scanwell* court held that "one who makes a prima facie showing alleging [arbitrary or capricious] action on the part of an agency or contracting officer has standing to sue under [the APA]." *Id.*

We acknowledge that the vast majority of cases brought under *Scanwell* were by disappointed bidders. But ADRA, which gave the Court of Federal Claims exclusive jurisdiction over the *full range* of procurement protest cases, "cannot reasonably be construed to have wholly abolished APA procurement claims that might otherwise have been brought under *Scanwell*." *Validata Chem. Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 84–85 (D.D.C. 2016) ("It is . . . a mistake to equate the 'vast majority of cases brought pursuant to *Scanwell*,' with all *Scanwell* cases."). Congress intended for ADRA to "consolidate[] federal court jurisdiction for procurement protest cases," not eliminate part of it. H.R. Conf. Rep. No. 104-841, at 9 (1996). Congress is presumed to be aware of *Scanwell* and its progeny when it enacted ADRA, *see Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010), and Congress chose

not to adopt the limited definition of "interested party" from CICA when it enacted § 1491(b)(1), even though it knew how to do so. *See Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("[W]e presume Congress says what it means and means what it says.").[4]

It is telling that Congress chose not to include CICA's definition for "interested party" in § 1491(b)(1). That choice reflects the broader scope of § 1491(b)(1) due to its inclusion of prong (3), and the goal of expanding the Court of Federal Claims' jurisdiction to include the district courts' jurisdiction under the APA.[5] That choice permits interpreting "interested party" in § 1491(b)(1) the same as in CICA where the object of interest is the same (awards, proposed awards, and solicitations, as in *AFGE*). But that choice leaves interpretation of "interested party" in prong (3) situations, which are not covered by CICA, to include parties who have a direct economic interest that would be affected by the alleged "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).

Because the parallelism between CICA and ADRA breaks down where a plaintiff's protest falls under only prong (3), CICA's definition of "interested party" should not

---

[4] Indeed, in 2008 when Congress added § 1491(b)(5), it defined interested party by expressly referencing CICA: "an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in [this type of] action." 28 U.S.C. § 1491(b)(5). Had Congress intended to incorporate CICA's definition of "interested party" into ADRA, it would have used similar language to expressly do so.

[5] The inclusion of prong (3) challenges in § 1491(b)(1) opens the door to new types of challengers having the requisite interest in those challenges. *Contra* Maj. Op. at 18–19.

apply to prong (3) challenges like Percipient's. The majority errs in holding otherwise.

This is a straight-forward statutory interpretation case with significant impact on the government contracting community. We respectfully dissent from the judicial narrowing of Congress' intent, stated clearly in the statutory language it chose.